modem and DSL service.[140] Changes in technology are spurring innovation in the use of networks. As discussed below, there is increasing competition at the retail level for broadband Internet access service as well as growing competition at the wholesale level for network access provided by the wireline providers' intramodal and intermodal competitors.[141] We find that an emerging market, like the one for broadband Internet access, is more appropriately analyzed in view of larger trends in the marketplace, rather than exclusively through the snapshot data that may quickly and predictably be rendered obsolete as this market continues to evolve.

51. At the outset, we note that, while household computer penetration is growing, only 54.6 percent of U.S. households subscribe to either broadband or narrowband Internet access service.[142] We also note that roughly 20 percent of consumers with access to advanced telecommunications capability subscribe to services providing that capability.[143] Some industry analysts predict that over the next decade, nearly 90 percent of all Americans will go on line from home via broadband networks that are dramatically faster than today's broadband networks.[144] We recognize that cable modem service is the most widely used means by which residential and small business obtain broadband service today.[145] As of December 31, 2002, facilities-based providers were providing approximately 17.4 million high-speed lines to American consumers and small businesses.[146] Among these customers, 65 percent received cable modem service, while approximately 32 percent received DSL service and other broadband services provided by incumbent LECs and competitive LECs.[147] As of December 31, 2004, the number of high-speed lines had more than doubled with facilities-based providers providing approximately 35 million high-speed lines to American consumers and small businesses.[148]

---

[140] *See, e.g., Fourth Section 706 Report*, at 16-23, 45 (describing broadband technologies generally). Based on the Commission's most recent broadband data report, the combined market share of high-speed lines via emerging broadband platforms is approximately 1.5% (not including new all fiber networks). *See High-Speed Services July 2005 Report*, at Table 1.

[141] *See infra* Part V.B.2.d (discussing various wholesale arrangements and incentives to make these available); *Broadband 271 Forbearance Order*, 19 FCC Rcd at 21508-09, para. 26.

[142] Federal Communications Commission, Wireline Comp. Bur., Industry Analysis & Technology Div., *Trends in Telephone Service*, at 2-10 (Apr. 2005) (*Trends in Telephone Service April 2005 Report*) (citing *NTIA Broadband Report*).

[143] *Fourth Section 706 Report*, at 10, 38 (describing advanced services lines as having transmission speeds of more than 200 kbps capability in the upstream (customer-to-provider) and downstream (provider-to-customer) directions, and high-speed lines as those having a transmission speed of more than 200 kbps capability in at least one direction). The Commission's data collection program requires service providers to identify each zip code in which a provider has at least one high-speed service subscriber (*i.e.*, a subscriber using a high-speed Internet access line). As of December 31, 2004, providers reported that they had subscribers to high-speed services in 95% of the nation's zip codes. In 83% of the nation's zip codes, more than one provider reported having subscribers. The Commission has stated that 99% of the country's population lives in 95% of the zip codes where a provider reports having at least one high-speed service subscriber. *High-Speed Services July 2005 Report*, at 4.

[144] PEW Internet & American Life, *The Future of the Internet*, at 41-42 (Jan. 9, 2005).

[145] *See High-Speed Services July 2005 Report*, at Table 3; *Triennial Review Order*, 18 FCC Rcd at 17135, para. 262 (citing *High-Speed Services December 2002 Report*, at Table 5).

[146] *High-Speed Services June 2003 Report*, at Table 3.

[147] *Id.*

[148] *High-Speed Services July 2005 Report*, at Table 3.

Among these customers, approximately 60.3 percent received cable modem service, while approximately 37.2 percent received DSL service and other broadband services provided by incumbent LECs and competitive LECs.[149]

52. While there is an increasing percentage of broadband users who receive DSL service, cable retains a relatively large share of the market. This reflects, in part, cable providers' substantial efforts to upgrade their individual networks to make them capable of providing cable modem service, among other services. Today, approximately 91 percent of the nation's cable systems have been upgraded to include the two-way digital capability that supports cable modem service.[150] As a result, the cable industry reports that more than 25 percent of cable households subscribe to cable modem service.[151]

53. Similarly, many incumbent LECs have upgraded, or are in the process of upgrading, their wireline networks to provide DSL broadband Internet access. In 2003, parties estimated that approximately 61 percent of the nation's households (66 million households) had access to DSL service, although only 6 percent of the nation's households subscribed to DSL-based Internet access services (6.2 million households).[152] As of December 31, 2004, the number of high-speed DSL lines in service had increased to approximately 13 million lines.[153] Further wireline network upgrades, including the deployment of hybrid fiber/copper loops and fiber to the home (FTTH), should provide additional households with access to wireline broadband service.[154]

---

[149] *Id.* at Chart 6.

[150] *Fourth Section 706 Report* at 14; National Cable & Telecommunications Industry, *2004 Year-End Industry Overview* at 9 (*2004 Year-End Industry Overview*).

[151] *2004 Year-End Industry Overview* at 9. We note that the data available regarding cable modem service generally does not distinguish between residential and small business subscribers.

[152] *See* Letter from Ann D. Berkowitz, Project Manager-Federal Affairs, Verizon, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, Attach. at 4 (filed Apr. 30, 2003) (Verizon Apr. 30, 2003 *Ex Parte* Letter); BellSouth June 5, 2003 *Ex Parte* Letter at 22; *see also High-Speed Services June 2003 Report*, Table 5. The approximately 6.2 million households include households that receive DSL service from competitive LECs as well as households that receive DSL service from incumbent LECs.

[153] *High-Speed Services July 2005 Report*, at Table 3.

[154] *Fourth Section 706 Report*, at 16-18 (describing new fiber technologies). A hybrid loop is a local loop composed of both fiber optic cable, usually in the feeder plant, and copper wire or cable, usually in the distribution plant. By "FTTH loop," we mean a local loop consisting entirely of fiber optic cable (and the attached electronics), whether lit or dark fiber, that connects a customer's premises with a wire center (*i.e.*, from the demarcation point at the customer's premises to the central office). *Triennial Review Order*, 18 FCC Rcd at 17475-17501, Appendix B (adopting section 51.319 of the Commission's rules). The deployment of hybrid loops allows an incumbent LEC to deploy DSLAMs in remote terminals and thus reduce the distance between a DSLAM and an end user's premises to one that can accommodate DSL service. *See, e.g.*, *Collocation Remand Order*, 16 FCC Rcd at 15460-61, para. 46 (recognizing that in order to provide DSL service, a LEC must deploy a DSLAM within a reasonable distance of the end user's premises). Incumbent LECs typically require a distance of no more than 18,000 feet. *Id.* Some competitive LECs will provide DSL service at greater distances. *See, e.g.*, *Petition of Cavalier Telephone LLC Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes with Verizon Virginia, Inc. and for Arbitration*, WC Docket No. 02-359, Memorandum Opinion and Order, 18 FCC Rcd 25887, 25929-34, paras. 72-81 (2003).

54. Approximately 83.2 percent of DSL subscribers receive broadband service from the BOCs, with another 12.5 percent receiving broadband service from independent incumbent LECs.[155] Competitive LECs provide the remaining DSL subscribers with broadband service as intramodal competitors of the incumbent LECs.[156] Competitive LECs generally provide these services using their own facilities in combination with UNEs leased from incumbent LECs pursuant to section 251(c)(3) of the Act.[157] Some competitive LECs, however, provide DSL services using their own facilities exclusively.[158] Competitive LECs offer consumers broadband Internet access directly or enter into service arrangements with independent ISPs that offer competing broadband Internet access services.[159] Specifically, competitive LECs currently provide wireline broadband Internet access service to approximately 597,000 end-user lines.[160]

55. In sum, while cable modem and DSL clearly have exhibited significant growth over the last few years, market penetration for these two technologies still is far below the size of the potential market. The 20 percent cumulative penetration rate for broadband services stands in marked contrast to other, more mature markets the Commission has examined and regulated to varying degrees. When the Commission determined that AT&T was no longer dominant in the long distance service market, that market was mature. About 94 percent of American households had telephone voice service, and the vast majority of the telephones provided equal access to long distance service.[161] More generally, telephone voice service has had market penetration rates ranging from 91.4 percent to 95.5 percent of all American households over the past 20 plus years.[162] When compared to the market penetration rate for telephone voice service, which typifies a long-established, mature market for network-based services, the market penetration rate

---

[155] *High-Speed Services July 2005 Report*, Table 5.

[156] *Id.*

[157] The Commission's *Triennial Review Order* expressly reaffirmed the competitive LECs' right to obtain unbundled access to stand-alone copper loops in order to provide broadband transmission services. *See Triennial Review Order*, 18 FCC Rcd at 17128-32, paras. 248-54. In addition, we reaffirmed the incumbent LECs' obligation to provide competitive LECs with the ability to line split (*i.e.*, where one competitive LEC provides narrowband voice service over the same loop that a second competitive LEC uses to provide DSL service). *Id.* at 17130-31, paras. 251-52. In that order, the Commission also grandfathered existing line sharing customers and declined to reinstate the Commission's vacated line sharing rules. The Commission instead established a three-year transition after which any new customer must be served through a line splitting arrangement, through use of the stand-alone copper loop, or through an arrangement that a competitive LEC has negotiated with the incumbent LEC to replace line sharing. Line sharing allowed a competing carrier to provide DSL service over the high-frequency portion of the same loop that the incumbent LEC uses to provide voice service. *Id.* at 17132-41, paras. 255-69. The D.C. Circuit expressly upheld the Commission's decision not to require line sharing. *USTA II*, 359 F.3d at 585. As we discuss in part VI.D, below, the decisions contained in this Order have no affect on competitive LECs' ability to obtain UNEs, or on the section 251(c) obligations of incumbent LECs.

[158] *See* ALTS 01-337 Comments at 3 (stating that competitive LECs have invested over $56 billion to construct new broadband networks since the passage of the 1996 Act).

[159] *See* Qwest May 23, 2003 *Ex Parte* Letter, Attach at 4; SBC Mar. 7, 2003 *Ex Parte* Letter, Attach. at 12.

[160] *High-Speed Services July 2005 Report*, at Table 5.

[161] *Trends in Telephone Service April 2005 Report*, at Table 16; *see also Motion of AT&T Corp. to be Reclassified as a Non-Dominant Carrier*, Order, 11 FCC Rcd 3271 (1995).

[162] *Trends in Telephone Service April 2005 Report*, at Table 1.

for broadband Internet access services indicates that this emerging market has the potential to grow significantly in the years ahead.

56. Given recent trends, the market penetration of cable modem and DSL broadband Internet access services, in particular, could grow dramatically in the future.[163] We expect these two market leaders to continue to compete head-to-head in a way that could result in higher customer penetration rates for one or both services.[164] Cable modem service and DSL broadband Internet access services currently compete directly with each other in certain areas, are marketed against each other, are sold almost exclusively to residential and small business customers, and often may be perceived by consumers as close substitutes for each other.[165] Continuous change and development are likely to be the hallmark of the marketplace for broadband Internet access at both the retail and wholesale levels over the next several years.[166]

57. We expect providers of both platforms will continue to invest and extend the reach of their services. We anticipate that, as the availability of cable modem and DSL broadband Internet access services grows with the modernization of network infrastructure and increased service deployment, more households will have the option of choosing between the cable and DSL broadband options. Increased intermodal and intramodal competition will continue to encourage these two broadband providers to deploy broadband Internet access services throughout their respective service areas.[167] In addition, the threat of competition from other forms of broadband Internet access, whether satellite, fixed or mobile wireless, or a yet-to-be-realized alternative, will further stimulate deployment of broadband infrastructure, including more advanced infrastructure such as fiber to the home.

58. These emerging broadband platforms exert competitive pressure even though they currently have relatively few subscribers compared with cable modem service and DSL-based Internet access service.[168]

---

[163] *See Fourth Section 706 Report*, at 13-16 (describing the technology and pricing that is driving the increasing demand for cable modem and DSL services).

[164] *Broadband 271 Forbearance Order*, 19 FCC Rcd at 21505-07, para. 22 (stating that cable providers have a significant role in encouraging the BOCs to provide competitive DSL services).

[165] *Id.* at 21505-07, para. 22; *see also NTIA Broadband Report*, at 7 (explaining generally the growth in market share for cable modem and DSL service); Robert W. Crandall, J. Gregory Sidak, & Hal J. Singer, *The Empirical Case Against Asymmetric Regulation of Broadband Internet Access*, 17 Berkeley Technology L.J. 953, 953-87 (2002). The authors develop an econometric model which estimates own price and cross price elasticities for cable modem and DSL. Based on this model, the authors conclude that price and cross-price elasticities are high, and that cable modem and DSL are substitutes when both are available to the mass market consumer. *Id.* at 957.

[166] *See, e.g.*, *High-Speed Services July 2005 Report*, at Tables 1-2, Charts 1-2 (showing growth of various broadband technologies over the past five years).

[167] *See Fourth Section 706 Report* at 14-16 (describing pricing for cable modem and DSL service). Verizon has recently decreased its prices, both retail and wholesale, for DSL service, http://www22.verizon.com/ForHomeDSL/channels/dsl/forhomedsl.asp?ID=Res announcing Verizon's limited time offer of $19.95 per month for DSL service for the first three months of a one-year commitment. In addition, SBC's retail Internet access rates are now set at an introductory rate of $14.95 per month for a one-year term. "SBC Communications Breaks New Ground for Consumers with Residential DSL for $14.95 When Ordered Online," http://www.sbc.com/gen/press-room?pid=4800&cdvn=news&newsarticleid=21690 announcing SBC's 13-state $14.95 price decrease for its DSL Express service. BellSouth has also lowered its retail DSL prices. Dionne Searcey, *BellSouth Shaves DSL Prices*, Wall St. J. (July 20, 2005) (describing BellSouth's permanent DSL price cut by $10.00 to $32.95 per month for customers who also buy its basic phone service).

[168] *See, e.g.*, BellSouth June 5, 2003 *Ex Parte* Letter at 11-12.

Ku-band satellite service is now available in most areas of the United States and is most attractive in areas that lack access to cable modem and DSL-based Internet access service, largely because this satellite service costs more than those alternatives.[169] Fixed wireless service is also available to provide high-speed Internet access in substantial areas of the nation.[170] By the end of 2002, satellite and fixed wireless providers reported about 257,000 high-speed Internet access service residential and small business subscribers.[171] Today, they report an increased subscriber base of approximately 422,000 lines in service.[172]

59. At the same time as cable modem and DSL broadband Internet access services are increasing market penetration, these other technology-based solutions could gain market share. In the near future, satellite and fixed wireless will likely continue to serve, at the very least, specialized geographic parts of the market not served by DSL or cable modems.[173] If more customers adopt satellite and fixed wireless solutions, the relative prices of those solutions could decline, which would make the services more competitive with cable modem and DSL broadband Internet access services. It is unclear in the current developing market which technology or technologies will serve the majority of customers when the market reaches greater maturity.

60. We recognize that the attributes of the available broadband platforms vary, particularly as to price, speed, and ubiquity. We expect that customers will weigh these attributes for each platform and make service-related decisions based on their specific needs. For example, a customer may select a broadband Internet access service with a somewhat slower speed than that associated with other service platforms in return for the lower price of the selected service.

61. As the Internet and related applications mature and continue to evolve, the demand for broadband Internet access services will likely grow. The presence of more content available through the Internet and the enhanced means of presenting the content, together with growth in broadband-related applications, such as streaming video, will lead more subscribers to seek broadband Internet access service. As the number of subscribers grows, so does the opportunity for alternative technologies and their respective providers. As any provider increases its market share or upgrades its broadband Internet access service, other providers are likely to mount competitive challenges, which likely will lead to wider deployment of broadband Internet access service, more choices, and better terms.[174]

62. We disagree with commenters that equate the ability of *ISPs* to obtain wireline broadband transmission services on a Title II basis with the ability of *consumers* to obtain facilities-based competitive broadband Internet access services.[175] A regulatory regime that promotes a competitive broadband Internet access services market where consumers have a choice of multiple providers is not

---

[169] *Fourth Section 706 Report*, at 23. Satellite providers are in the process of increasing by a large multiple the amount of bandwidth they make available for broadband, with several launches of new satellites scheduled during the near future. *Id.* at 23, 46. *See supra* note 95. Satellite currently has just less than a 1% broadband market share.

[170] *Fourth Section 706 Report*, at 20-22.

[171] *High-Speed Services June 2003 Report*, at Table 3.

[172] *High-Speed Services July 2005 Report*, at Table 3.

[173] *See Fourth Section 706 Report*, at 18-23.

[174] *See id.* at 44-45 (describing the broadband trends).

[175] *See, e.g.*, AOL Comments at 21-23; EarthLink Comments at 16-27; MCI *et al.* Comments at 24-32; Ad Hoc Reply at 14-18.

necessarily the same as a regulatory regime that mandates that one particular type of broadband Internet access service transmission technology, and one alone, is available, on a nondiscriminatory basis, to any entity that desires to become an ISP.[176] Vigorous competition between different platform providers already exists in many areas and is spreading to additional areas.[177] While we recognize that broadband Internet access service is not ubiquitously available today, this market is rapidly changing and growing.[178] In addition, service providers tend to set prices on a national or regional basis regardless of whether there are multiple broadband providers serving local markets.[179]

63. It is difficult to make a meaningful assessment of the market for wholesale access to the transmission component of broadband Internet access service. Although we recognize that, in many areas, the incumbent LEC is currently the only wholesale provider of this transmission component, this observation, on its own, is not dispositive. At this time, facilities-based wireline carriers are the only providers of broadband Internet access services that are compelled by regulation to make such an offering available. As stated above, this compulsion is not the result of the Commission's analysis of broadband Internet access services specifically, but rather is the product of the application of legacy rules adopted decades ago.[180] Therefore, we cannot state unequivocally that incumbent LECs would not otherwise provide wholesale access, absent this compulsion. In fact, the record shows that incumbent LECs would and indeed already do provide such access, albeit through arrangements other than a mandatory tariff regime that requires a standardized general offering.[181] In addition, this regulatory compulsion of facilities-based wireline carriers may be impeding the development of competitive alternatives, most notably through entry by other broadband Internet access platform providers. Because our rules require a particular type of generalized wholesale offering, they may reduce incentives for ISPs to seek alternative arrangements from other broadband Internet access platform providers and for those other providers to offer such arrangements.[182]

---

[176] The Commission concluded in the *Broadband 271 Forbearance Order* that competition from multiple sources and technologies in the retail broadband market, especially from cable modem providers, will encourage the BOCs to utilize wholesale customers to grow their share of the broadband markets and retain their business. *Broadband 271 Forbearance Order*, 19 FCC Rcd at 21508, para. 26.

[177] *See supra* Part V.B.2.a; *Broadband 271 Forbearance Order*, 19 FCC Rcd at 21505-10, paras. 22-29.

[178] *See supra* Part V.B.2.a.

[179] *See, e.g., supra* n.167 (describing the BOCs' regionwide DSL pricing offers).

[180] *See NCTA v. Brand X*, slip op. at 30.

[181] For example, BellSouth indicates that few unaffiliated ISPs continue to take its tariffed DSL transport service. Instead, many ISP competitors have entered into commercial contracts for broadband Internet access capability because it meets their demands better than the *Computer Inquiry* tariffed transmission-only component. *See* Letter from Glenn T. Reynolds, Vice President-Federal Regulatory, BellSouth, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, Attach. at 8 (filed Apr. 25, 2005) (BellSouth Apr. 25, 2005 *Ex Parte* Letter) (noting that only one percent of the total broadband customers in BellSouth's nine-state region obtain service from ISPs using BellSouth's *Computer Inquiry*-required tariffed DSL transmission offering, but over 26% of the customers are served by ISPs using BellSouth's contract offering (*i.e.*, its regional broadband aggregation network (RBAN) offering).

[182] *See, e.g.*, BellSouth June 5, 2003 *Ex Parte* Letter at 18 ("BellSouth's ability to negotiate and enter into such tailored agreements [for ISPs] is frustrated immensely by the existing regulatory burdens of having to offer the underlying tariff components immediately to any other requesting carrier anywhere in BellSouth's region at tariffed rates.").

64. Based on the record before us, we expect that facilities-based wireline carriers will have business reasons to continue making broadband Internet access transmission services available to ISPs without regard to the *Computer Inquiry* requirements.[183] The record makes clear that such carriers have a business interest in maximizing the traffic on their networks, as this enables them to spread fixed costs over a greater number of revenue-generating customers.[184] For their part, cable operators, which have never been required to make Internet access transmission available to third parties on a wholesale basis,[185] have business incentives similar to those of incumbent LECs to make such transmission available to ISPs, and are continuing to do so pursuant to private carriage arrangements.[186] Given the Supreme Court's decision that cable operators can offer the transmission underlying cable modem service as a functionally integrated part of a finished information service without becoming subject to regulation under Title II,[187] we expect that these wholesale arrangements will continue to evolve. We believe that the convergence of these two factors – increasing competition among facilities-based broadband providers and the potential for competition in wholesale network access – will sustain and increase competitive choice among broadband providers and Internet access products.

**b) Technological Innovation**

65. We find that application of the *Computer Inquiry* requirements to wireline broadband Internet access services, and any alternative requirements that would guarantee ISPs access to the transmission component of that service, would impede the development and deployment of innovative wireline broadband Internet access technologies and services. As noted above, these requirements slow innovation because vendors do not create new technologies with the *Computer Inquiry* requirements in mind.[188] Deployment to consumers of these technologies then, at best, is delayed and, in many cases, may be avoided altogether. Broadband Internet access services are also not developing in ways that neatly fall within existing regulatory classifications or the current *Computer Inquiry* requirements (*i.e.*, they cannot be easily separated into discrete information service and telecommunications service components).[189] As

[183] *See infra* Part V.B.2.d.

[184] Letter from Jeffry Brueggeman, General Attorney, SBC, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, Attach. at 8 (filed July 31, 2003) (SBC July 31, 2003 *Ex Parte* Letter); BellSouth June 5, 2003 *Ex Parte* Letter at 16-18; *Broadband 271 Forbearance Order*, 19 FCC Rcd at 21508-09, para. 26.

[185] *NCTA v. Brand X*, slip op. at 30; *Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4823-25, paras. 39-43.

[186] *See, e.g.*, Comcast Corp., 2004 Form 10-K Annual Report filed with the Securities and Exchange Commission, at 7 (Feb. 23, 2005) (stating that Comcast and a number of cable operators have reached agreements to provide unaffiliated ISPs access to their cable systems in the absence of regulatory requirements). In addition, AOL Time Warner, as a result of a consent decree with the Federal Trade Commission, provides certain independent ISPs with access to its network of over 12 million subscribers. *Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4828-29, para. 52 & n.196.

[187] *NCTA v. Brand X*, slip op. at 6-15.

[188] *See, e.g.*, Verizon June 26, 2003 *Ex Parte* Letter at 1-3; Letter from L. Barbee Ponder IV, Senior Regulatory Counsel-D.C., BellSouth, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, Attach. at 5 (filed May 23, 2003) (BellSouth May 23, 2003 *Ex Parte* Letter) (stating that next generation broadband equipment does not provide demarcations for regulatory purposes, and that vendors have no incentives to create demarcations because only four entities need or want them).

[189] *See* Verizon June 26, 2003 *Ex Parte* Letter at 2 (noting that in past decades, "equipment manufacturers designed central office equipment based on the needs of the Bell companies' and that "[t]oday's manufacturers have broader markets and are designing the next generation of equipment for a broader base of IP network providers").

a result, unlike cable modem providers or other broadband Internet access service competitors, wireline carriers must make either of two less-than-optimal choices when they seek to deploy advanced network equipment: either they must decide not to use all the equipment's capabilities, thereby reducing their operational efficiency;[190] or they must defer deployment while the manufacturer re-engineers it to facilitate compliance with the *Computer Inquiry* rules, thereby creating unnecessary costs and service delays.[191]

66. Wireline commenters argue that their inability to integrate more efficient equipment into wireline networks in a timely and efficient manner limits their ability to offer innovative broadband Internet access services to customers.[192] They also contend that these constraints hinder their ability to respond to requests for new or modified innovative features or services.[193] For example, some commenters argue that manufacturers have little incentive to design next generation broadband equipment that facilitates compliance with the Computer *Inquiry* obligations as the majority of broadband platform providers neither need nor want this capability.[194] As a result, these carriers maintain that they are faced with a decision either to forgo the use of more efficient or innovative equipment or to incur substantial additional costs and development time to have the vendor "de-integrate" the more efficient, integrated equipment simply to comply with the *Computer Inquiry* requirements.[195] These increased costs and delays often deter a carrier from deploying new broadband technologies.[196]

67. Other commenters suggest that because of the BOCs' size and influence, they are well-positioned to demand that vendors meet their requirements that innovative broadband equipment and new functionalities comply with the *Computer Inquiry* obligations.[197] Assuming arguendo that this is true, to

---

[190] For example, SBC explains that, in order to comply with the *Computer Inquiry* rules, it often must disable or "turn off" protocol conversion functionality in its broadband Internet access equipment. *See* SBC July 31, 2003 *Ex Parte* Letter at 12.

[191] *See* Verizon June 26, 2003 *Ex Parte* Letter at 3.

[192] *See, e.g.*, SBC Mar. 7, 2003 *Ex Parte* Letter at 8 (arguing that *Computer II*'s stand-alone telecommunications service requirement "[r]estricts full utilization of technology integration in design and evolution of broadband networks" and in "developing broadband services," and, thus, limits SBC's "ability to offer new and innovative integrated broadband services to consumers"); *see also* Verizon May 20, 2003 *Ex Parte* Letter, Attach. at 9; Letter from Ann D. Berkowitz, Project Manager-Federal Affairs, Verizon, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, Attach. at 10 (filed Mar. 17, 2003) (Verizon Mar. 17, 2003 *Ex Parte* Letter).

[193] *See, e.g.*, BellSouth June 5, 2003 *Ex Parte* Letter at 18. Non-carrier commenters have also argued that the *Computer Inquiry* regime is inappropriate for today's broadband market. *See, e.g.*, Alcatel Comments at 8 (contending that the Commission should seek to remove some of the network unbundling obligations placed on incumbent LECs); HTBC Reply at 3-8 (advocating a minimally regulatory environment for wireline broadband transmission but stating the Commission should require incumbent LECs to make any arrangements with their affiliated ISPs available to unaffiliated ISPs in a nondiscriminatory manner at least for the next two years).

[194] *See, e.g.*, BellSouth Apr. 25, 2005 *Ex Parte* Letter, Attach. at 8; BellSouth May 23, 2003 *Ex Parte* Letter, Attach. at 5; *see also* Catena Comments at 6 (noting that several telecommunications equipment manufacturers have halted or decreased their DSL technology activities as the current regulatory environment is retarding the investment in new technologies).

[195] *See, e.g.*, SBC July 31, 2003 *Ex Parte* Letter at 11-12; Verizon June 26, 2003 *Ex Parte* Letter at 3.

[196] *See, e.g.*, SBC Comments at 26; Verizon May 20, 2003 *Ex Parte* Letter, Attach. at 9-13 (outlining impediments to offering VoIP services).

[197] *See, e.g.*, Letter from Richard S. Whitt, Director-Federal Advocacy, MCI, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, Attach. at 11 n.13 (filed Oct. 10, 2003) (MCI Oct. 10, 2003 *Ex Parte* Letter); Letter from (continued . . .)

some extent, the fact that BOCs can exert some influence does not necessarily make the *Computer Inquiry* obligations or a less onerous broadband Internet access transmission obligation desirable public policy, nor does it mean that the resulting equipment is as efficient or innovative as it could otherwise be. The issue is not whether the BOCs could have this "de-integrated" equipment produced, rather it is whether the production of this equipment would yield benefits that outweigh the obvious technological costs. These commenters fail to recognize that manufacturers develop broadband equipment that pushes technology in the direction they think will best respond to future consumer demands (which is currently toward equipment that integrates information service and transmission capabilities in a manner that allows functions to be performed at multiple points within a broadband network and closer to the end user than ever before).[198] Our rules should not force technological development in another, less efficient direction.

68. Some carriers argue that compliance with the *Computer Inquiry* obligations requires costly redundant systems and duplicative processes that result in operational inefficiencies.[199] For example, BellSouth states that it incurs significant costs solely to comply with those obligations. These costs are incurred, according to BellSouth, because it must: maintain separate customer service centers, systems, and processes for its telecommunications service and broadband Internet access service operations;[200] dispatch both telecommunications service and information service technicians to install DSL service or respond to customer-reported problems;[201] and incur additional transport costs to comply with the Commission's "two-mile" rule.[202] While other commenters maintain that these costs do not warrant elimination of the *Computer Inquiry* requirements,[203] we find that the costs on the record are sufficient to act as an investment disincentive. As explained below, consistent with our obligations under section 706, we must consider this impact in our overall analysis of the costs and benefits of retaining these rules.

(continued from previous page)
David L. Lawson, Counsel for AT&T, Sidley Austin Brown & Wood LLP, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, at 5-6 (filed Aug. 14, 2003).

198 *See supra* paras. 65-66.

199 *See, e.g.*, Verizon June 26, 2003 *Ex Parte* Letter at 1-4; BellSouth Apr. 2, 2003 *Ex Parte* Letter, Attach. at 6-9.

200 *See, e.g.*, BellSouth Apr. 2, 2003 *Ex Parte* Letter at 8 (an estimated cost of $13.5 million per year).

201 *Id.* (costing approximately $6 million per year). BellSouth claims that it incurs these costs because it must treat its broadband Internet access service customer in the same manner as it would treat an independent ISP's customer. Thus, for example, if a BellSouth telephone service technician discovers a problem with a DSL connection, BellSouth must dispatch a different technician to correct that problem for the end-user consumer. *See also id.* at 9 (stating that it incurs approximately $9.5 million per year in other unnecessary system redundancy costs).

202 *Id.* at 11. The two-mile rule requires BOCs to charge their "collocated enhanced service operations a rate for distance-sensitive transmission equal to a rate for transmission paid by non-collocated operations at a two mile distance from the [central office]." *See Filing and Review of Open Network Architecture Plans*, 5 FCC Rcd 3103, 3110, para. 66 & n.111 (1990). BellSouth maintains that this rule is administratively costly and archaic since all packet traffic is aggregated efficiently at the central office and because ISPs are able to collocate there pursuant to the expanded interconnection rules. BellSouth Apr. 2, 2003 *Ex Parte* Letter at 11.

203 *See, e.g.*, Letter from Mark J. O'Connor, Counsel for EarthLink, Inc., Lampert & O'Connor, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, Attach. at 3-7 (filed May 12, 2003) (EarthLink May 12, 2003 *Ex Parte* Letter); *see also* Letter from Kenneth R. Boley, Counsel for EarthLink, Inc., Lampert & O'Connor, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, Attach. at 2-3 (filed Mar. 19, 2003) (EarthLink Mar. 19, 2003 *Ex Parte* Letter).

69. The fact that carriers incur costs, potentially even significant costs, to comply with our regulations is not, alone, a basis for eliminating such regulations. To the extent such costs are incurred to achieve statutory obligations or important policy objectives, they are a necessary component of operating in a regulated industry.[204] But when, as a relative matter, the regulations' costs outweigh their benefits, or are no longer necessary to achieve the desired objectives, we must evaluate whether our obligations and objectives can be met in a manner that reduces or eliminates such costs. This becomes even more critical if there is evidence that the regulation actually impedes or frustrates the accomplishment of important statutory goals.

70. At the time the *Computer Inquiry* rules were adopted (and even thereafter as they were being revised and refined to better balance costs and benefits), the public benefits with respect to narrowband network-based services justified the costs. For example, it was much clearer at that time that because computer processing occurred at the network's edge or outside the network, the major innovation would occur there too. The *Computer Inquiry* rules themselves reflect a fairly static picture of network development, and an assumption that a line could be drawn between the network functions and computer processing without impeding technological innovation. Today, this line is even more blurred than it was when the Commission adopted its *Computer II Final Decision*. Innovation can occur at all network points and at all network layers as well as in non-network applications and equipment. Continued application of the *Computer Inquiry* rules, however, would prevent much of this innovation from occurring.[205] This by-product of our current regulations is a persuasive factor for their removal.

#### c) New Services

71. One of the primary purposes of this technological innovation would be to let wireline broadband Internet access services providers, like their competitors, produce new or improved services in response to consumer demands.[206] Several parties argue that the *Computer Inquiry* requirements prevent them from altering business priorities in response to changing market demands, impede their ability to take advantage of business opportunities due to "time to market" issues, and provide competitors with advance notice of innovative service enhancements, thus eliminating any potential wireline broadband competitive advantage *vis-à-vis* cable modem or other platform providers.[207] For example, Qwest points to the inherent regulatory delay that occurs through the network change disclosure process, the web posting requirements, and tariffing requirements, which a BOC must comply with before making *any* change to its network that enhances or upgrades its Internet access services.[208] Verizon contends that before it can decide whether it will provide an ISP customer with a requested new Internet access service capability, it

---

[204] *See, e.g., IP-Enabled Services*, WC Docket No. 04-36; *E911 Requirements for IP-Enabled Service Providers*, WC Docket No. 05-196, First Report and Order and Notice of Proposed Rulemaking, FCC 05-116, at paras. 3-5, 36-53 (rel. June 3, 2005) (*VoIP E911 Order*), *petitions for review pending sub nom. Nuvio Corp. v. FCC*, D.C. Cir. No. 05-1248 (and consolidated cases) (filed July 11, 2005).

[205] *See, e.g.*, Catena Comments at 5-6; Verizon June 26, 2003 *Ex Parte* Letter at 3-6; BellSouth Apr. 2, 2003 *Ex Parte* Letter, Attach. at 5.

[206] *See Wold Communications*, 735 F.2d at 1475 (citing *Western Union Telegraph v. FCC*, 674 F.2d 160 (2d Cir. 1982) ("newly unleashed market forces" constitute a reasonable regulatory tool). Where technology is fast-moving and arcane, the D.C. Circuit gave the Commission "particular deference" in determining whether the treatment of a service as non-common carrier would bring sufficient public interest benefits. *Id.* at 1468.

[207] *See, e.g.*, Qwest Apr. 10, 2003 *Ex Parte* Letter, Attach. at 11.

[208] *Id.*

must analyze each function of the proposed capability to determine its classification under the *Computer Inquiry* regime[209] and then determine the associated requirements for compliance.[210] Verizon states that this compliance review often involves complex and lengthy new system development or modification to accommodate the *Computer Inquiry* access obligations without any knowledge or assurance that other ISPs will even want such access. As a result, Verizon states that it frequently must deny requests for new Internet access service capabilities because the process to accommodate them under existing *Computer Inquiry* regulations is prohibitively expensive.[211] We find that these costs, inefficiencies, and delays are significant and substantially impede network development. We therefore disagree with commenters that claim that the record contains no evidence that costs, inefficiencies, and investment delays have occurred that would justify the elimination of the *Computer Inquiry* requirements.[212]

72. Based on the record before us, we conclude that eliminating the *Computer Inquiry* rules at this time will make it more likely that wireline network operators will take more risks in investing in and deploying new technologies than they are willing and able to take under the existing regime.[213] Tailored private contractual agreements, in general, provide service providers more flexibility in developing a new technology and more incentives to do so.[214] As the Commission found in the *Transponder Sales Order*, a service provider is more likely to invest in technologies if the service provider is able to obtain assurances through private contracts that the technologies will be used.[215] Private commercial contracts likewise provide assurances to potential customers that capacity will be available.[216] Indeed, a number of carrier commenters indicate that their preferred means of offering wireline broadband transmission service is through customized arrangements tailored to the particular needs of requesting ISP customers.[217] They show, in particular, that through the ability to engage in these types of non-common carrier arrangements

---

[209] *See supra* n.78 (describing the four "basic service elements").

[210] *See, e.g.*, Verizon June 26, 2003 *Ex Parte* Letter at 4; Verizon May 20, 2003 *Ex Parte* Letter, Attach. at 11-13.

[211] *See, e.g.*, Verizon June 26, 2003 *Ex Parte* Letter at 4-6; Verizon May 20, 2003 *Ex Parte* Letter, Attach. at 11-13; *see also* Letter from L. Barbee Ponder IV, Senior Regulatory Counsel-D.C., BellSouth, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 02-33, at 1-9 (filed July 10, 2003) (BellSouth July 10, 2003 *Ex Parte* Letter); BellSouth Apr. 25, 2005 *Ex Parte* Letter, Attach. at 7-10.

[212] *See, e.g.*, AT&T Comments at 62-72; GCI Comments at 23-27; Ohio ISP Assoc. *et al.* Comments at 56-58; MCI *et al.* Comments at 39-42; AT&T Reply at 35-42; AT&T Mar. 14, 2003 *Ex Parte* Letter at 15; *see also* Covad Comments at 32-36.

[213] *See, e.g.*, Verizon June 26, 2003 *Ex Parte* Letter at 4, 6.

[214] *See, e.g.*, *Transponder Sales Order*, 90 FCC 2d at 1250-52, paras. 31-34; *see also infra* at paras. 87-88 (discussing the benefits of non-common carriage contracts).

[215] *Transponder Sales Order*, 90 FCC 2d at 1250-52, paras. 31-34 (noting typical long lead time between inception of a technology and its deployment).

[216] *See id.*

[217] *See NARUC I*, 525 F.2d at 643 (the inquiry is whether there is reason to believe that the service provider will, in fact, serve the public indifferently even absent a regulatory compulsion to do so). Consequently, we disagree with EarthLink, which argues that the Commission's determination as to whether this service must be a common carrier service begins and ends with the recognition that incumbent LECs provide wholesale DSL transmission to ISPs on a tariffed (*i.e.*, indifferent) basis. EarthLink Apr. 29, 2003 *Ex Parte* Letter at 9-11.

(rather than "cookie-cutter" common carrier offerings available indiscriminately to all ISPs), they will be able to develop more technologically innovative broadband offerings to meet consumer needs.[218]

73. As discussed above, some commenters argue that the transmission component of wireline broadband Internet access service must continue to be regulated as a common carrier service because wireline carriers currently offer these transmission services on such a basis.[219] In doing so, however, these parties fail to recognize that a Commission determination regarding the regulatory status of a service depends on, among other things, what practice and experience indicate the likely character of the service offering would be, assuming the carrier could decide how it would offer the service.[220] Merely because facilities-based wireline carriers offer some common carrier services does not mean that all their services must be similarly offered.[221] The Commission, upheld by the courts, has provided carriers the flexibility to offer services that were previously regulated under Title II on a common carrier or non-common carrier basis.[222]

#### d) Wireline Broadband Internet Access Service Providers' Business Incentives

74. Given the nature and history of the broadband Internet access services industry, we expect that wireline broadband transmission will remain available to ISPs and others without any *Computer Inquiry* requirements. Incumbent LECs have represented that they not only intend to make broadband Internet

---

[218] *See, e.g.*, SBC July 31, 2003 *Ex Parte* Letter at 4-15; Verizon June 26, 2003 *Ex Parte* Letter at 4, 6; BellSouth June 5, 2003 *Ex Parte* Letter at 12 (noting that BellSouth negotiated a private agreement with an independent ISP because BellSouth's tariffed unbundled broadband transmission offering was "cumbersome, inefficient and not competitive"); Qwest May 23, 2003 *Ex Parte* Letter, Attach. at 17-18.

[219] *See infra* Part V.D.

[220] *See Vitelco v. FCC*, 198 F.3d at 924 (citing *NARUC I*, 525 F.2d at 642, for the proposition that the second prong of the *NARUC I* test examines whether there are reasons implicit in the nature of the offering to expect an indifferent holding out to the eligible user public); *see also NARUC I*, 525 F.2d at 643-44 (noting that the inquiry into whether specialized mobile radio service (SMRS) providers will hold themselves out indifferently absent a regulatory compulsion to do so is "highly speculative" because no operating SMRS providers were then in existence); *see also* BellSouth June 5, 2003 *Ex Parte* Letter at 21 (asserting that the previous regulatory compulsion cannot be used as a basis for claiming that carriers have chosen to provide broadband transmission on a common carrier basis).

[221] 47 U.S.C. § 153(10) (defining common carrier); *see, e.g.*, *Southwestern Bell*, 19 F.3d at 1482 (quoting *NARUC v. FCC*, 533 F.2d 601, 608 (D.C. Cir. 1976) (*NARUC II*) ("[I]t is at least logical to conclude that one can be a common carrier with regard to some activities but not others")).

[222] *See, e.g.*, *Vitelco v. FCC*, 198 F.3d at 925-30 (affirming the Commission's grant of a submarine cable operator's application for cable landing rights as a non-common carrier); *Computer and Communications Industry Ass'n v. FCC*, 693 F.2d at 207-14 (The court stated: "In designing the Communications Act, Congress sought to endow the Commission with sufficiently elastic powers such that it could readily accommodate dynamic new developments in the field of communications. Congress thus hoped to avoid the necessity of repetitive legislation. In *Computer II* the Commission took full advantage of its broad powers to serve the public interest by accommodating a new development in the communications industry, the confluence of communications and data processing. Because the Commission's judgment on how the public interest is best served is entitled to substantial judicial deference, the Commission's choice of regulatory tools in *Computer II* must be upheld unless arbitrary or capricious. Our review of the Commission's decision convinces us that the Commission acted reasonably in defining its jurisdiction over enhanced services and CPE. We therefore uphold the Computer II scheme.") (internal quotation marks omitted); *Wold Communications*, 735 F.2d at 1473-79 (affirming the decision in the *Transponder Sales Order* to allow sales of satellite transponder service on a non-common carrier basis); *see also infra* note 280.

access transmission offerings available to unaffiliated ISPs in a manner that meets ISPs' needs, but that they have business incentives to do so.[223] For example, Qwest offers a tariffed wireline broadband DSL service that enables hundreds of independent ISPs to serve end-user customers over Qwest's broadband facilities.[224] Regardless of the outcome of this proceeding, Qwest has stated it will continue to make available a DSL offering that will enable consumers to reach unaffiliated ISPs because consumers demand the choice, and meeting that demand makes its product more attractive.[225] SBC previously entered into a memorandum of understanding with a trade association representing nearly 300 members of the Internet industry, including many independent ISPs, committing to negotiate private commercial arrangements with unaffiliated ISPs for broadband Internet access.[226] Verizon has similarly indicated its intent to enter into commercially reasonable contracts with unaffiliated ISPs for broadband transmission services because it is in its best interest to do so.[227] Finally, BellSouth has also evidenced a willingness, desire, and incentive to deal with unaffiliated ISPs absent a Commission requirement that compels them to do so.[228] For example, BellSouth has indicated that it will benefit financially from providing DSL transmission to independent ISPs, as it has an economic incentive to spread the costs of its network over as much traffic and as many customers as possible regardless of whether such customers are wholesale or retail.[229]

75. We finds these incentives significant, and therefore disagree with the contention of some commenters that a mandatory common carrier broadband transmission requirement is essential for independent ISPs to obtain wireline broadband transmission that meets their needs at reasonable prices.[230] Based on the record before us, we expect that business incentives will compel wireline broadband carriers to offer broadband transmission on a commercially reasonable basis to independent ISPs and will

---

[223] *See* SBC July 31, 2003 *Ex Parte* Letter at 8 ("SBC will continue to enter into ISP broadband access arrangements as a way of increasing subscriber growth and utilization of its broadband network regardless of any regulatory compulsion to do so."). Indeed, carriers voluntarily have entered into certain non-common carrier agreements already. *E.g.*, Letter from Edward Shakin, Vice President and Associate General Counsel, Verizon, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, at 1-2 (filed July 29, 2004) (Verizon July 29, 2004 *Ex Parte* Letter) (describing Verizon's Fios services, which are high-speed Internet services provided over Verizon's fiber networks); BellSouth June 5, 2003 *Ex Parte* Letter at 12-13 (describing BellSouth's negotiated RBAN service arrangement with EarthLink).

[224] *See, e.g.*, Qwest Apr. 10, 2003 *Ex Parte* Letter, Attach. at 2 (noting Qwest's "DSL+" access offering to 400 ISPs); Qwest May 23, 2003 *Ex Parte* Letter, Attach. at 5 (describing this service).

[225] Qwest Apr. 10, 2003 *Ex Parte* Letter, Attach. at 2, 10.

[226] *See* Letter from Donald E. Cain, Vice President-Federal Regulatory, SBC, & David P. McClure, USIIA, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, at 1-2 & Attach. at 2 (filed May 3, 2002) (SBC and USIIA May 3, 2002 *Ex Parte Letter*) (describing memorandum of understanding dated May 2, 2002). This memorandum of understanding has no expiration date. *See id.*, Attach. at 1-2.

[227] *See, e.g.*, Verizon Comments at 31 (explaining that the significant costs to upgrade its network can be recovered through use of its network by other broadband providers.)

[228] *See, e.g.*, BellSouth June 5, 2003 *Ex Parte* Letter at 16-18.

[229] *See id.*

[230] *See, e.g.*, Big Planet Comments at 16-17; EarthLink Comments at 19-20; ITAA Comments at 12-18; Ohio ISP Assoc. *et al.* Comments at 39-41; *Earthlink et al. Streamlining Proposal* at 6-7; Letter from Maura J. Colleton, The BroadNet Alliance, to Marlene H. Dortch, Secretary, FCC, CC Docket Nos. 02-33, 98-10, & 95-20, Attach. at 26-29 ("The Significant Role of Online Service Providers in the Development and Success of the Information Age") (filed July 1, 2002) (BroadNet Alliance July 1, 2002 *Ex Parte* Letter).

motivate wireline carriers to negotiate mutually acceptable rates, terms, and conditions with unaffiliated ISPs. We strongly encourage the parties to work together to develop individual contracts that are mutually beneficial to each party.

76. We also expect that the rapid growth and development of innovative broadband service offerings, including IP telephony, among the different broadband Internet access platform providers, particularly cable modem, will provide significant incentives to facilities-based wireline carriers to increase subscriber usage of wireline-based Internet access services *vis-à-vis* cable modem and other platform providers of broadband Internet access services.[231] That is, to the extent that IP telephony services provided via other broadband platforms erode revenues that the BOCs and other incumbent LECs derive from traditional voice services, these carriers will have incentives to mitigate this potential revenue loss by retaining customers on the wireline broadband platform to the maximum extent possible.[232] Providing wholesale wireline broadband transmission to independent ISPs, whether through partnering, stand-alone transmission agreements, or other types of commercial service arrangements, would ensure that the facilities-based carrier derives some financial benefit from that customer.

#### e) A Change of Course Is Justified

77. As we have noted above, the Act does not address directly how wireline broadband Internet access service should be classified or regulated.[233] Through section 706, however, it does provide the Commission with a specific mandate to encourage broadband deployment, generally, and to promote and preserve a freely competitive Internet market, specifically.[234] Indeed, Congress mandated that the Commission encourage broadband capability "without regard to any transmission media or technology" and "remove barriers to infrastructure investment."[235]

78. Because our decision necessarily relies, in part, on our predictive judgment regarding a rapidly changing, dynamic industry, we do not pretend that there is a single, clear-cut answer.[236] As with the Commission's previous decisions to adopt and then modify the *Computer Inquiry* requirements, the decision that we must make today – whether or not to retain the *Computer Inquiry* requirements in some form – at its core involves an assessment of the relative costs and benefits of the various alternatives. In making this assessment, we must consider the broadband objectives Congress established in section 706.[237] Those objectives make clear that the Commission must encourage the deployment of advanced

---

[231] *See, e.g.*, Verizon June 26, 2003 *Ex Parte* Letter at 3 (noting that VoIP is an example of a new and emerging service that incumbent LECs will need to provide to be competitive with cable and other broadband providers).

[232] *See* BellSouth June 5, 2003 *Ex Parte* Letter at 11-13.

[233] *See supra* para. 8.

[234] *See supra* paras. 3, 8.

[235] *See* 47 U.S.C. § 157 nt.

[236] *See Wold Communications*, 735 F.2d at 1475 (noting that the public interest is served if the Commission's powers remain sufficiently elastic to address dynamic developments in the communications field, especially when Congress had taken no "specific action geared to the industry"); *compare Transponder Sales Order*, 90 FCC 2d at 1248-49, para. 28 ("The Communications Act was adopted long before the advent of communications satellites, and therefore it nowhere mandates that domestic satellite operators be regulated as common carriers.").

[237] *See* 47 U.S.C. § 157 nt (§ 706 of the Act). In the *Fourth Section 706 Report*, the Commission concluded, as it did in the previous three section 706 reports, that the overall goal of section 706 is being met, and that advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. In this *Fourth* (continued . . .)

telecommunications capability to all Americans by removing barriers to infrastructure investment. The D.C. Circuit recently upheld a similar Commission balancing approach that considered section 706's goals of swift, ubiquitous broadband deployment in adopting unbundling rules for mass market next generation broadband-capable loops pursuant to section 251(c)(3) of the Act.[238] Therefore, in assessing the alternative regulatory frameworks for wireline broadband Internet access services, we must ensure that the balance struck provides adequate incentives for infrastructure investment.

79. The following factors guide us toward replacing the *Computer Inquiry* obligations for wireline broadband Internet access service providers with a less regulatory framework: the increasing integration of innovative broadband technology into the existing wireline platform; the growth and development of entirely new broadband platforms; the flexibility to respond more rapidly and effectively to new consumer demands; and our expectation of the availability of alternative competitive broadband transmission to the currently required wireline broadband common carrier offerings. We believe our actions today will enhance each of these factors. Fostering the ubiquitous availability of broadband Internet access to all Americans across multiple competitive broadband platforms is best accomplished by recalibrating regulation where it is appropriate to do so.[239] Fulfilling our statutory obligations and policy objectives to maximize the acceleration of all types of broadband infrastructure deployment no longer requires a Commission-mandated wholesale *wireline* broadband Internet access transmission market.[240] Requiring a single type of broadband platform provider (*i.e.*, wireline) to make available its transmission on a common carriage basis is neither necessary nor desirable to ensure that the statutory objectives are met.[241] Indeed, as the evidence demonstrates, continuing this requirement would contravene these objectives. Importantly, this does not mean that we sacrifice competitive ISP choice for greater deployment of broadband facilities. Rather, as we have explained above, our reasoned judgment tells us that sufficient marketplace incentives are in place to encourage arrangements with innovative ISPs. Indeed, the incentives are growing as cable modem and wireline providers compete head-to-head with

(continued from previous page)
*Report*, the Commission stated that to continue the further growth of broadband Internet access services, we will need to apply "[m]inimal regulation of advanced telecommunications networks and services." *Fourth Section 706 Report*, at 9.

[238] *USTA II*, 359 F.3d at 578-85; *see Triennial Review Order*, 18 FCC Rcd at 17121, para. 234. Considering these 706 objectives, the Commission imposed only limited unbundling obligations on incumbent LECs' mass market next-generation broadband loop architectures, yet ensured that access to unbundled narrowband facilities was available where appropriate. *Id.* at 17141-54, paras. 272-97.

[239] *See Wold Communications*, 735 F.2d at 1475 (citing *FCC v. WNCN Listeners Guild*, 450 U.S. at 595 (Congress gave the Commission "sweeping authority" over rapidly unfolding enterprises); *CCIA v. FCC*, 693 F.2d at 212; *NARUC I*, 525 F.2d at 645; & *Philadelphia Television Broadcasting Co. v. FCC*, 359 F.2d 282 (D.C. Cir. 1966)) (public interest touchstone permits Commission to substitute marketplace for direct Commission regulation); *see also NCTA v. Brand X*, slip op. at 30 (affirming the Commission's "fresh analysis" of regulations in the wake of changed market conditions).

[240] Our statutory obligations and policy objectives guide us in the direction that maximizes the acceleration of all types of broadband infrastructure deployment. Indeed, Congress specifically directed the Commission to encourage broadband capability "without regard to any transmission media or technology." *See* 47 U.S.C. § 157 nt.

[241] *See, e.g.*, *Wold Communications*, 735 F.2d at 1468 (citing *FCC v. WNCN Listeners Guild*, 450 U.S. at 595 (giving the Commission particular deference with respect to policy judgments and predictions of the direction in which the public interest lies in a "fast-moving field of technology")). Continued *Computer Inquiry* obligations could have a chilling impact not only on the continued deployment of wireline broadband infrastructure, but on other new and innovative technologies.

one another and other platform providers such that wireline platform providers will find it necessary and desirable to negotiate arrangements with unaffiliated ISPs for access to their broadband networks in order to grow the base of users of their broadband infrastructures.

80. Weighing all of these factors, we conclude that the elimination of our *Computer Inquiry* requirements for wireline broadband Internet access service providers, subject to the transitional mechanism described below, best facilitates the accomplishment of our broadband goals and objectives in light of the rapidly changing market conditions for broadband Internet access services.[242] We expect this new framework to enable consumers to reap the benefits of advanced wireline broadband Internet access services that incorporate the latest technologically advanced integrated equipment, on a more widely available and more timely basis than if we maintained the existing regime.

81. In taking this action, we note that some commenters argue that we must undertake a forbearance analysis pursuant to section 10 of the Act before we can remove our *Computer Inquiry* requirements.[243] We do not agree. The Commission is free to modify its own rules at any time to take into account changed circumstances.[244] The *Computer Inquiry* requirements are not mandated by statute but, rather, were adopted prior to the 1996 Act in the exercise of the Commission's policy judgment. Indeed, the Supreme Court affirmed the Commission's determination that the 1996 Act did not "unambiguously freeze[] in time the *Computer II* treatment of facilities based information service providers."[245] As such, in our discretion, subject to reasoned explanation, we are free to alter the policy judgment reflected in those requirements based on our assessment of their relevant costs and benefits in light of changed technological and market conditions.[246]

82. We also find that we need not retain the *Computer Inquiry* regime, or any of its individual requirements, to protect against improper cross-subsidization. When the Commission developed the *Computer Inquiry* rules, wireline carriers, including the BOCs, typically charged rates developed under rate base, cost-of-service regulation. The Commission was concerned that allowing wireline carriers to provide enhanced services would increase the rates captive ratepayers would have to pay for common carrier telecommunications services, as the carriers would have every incentive to include the costs of their enhanced services operations in their cost-of-service calculations for those services. The Commission therefore developed safeguards (*e.g.*, structural separation in *Computer II* and non-structural accounting safeguards in connection with *Computer III*) designed to reduce the potential for improper

---

[242] *See NCTA v. Brand X*, slip op. at 30 (noting the changed market conditions, *i.e.*, the existence of "substitute forms of Internet transmission").

[243] 47 U.S.C. § 160; Letter from Florence Grasso, Covad, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, Attach. at 5 (filed Oct. 21, 2002). This situation is different than what the court examined in *Association of Communications Enterprises v. FCC*, 235 F.3d 662 (D.C. Cir. 2001) (*ASCENT v. FCC*), where the court held that the Commission could not relieve an entity of section 251 obligations without conducting a section 10 analysis.

[244] *NCTA v. Brand X*, slip op. at 9 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 863-64 (1984), for the propositions that an agency interpretation "'is not instantly carved in stone'" but rather the "'agency must consider varying interpretations and the wisdom of its policy on a continuing basis'").

[245] *NCTA v. Brand X*, slip op. at 24 (affirming that the Commission's *Computer II* rules were not a function of statutory definitions, "but instead of a choice by the Commission to regulate more stringently, in its discretion, certain entities that provided enhanced services").

[246] *See NCTA v. Brand X*, slip op. at 15 ("Nothing in the Communications Act or the Administrative Procedure Act makes unlawful the Commission's use of its expert policy judgment to resolve these difficult questions.").

cross-subsidization.[247] In 1994, the Ninth Circuit affirmed the Commission's judgment that the non-structural accounting safeguards had eliminated any need to retain structural separation as a safeguard against cross-subsidization.[248] The court stated, in particular, that price cap regulation had left the BOCs "with little incentive to shift costs" from their enhanced services operations to tariffed telecommunications services because they were not "able to increase regulated rates to recapture those costs."[249]

83. The Commission's ratemaking methods and those of our state counterparts have changed considerably since the Ninth Circuit addressed the need for structural separation as a safeguard against cross-subsidization in 1994.[250] We conclude that changes have further reduced the potential that the BOCs could increase rates for tariffed telecommunications services through cost shifting. Indeed, unlike the situation before the Ninth Circuit in 1994, the BOCs' costs are no longer used to determine the BOCs' price cap rates.[251] In view of this reduced potential, we find that there is no need to retain either the *Computer II* structural separation requirement or the *Computer III* nonstructural safeguards to keep the BOCs from cross-subsidizing their broadband Internet access service operations with revenues from the telecommunications services operations. The benefits we anticipate from the elimination of these structural and nonstructural safeguards, including the increased infrastructure investment that our new framework should generate, outweigh any protection against cross-subsidization that those safeguards provide.

84. Based on the record before us, it is not necessary to make a finding of market non-dominance as to the incumbent LECs in the provision of broadband Internet access transmission, as some parties have asked us to do, before we may eliminate the *Computer Inquiry* obligations. We decline to do so.[252] Nor

---

[247] *See, e.g., Computer II Final Decision*, 77 FCC 2d at 462, para. 205 (structural separation); *Joint Cost Order*, 2 FCC Rcd at 1310-34, paras. 94-289 (non-structural accounting safeguards).

[248] *California III*, 39 F.3d at 926-27; *see also supra* n.80.

[249] *California III*, 39 F.3d at 926.

[250] *See, e.g., Multi-Association Group (MAG) Plan for Regulation of Interstate Services of Non-Price CAP Incumbent Local Exchange Carriers and Interexchange Carriers*, CC Docket No. 00-256, Report and Order and Second Further Notice of Proposed Rulemaking, 19 FCC Rcd 4122, 4153-55, paras. 70-72 (2004) (*MAG Order*) (tracing evolution of our ratemaking from cost-of-service ratemaking through price caps with sharing to the current Coalition for Affordable Local and Long Distance Service (CALLS) regime); Letter from Richard T. Ellis, Director-Federal Regulatory Advocacy, Verizon, to Marlene H. Dortch, Secretary, FCC, at 3 (filed Jan. 6, 2004) (Verizon Jan. 6, 2004 *Ex Parte* Letter) (pointing out that, in most states, cost allocation results do not affect rates for local telephone services).

[251] The price cap plan in place in 1994 contained two mechanisms – "sharing" (which required a price cap carrier to return to ratepayers a portion of earnings above a specified level) and low-end adjustments (which provided for increases in the price cap indices upon a showing that a price cap carrier had earned returns below a specified level in a given year – whose operation would have enabled a BOC to profit from shifting costs to tariffed interstate services. In 1997, the Commission eliminated the sharing mechanism. *See Price Cap Performance Review for Local Exchange Carriers*, CC Docket No. 94-1, Fourth Report and Order, CC Docket No. 96-262, Second Report and Order, 12 FCC Rcd 16642, 16700-03, paras. 148-55 (1997), *aff'd in part & rev'd in part sub nom. USTA v. FCC*, 188 F.3d 521 (D.C. Cir. 1999). In addition, each of BOCs has foregone its opportunity to seek low-end adjustments as a condition of using our pricing flexibility rules to price access services. *See generally MAG Order*, 19 FCC Rcd at 4154, para. 72.

[252] A determination to compel the provision of a service by regulation is not equivalent to a finding that the provider of the service is dominant in the market for that service. Each issue is the subject of a distinct inquiry. Therefore, it (continued . . .)

do we think it necessary or appropriate to make findings about dominance or non-dominance with respect to the retail market for broadband Internet access.[253] The Commission developed its distinction between dominant carriers, which possess individual market power, and non-dominant carriers, which lack individual market power, to enable it to develop a regulatory environment appropriate for a telecommunications industry that was in the early stages of evolving from one "where service was provided largely on a monopoly basis to one where a degree of competition [existed] for the provision of some communications services."[254] As discussed above,[255] this market environment differs markedly from the dynamic and evolving broadband Internet access marketplace before us today where the current market leaders, cable operators and wireline carriers, face competition not only from each other but also from other emerging broadband Internet access service providers. This rapidly changing market does not lend itself to the conclusions about market dominance the Commission typically makes to determine the degree of regulation to be applied to well-established, relatively stable telecommunications service markets.[256] On the contrary, any finding about dominance or non-dominance in this emerging broadband Internet access service market would be premature.

85. In addition, our long-standing *Computer Inquiry* regulations, which apply only to wireline facilities-based carriers, have required wireline carriers to provide wholesale transmission for Internet access, whether broadband or narrowband, since the genesis of the Internet. This mandated participation by these providers has affected the wholesale market for broadband Internet access transmission. Applying a traditional market dominance analysis to a situation where the facilities-based wireline carriers have been required to provide service on specified terms and conditions while the market was still relatively undefined (and remains dynamic and evolving even today) would lead to a result that would be misleading and could be self-fulfilling. Therefore, we believe that a conclusive finding about dominance or non-dominance of these carriers in this context is ill-suited and inappropriate. Instead, for an emerging market that cannot be characterized with certainty at this particular point in time, and will likely be subjected to rapid technological and competitive developments, we find that the public interest is best served if we permit competitive marketplace conditions to guide the evolution of broadband Internet access service.[257]

(continued from previous page)
is not necessary that we affirmatively find incumbent LECs to be non-dominant as a prerequisite to taking the steps set forth in this Order.

[253] Were we to do so, however, given the relative market share of cable modem service providers *vis-à-vis* wireline broadband Internet access service providers, we find it highly unlikely that wireline broadband Internet access service providers would be found to be dominant.

[254] *Policies and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor*, CC Docket No. 79-252, Notice of Inquiry and Proposed Rulemaking, 77 FCC 2d 308, 309 (1979) (*Competitive Carrier NOI and NPRM*). Dominant carriers under Title II are subject to a broad range of regulatory requirements that are generally intended to protect consumers from unjust and unreasonable rates, terms, and conditions, and unreasonable discrimination in the provision of regulated services. In contrast, non-dominant carriers now are subject to significantly reduced regulation.

[255] *See supra* Part V.B.2.a.

[256] The analysis we conduct in this Order is different from the impairment analysis we relied upon in the *Triennial Review Order*, which also considered generally the potential market power of the incumbent LEC.

[257] *See, e.g.*, CompTel 01-337 Comments at 3 (maintaining that "[t]he broadband market is in a state of flux, and any market delineations that may tentatively exist today could be changed or eliminated tomorrow").

### C. New Regulatory Framework for Wireline Broadband Internet Access Service Providers

86. We adapt our regulatory requirements, consistent with the Act, to correct for restrictions on wireline broadband Internet access service providers' ability to incorporate advanced integrated technology into their broadband offerings, impediments to responding rapidly and efficiently to changing broadband market demands due to outdated existing rules,[258] and constraints on broadband innovation and infrastructure investment.[259] We eliminate the *Computer Inquiry* obligations as applied to facilities-based providers of wireline broadband Internet access service, and, in particular, the obligation to offer the transmission component of wireline broadband Internet access service on a stand-alone common carrier basis. Facilities-based wireline broadband Internet access service providers, subject to a one-year transition period which we also adopt, may choose to offer the transmission component of wireline broadband Internet access services to both affiliated and unaffiliated ISPs or others on a non-common carrier basis or a common carrier basis.[260] We incorporate this flexibility into our new framework to account for the differing business issues affecting different wireline broadband Internet access service providers. For example, associations of rural incumbent LECs have indicated that their members may choose to offer broadband Internet access transmission service on a common carrier basis.[261] Thus, unlike previous Commission initiatives (*e.g.*, the deregulation of CPE),[262] we are not eliminating carriers' ability to offer wireline broadband transmission on a Title II basis. Indeed, as we discuss below, enabling carriers to offer broadband Internet access transmission in alternative ways furthers our policy objectives and is consistent with precedent.

#### 1. Wireline Broadband Internet Access Service Providers May Offer Transmission Service on a Non-Common Carrier Basis or a Common Carrier Basis

##### a) Non-Common Carriage Arrangements

87. The record demonstrates that allowing non-common carriage arrangements for wireline broadband transmission will best enable facilities-based wireline broadband Internet access service providers, particularly incumbent LECs, to embrace a market-based approach to their business relationships with ISPs, providing the flexibility and freedom to enter into mutually beneficial commercial arrangements with particular ISPs.[263] Facilities-based wireline carriers as well as certain

---

[258] *See supra* Part V.B.2.b (discussing the current constraints on innovative integrated broadband offerings)

[259] *E.g.*, SBC Comments at 25 ("Not only do the existing requirements limit the way wireline broadband providers may design and engineer their facilities, they also constrain the way such providers structure their relationships with ISPs"); *see, e.g.*, BellSouth Comments at 19-20; Verizon Comments at 18-21; SBC Reply at 22-23; USTA Apr. 2, 2003 *Ex Parte* Letter at 3.

[260] As discussed in paragraphs 98-99 below, existing common carrier wireline broadband Internet access transmission service offerings provided to current ISP and other customers must continue to be made available to those customers during the one-year transition period.

[261] *See, e.g.*, Letter from L. Marie Guillory, NTCA, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, Attach. at 1 (filed Mar. 7, 2003) (NTCA Mar. 7, 2003 *Ex Parte* Letter).

[262] *See Computer II Final Decision*, 77 FCC 2d at 438-47, paras. 140-60 (explaining that CPE must be de-tariffed because it is a commodity severable from the provision of transmission services and because the offering of CPE in conjunction with regulated services has a direct effect on rates charged for the services).

[263] *See, e.g.*, BellSouth Apr. 2, 2003 *Ex Parte* Letter, Attach. at 3 (stating that contract carriage increases the ability of customers to negotiate service arrangements that best address their particular needs); SBC Mar. 7, 2003 *Ex Parte* Letter at 9, 13; *see also supra* n.222.

portions of the ISP community and broadband equipment manufacturers agree that market-based commercial arrangements will better serve the interests of ISPs, broadband providers, and consumers.[264]

88. Non-common carriage contracts will permit ISPs to enter into various types of compensation arrangements for their wireline broadband Internet access transmission needs that may better accommodate their individual market circumstances.[265] For example, ISPs and facilities-based carriers could experiment with revenue-sharing arrangements or other types of compensation-based arrangements keyed to the ISPs' marketplace performance, enabling the ISPs to avoid a fixed monthly recurring charge (as is typical with tariffed offerings) for their transmission needs during start-up periods.[266] Non-common carriage also enables parties to a contract to modify their arrangement over time as their respective needs and requirements change without the inherent delay associated with a tariffed offering that must be made available to all ISPs.[267] Moreover, it encourages other types of commercial arrangements with ISPs, reflecting business models based on risk sharing such as joint ventures or partnership-type arrangements, where each party brings their added value, benefiting both the consumer (through the ability to obtain a new innovative service) and each party to the commercial arrangement.[268] Such arrangements may also encourage unaffiliated ISPs to develop innovative applications and services that differentiate them from other ISPs. The ability to deliver such innovative services over their platforms in order to attract customers will likely motivate wireline facilities-based broadband transmission providers to negotiate mutually beneficial arrangements that enable the wireline facilities-based broadband transmission provider to share the financial rewards of bringing the new Internet access applications or services to consumers.

### b) Common Carriage Offerings

89. A number of parties have indicated that some carriers may nevertheless choose to offer the transmission component of broadband Internet access service as a common carrier service absent the *Computer Inquiry* requirements.[269] Other parties have indicated they would avail themselves of the

---

[264] *See, e.g.*, Alcatel Comments at 10; SBC Reply (attaching memorandum of understanding between SBC and USIIA, dated May 2, 2002); *see also* BellSouth Comments at 20-22; HTBC Reply at 6-7.

[265] For example, certain unaffiliated ISP niche-market providers develop service applications tailored to particular customer market segments (*e.g.*, health care providers, the real estate industry, and corporate telecommuters) providing features such as enhanced security that can only occur on the ISP side of the Internet. We expect that non-common carrier arrangements will encourage the development of greater niche-market services as ISPs negotiate customized arrangements that pair their specialized niche offerings with the BOCs' transmission capabilities.

[266] *See, e.g.*, Verizon May 20, 2003 *Ex Parte* Letter, Attach. at 17; Verizon Nov. 25, 2002 *Ex Parte* Letter, Attach. at 5.

[267] Verizon May 20, 2003 *Ex Parte* Letter, Attach. at 17; *see also* BellSouth Apr. 2, 2003 *Ex Parte* Letter, Attach. at 3.

[268] *See, e.g., Cable Modem Declaratory Ruling*, 17 FCC Rcd 4828-29, paras 52-53 (discussing various types of non-common carriage arrangements between cable modem broadband providers and unaffiliated ISPs); *see also* Verizon June 26, 2003 *Ex Parte* Letter at 4.

[269] *See, e.g.*, Letter from Richard A. Askoff, Executive Director, Regulatory and Government Relations, NECA, Dan Mitchell, Vice President, Legal and Industry, NTCA, Stuart Polikoff, Director of Government Relations, OPASTCO, David W. Zesiger, Executive Director, ITTA, James W. Olson, Vice President, Law & General Counsel, USTA, & Derrick Owens, Director of Government Affairs, Western Telecommunications Alliance, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, Attach. at 1-2 (filed July 22, 2005) (NECA July 22,
(continued . . .)

opportunity to offer certain types of broadband Internet access transmission on a common carrier basis and other types of broadband Internet access transmission on a non-common carrier basis.[270] Our primary goal in this proceeding is to facilitate broadband deployment in the manner that best promotes wireline broadband investment and innovation, and maximizes the incentives of all providers to deploy broadband. We find that we can best further this goal by providing all wireline broadband providers the flexibility to offer these services in the manner that makes the most sense as a business matter and best enables them to respond to the needs of consumers in their respective service areas.

90. We therefore conclude that providers of wireline broadband Internet access service that offer that transmission as a telecommunications service after the effective date of this Order may do so on a permissive detariffing basis.[271] Such providers thus may, in lieu of filing tariffs with the Commission setting forth the rates, terms, and conditions under which they will provide broadband Internet access transmission service, include those rates, terms, and conditions in generally available offerings posted on their websites.[272] Each such provider electing not to tariff the broadband Internet access transmission that it offers as a telecommunications service also must make physical copies of its offering reflecting the rates, terms and conditions available for public inspection at a minimum of one place of business.

91. While we do not believe that we need to perform a forbearance analysis under section 10 of the Act to allow permissive detariffing,[273] we find that each of the three forbearance criteria is nonetheless met. Specifically, the reasons that persuade us not to require that the transmission component of wireline broadband Internet access service be offered as a telecommunications service under Title II also persuade

(continued from previous page)
2005 *Ex Parte* Letter); NTCA Mar. 7, 2003 *Ex Parte* Letter at 2. These associations, which represent rural incumbent LECs, indicate that their members may choose to offer some wireline broadband transmission on a common carrier basis even if we eliminate the *Computer Inquiry* requirements. These associations also explain that their members' progress in deploying broadband in rural areas to date has been attributable to an ability to lower the costs of deployment through participation in the National Exchange Carrier Association, Inc. (NECA) pooling arrangements or other tariffed rate structures that reflect rate of return regulation. *See, e.g.*, NCTA Mar. 7, 2003 *Ex Parte* Letter at 2. To participate in a NECA pool, a carrier must offer an interstate telecommunications service pursuant to a federally filed, NECA tariff that contains the same rates, terms, and conditions of service for all participating carriers. The rates for these services are based on the pooled or averaged costs of each participating carrier. Without the ability to continue tariffing broadband transmission services, rural incumbent LECs explain that they would be unable to afford the investment necessary to deploy facilities necessary to provide broadband Internet access services.

[270] For example, Qwest has indicated it may continue offering a common carrier DSL transmission service to end users (*i.e.*, its current retail "DSL+" transmission service), while entering into individually tailored arrangements with ISPs for other types of broadband transmission. *See* Qwest May 23, 2003 *Ex Parte* Letter, Attach. at 3-5 (describing Qwest's "DSL+" access offering); *see also infra* para. 95 (specifying that a facilities-based wireline broadband Internet access provider may not simultaneously offer the same type of broadband Internet access transmission on both a common carrier and a non-common carrier basis).

[271] *See infra* paras. 98-101 (explaining the one-year transition and granting blanket certification to discontinue the provision of common carrier broadband Internet access transmission services to existing customers).

[272] Carriers electing to offer new transmission services on a permissive detariffing basis must comply with section 63.71 if they later decide to cease offering such service on a common carrier basis. By contrast, carriers electing permissive detariffing for existing transmission services during the transition period are covered by our blanket certification to discontinue the provision of those existing common carrier broadband Internet access transmission services. *See infra* para. 101.

[273] 47 U.S.C. § 160.

us that application of the tariffing provisions in Title II is "not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory" within the meaning of section 10(a)(1).[274] In particular, competition from other broadband Internet access service providers, particularly cable modem service providers, will pressure wireline carriers that choose to provide broadband Internet access transmission as a common carrier service to offer their customers rates, terms, and conditions that are just, reasonable, and not unreasonably discriminatory. These carriers, like wireline carriers that offer broadband Internet access transmission on a non-common carrier basis, will have business incentives to attract both end user and ISP customers to their networks in order to spread network costs over as much traffic and as many customers as possible.[275] These incentives, in combination with the requirements that the carrier publish and make generally available any rates, terms, and conditions for broadband Internet access transmission offered on a common carrier basis,[276] should provide protection against unjust, unreasonable, and unjustly or unreasonably discriminatory rates, terms, and conditions comparable to that available under a tariffing regime.

92. The need to attract end user and ISP customers also makes clear that tariffing "is not necessary for the protection of consumers" within the meaning of section 10(a)(2).[277] On the contrary, permissive detariffing will enable broadband Internet access service providers to respond to changing consumer demands more quickly than would be possible under a tariffing regime. Thus, in comparison to a mandatory tariffing regime, permissive detariffing will benefit consumers by making it more likely that they will be offered innovative service arrangements responding to their changing needs.

93. Finally, the public interest considerations that persuade us not to mandate a telecommunications service offering in the first place also persuade us that a permissive tariffing regime for voluntary broadband Internet access telecommunications service offerings "is consistent with the public interest" within the meaning of section 10(a)(3).[278] In particular, we find that mandatory tariffing of these voluntary offerings would unnecessarily constrain how wireline carriers may offer broadband Internet access transmission as a telecommunications service. We also find that by removing this unnecessary constraint, permissively detariffing these telecommunications service offerings will promote competitive market conditions. Since we find that each of the statutory forbearance criteria is met, we forbear from application of these tariffing provisions in Title II to voluntary offerings of broadband Internet access transmission as a telecommunications service.[279]

94. Consequently, to enable facilities-based wireline Internet access providers to maximize their ability to deploy broadband Internet access services and facilities in competition with other platform providers, under a regulatory framework that provides all market participants with the flexibility to determine how best to structure their business operations, facilities-based carriers are able to choose whether to offer wireline broadband Internet access transmission as non-common carriage or common carriage. In addition, to the extent they choose to offer that transmission as common carriage, they may do so either under tariff or on a non-tariffed basis. The Commission, on numerous occasions, has

[274] 47 U.S.C. § 160(a)(1).

[275] *See supra* Part V.B.2.d.

[276] *See supra* para. 90.

[277] 47 U.S.C. § 160(a)(2).

[278] 47 U.S.C. § 160(a)(3).

[279] 47 U.S.C. §§ 203-05.

determined that a particular service can be offered on a non-common carrier or common carrier basis at the service provider's option.[280] Similarly, here, we conclude that it is appropriate to provide facilities-based wireline broadband Internet access service providers with freedom to determine how to provide the broadband transmission capabilities of such services.[281]

95. In order to ensure that this flexible approach is consistent with statutory requirements, efficient, and administrable, we specify that a facilities-based wireline broadband Internet access provider may not simultaneously offer the same type of broadband Internet access transmission on both a common carrier and non-common carrier basis. It may, however, choose to make available one type of broadband Internet access transmission on a common carrier basis and *another type of such transmission* on a non-common carrier basis. Of course, any transmission offering that a facilities-based wireline broadband Internet access provider makes available on a tariffed common carrier basis will be subject to the terms contained in its tariff and, consistent with Title II of the Act, the provider may charge customers for that service only at the rates contained in the tariff.[282]

[280] In several prior instances, the Commission has permitted carriers to decide how to offer a service (*i.e.*, as non-common or common carriage). *See, e.g.*, 47 C.F.R. §§ 27.10 (designated wireless communication services), 90.1309 (wireless broadband services); 101.533 (24 GHz fixed microwave services); 101.1017 (local multipoint distribution service). In an order concerning multichannel video and data distribution service, for example, the Commission found that "the option of choosing either common carrier and/or non-common carrier status will provide maximum flexibility and restrict unnecessary regulatory burden for this service." *See Amendment of Parts 2 and 25 of the Commission's Rules to Permit Operation of NGSO FSS Systems Co-Frequency with GSO and Terrestrial Systems in the Ku Band Frequency Range*, ET Docket No. 98-206, RM-9147, RM-9245, Memorandum Opinion and Order and Second Report and Order, 17 FCC Rcd 9614, 9676, para. 157 (2002). Similarly, with respect to wireless carriers, the Commission stated that it will "allow the service offering selected by a [wireless communications service] licensee to determine its regulatory status." *See Wireless Operations in the 3650-3700 MHZ Band*, ET Docket No. 04-151; *Rules for Wireless Broadband Services in the 3650-3700 MHZ Band*, ET Docket No. 05-96; *Additional Spectrum for Unlicensed Devices Below 900 MHZ and in the 3 GHZ Band*, ET Docket No. 02-380; *Amendment of the Commission's Rules with Regard to the 3650-3700 MHZ Government Transfer Band*, ET Docket No. 98-237, Report and Order and Memorandum Opinion and Order, 20 FCC Rcd 6502, paras. 35-36 (2005) (allowing providers to offer wireless broadband services on a common carrier or non-common carrier basis because such an approach will provide them with the greatest flexibility to use the spectrum for service applications that are best suited for their needs, and encourage multiple entrants and stimulate expansion of wireless broadband services); *Amendment of the Commission Rules to Establish Part 27, the Wireless Communications Service ("WCS")*, GN Docket No. 96-228, Report and Order, 12 FCC Rcd 10785, 10847-48, paras, 120 & 122 (1997); *see also Amendment to the Commission's Regulatory Policies Governing Domestic Fixed Satellites and Separate International Systems*, IB Docket No. 95-41, Report and Order, 11 FCC Rcd 2429, 2436, paras. 45-50 (1996) (giving fixed satellite service operators the choice of operating as common carriers or non-common carriers, and allowing the opportunity to elect their regulatory classifications in their applications). In this latter order, the Commission modified its policy set forth in the *Transponder Sales Order* by concluding that market forces had eliminated any need to require domestic satellite licensees to provide capacity on a common carrier basis. *Id.* at 2436, paras. 45-46 & 49 (citing *Transponder Sales Order*, 90 FCC 2d at 1252).

[281] *See infra* paras. 87-88.

[282] *See Orloff v. FCC*, 352 F3d 415, 418 (D.C. Cir. 2003) (*citing MCI Telecom. Corp. v. AT&T*, 512 U.S. 218, 220 (1994)).

**c) Other Proposed Alternative Regulations for Wireline Broadband Internet Access Services**

96. Some commenters request that we impose certain content-related requirements on wireline broadband Internet access service providers that would prohibit them from blocking or otherwise denying access to any lawful Internet content, applications, or services a consumer wishes to access.[283] While we agree that actively interfering with consumer access to any lawful Internet information, products, or services would be inconsistent with the statutory goals of encouraging broadband deployment and preserving and promoting the open and interconnected nature of the public Internet,[284] we do not find sufficient evidence in the record before us that such interference by facilities-based wireline broadband Internet access service providers or others is currently occurring. Nonetheless, we articulate principles recognizing the importance of consumer choice and competition in regard to accessing and using the Internet: the *Internet Policy Statement* that we adopt today adopts such principles.[285] We intend to incorporate these principles into our ongoing policymaking activities.[286] Should we see evidence that providers of telecommunications for Internet access or IP-enabled services are violating these principles, we will not hesitate to take action to address that conduct.[287]

97. Finally, as noted above, some commenters, in acknowledging that the current *Computer Inquiry* regime is outdated, propose more streamlined regulatory requirements for wireline broadband Internet access service.[288] They seek to retain the core Title II principle underlying the *Computer Inquiry* obligations (*i.e.,* the requirement to separate out and offer any broadband Internet access transmission capabilities and services on a nondiscriminatory basis to *all* ISPs).[289] As the record demonstrates,

---

[283] *See, e.g.*, Letter from Gerard J. Waldron, Coalition of Broadband Users and Innovators, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, at 1-2 (filed Aug. 27, 2003); Letter from Amy L. Levine, Counsel to Amazon.com, Covington & Burling, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, at 1-2 (filed May 21, 2003).

[284] *See Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, CC Docket No. 02-33, Policy Statement, FCC 05-151 (rel. Sept. 23, 2005) (*Internet Policy Statement*).

[285] *Id.* at para. 5.

[286] *Id.* at para. 6.

[287] Federal courts have long recognized the Commission's authority to promulgate regulations to effectuate the goals and accompanying provisions of the Act in the absence of explicit regulatory authority, if the regulations are reasonably ancillary to the effective performance of the Commission's various responsibilities. *See United States v. Southwestern Cable Co.*, 392 U.S. 157, 178 (1968) (*Southwestern Cable*); *see also FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979) (*Midwest Video II*); *United States v. Midwest Video Corp.*, 406 U.S. 649 (1972) (*Midwest Video I*); *Promotion of Competitive Networks in Local Telecommunications Markets, Wireless Commun. Ass'n Int'l, Inc., Petition to Amend Section 1.4000 of the Commission's Rules*, WT Docket No. 99-217, First Report and Order and Further Notice of Proposed Rulemaking, 15 FCC Rcd 22983, 23028-29, para. 101 & n.261 (2000) (*Competitive Networks*). In this regard, we note that the Enforcement Bureau recently entered into a consent decree to resolve an investigation with respect to the blocking of ports used for VoIP. *See Madison River LLC and Affiliated Companies*, File No. EB-05-IH-0110, Order, 20 FCC Rcd 4295 (Enf. Bur. 2005) (adopting a consent decree terminating an investigation into Madison River's compliance with section 201(b) regarding the unlawful blocking of ports used for VoIP applications).

[288] *See supra* para. 42.

[289] *Id.* The *Earthlink et al. Streamlining Proposal* would eliminate CEI's nine parameters and procedural requirements and ONA's unbundling obligations, reporting requirements, and BSE and BSA tariffing requirements. The underlying nondiscriminatory access obligations would be retained such that BOCs would be obligated to (continued . . .)

however, the inability to customize broadband service offerings inherent in the nondiscriminatory access requirement impedes deployment of innovative wireline broadband services taking into account technological advances and consumer demand.[290] Thus, continuing to impose such requirements would only perpetuate wireline broadband Internet access providers' inability to make better use of the latest integrated broadband equipment and would deprive consumers of more efficient and innovative enhanced services.[291] Similarly, a continued obligation to provide any new broadband transmission capability to all ISPs indiscriminately, and provide advance notice thereof, would reduce incentives to develop innovative wireline broadband capabilities and places wireline broadband at a substantial competitive disadvantage *vis-à-vis* cable modem and other broadband Internet access service providers.[292] Thus, we reject these proposals.

### 2. Current Title II Unbundled Wireline Broadband Internet Access Transmission Services Must Remain Available During a One-Year Transition Period

98. Although we determine above that immediate relief for wireline broadband Internet access transmission providers is warranted, we are nonetheless sensitive to the fact that the Commission's previous regulatory regime for these services has created reasonable reliance and expectation by unaffiliated ISPs on the availability of currently tariffed, broadband Internet access transmission offerings.[293] In addition, we are concerned that a flash-cut transition may unnecessarily disrupt customers' service due to a provider's inability to adapt its business practices so quickly. We therefore adopt a one-year transition period, which begins on the effective date of this Order, in order to give both ISPs and facilities-based wireline broadband Internet access transmission providers sufficient time to adjust to our new framework.[294] During the transition, facilities-based wireline broadband Internet access

(continued from previous page)
provide all of their broadband transmission services and capabilities to all ISPs on just, reasonable and nondiscriminatory rates, terms and conditions, including any offerings made pursuant to individual contracts with ISPs, as well as other access-related obligations such as access to electronic OSS, databases and other systems. In addition, BOCs would be required to develop new broadband transmission capabilities upon reasonable request by an ISP within 90 days. This proposal would, however, permit streamlined tariff or web posting requirements for transmission access services, but would still require advance notification of new or changed aspects of their transmission capabilities. *Earthlink et al. Streamlining Proposal, passim.*

[290] *See, e.g.*, Verizon June 26, 2003 *Ex Parte* Letter at 6-7 (noting that these proposed streamlined changes "do nothing to deal with the fundamental problems . . . that Verizon is unable to provide customers specially designed arrangements, specially designed terms and conditions or experimental offerings").

[291] *See id.* at 7; *see also supra* paras. 65-70 (discussing impact of unbundling obligation on ability to implement integrated equipment into offerings).

[292] *See, e.g.*, Verizon June 26, 2003 *Ex Parte* Letter at 6-7; *see also supra* para. 71 (discussing impact of nondiscrimination requirement on ability to respond to individualized requests.)

[293] *See, e.g.*, Big Planet Comments at 15; Covad Reply at 20-21; EarthLink Reply at 17-20, 22; *see also, e.g.*, *CompTel v. FCC*, 117 F.3d 1068 (8th Cir. 1997) (stating that although temporary agency rules are subject to judicial review notwithstanding their transitory nature, substantial deference by courts is accorded to an agency when the issue concerns interim relief); *CompTel v. FCC*, 87 F.3d 522, 531 (D.C. Cir. 1996); *MCI v. FCC*, 750 F.2d 135, 140 (D.C. Cir. 1984). We note, however, that some ISPs have already engaged in contractual arrangements with facilities-based wireline broadband providers that enable them to obtain not only broadband transmission but also other enhanced services associated therewith. *See supra* para. 74.

[294] *See, e.g.*, SBC and USIIA May 3, 2002 *Ex Parte* Letter, Attach. at 2 (SBC and USIIA memorandum of understanding providing that SBC is willing to grandfather existing agreements with ISPs for their remaining term or one year, at the choice of the ISP); *see also* HTBC Reply at 7 (proposing a two-year period of non-common
(continued . . .)

transmission providers must continue to honor existing transmission arrangements with their current ISP or other customers, but they are not required to offer such arrangements to new customers or to existing customers at new locations. If these arrangements are provided pursuant to tariffs currently on file with the Commission, wireline broadband Internet access transmission providers may retain these tariffs during the one-year period, or, alternatively, they may cancel the tariffs pursuant to normal tariff cancellation procedures provided they honor existing wireline broadband Internet access transmission arrangements in another manner. To the extent facilities-based wireline broadband Internet access transmission providers have entered into any other common carrier transmission arrangements with ISP customers that are not subject to tariffing,[295] these arrangements must also be continued during the one-year transition unless, of course, they would otherwise expire during the transition period pursuant to their pre-existing terms. Upon the effective date of this Order, facilities-based wireline broadband Internet access providers, including the BOCs and their affiliates, are no longer required to continue taking the existing common carrier transmission arrangements that they provide to ISPs as an input to their self-provided wireline broadband Internet access service. To the extent facilities-based carriers offer new wireline broadband Internet access transmission arrangements after the effective date of this Order or provide such service to new customers, these arrangements may be made available on a common carrier basis or a non-common carrier basis as set forth above.[296]

99. This one-year period will allow ISPs to continue operating under their current arrangements while they negotiate non-common carrier agreements with providers of wireline broadband Internet access transmission. Based on the assurances made by facilities-based wireline broadband Internet access providers and their stated desire to ensure that their platform is competitive with other broadband platforms, we strongly encourage the parties to work together to develop individual contracts that are mutually beneficial to each party.[297] In the meantime, the ability to continue operating under existing

(continued from previous page)
carriage coupled with, *inter alia*, the requirement that incumbent LECs honor their existing transmission arrangements with unaffiliated ISPs).

[295] *See, e.g., SBC Advanced Services Forbearance Order*, 17 FCC Rcd at 27008-16, paras. 13-28 (allowing SBC to provide advanced services on a detariffed basis to the extent SBC operates in accordance with a specified separate affiliate structure and other safeguards and commitments). SBC may already offer the transmission component of wireline broadband Internet access service on a detariffed basis. Any common carrier broadband Internet access transmission arrangements that an SBC affiliate has with an existing customer pursuant to the *SBC Advanced Services Forbearance Order* also are subject to this one-year transition.

[296] As defined in section 61.3(x) of our rules, a "new service offering" is one that "provides for a class or sub-class of service not previously offered by the carrier involved and that enlarges the range of service options available to ratepayers." 47 C.F.R. § 61.3(x). Consistent with this rule, we determine that an existing offering, for purposes of the transition, is one that was available, by tariff or by other similar means, to unaffiliated ISPs and other customers as of the date this Order is released. We note that we expect our actions in this Order to increase wireline providers' incentive and ability to deploy new broadband Internet access services. *See infra* Part V.B.2.c.

[297] *See supra* paras. 74-75; Letter from L. Barbee Ponder IV, Senior Regulatory Counsel-D.C., BellSouth, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 02-33, at 3 (filed Apr. 20, 2004); SBC July 31, 2003 *Ex Parte* Letter at 7 ("The reason SBC has made an express commitment to continue offering independent ISPs commercial access arrangements in a deregulated environment is that SBC benefits from having independent ISPs as additional sales channels for its broadband services."); Verizon June 26, 2003 *Ex Parte* Letter at 3 ("Verizon recognizes the substantial value of providing wholesale broadband offerings to ISPs and intends to provide unaffiliated ISPs private carriage access to Verizon's network."); SBC and USIIA May 3, 2002 *Ex Parte* Letter at 1 & Attach. at 2 (SBC and USIIA memorandum of understanding dated May 2, 2003); *see also* Qwest May 23, 2003 *Ex Parte* Letter at 1, Attach. at 2 (indicating that consumers prefer having a choice of ISPs).

arrangements for an additional one-year period during new contract negotiations will avoid unnecessary customer disruption. Such a transition period is consistent with previous decisions in which the Commission modified the regulatory framework for certain services subject to a transition.[298] Indeed, several parties, including most BOCs, that urge elimination of the *Computer Inquiry* rules support a transition.[299] Here, as in these other proceedings, a transition period will allow sufficient time for all affected parties to adjust to the new framework without unnecessary disruption and without unduly extending the old framework.

### 3. Discontinuation of Service

100. Section 214(a) of the Act requires that, prior to discontinuing any interstate or foreign telecommunications service, a telecommunications carrier obtain from the Commission "a certification that neither the present nor future public convenience or necessity will be adversely affected thereby."[300] The reasons that persuade us not to require that the transmission component of wireline broadband Internet access service continue to be offered as a telecommunications service under Title II also persuade us that discontinuance of the provision of common carrier broadband Internet access transmission services to existing customers would not adversely affect the present or future public convenience or necessity. Instead, competition from other broadband Internet access service providers and the wireline providers' business incentives to attract ISP customers should ensure the continued availability of this transmission component, under reasonable rates, terms, and conditions.[301] Accordingly, we find that the circumstances here meet our test for determining whether a telecommunications service may be discontinued under section 214(a).[302]

---

[298] *See, e.g.*, *Computer II Final Decision*, 77 FCC 2d at 488, para. 266 (establishing a two-year transition period for carriers to restructure manner in which they were providing existing services affected by the new resale structure); *see also Triennial Review Order*, 18 FCC Rcd at 17137-41, paras. 264-69 (finding that a transitional mechanism is an effective means to implement a new regulatory regime and that section 201(b) gives the Commission broad authority to adopt a three-year transition for line sharing); *id.* at 17312-13, para. 525, 528-32 (adopting a transition plan to migrate the existing unbundled local circuit switching customer base to alternative service arrangements when unbundled local circuit switching was no longer available); *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996; Intercarrier Compensation for ISP-Bound Traffic*, 16 FCC Rcd 9151, 9186-87, paras. 77-78 (2001) (establishing a three-year interim intercarrier compensation regime for ISP-bound traffic to avoid a "flash cut" to a new compensation regime).

[299] *See, e.g.*, HTBC Reply at 7-8; *see also* Letter from Robert T. Blau, Vice President-Executive and Federal Regulatory Affairs, BellSouth, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, at 1-2 (filed Sept. 29, 2003); Letter from W. Scott Randolph, Director-Regulatory Affairs, Verizon, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, Attach. at 1-2 (filed Sept. 29, 2003); Letter from James C. Smith, Senior Vice President, SBC, to Michael K. Powell, Chairman, FCC, CC Docket No. 02-33, at 1-2 (filed Sept. 29, 2003); Letter from Gary Lytle, Vice President-Federal Relations, Qwest, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, at 1-3 (filed Sept. 30, 2003) (all supporting the HTBC proposed two-year transition plan).

[300] 47 U.S.C. § 214(a).

[301] *See supra* para. 91 (finding that mandatory tariffing of broadband Internet access telecommunications service offerings is not necessary to ensure that the rates, terms, and conditions for those offerings are just, reasonable, and not unjustly or unreasonably discriminatory).

[302] In evaluating discontinuance requests, the Commission considers a number of factors including: (1) the financial impact on the common carrier of continuing to provide the service; (2) the need for the service in general; (3) the need for the particular facilities in question; (4) the existence, availability, and adequacy of alternatives; and (5) increased charges for alternative services, although this factor may be outweighed by other considerations. *See* (continued . . .)

101. Therefore, pursuant to our rule for discontinuing domestic telecommunications services,[303] we grant facilities-based, wireline broadband Internet access transmission providers blanket certification to discontinue providing existing customers the common carrier broadband Internet access transmission services that are the subject of this Order,[304] subject to the following conditions.[305] First, to protect these customers against abrupt termination of service, we require that a carrier discontinuing common carrier broadband Internet access transmission service shall provide affected customers with advance notice of the discontinuance. Specifically, the carrier shall provide all affected customers with its name and address, the date of the planned discontinuance, the geographic areas where service will be discontinued, and a brief description of the service to be discontinued.[306] In addition, on or after the date it provides the advance notice to its customers and at least 30 days prior to the date on which service will be discontinued, the carrier must file with the Commission notice of its intent to discontinue service.[307] Carriers are not required to make any showing in this notice and do not need to obtain any additional permission from the Commission to cease service.[308] Upon notification of discontinuance, the Commission reserves the right to take actions where appropriate under the circumstances to protect the public interest.[309]

(continued from previous page)
*Verizon Telephone Companies, Section 63.71 Application to Discontinue Expanded Interconnection Service Through Physical Collocation*, WC Docket No. 02-237, Order, 18 FCC Rcd 22737, 22742, para. 8 (2003); *Application for Authority Pursuant to Section 214 of the Communications Act of 1934 to Cease Providing Dark Fiber Service*, File Nos. W-P-C-6670 and W-P-D-364, 8 FCC Rcd 2589, 2600, para. 54 (1993) (*Dark Fiber Order*), *remanded on other grounds, Southwestern Bell v. FCC*, 19 F.3d 1475 (D.C. Cir. 1994). Here, requiring that wireline carriers continue to provide existing customers with the transmission component of wireline broadband Internet access service as a telecommunications service would harm the public interest by impeding the deployment of innovative broadband infrastructure and services responsive to consumer demands. *See supra* paras. 79-80.

[303] 47 C.F.R. § 63.71(c).

[304] *See supra* para. 9 (describing the scope of this Order).

[305] This discontinuance could occur at the end of the transition period or, provided that all existing customers of the grandfathered wireline broadband transmission service at issue have transitioned to some other type of service arrangement, sometime during the transition period. *See supra* para. 98.

[306] *See* 47 C.F.R. § 63.71(a)(1)-(a)(4). While we note that the affected customers typically will be ISPs that use the common carrier broadband Internet access transmission service as an input for the broadband Internet access services they offer end users, carriers may have other customers that also use these existing services. *See, e.g., supra* note 270 (describing Qwest's "DSL+" service).

[307] *See* 47 C.F.R. § 63.71(b). The carrier may provide this notice to the Commission at any time after the effective date of this Order. This notice shall be filed in CC Docket No. 02-33 and shall be captioned, "Notice of Discontinuance of Common Carrier Broadband Internet Access Transmission Service." The notice shall include, in addition to the information set forth in the notice provided affected customers, a brief description of the dates and methods of notice to those customers. *See* 47 C.F.R. § 63.71(b). The carrier shall submit copies of this notice to the state public utility commission and the Governor of each State in which service is to be discontinued as well as to the Special Assistant for Telecommunications at the Department of Defense. *See* 47 C.F.R. § 63.71(a).

[308] This Order provides carriers all necessary authority to cease providing to existing customers the common carrier broadband Internet access transmission services that are the subject of this Order.

[309] In the Notice of Proposed Rulemaking we adopt today, we seek comment on whether we should exercise our Title I authority to impose section 214-type requirements on providers of broadband Internet access service to protect end users from service discontinuance without notice. *See infra* Part VIII.E.

### D. Classification of Wireline Broadband Internet Access Transmission Component

102. Above, we affirm that wireline broadband Internet access service is an information service, and decline to continue the reflexive application of the *Computer Inquiry* regime to facilities-based providers of such service. This is not, however, the end of our inquiry. The *Wireline Broadband NPRM* also sought comment on the legal classification of the transmission component underlying facilities-based wireline broadband Internet access service.[310] In contrast to the classification of wireline broadband Internet access service as an information service,[311] there is considerable disagreement in the record as to the appropriate classification of the transmission component of such Internet access service.[312] The legal classification of this transmission component has certain regulatory implications for its provider. Specifically, if the transmission component is a telecommunications service under the Act,[313] providers of that service are subject to common carrier regulation under Title II of the Act in their provision of that service.[314] Conversely, if the transmission component is not a telecommunications service under the Act, providers of that component are not subject to Title II requirements,[315] except to the extent the Commission imposes similar or identical obligations pursuant to its Title I ancillary jurisdiction.[316]

103. We address two circumstances under which the statutory classification of the transmission component arises: the provision of transmission as a wholesale input to ISPs (including affiliates) that provide wireline broadband Internet access service to end users, and the use of transmission as part and parcel of a facilities-based provider's offering of wireline broadband Internet access service using its own transmission facilities to end users. First, we address the wholesale input. Nothing in the Communications Act compels a facilities-based provider to offer the transmission component of wireline broadband Internet access service as a telecommunications service to anyone. Furthermore, consistent with the *NARUC* precedent,[317] the transmission component of wireline broadband Internet access service

---

[310] *Wireline Broadband NPRM*, 17 FCC Rcd at 3029, para. 17, & 3033, para. 25.

[311] *See supra* Part IV.

[312] Several parties, including all of the BOCs, argue that wireline broadband Internet access service has a telecommunications component that does not fall under Title II. *See, e.g.*, Qwest Comments at 4; Verizon Comments at 9; NextLevel Reply at 7-10. Allegiance disputes this, arguing that "*self-provisioned* wireline broadband Internet access is a bundled offering of a telecommunications service *and* information service." Allegiance Comments at 12 (citing Joint Explanatory Statement of the Committee of Conference, S. Conf. Rep. No. 230, 104th Cong., 2d Sess. 1 (1996) (*Joint Explanatory Statement*) (emphasis added)).

[313] 47 U.S.C. § 153(46).

[314] We note that the Commission has authority under section 10 of the Act to forbear from applying Title II requirements. *See* 47 U.S.C. § 160; *see also NCTA v. Brand X*, slip op. at 3.

[315] *See NCTA v. Brand X*, slip op. at 3-4.

[316] Indeed, it was precisely the Commission's historic exercise of its Title I ancillary jurisdiction that resulted in the imposition of the *Computer Inquiry* obligations that we eliminate today for wireline broadband Internet access service providers. *See supra* Part V.B; *see also NCTA v. Brand X*, slip op. at 24-25. We further note that the *Computer Inquiry* rules did not require a Title II offering with respect to the end user of the information service for which the transmission is a component; rather, those rules required the offering of a Title II transmission component offering to competing information services providers.

[317] Under the so-called *NARUC I* decision, and other compelling precedent, the Commission and courts perform a two-step analysis to determine whether a communications service offering is subject to Title II. First, the Commission inquires whether there is a legal compulsion to serve the public indifferently. *NARUC I*, 525 F.2d at 642 ("we must inquire, first, whether there will be any legal compulsion . . . to serve [the public] indifferently"). (continued . . .)

is a telecommunications service only if one of two conditions is met: the entity that provides the transmission voluntarily undertakes to provide it as a telecommunications service; or the Commission mandates, in the exercise of our ancillary jurisdiction under Title I, that it be offered as a telecommunications service.[318] As to the first condition, we explain above that carriers may choose to offer this type of transmission as a common carrier service if they wish. In that circumstance, it is of course a telecommunications service. Otherwise, however, is it not, as we would not expect an "indifferent holding out" but a collection of individualized arrangements.[319] As to the second condition, based on the record, we decline to continue our reflexive application of the *Computer Inquiry* requirement, which compelled the offering of a telecommunications service to ISPs.[320] Thus, we affirm that neither the statute nor relevant precedent mandates that broadband transmission be a telecommunications service when provided to an ISP, but the provider may choose to offer it as such.

104. Second, we address the use of the transmission component as part of a facilities-based provider's offering of wireline broadband Internet access service to end users using its own transmission facilities. We conclude, consistent with *Brand X*, that such a transmission component is mere "telecommunications" and not a "telecommunications service."[321] As stated above, the Act defines telecommunications service as "the *offering* of telecommunications for a fee directly *to the public*, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."[322] Thus, whether a telecommunications service is being provided turns on what the entity is "offering . . . to the public," and customers' understanding of that service.[323] End users subscribing to wireline broadband Internet access service expect to receive (and pay for) a finished, functionally integrated service that provides access to the Internet. End users do not expect to receive (or pay for) two distinct services – both Internet access

(continued from previous page)
Second, if the Commission finds that neither the statute nor the public interest compel a common carriage offering of the service, the Commission then examines "whether there are reasons implicit in the nature of [the provider's] operations to expect an indifferent holding out to the eligible user public." *NARUC I*, 525 F.2d at 642; *see Vitelco v. FCC*, 198 F.3d at 924 (asking whether the service provider intends to "make capacity available to the public indifferently"). In the communications context, implicit in this prong is the notion that the carrier is providing a service whereby customers may "transmit intelligence of their own design and choosing." *See CCIA v. FCC*, 693 F.2d at 210 (citing *NARUC I*, 525 F.2d at 641 n.58 (quoting *Industrial Radiolocation Service*, 5 FCC 2d 197, 202 (1966))) (internal quotation marks omitted).

[318] *See Southwestern Bell Tel. Co. v. FCC*, 19 F.3d 1475, 1481 (D.C. Cir. 1994) (*Southwestern Bell*); *AT&T-SSI*, 13 FCC Rcd at 21588-89, paras. 8-9; *NORLIGHT Request for Declaratory Ruling*, 2 FCC Rcd 132, 133, para. 14 (1987); *NARUC II*, 533 F.2d at 608-09; *NARUC I*, 525 F.2d at 640. In 1998, the Commission found, and the court agreed, that the enactment of the 1996 Act did not disturb the *NARUC I* decision's common carriage test. *See Vitelco v. FCC*, 198 F.3d at 927 (holding that "the legislative history [of the 1996 Act] . . . can be reasonably construed as manifesting Congress' intention to maintain the public-private dichotomy of *NARUC I*").

[319] *NARUC I*, 525 F.2d at 642.

[320] *See supra* Part V.A.2

[321] *See NCTA v. Brand X*, slip op. at 14-31(affirming as a reasonable construction of the statute the Commission's conclusion that cable modem service does not include a telecommunications service).

[322] 47 U.S.C. § 153(46) (emphasis added).

[323] *See NCTA v. Brand X*, slip op. at 10 (discussing the word "offering" in the statutory definition of "telecommunications service").

service and a distinct *transmission* service, for example.[324] Thus, the transmission capability is part and parcel of, and integral to, the Internet access service capabilities.[325] Accordingly, we conclude that wireline broadband Internet access service does not include the provision of a telecommunications service to the end user irrespective of how the service provider may decide to offer the transmission component to other service providers.

105. In so concluding, we reject arguments that companies using their own facilities to provide wireline broadband Internet access service simultaneously provide a telecommunications service to their end user wireline broadband Internet access customers.[326] The record demonstrates that end users of wireline broadband Internet access service receive and pay for a single, functionally integrated service, not two distinct services.[327] This conclusion also is consistent with certain past Commission pronouncements that the categories of "information service" and "telecommunications service" are mutually exclusive.[328] Moreover, the fact that the Commission has, up to now, required facilities-based providers of wireline broadband Internet access service to separate out a telecommunications transmission service and make that service available *to competitors* on a common carrier basis under the *Computer Inquiry* regime has no bearing on the nature of the service wireline broadband Internet access service providers offer their *end user customers*.[329] We conclude now, based on the record before us, that wireline broadband Internet access service is, as discussed above, a functionally integrated, finished product, rather than both an information service and a telecommunications service.

106. Finally, some parties argue (without clearly distinguishing between the transmission component as a wholesale input and transmission used to provide the information service to the end user) that

---

[324] *NCTA v. Brand X*, slip op. at 18 (stating that "[i]t is common usage to describe what a company 'offers' to a consumer as what the consumer perceives to be the integrated finished product, even to the exclusion of discrete components that compose the product").

[325] *NCTA v. Brand X*, slip op. at 18-19 (explaining the integrated nature of the transmission component in cable modem Internet access service); *Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4823, paras. 39-40; SBC Comments at 17.

[326] *See, e.g.*, Allegiance Comments at 8-9 ("[T]hroughout the past 25 years, the Commission has consistently determined that facilities-based providers [of information service] provide two separate services – a telecommunications service and an information service."); *id.* at 10-11 (arguing that Commission has already imposed "two-service treatment for regulatory purposes" on incumbent LEC-provided broadband Internet access); McLeodUSA Comments at 9 ("The [1996 Act] definitions of the terms 'information service,' 'telecommunications service,' and 'telecommunications' were expressly intended to acknowledge the concept from the *Computer Inquiry* cases that *there is always a 'telecommunications service' underlying every 'information service.'*") (emphasis added); *id.* at 11-12 (since certain functions of wireline broadband Internet access service, such as e-mail, file transfer, and instant messaging, provide "raw transmission," that service is a telecommunications service, and therefore "the service offered to customers as 'broadband access' includes both information services and telecommunications services"); US LEC Comments at 2-3; ASCENT Reply at 3-4.

[327] *E.g.*, SBC Comments at 16-17; Qwest Reply at 4-8; Verizon Reply at 6-11.

[328] As explained above, although the Commission has not been entirely consistent on this point, we agree for the wireline broadband Internet access described in this Order with the past Commission pronouncements that the categories of "information service" and "telecommunications service" are mutually exclusive. *See supra* note 32.

[329] *See infra* Part V.A; *see also NCTA v. Brand X*, slip op. at 24-25 (observing that "[i]n the *Computer II* rules, the Commission subjected facilities-based providers to common carrier duties not because of the nature of the 'offering' made by those carriers, but rather because of the concern that local telephone companies would abuse the monopoly power they possessed by virtue of the 'bottleneck' local telephone facilities they owned").

Commission precedent mandates that we classify the transmission underlying wireline broadband Internet access as a telecommunications service.[330] We disagree. As an initial matter, as the Supreme Court held in relation to the transmission underlying cable modem service, "the Commission is free within the limits of reasoned interpretation to change course if it adequately justifies the change."[331] The Court acknowledged the Commission's ability to respond to changed circumstances and market conditions, factors which serve as the basis for the actions we take in this Order.[332] The previous orders upon which commenters rely assumed, correctly in each instance, that the offering of DSL transmission on a common carrier basis was a telecommunications service.[333] These decisions, however, did not address the important threshold public interest issue we address in this Order – whether this broadband transmission component must continue to be offered to competing providers of facilities-based wireline broadband Internet access service on a common carrier basis. And as we explain above, the current record does not support a finding or compulsion that the transmission component of wireline broadband Internet access service is a telecommunications service as to the end user.[334]

107. Now that we have concluded that a common carrier offering is no longer required, and have made the statutory classification findings, we address what impact these actions have on other regulatory obligations.[335]

---

[330] *See, e.g.*, AOL Comments at 6-12; Covad Comments at 72-75; Time Warner Comments at 9-16; Vermont Commission Comments at 20-26; Letter from Ruth Milkman, Counsel to MCI, to Michelle Carey, Chief, Competition Policy Division, Wireline Competition Bureau, FCC, CC Docket Nos. 02-33 & 01-337, at 2 (filed June 23, 2003) (MCI June 23, 2003 *Ex Parte* Letter) (citing *Wireline Broadband NPRM*, 17 FCC Rcd at 3040, para. 42).

[331] *See NCTA v. Brand X*, slip op. at 14.

[332] *See id.*, slip op. at 15.

[333] For example, in its *AOL Bulk Services Order*, the Commission stated that although bulk DSL services sold to ISPs are not retail services subject to section 251(c)(4), "these services are telecommunications services. . . ." *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147, Second Report and Order, 14 FCC Rcd 19237, 19247, para. 21 (1999) (*AOL Bulk Services Order*). In that order, the Commission devoted its entire analysis to section 251(c)(4) and only in its "Conclusion" did it mention that incumbent LECs must continue to comply with their common carrier obligations. *Id.* Similarly, in its *GTE DSL Order*, the Commission found that GTE's asynchronous DSL (ADSL) service offering was interstate and appropriately tariffed with the Commission. *GTE Telephone Operating Cos. GTOC Tariff No. 1, GTOC Transmittal No. 1148*, 13 FCC Rcd 22466, para. 1 (1998) (*GTE DSL Order*), *recon.*, 17 FCC Rcd 27409 (1999) (*GTE DSL Reconsideration Order*). Again, its analysis concerned another issue – the jurisdiction of GTE's ADSL transmission for purposes of determining whether GTE should file an interstate, as opposed to intrastate, tariff. *Id.* at 22478-79, para. 22 (noting that this transmission "does in fact constitute an interstate telecommunication"). Similarly, in the *CPE/Enhanced Services Bundling Order*, the Commission assumed without analysis that the provision of DSL was a telecommunications service. *CPE/Enhanced Services Bundling Order*, 16 FCC Rcd at 7445-46, para. 46.

[334] To the extent *NARUC I* is relevant to this inquiry, our analysis accords with this precedent. There is no legal compulsion to serve the public indifferently. Nor is there anything implicit in the nature of wireline broadband Internet access service that makes it reasonable to expect that its telecommunications component would be offered to the public indifferently. Consequently, *NARUC I* provides no support for claims that the transmission component of facilities-based wireline broadband Internet access service is, or must be found to be, a telecommunications service.

[335] We find moot Verizon's pending petition for forbearance with regard to broadband services provided via FTTP, as well as its simultaneously filed petition for declaratory ruling or interim waiver with regard to the same services. Conditional Petition of the Verizon Telephone Companies for Forbearance Under 47 U.S.C. § 160(c) with Regard to Broadband Services Provided Via Fiber to the Premises, WC Docket No. 04-242 (filed June 28, 2004) (Verizon (continued . . .)

## VI. EFFECT ON EXISTING OBLIGATIONS

108. The *Wireline Broadband NPRM* sought comment on what effect classifying wireline broadband Internet access service as an information service would have on other regulatory obligations. Title II obligations have never generally applied to information services, including Internet access services.[336] Instead, when the Commission has deemed it necessary to impose regulatory requirements on information services, it has done so pursuant to its Title I ancillary jurisdiction. Indeed, as noted above, the Commission imposed the *Computer Inquiry* obligations on facilities-based common carriers pursuant to its Title I ancillary jurisdiction.[337] Similarly, the Commission has exercised its ancillary jurisdiction under Title I to extend accessibility obligations that mirror those under section 255 to certain information services, *i.e.*, voicemail and interactive menu service.[338] The Commission's ancillary jurisdiction under Title I to impose regulatory obligations on broadband Internet access service providers was recently recognized by the Supreme Court.[339]

109. The Commission may exercise its ancillary jurisdiction when Title I of the Act gives the Commission subject matter jurisdiction over the service to be regulated[340] and the assertion of jurisdiction

(continued from previous page)
FTTP Forbearance Petition); Petition of the Verizon Telephone Companies for Declaratory Ruling or, Alternatively, for Interim Waiver with Regard to Broadband Services Provided Via Fiber to the Premises, WC Docket No. 04-242 (filed June 28, 2004) (Verizon FTTP Petition for Declaratory Ruling or Interim Waiver). In these two petitions, Verizon sought to ensure that it could "offer those of its broadband services that are provided via [FTTP] in the same manner that cable companies offer broadband services via cable modem." Verizon FTTP Forbearance Petition at 1. Verizon emphasized that the relief sought in its petitions would be temporary, necessary only "[u]ntil the Commission has determined an appropriate regulatory framework for broadband generally." *Id.*, Attach. at 12. Because this Order establishes a regulatory framework for wireline broadband Internet access service and eliminates disparities between the regulatory treatment of that broadband and cable modem service, Verizon's petitions are moot.

[336] *See Report to Congress*, 13 FCC Rcd at 11523-24, para. 44 (noting legislative history demonstrating a Congressional intent that information service providers not be deemed providers of telecommunications service); *Computer II Final Decision*, 77 FCC 2d at 428-35, paras. 114-132 (enhanced services are not subject to Title II obligations); *see also Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4823, paras. 39-40.

[337] *See supra* para. 24.

[338] *See infra* para. 121.

[339] *See NCTA v. Brand X*, slip op. at 25 (stating that after designating cable modem service an information service, "the Commission remains free to impose special regulatory duties on facilities-based ISPs under its Title I ancillary jurisdiction").

[340] *See Southwestern Cable*, 392 U.S. at 177-78. *Southwestern Cable*, the lead case on the ancillary jurisdiction doctrine, upheld certain regulations applied to cable television systems at a time before the Commission had an express congressional grant of regulatory authority over that medium. *See id.* at 170-71. In *Midwest Video I*, the Supreme Court expanded upon its holding in *Southwestern Cable*. The plurality stated that "the critical question in this case is whether the Commission has reasonably determined that its origination rule will 'further the achievement of long-established regulatory goals in the field of television broadcasting by increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services . . . .'" *Midwest Video I*, 406 U.S. at 667-68 (quoting *Amendment of Part 74, Subpart K, of the Commission's Rules and Regulations Relative to Community Antenna Television Systems; and Inquiry into the Development of Communications Technology and Services to Formulate Regulatory Policy and Rulemaking and/or Legislative Proposals*, Docket No. 18397, First Report and Order, 20 FCC 2d 201, 202 (1969) (*CATV First Report and Order*)). The Court later restricted the scope of *Midwest Video I* by finding that if the basis for jurisdiction over cable is that the authority is
(continued . . .)

is "reasonably ancillary to the effective performance of [its] various responsibilities."[341] We recognize that both of the predicates for ancillary jurisdiction are likely satisfied for any consumer protection, network reliability, or national security obligation that we may subsequently decide to impose on wireline broadband Internet access service providers.[342]

110. First, we find that we have subject matter jurisdiction over providers of broadband Internet access services. These services are unquestionably "wire communication" as defined in section 3(52)[343] because they transmit signals by wire or cable, or they are "radio communication" as defined in section 3(33) if they transmit signals by radio.[344] The Act gives the Commission subject matter jurisdiction over "all interstate and foreign communications by wire or radio . . . and . . . all persons engaged within the United States in such communication" in section 2(a).[345] Second, with regard to consumer protection obligations, we find that regulations would be "reasonably ancillary" to the Commission's responsibility to implement sections 222 (customer privacy), 255 (disability access), and 258 (slamming and truth-in-billing), among other provisions, of the Act.[346] Similarly, network reliability, emergency preparedness, national security, and law enforcement requirements would each be reasonably ancillary to the Commission's obligation to make available "a rapid, *efficient*, Nation-wide, and world-wide wire and radio communication service . . . for the purpose of the *national defense* [and] for the purpose of *promoting safety of life and property* through the use of wire and radio communication."[347]

(continued from previous page)
ancillary to the regulation of broadcasting, the cable regulation cannot be antithetical to a basic regulatory parameter established for broadcast. *See Midwest Video II*, 440 U.S. at 700; *see also American Library Ass'n v. FCC*, 406 F.3d 689 (D.C. Cir. 2005) (holding that the Commission lacked authority to impose broadcast content redistribution rules on equipment manufacturers using ancillary jurisdiction because the equipment at issue was not subject to the Commission's subject matter jurisdiction over wire and radio communications).

341 *Southwestern Cable*, 392 U.S. at 178; *see also VoIP E911 Order*, at paras. 26-35.

342 To this end, we concurrently adopt a Notice of Proposed Rulemaking (Notice) to determine what specific duties are necessary for broadband Internet access service providers, regardless of the technology they employ, to ensure the Commission's ability to fulfill its statutory obligations in the important area of consumer protection. *See infra* Part VIII.

343 Section 3(52) of the Act defines the term "wire communication" or "communication by wire" to mean "the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." 47 U.S.C. § 153(52). As the Commission recently found with respect to VoIP services, irrespective of whether such services are telecommunications services or information services, based on sections 1 and 2(a) of the Act, 47 U.S.C. §§ 151, 152(a), they are covered by the Commission's general jurisdictional grant. *See VoIP E911 Order* at paras. 26-35.

344 47 U.S.C. § 153(33) (defining "radio communication" as "the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission").

345 47 U.S.C. § 152(a).

346 As we have explained, the Commission's truth-in-billing rules derive from section 258 as well as section 201(b). *See infra* paras. 152-53.

347 47 U.S.C. § 151 (emphasis added); *see also VoIP E911 Order* at para. 29.

111. In the attached *Notice of Proposed Rulemaking* (*Notice*), we specifically seek comment on what obligations we should impose pursuant to our Title I authority to further consumer protection in the broadband age. We emphasize that we will not hesitate to adopt any non-economic regulatory obligations that are necessary to ensure consumer protection and network security and reliability in this dynamically changing broadband era.

### A. Federal Universal Service Contribution Obligations

112. In section 254 of the Act, Congress codified our Federal universal service programs to ensure affordable telecommunications services to all Americans, including consumers living in high-cost areas, low income consumers, eligible schools and libraries, and rural health care providers. In this section, we address the universal service contribution obligations of providers of wireline broadband Internet access service. Section 254(d) of the Act states that "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute" to universal service.[348] In the *Universal Service Order*, the Commission interpreted the first sentence of section 254(d) as imposing a mandatory contribution requirement on all telecommunications carriers that provide interstate telecommunications services.[349] In the *Wireline Broadband NPRM*, the Commission recognized that, under its existing rules and policies, telecommunications carriers providing telecommunications services, including broadband transmission services, are subject to universal service contribution requirements.[350] Under current law, the Commission has permissive authority to require "[a]ny other provider of interstate telecommunications to contribute to universal service if required by the public interest."[351] The question of "whether and under what circumstances the public interest would require us to exercise our permissive authority over wireline broadband Internet access providers" is pending before the Commission in this docket.[352] In addition, the question of "whether other facilities-based providers of broadband Internet access services may, as a legal matter, or should as a policy matter, be required to contribute" is also pending before us.[353] We expect to address these issues in a comprehensive fashion either in this docket or in the *Universal Service Contribution Methodology* proceeding now pending in Docket No. 96-45.[354]

113. Congress required in section 254 of the Act that "[t]here should be specific, predictable, and sufficient Federal and State mechanisms to preserve and advance universal service."[355] Accordingly, we conclude that facilities-based providers of wireline broadband Internet access services must continue to contribute to existing universal service support mechanisms based on the current level of reported revenue for the transmission component of their wireline broadband Internet access services for a 270-day period

[348] 47 U.S.C. § 254(d).

[349] *Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Report and Order, 12 FCC Rcd 8776, 9173, para. 777 (1997) (*Universal Service Order*) (subsequent history omitted); *see also* 47 C.F.R. § 54.706.

[350] *Wireline Broadband NPRM*, 17 FCC Rcd at 3051, para. 72; *see also CPE/Enhanced Services Bundling Order*, 16 FCC Rcd at 7446-47, para. 48.

[351] 47 U.S.C. § 254(d).

[352] *Wireline Broadband NPRM*, 17 FCC Rcd at 3052, para. 74.

[353] *Id.* at 3054, para. 79.

[354] *E.g.*, *Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Report and Order and Second Further Notice of Proposed Rulemaking, 17 FCC Rcd 24952, 24983-97, paras. 66-100 (2002) (*Universal Service Contribution Methodology NPRM*).

[355] 47 U.S.C. § 254(b)(5).

after the effective date of this Order or until we adopt new contribution rules in the *Universal Service Contribution Methodology* proceeding,[356] whichever occurs earlier. That is, wireline broadband Internet access providers must maintain their current universal service contribution levels attributable to the provision of wireline broadband Internet access service for this 270-day period.[357] We take this action, as a matter of policy, to preserve existing levels of universal service funding, and prevent a precipitous drop in fund levels while we consider reform of the system of universal service in the *Universal Service Contribution Methodology* proceeding.[358] We are committed to ensuring that there continue to be specific, predictable, and sufficient Federal and State mechanisms to preserve and advance universal service. If we are unable to complete new contribution rules within the 270-day period of time, the Commission will take whatever action is necessary to preserve existing funding levels, including extending the 270-day period discussed above or expanding the contribution base. We have ample authority to take interim actions to preserve the *status quo*.[359]

## B. Law Enforcement, National Security, and Emergency Preparedness

### 1. CALEA

114. The Communications Assistance for Law Enforcement Act (CALEA) requires telecommunications carriers to ensure that "equipment, facilities or services that provide a customer or subscriber with the ability to originate, terminate, or direct [communications]" are capable of providing authorized surveillance to law enforcement agencies.[360] In a separate order adopted today, we conclude that providers of facilities-based broadband Internet access service and interconnected VoIP service are subject to CALEA.[361] We therefore do not address CALEA issues in this Order.

---

[356] *E.g.*, *Universal Service Contribution Methodology NPRM*, 17 FCC Rcd 24952, 24983-97, paras. 66-100.

[357] Of course, as we stated above, some providers of wireline broadband Internet access service may choose to offer a stand-alone broadband telecommunications service on a common carrier basis. To the extent that they do so, they must continue to contribute to universal service mechanisms on a permanent basis pursuant to section 254(d).

[358] *See Universal Service Contribution Methodology NPRM*, 17 FCC Rcd 24952, 24983-97, paras. 66-100.

[359] As the D.C. Circuit has held, "[a]voidance of market disruption pending broader reforms is, of course, a standard and accepted justification for a temporary rule." *Competitive Telecommunications Ass'n v. FCC*, 309 F.3d 8, 14 (D.C. Cir. 2002) (citing *MCI Telecommunications Corp. v. FCC*, 750 F.2d 135, 141 (D.C. Cir. 1984) (*MCI v. FCC*) & *ACS of Anchorage v. FCC*, 290 F.3d 403, 410 (D.C. Cir. 2002)). Indeed, "[s]ubstantial deference must be accorded an agency when it acts to maintain the *status quo* so that the objectives of [related proceedings] will not be frustrated." *MCI v. FCC*, 750 F.2d at 141. Similarly, we require facilities-based wireline broadband Internet access services providers that are subject to the actions we take today to continue contributing to the Telecommunications Relay Services (TRS) Fund and the North American Numbering Plan Administration (NANPA) cost recovery mechanisms during the transition. *See supra* para. 68 & *infra* note 390.

[360] *See* 47 U.S.C. § 1002(a). As noted by the Department of Justice and Federal Bureau of Investigation, "CALEA is intended to preserve the government's *technical* capability to conduct electronic surveillance that is otherwise allowed under the law." DOJ/FBI Comments at 4 (emphasis in original).

[361] *Communications Assistance for Law Enforcement Act and Broadband Access and Services*, ET Docket No. 04-295, First Report and Order and Further Notice of Proposed Rulemaking, FCC 05-153 (rel. Sept. 23, 2005) (determining that providers of facilities-based broadband Internet access service and interconnected VoIP service are subject to CALEA).

### 2. USA PATRIOT Act

115. We find that our actions in this Order will not affect the government's implementation or enforcement of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act).[362] This Act amended the federal criminal code to authorize the interception of *wire and electronic communications* for the production of evidence of terrorism offenses and computer fraud, and modified only one section of the Communications Act, section 631 of Title VI.[363] We conclude that the scope of activities covered under the definitions of wire communications and electronic communications is broad enough to encompass wireline broadband Internet access service regardless of the legal classification of this service, or its transmission component, under the Communications Act. Only one party submitted comments on the subject, agreeing that the legal classification of wireline broadband Internet access service as an information service will have no impact on the applicability of the USA PATRIOT Act.[364]

### 3. Emergency Preparedness and Response

116. We find that our classification of wireline broadband Internet access service as an information service, and the transmission input as telecommunications (except to the extent that the provider chooses to offer that transmission on a common carrier basis), will not affect the Commission's existing rules implementing the National Security Emergency Preparedness (NSEP) Telecommunications Service Priority (TSP) System.[365] But, we will nonetheless exercise our Title I authority, as necessary, to give full effect to the principles and purpose of the NSEP TSP System. The NSEP TSP System is set forth in appendix A to Part 64 of the rules and provides that the Commission has "authority over the assignment and approval of priorities for provisioning and restoration of common carrier-provided telecommunications services."[366] The facilities-based wireline broadband Internet access service providers that are the subject of our Order today are telecommunications carriers with respect to other services that they provide. Therefore, we find that these providers remain subject to the NSEP TSP.

117. The Secretary of Defense (Secretary), the only party to submit comments on this issue, expressed concern that the existing National Communications System programs will no longer apply to wireline broadband Internet access service if it is classified as an information service unless the Commission exercises its ancillary jurisdiction.[367] As the Secretary recognizes, NSEP communications are currently

---

[362] P. L. No. 107-56, 115 Stat. 272 (2001) (codified in scattered sections of 18 U.S.C., 47 U.S.C., 50 U.S.C.).

[363] *See* § 211 of the USA PATRIOT Act (amending 47 U.S.C. § 631(c)(2) to permit specified disclosures to government entities, except for records revealing cable subscriber selection of video programming, for a cable operator).

[364] *See* SBC Reply at 52 (citing 18 U.S.C. §§ 2510(12), 2703).

[365] The NSEP TSP System enables telecommunications users with responsibility for national security and emergency preparedness to receive priority in the deployment of new telecommunications services and the restoration of existing telecommunications services vital to coordinating and responding to natural and man-made disasters. *See Welcome to the TSP Website!*, available at http://tsp.ncs.gov/ (visited July 28, 2005).

[366] 47 C.F.R. Pt. 64, App. A, at § 1.b.

[367] Secretary of Defense Comments at 4-5 (citing *Southwestern Cable*, 392 U.S. at 178 (holding that the Commission has ancillary jurisdiction where it has subject matter jurisdiction under Title I of the Act and the subject of the regulation is "reasonably ancillary to the effective performance of the Commission's various responsibilities")). Among other functions, the National Communications System helps coordinate the planning for and provision of national security and emergency preparedness communications for the Federal government during (continued . . .)

provided by carriers subject to Title II.[368] Information service providers, therefore, have not been subject to these rules unless those providers are also offering services as telecommunications carriers.[369] Since the actions we take in this Order affect only wireline carriers that provide the transmission component of wireline broadband Internet access service, we have no reason to expect that those actions will adversely affect emergency preparedness efforts. These service providers, for the most part, provide their wireline broadband Internet access services over the same facilities used to provide other telecommunications services and thus these facilities remain subject to Part 64 to the same extent as they have before. Moreover, we do agree with the Secretary's conclusion that, should the need arise, we do have the authority to regulate NSEP under Title I. We will closely monitor the development of wireline broadband Internet access service and its effect on the NSEP TSP System and, if needed, will expeditiously take all appropriate actions to promote the viability of that system.[370]

118. Moreover, lest there be any uncertainty, we state that our decision to classify wireline broadband Internet access service as an information service, and the transmission input as telecommunications (except when offered on a common carrier basis), has no effect whatsoever on our recently adopted E911 rules for interconnected VoIP providers.[371] In that order, we required providers of interconnected VoIP[372] to offer E911 service to their subscribers. Although interconnected VoIP is necessarily provided via broadband, nothing in the *VoIP E911 Order* in any way turns on the statutory classification of that broadband connection. Thus, we reaffirm that, after today's Order, interconnected VoIP providers must comply with the *VoIP E911 Order* regardless of how or by whom the underlying broadband connection is provided.

#### 4. Network Reliability and Interoperability

119. We reject arguments that classifying wireline broadband Internet access service as an "information service" and its transmission component as "telecommunications" (except to the extent that the provider chooses to offer that transmission on a common carrier basis) requires that we obtain additional authorization from the Network Reliability and Interoperability Council (NRIC) at this time. NRIC, initially established by the Commission in 1992 as the Network Reliability Council, advises the Commission on recommendations to ensure optimal reliability and interoperability of the nation's

(continued from previous page)
crises and emergencies. National Communications System Mission Statement, available at http://www.ncs.gov/index.html (visited July 28, 2005).

[368] Secretary of Defense Comments at 2.

[369] A service provider may be a common carrier for some purposes and not for others. *NARUC II*, 533 F.2d at 608; *see* 47 U.S.C. 153(44) (specifying that a "telecommunications carrier shall be a common carrier under [the] Act only to the extent it is engaged in providing telecommunications services").

[370] We further note that the pending *IP-Enabled Services Proceeding* addresses issues relating to IP-enabled services (a category that may overlap with wireline broadband Internet access service) and critical infrastructure necessary to provide for homeland security and public safety. *See IP-Enabled Services*, WC Docket No. 04-36, Notice of Proposed Rulemaking, 19 FCC Rcd 4863, 4897-501, paras. 51-57 (2004) (*IP-Enabled Services NPRM*).

[371] *VoIP E911 Order*, at paras. 36-51.

[372] We defined interconnected VoIP as a service bearing the following characteristics: (1) the service enables real-time, two-way voice communications; (2) the service requires a broadband connection from the user's location; (3) the service requires IP-compatible CPE; and (4) the service offering permits users generally to receive calls that originate on the public switched telephone network (PSTN) *and* to terminate calls to the PSTN. *Id.* at para. 24.

communications networks.[373] Section 256 of the Act codifies the Commission's ability and obligation to oversee network planning and set standards to enable the Commission to carry out the objectives of this section as well as the Commission's prior practices in the area of network reliability and interoperability through the NRIC.[374] NRIC VI, the latest chartered council, significantly expanded its membership to include the Internet service industry[375] and included among its scope of activities numerous issues relating to the Internet and broadband deployment.[376]

120. Contrary to what some commenters suggest, we do not agree that classifying wireline broadband Internet access service as an information service would deny us the ability to oversee broadband interconnectivity.[377] Rather, we agree with the view that our actions in this proceeding will not constrain our ability to address network reliability and interoperability issues.[378] A purpose of section 256 is "to ensure the ability of users and information providers to seamlessly and transparently transmit and receive information between and across telecommunications networks."[379] This provision affords the Commission adequate authority to continue overseeing broadband interconnectivity and reliability issues, regardless of the legal classification of wireline broadband Internet access service. Moreover, NRIC's current charter directs it to make recommendations to increase the deployment and improve the security, reliability, and interoperability of "high-speed residential Internet access service,"[380] and we find that its activities in this regard are consistent with section 256.

### C. Access by Persons with Disabilities

121. Section 255(c) of the Act requires that "a provider of telecommunications service shall ensure that the service is accessible to and usable by individuals with disabilities, if readily achievable."[381] Like the other Title II obligations discussed above, section 255 expressly applies to telecommunications services, not information services. Although the requirements contained in section 255 do not apply to information services, in the past the Commission has exercised its ancillary jurisdiction under Title I to extend accessibility obligations that mirror those under section 255 to two critically important information services, voicemail and interactive menu service.[382] This Order does not affect voicemail or interactive

[373] *See, e.g.*, Charter of the Network Reliability and Interoperability Council - VII, at § B, *available at* http://www.nric.org/charter_vii/NRICVII_Charter_FINAL_Amended_2004_3_12_04.pdf ) (visited July 21, 2005) (*NRIC VII Charter*).

[374] 47 U.S.C. § 256(b)(2), (c); *see, e.g.*, Network Reliability Performance Committee, Compendium of Technical Papers, § 2, *available at* http://www.nric.org/pubs/nric2/fg1/execsumm.pdf (visited July 21, 2005).

[375] *See* 47 U.S.C. § 256; *see also* NRIC Mission Statement, available at http://www.nric.org/ (visited July 11, 2005).

[376] *See, e.g., NRIC VII Charter*, at § B.1.

[377] *See, e.g.*, Allegiance Comments at 53 (arguing that section 256(b) limits to telecommunications services the Commission's authority to oversee and coordinate network planning).

[378] SBC Comments at 41.

[379] 47 U.S.C. § 256(a)(2).

[380] *NRIC VII Charter*, at § B.4.

[381] 47 U.S.C. § 255(c).

[382] *See Implementation of Sections 255 and 251(a)(2) of the Communications Act of 1934, as Enacted by the Telecommunications Act of 1996, Access to Telecommunications Service, Telecommunications Equipment and Customer Premises Equipment by Persons with Disabilities*, WT Docket No. 96-198, Report and Order and Further Notice of Inquiry, 16 FCC Rcd 6417, 6455, para. 93 (1999) (*Section 255 Order*). The Commission declined at that (continued . . .)

menu service providers' obligations or other telecommunications service providers' obligations under section 255(c). We will continue to exercise our Title I authority, as necessary, to give full effect to the accessibility policy embodied in Section 255.

122. In addition, section 225(b) directs the Commission to ensure "telecommunications relay services" (TRS), a set of services that includes both video relay service (VRS) and IP relay, are available to individuals with hearing or speech impairments.[383] The Commission has previously determined that the statutory definition of TRS includes both information services and telecommunications services.[384] Nothing in this Order disturbs that earlier conclusion; consequently, this Order will not affect TRS requirements or the ability of TRS users to access VRS or IP relay.[385]

123. In addition, the Commission will remain vigilant in monitoring the development of wireline broadband Internet access service and its effects on the important policy goals of section 255.[386] As noted

(continued from previous page)

time, however, to extend accessibility obligations to other information services, such as e-mail, electronic information services, and web pages, that did not appear to have the potential to render telecommunications services inaccessible to persons with disabilities. *Id.* at 6461, para. 107. The Commission instituted a Further Notice of Inquiry at the same time to obtain additional information about Internet telephony and certain computer-based equipment that replicates current telecommunications functionality. The Commission stated that its goal was "to take full advantage of the promise of new technology, not only to ensure that advancements do not leave people with disabilities behind, but also to harness the power of innovation to break down the accessibility barriers we face today and prevent their emergence tomorrow." *See id.* at 6483, para. 175.

[383] 47 U.S.C. § 225(b); *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CC Docket No. 98-67 & CG Docket No. 03-123, Order on Reconsideration, FCC 05-139, at paras. 6-7 (rel. July 19, 2005) (*IP Relay Reconsideration Order*). VRS is TRS that permits individuals with hearing or speech disabilities to communicate with voice telephone users through video equipment. *See* 47 C.F.R. § 64.601(17). IP Relay is TRS provided over the Internet. After a user establishes a local connection to an ISP and selects an Internet address of an IP Relay provider, the IP Relay provider will establish an Internet connection, via a toll-free number, to the relay center. This call is then routed to a communications assistant and the regular relay session is initiated. *IP Relay Reconsideration Order*, at n.6; *Provision of Improved Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CC Docket No. 98-67, Declaratory Ruling and Second Further Notice of Proposed Rulemaking, 17 FCC Rcd 7779 (2002) (*IP Relay Declaratory Ruling & FNPRM*).

[384] 47 U.S.C. § 225(a)(3); *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CC Docket No. 98-67, Report and Order and Further Notice of Proposed Rulemaking, 15 FCC Rcd 5140, 5177-78, para. 88 (2000) (*Improved TRS Order & FNPRM*) (concluding that "section 225 does not limit relay services to telecommunications services, but . . . reaches enhanced or information services").

[385] We note that, as part of our efforts to help ensure that individuals with hearing or speech disabilities have access to communications technologies that is functionally equivalent to that available to people without these disabilities, we recently adopted new VRS rules that establish mandatory speed of answer requirements for VRS; require VRS to be offered 24 hours a day, seven days a week; and permit VRS providers to receive compensations from the interstate TRS fund for providing VRS mail and translation between American Sign Language and Spanish. *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CC Docket No. 98-67 & CG Docket No. 03-123, Order, FCC 05-140 (rel. July 19, 2005); *IP Relay Reconsideration Order*, *supra* n.383.

[386] The Commission is currently reviewing the issue of disability access with respect to IP-enabled services. *IP-Enabled Services NPRM*, 19 FCC Rcd at 4897-501, paras. 58-60. In addition, the Commission has before it a number of other pending proceedings related to disability issues. *See, e.g.*, California Coalition of Agencies Serving (continued . . .)

above, we will exercise our Title I ancillary jurisdiction to ensure achievement of important policy goals of section 255 and also section 225 of the Act.[387]

124. Consistent with our decision today to require facilities-based wireline broadband Internet access service providers to continue to contribute to universal service support mechanisms for an additional 270-day period,[388] as a matter of policy, we also require such providers to report the revenue on Form 499-A[389]

(continued from previous page)
the Deaf and Hard of Hearing, Petition for Declaratory Ruling on Interoperability, CC Docket No. 98-67 & CG Docket No. 03-123 (filed Feb. 15, 2005) (seeking ruling that VRS providers cannot limit access of their equipment to one provider); *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CC Docket Nos. 90-571 & 98-67, CG Docket No. 03-123, Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, 19 FCC Rcd 12475 (June 30, 2004) (*2004 TRS Report & Order*) (issues raised in the FNPRM are pending); *Closed Captioning of Video Programming, Telecommunications for the Deaf, Inc. Petition for Rulemaking*, CG Docket No. 05-231, Notice of Proposed Rulemaking, FCC 05-142 (July 21, 2005); *Implementation of Sections 255 and 251(a)(2) of the Communications Act of 1934, as Enacted by the Telecommunications Act of 1996, Access to Telecommunications Service, Telecommunications Equipment and Consumer Premises Equipment by Persons with Disabilities*, WT Docket No. 96-198, Report and Order and Further Notice of Inquiry, 16 FCC Rcd 6417 (1999). Also pending are petitions for reconsideration of various aspects of the *2004 TRS Report & Order* filed by Communication Services for the Deaf, Inc. (CSD), the National Video Relay Service Coalition (NVRSC), Hands On Video Relay Services, Inc. (HOVRS), and Hamilton Relay, Inc. (Hamilton). Further, CSD, NVRSC, HOVRS, and Hamilton have filed applications for review of *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CC Docket No. 98-67, Order, 19 FCC Rcd 12224 (Con. & Gov. Aff. Bur. 2004) (*2004 Bureau TRS Order*), *modified Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CC Docket No. 98-67, Order, 19 FCC Rcd 24981 (Con. & Gov. Aff. Bur. 2004) (*Modified 2004 Bureau TRS Order*). Finally, on July 26, 2004, Telco Group, Inc., filed a Petition for Declaratory Ruling, or in the Alternative, Petition for Waiver seeking a ruling excluding international revenues from the revenue base used to calculate contributions to the Interstate TRS Fund.

[387] We will take this commitment into account in all ongoing proceedings that affect access to services by people with disabilities. *See Implementation of Sections 255 and 251(a)(2) of the Communications Act of 1934, as amended by the Telecommunications Act of 1996, Access to Telecommunications Service, Telecommunications Equipment and Consumer Premises Equipment by Persons with Disabilities*, Report and Order and Further Notice of Inquiry, WT Docket No. 96-198 (Sept. 29, 1999); *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CC Docket No. 90-571, Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, 19 FCC Rcd 12475 (2004) (petitions for reconsideration filed by CSD, NVRSC, HOVRS, and Hamilton; Telco Group, Inc., Petition for Declaratory Ruling, or in the Alternative, Petition for Waiver (filed July 26, 2004) (seeking ruling excluding international revenues from the revenue base used to calculate contributions to the Interstate TRS Fund); California Coalition of Agencies Serving the Deaf and Hard of Hearing, Petition for Declaratory Ruling on Interoperability, CC Docket No. 98-67, CG Docket No. 03-123 (filed Feb. 15, 2005); *Modified 2004 Bureau TRS Order*, *supra* (applications for review filed by CSD, NVRSC, HOVRS, and Hamilton.

[388] *See supra* para. 113. Section 225(b)(1) of the Communications Act, which codifies Title IV of the Americans with Disabilities Act of 1990, directs the Commission to "ensure that interstate and intrastate telecommunications relay services are available, to the extent possible and in the most efficient manner, to hearing-impaired and speech-impaired individuals in the United States." 47 U.S.C. § 225(b)(1). To that end, the Commission established the TRS Fund to reimburse TRS providers for the costs of providing interstate telecommunications relay services. *See Telecommunications Relay Services and the Americans with Disabilities Act of 1990*, CC Docket No. 90-571, Third Report and Order, 8 FCC Rcd 5300, 5301, para. 7 (1993) ("*TRS III Order*"). NECA currently is responsible for administering the TRS Fund. Pursuant to section 64.604(c)(5)(iii)(A) of the Commission's rules, every carrier that provides interstate telecommunications services must contribute to the TRS Fund based upon its interstate end-user revenues. 47 C.F.R. § 64.604(c)(5)(iii)(A).

associated with the transmission component of their wireline broadband Internet access service as of the effective date of this Order for an additional 270-day period for purposes of contributing to the TRS fund for that same 270-day period.[390]

### D. NANPA Funding

125. Pursuant to this same interim authority,[391] we require facilities-based wireline broadband Internet access service providers to continue to contribute to the cost of numbering administration through the NANPA funding mechanism established by the Commission pursuant to section 251(e) of the Act for the same 270-day period. We take this action to ensure that the funding for this critical function does not immediately decrease while the Commission examines what, if any funding related obligations should apply to facilities-based broadband Internet access service providers.[392] Section 251(e)(2) requires that "[t]he cost of establishing telecommunications numbering administration arrangements . . . be borne by all telecommunications carriers on a competitively neutral basis as determined by the Commission."[393] In carrying out this statutory directive, the Commission adopted section 52.17 of its rules, which requires, among other things, that all telecommunications carriers contribute toward the costs of numbering administration on the basis of their end-user telecommunications revenues for the prior calendar year.[394]

### E. Obligations of Incumbent LECs Under Section 251

126. As noted, the *Wireline Broadband NPRM* sought comment on the relationship between a competitive LEC's rights under section 251 and the Commission's tentative conclusion that wireline broadband Internet access service is an information service with a telecommunications input.[395] Several competitive LECs, and one BOC, argue that regardless of how the Commission classifies wireline

(continued from previous page)

389 The Commission requires telecommunications providers to submit financial information on Telecommunications Reporting Worksheets (FCC Form 499-A) to enable the Commission to determine and collect certain statutorily mandated assessments. In 1999, to streamline the administration of multiple federal funding programs and to ease the burden on regulatees, the Commission consolidated the information filing requirements for multiple telecommunications regulatory programs into the annual Telecommunications Reporting Worksheet. *See 1998 Biennial Regulatory Review – Streamlined Contributor Reporting Requirements Associated with Administration of Telecommunications Relay Services, North American Numbering Plan, Local Number Portability, and Universal Service Support Mechanisms*, CC Docket No. 98-171, Report and Order, 14 FCC Rcd 16602 (1999) (*Contributor Reporting Requirements Order*). The next year the Commission revised the Telecommunications Reporting Worksheet slightly to collect the additional information necessary to achieve its goal of establishing a central repository for interstate telecommunications providers by the least provider-burdensome method. *Implementation of the Subscriber Carrier Selection Provisions of the Telecommunications Act of 1996*, CC Docket No. 94-129, Third Report and Order and Second Order on Reconsideration, 15 FCC Rcd 15996, 16026, para. 63 (2000) (*Carrier Selection Order*). NECA, as the TRS Administrator, uses the prior year's revenue information provided on the Telecommunications Reporting Worksheet to determine amounts owed for the TRS. *See* 47 C.F.R. § 64.604(c).

390 Our authority to take this interim action to preserve the *status quo* mirrors the authority upon which we require continued contribution for USF funding. *See supra* note 359.

391 *See id.*

392 47 U.S.C. § 251(e).

393 47 U.S.C. § 251(e)(2).

394 47 C.F.R. § 52.17(a).

395 *Wireline Broadband NPRM*, 17 FCC Rcd at 3047, para. 61.

broadband Internet access service, including its transmission component, competitive LECs should still be able to purchase UNEs, including UNE loops to provide stand-alone DSL telecommunications service, pursuant to section 251(c)(3) of the Act.[396] We agree.

127. Section 251(c)(3) and the Commission's rules look at what use a competitive LEC will make of a particular network element when obtaining that element pursuant to section 251(c)(3); the use to which the incumbent LEC puts the facility is not dispositive.[397] In this manner, even if an incumbent LEC is only providing an information service over a facility, we look to see whether the requesting carrier intends to provide a telecommunications service over that facility.[398] Thus, competitive LECs will continue to have the same access to UNEs, including DS0s and DS1s, to which they are otherwise entitled under our rules, regardless of the statutory classification of service the incumbent LECs provide over those facilities. So long as a competitive LEC is offering an "eligible" telecommunications service – *i.e.*, not exclusively long distance or mobile wireless services – it may obtain that element as a UNE.[399] Accordingly, nothing in this Order changes a requesting telecommunications carriers' UNE rights under section 251 and our implementing rules.[400]

---

[396] *See* Covad Comments at 84; MCI Comments at 73-76; Letter from Andrew D. Lipman, Richard M. Rindler, & Patrick J. Donovan, Counsel for McLeodUSA, to Chairman Kevin J. Martin, FCC, CC Docket No. 02-33, at 1-2 (filed Aug. 3, 2005) (McLeodUSA Aug. 3, 2005 *Ex Parte* Letter); Letter from Jason Oxman, Senior Vice President, Legal Affairs, CompTel/ALTS, to Marlene H. Dortch, Secretary, FCC, at 2 (filed July 12, 2005) (CompTel/ALTS July 12, 2005 *Ex Parte* Letter); *see also* Qwest Apr. 10, 2003 *Ex Parte* Letter, Attach. at 3 ("CLEC access to UNEs not at risk in this proceeding").

[397] A "network element" is an element that is "capable of being used by a requesting carrier in the provision of a telecommunications service," regardless of whether the element is "actually used by the incumbent LEC in the provision of a telecommunications service." *Triennial Review Order*, 18 FCC Rcd at 17020, para. 59 (emphasis omitted).

[398] In any event, section 251(h) of the Act defines incumbent LECs for purposes of section 251 of the Act, and nothing in this Order has any effect on such definition or the obligations associated therewith. 47 U.S.C. § 251(h); *cf. WorldCom v. FCC*, 246 F.3d. 690, 695 (D.C. Cir. 2001) ("[W]e find no error in the Commission's conclusion that it can apply the § 251(c) duties to a firm that met the § 251(h) criteria on February 8, 1996 and is still providing 'exchange access' or 'telephone exchange service.'") (emphasis omitted). An incumbent LEC's obligations under section 251(c) will remain until the incumbent LEC is either determined not to be an incumbent LEC under section 251(h), or the Commission forbears from section 251 obligations; we have not done either to date.

[399] *See, e.g.*, 47 C.F.R. § 51.309(b), (d) (allowing a requesting carrier to provide any telecommunications services over a UNE, provided that the UNE is not used exclusively for the provision of mobile wireless services or interexchange services); *USTA II*, 359 F.3d at 592 (affirming the need to analyze the services that a competing carrier seeks to provide using UNEs); *Triennial Review Remand Order*, 20 FCC Rcd at 2551-58, paras. 34-40 (evaluating the need for competitive LECs to obtain UNEs based on the services the competitive LECs seek to offer); *see also Triennial Review Order*, 18 FCC Rcd at 17350-66, paras. 590-619 (establishing criteria to limit access to enhanced extended links (EELs) to eligible services), *aff'd USTA II*, 359 F.3d at 592-93; McLeodUSA Aug. 3, 2005 *Ex Parte* Letter at 1 (stating that competitive LECs must continue to have access to UNEs regardless of the statutory classification of wireline broadband Internet access service).

[400] Similarly, our classification determinations in this Order have no effect whatsoever on the section 251 interconnection obligations of incumbent LECs or on competitive LECs' rights to obtain such interconnection. *See* 47 U.S.C. § 251(c)(2).

### F. Cost Allocation

128. In this section, we address cost allocation issues raised by our decision to allow incumbent LECs to enter into non-common carriage arrangements with affiliated and unaffiliated ISPs for the provision of wireline broadband Internet access transmission using facilities that are also used for provision of regulated telecommunications services. Specifically, we address whether we should require incumbent LECs subject to our part 64 cost allocation rules to classify that activity as a regulated activity, as opposed to a nonregulated activity, under our part 64 cost allocation rules.[401] We conclude that incumbent LECs should classify this non-common carrier activity as a regulated activity under those rules and that this accounting treatment is consistent with section 254(k) of the Act.[402]

#### 1. Relative Costs and Benefits

129. The part 64 cost allocation rules set forth a detailed methodology that incumbent LECs subject to those rules must follow in allocating the amounts recorded in their part 32 accounts between regulated and nonregulated activities.[403] Those rules also require some of these incumbent LECs to maintain cost allocation manuals setting forth how they will implement those principles.[404] The costs and revenues allocated to nonregulated activities are excluded from the jurisdictional separations process. In contrast, the costs and revenues allocated to regulated activities are apportioned between the state and interstate jurisdictions in accordance with the part 36 jurisdictional separations rules.[405] Each regulatory jurisdiction applies its own ratemaking processes to the amounts assigned to it by part 36. States, however, may add back costs that are identified as nonregulated under part 64, or remove additional costs that are identified as regulated under part 64.[406]

130. In this Order, we allow the non-common carrier provision of wireline broadband Internet access transmission that we previously have treated as regulated, interstate special access service,[407] but we do not preemptively deregulate any service currently regulated by any state.[408] Therefore, as specified in section 32.23 of our rules, the provision of this transmission is to be classified as a regulated activity under part 64 "until such time as the Commission decides otherwise."[409] We do not "decide otherwise" at this time because we find that the costs of changing the federal accounting classification of the costs

---

[401] 47 C.F.R. § 64.901.

[402] 47 U.S.C. § 254(k).

[403] 47 C.F.R. § 64.901. Part 32 establishes a Uniform System of Accounts that certain incumbent LECs must use to record their historical costs and revenues. 47 C.F.R. Part 32.

[404] 47 C.F.R. § 64.903.

[405] 47 C.F.R. Part 36.

[406] *Joint Cost Order*, 2 FCC Rcd at 1310, paras. 88-90 (states not required to use joint cost rules for intrastate ratemaking); *see Detariffing the Installation and Maintenance of Inside Wiring*, Third Report and Order, CC Docket No. 79-105, 7 FCC Rcd 1334, 1339, paras. 41-42 (1992).

[407] *See GTE DSL Order*, 13 FCC Rcd at 22474-83, paras. 16-32 (finding that GTE's ADSL service is an interstate special access service that should be federally tariffed).

[408] *See GTE DSL Reconsideration Order*, 17 FCC Rcd at 27411-12, para. 9 (stating that, in some circumstances, ADSL services may be appropriately tariffed as interstate services).

[409] 47 C.F.R. § 32.23(a); *see Joint Cost Order*, 2 FCC Rcd at 1308-09, para. 79 (stating intent to address on a case-by-case basis the accounting treatment to be accorded activities deregulated only in the interstate jurisdiction).

underlying this transmission would outweigh any potential benefits and that section 254(k) of the Act does not mandate such a change.

131. Requiring that incumbent LECs classify the provision of broadband Internet access transmission provided on a non-common carrier basis as a nonregulated activity under part 64 would mean, among other matters, that incumbent LECs would have to develop, and we would have to review, methods for measuring the relative usage that this transmission and the incumbent LECs' traditional local services make of incumbent LECs' transmission facilities.[410] Incumbent LECs argue that they should not have to undertake this task because it would impose significant burdens on them with little discernible benefit.[411] We agree. The Commission adopted the part 64 cost allocation rules during the late 1980s as one element of the nonstructural safeguards that were to replace the *Computer II* regime.[412] The principal purpose of those rules was to ensure that telephone ratepayers would continue to receive reasonable protections against improper cross-subsidization in the event the BOCs provided enhanced services on an integrated basis, rather than through separate subsidiaries.[413] The Commission also sought to ensure that ratepayers would share in any savings achieved through the integrated provision of regulated and nonregulated activities and to improve the cost allocation procedures used by other LECs, which had been relieved of structural separation requirements in *Computer II*.[414]

132. When the Commission developed the part 64 cost allocation rules, the LECs' interstate rates and many of their intrastate rates were set under rate base, cost-of-service regulation. The Commission designed those rules "to make sure that all of the costs of nonregulated activities are removed from the rate base and allowable expenses for interstate regulated services."[415] The rules therefore are quite detailed: they require LECs to apportion, on an account-by-account basis, all of their costs between regulated and nonregulated activities using direct assignment wherever possible and a specific cost allocation hierarchy where direct assignment is not possible.[416] This level of detail paralleled the level of detail in the cost-of-service calculations that LECs performed to develop their rates for interstate access services. Although not required to do so, many state commissions followed these rules for intrastate ratemaking purposes.

133. During the period since the adoption of the part 64 cost allocation rules, our ratemaking methods and those of our state counterparts have evolved considerably.[417] This evolution has greatly reduced

[410] *See* 47 C.F.R. § 64.901(b)(4) (requiring that investment in central office equipment and outside plant be allocated between regulated and nonregulated activities based on peak relative regulated and nonregulated usage).

[411] *See, e.g.*, Letter from Stephen L. Ernest, Regulatory Counsel, BellSouth, to Marlene. H. Dortch, Secretary, FCC, at 8-9 (filed June 29, 2004) (BellSouth June 29, 2004 *Ex Parte* Letter); Verizon Jan. 6, 2004 *Ex Parte* Letter at 3; Letter from Stephen L. Ernest, Regulatory Counsel, BellSouth, to Marlene. H. Dortch, Secretary, FCC, at 3-6 (filed Aug. 26, 2003) (BellSouth Aug. 26, 2003 *Ex Parte* Letter).

[412] *Computer III Phase I Order*, 104 FCC Rcd at 1074-77, paras. 234-40.

[413] *See Joint Cost Order*, 2 FCC Rcd at 1303, para. 37; *see Joint Cost Reconsideration Order*, 2 FCC Rcd at 6283-84, paras. 1, 6.

[414] *See Joint Cost Order*, 2 FCC Rcd at 1304, para. 39; *Joint Cost Reconsideration Order*, 2 FCC Rcd at 6300, para. 156.

[415] *Joint Cost Order*, 2 FCC Rcd at 1304, para. 40.

[416] *See* 47 C.F.R. § 64.901.

[417] *See, e.g., MAG Order*, 19 FCC Rcd at 4153-55, paras. 70-72; Verizon Jan. 6, 2004 *Ex Parte* Letter at 3 (pointing out that, in most states, cost allocation results do not affect rates for local telephone services).

incumbent LECs' incentives to overstate the costs of their tariffed telecommunications services.[418] Based on the current record, we find that this reduction in incentives diminishes the need for incumbent LECs to apply detailed and burdensome procedures to exclude the costs of providing broadband Internet access transmission from their regulated costs.[419] A nonregulated classification therefore would generate at most marginal benefits.[420]

134. Requiring that incumbent LECs classify their non-common carrier, broadband Internet access transmission activities as nonregulated activities under part 64 would impose significant burdens that outweigh these potential benefits.[421] In particular, the cost allocation principles set forth in our part 64 rules assume that meaningful measures of cost causality and usage will be available to help allocate a carrier's investments and expenses between regulated and nonregulated activities.[422] If we were to require that incumbent LECs classify their non-common carrier, broadband Internet access transmission activities as nonregulated activities under part 64, the extent of nonregulated usage of incumbent LECs' networks could increase dramatically. New measures of cost causality and usage would have to be developed to reflect this increased nonregulated usage.[423] These measures, moreover, would have to reflect the evolution of the incumbent LECs' networks from traditional circuit-switched networks into IP-based networks.[424] The proceedings to set these measures would be both resource-intensive and, given the changes in network technology from the time when the part 64 cost allocation rules were developed, likely to lead to arbitrary cost allocation results.

135. Because the costs of requiring that incumbent LECs classify their non-common carrier, broadband Internet access transmission operations as nonregulated activities under part 64 exceed the potential benefits, we decline to require such a classification. Classifying those operations as regulated under part 32 means that any necessary ratemaking adjustments, including any reallocations of costs, will be addressed in the ratemaking process in the relevant regulatory jurisdiction. In our case, that is the interstate jurisdiction. Currently, some price cap carriers treat broadband special access services as price cap services, while others treat these broadband services as services excluded from price caps. Price cap carriers that have tariffed these services under price caps, and that choose to replace these tariffed services with non-common carriage arrangements, will make the appropriate adjustments to the actual price index (API) and price cap index (PCI) for the special access basket. The ordinary application of the price cap rate formulas will ensure that other special access rates remain consistent with the price cap rules after deregulation of broadband transmission services. Carriers that have excluded broadband transmission services from price caps will not need to make these adjustments.

---

418 *See, e.g.*, BellSouth Aug. 26, 2003 *Ex Parte* Letter at 3-6.

419 *See, e.g.*, BellSouth June 29, 2004 *Ex Parte* Letter at 3-7; BellSouth Aug. 26, 2003 *Ex Parte* Letter at 3-6; Verizon Jan. 6, 2004 *Ex Parte* Letter at 3.

420 *See, e.g.*, BellSouth June 29, 2004 *Ex Parte* Letter at 3-7; BellSouth Aug. 26, 2003 *Ex Parte* Letter at 3-6; Verizon Jan. 6, 2004 *Ex Parte* Letter at 3.

421 *E.g.*, BellSouth June 29, 2004 *Ex Parte* Letter at 8.

422 *See* 47 C.F.R. § 64.901(b)(3), (4).

423 *See, e.g.*, BellSouth June 29, 2004 *Ex Parte* Letter at 8-9.

424 *See* Verizon June 26, 2003, *Ex Parte* Letter at 4 (asserting that it likely is not even possible to apply the part 64 cost allocation rules to wireline broadband Internet access services in any reasonable fashion because those rules require allocations based on usage, a concept applicable to circuit-switched services but almost-meaningless in the packet-switched world).

136. Our ruling here with respect to the accounting treatment of broadband Internet access transmission provided on a non-common carrier basis does not change the accounting treatment that applies to broadband Internet access service provided to end users. That is, and always has been, an information service. An incumbent LEC that offers this service must continue to account for it as a nonregulated activity.

137. We note that our decision to treat the non-common carrier provision of broadband Internet access transmission as a regulated activity under part 64 will affect the results of computations of the rate of return earned on interstate Title II services. This is not a matter of practical concern with respect to most incumbent LECs regulated under the *CALLS* plan or price caps, because earnings determinations are not used in determining their price cap rates.[425] In the event that an earnings determination is needed for some ratemaking purpose, the affected carrier will have to propose a way of removing the costs of any non-Title II services from the computation. Price cap carriers that have not taken advantage of pricing flexibility, and therefore are still able to take advantage of low-end adjustments to their price cap rates, will have to address this cost allocation issue if and when they seek a low-end adjustment.

138. Finally, all rate-of-return carriers that have participated in this proceeding have stated that they wish to continue offering broadband transmission as a Title II common carrier service.[426] We have provided them with this option. As such, we do not, at this time, address the treatment of private carriage arrangements by rate-of-return carriers because the issue is entirely hypothetical.

### 2. Section 254(k)

139. Section 254(k) of the Act states that a telecommunications carrier "may not use services that are not competitive to subsidize services that are subject to competition."[427] That section also requires the Commission to establish, with respect to interstate services, accounting and cost allocation rules that ensure that "services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services."[428] By continuing to treat the provision of wireline broadband transmission as a regulated activity under part 64, we do not change the regulatory cost allocation treatment and thus do not change their status under section 254(k). Our actions in this Order therefore do not create a violation of section 254(k).

---

[425] The price cap plan no longer contains a sharing requirement, and most price cap carriers have foregone the possibility of obtaining an earnings-based low-end adjustment in order to take advantage of pricing flexibility. *See generally MAG Order*, 19 FCC Rcd at 4154-55, paras. 71-72; *Section 272(b)(1)'s "Operate Independently" Requirement for Section 272 Affiliates*, WC Docket No. 03- 228, Report and Order, 19 FCC Rcd 5102, 5115 n.72 (2003) (*Operate Independently Order*) (pointing out that because the BOCs have taken advantage of pricing flexibility, they cannot resort to the low-end adjustment).

[426] Letter from Daniel Mitchell, Vice President, Legal and Industry, NTCA, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, at 1 (filed Aug. 2, 2005) (NTCA Aug. 2, 2005 *Ex Parte* Letter); Letter from Stuart Polikoff, Director of Government Relations, OPASTCO, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 02-33, at 2 (filed July 12, 2005) (OPASTCO July 12, 2005 *Ex Parte* Letter) (stating that many rural incumbent LECs offer DSL transmission services under the NECA tariff and participate in associated revenue pools, and that the Commission must preserve this option for those carriers).

[427] 47 U.S.C. § 254(k).

[428] *Id.*