140. We reject NARUC's and the State Consumer Advocates' argument that we must, under section 254(k), require incumbent LECs to reallocate a portion of their joint and common loop costs from "universal services" as a group to wireline broadband Internet access transmission.[429] The State Consumer Advocates submit a cost allocation proposal (which it characterizes as "market-driven") that differs from the current part 64 rules.[430] BellSouth and SBC assert that cost allocations are not relevant under price cap regulation and that the Commission should reject the State Consumer Advocates' proposal.[431]

141. We find that section 254(k) of the Act does not mandate allocation of interstate loop costs to non-common carrier broadband Internet access transmission. Under the *CALLS* access charge plan, the interstate loop costs of price cap carriers are not assigned to the different services that subscribers may receive over the loop, but are recovered directly from end users through the subscriber line charge. The Commission explicitly found that section 254(k) did not prohibit this cost recovery mechanism,[432] and the Fifth Circuit upheld this finding.[433]

142. The subscriber line charge is not itself a "service included in the definition of universal service." The interstate loop costs recovered through the subscriber line charge represent the costs of all jurisdictionally interstate uses of the loop. Since 1998, those uses have included both services supported by universal service, such as access to interexchange service, and broadband special access services, which are not supported by universal service. Costs need not be reallocated at this time from the subscriber line charge to non-common carrier, broadband Internet access transmission in order to prevent imposition of an unreasonable level of joint and common costs on services included in the definition of universal services. This is not, as State Consumer Advocates claim, unreasonable. Rather, it is a reasonable and rational cost allocation approach.[434] We can take additional steps to address cost allocation issues in the future if the need arises.

143. We observe that NARUC and the State Consumer Advocates appear to assume that any reallocation of loop costs to broadband Internet access transmission would be given effect in the ratemaking process in such a way that consumers who do not receive wireline broadband Internet access service over their loops would have their tariffed rates reduced. This ratemaking approach would likely produce a relatively small per-line rate reduction for the large number of consumers who do not receive this broadband service, while leaving a larger per-line amount to be recovered from the smaller number of consumers who receive both narrowband and broadband services over their loops. This form of cost reallocation produces anomalous results, and we do not adopt it. It would cause a consumer who buys the

---

[429] NARUC Comments at 12-13; State Consumer Advocates Comments at 24-25.

[430] State Consumer Advocates Comments at 26. This proposal would require allocation to broadband Internet access of an amount of cost equal to the difference between the competitor's wholesale price and the incumbent LEC's incremental cost for broadband transmission service. *Id.* at 27.

[431] BellSouth Comments at 27-29; SBC Reply at 63-64.

[432] *See Access Charge Reform*, CC Docket Nos. 96-262 and 94-1, Sixth Report and Order, 15 FCC Rcd 12962, 12998-13001, paras. 91-97 (2000) (subsequent history omitted) (*CALLS Order*).

[433] *Texas Office of Public Utility Counsel v. FCC*, 265 F.3d 313, 323-324 (5th Cir. 2001).

[434] State Consumer Advocates argue that the need to assign costs among all services using the loop will become even more important as incumbent LEC networks are engineered to deliver a variety of integrated services. State Consumer Advocates Comments at 33-34. We conclude instead that as more services are offered over a single loop, cost allocations are likely to become more arbitrary and thus less reasonable.

two services over the same loop to pay much more for that facility than a consumer who buys only narrowband service, even though the cost of that facility is fixed and does not vary in proportion to usage. It would be possible to devise a scheme in which costs were reallocated only with respect to those loops on which both services are being provided, but this would seem to produce only a shifting of charges from one part of the customer's bill to another.

144. We note that the question whether there should be any changes to the jurisdictional allocation of loop costs in light of use of the loop for broadband services was referred to the Federal-State Joint Board on Separations in 1999.[435] Specifically, in the wake of the Commission's determination in its 1999 tariff investigation that GTE's ADSL service was an interstate special access service subject to federal tariffing, NARUC filed a petition for clarification regarding the proper allocation under Part 36 of the Commission's rules of loop costs associated with DSL services.[436] Noting that issues associated with how to allocate local loop plant between voice and data services for purposes of jurisdictional separations were beyond the scope of the limited investigation in the tariff proceeding, the Commission stated that it would address these important issues in conjunction with the Joint Board.[437] This issue remains pending. In any event, separations is now subject to a five-year freeze, and the Joint Board is working on the approach that should follow this freeze; the issues we describe in this Order already fall within this context.[438] After the Joint Board makes its recommendation, we can reexamine the question of how any additional costs that might be assigned to the interstate jurisdiction may be recovered by local exchange carriers.

## VII. ENFORCEMENT

145. We intend to swiftly and vigorously enforce the terms of this Order. Significantly, through review of consumer complaints and other relevant information, we will monitor all consumer-related problems arising in this market and take appropriate enforcement action where necessary. Similarly, we will continue to monitor the interconnection[439] and interoperability practices[440] of all industry participants, including facilities-based Internet access providers, and reserve the ability to act under our ancillary authority in the event of a pattern of anti-competitive conduct.[441]

## VIII. NOTICE OF PROPOSED RULEMAKING

146. The broadband marketplace before us today is an emerging and rapidly changing one. Nevertheless, consumer protection remains a priority for the Commission. We have a duty to ensure that consumer protection objectives in the Act are met as the industry shifts from narrowband to broadband services. Through this *Notice*, we thus seek to develop a framework for consumer protection in the broadband age – a framework that ensures that consumer protection needs are met by *all* providers of

[435] *GTE DSL Reconsideration Order*, 17 FCC Rcd at 27412, para. 9; *see also Jurisdictional Separations and Referred to the Federal-State Joint Board*, CC Docket No. 80-286, Report and Order, 16 FCC Rcd 11382, 11397-98, para. 31 (2001).

[436] *GTE DSL Reconsideration Order*, 17 FCC Rcd at 27411, para. 7.

[437] *Id.* at 27412, para. 9.

[438] *See Jurisdictional Separations and Referral to the Federal-State Joint Board*, CC Docket No. 80-286, Report and Order, 16 FCC Rcd 11382 (2001).

[439] 47 U.S.C. § 251(a).

[440] 47 U.S.C. § 256.

[441] *See supra* n.339 (*citing NCTA v. Brand X*, slip op. at 25, regarding the Commission's Title I authority).

broadband Internet access service, regardless of the underlying technology.[442] This framework necessarily will be built on our ancillary jurisdiction under Title I; as we explain in the Order,[443] this jurisdiction is ample to accomplish the consumer protection goals we identify below, and we will not hesitate to exercise it.[444]

147. For each of the specific areas of Commission regulation described below, we ask commenters to address whether the imposition of regulations pursuant to our ancillary jurisdiction, and the corresponding ability of consumers to take advantage of Commission avenues for resolution of consumer protection issues, is desirable and necessary as a matter of public policy, or whether we should rely on market forces to address some or all of the areas listed. Are these types of regulations more or less relevant in the context of broadband Internet access service than they are for traditional telephony services? We ask commenters to describe any technical, economic, or other impediments that may affect the ability of broadband Internet access service providers to comply with such regulations. Are there areas of consumer protection not listed above for which the Commission should impose regulations? If so, commenters should describe the nature of the concern and address the questions posed in this paragraph.

### A. CPNI

148. Consumers' privacy needs are no less important when consumers communicate over and use broadband Internet access than when they rely on telecommunications services. For example, a consumer may have questions about whether a broadband Internet access service provider will treat his or her account and usage information as confidential, or whether the provider reserves the right to use account information for marketing and other purposes. Section 222 of the Act establishes the regulatory framework governing telecommunications carriers' use and disclosure of CPNI and other customer information obtained by those carriers in their "provision of a *telecommunications service*."[445] That section requires, in general, that telecommunications carriers use or disclose CPNI only in the provision of the telecommunications service from which the CPNI is derived, or in the provision of services necessary to, or used in, the provision of such telecommunications services.[446]

149. We seek comment on whether we should extend privacy requirements similar to the Act's CPNI requirements to providers of broadband Internet access services. For example, should we adopt rules under our Title I authority that forbid broadband Internet access providers from disclosing, without their

---

[442] We note that questions regarding necessary regulatory obligations of cable modem providers have previously been raised in the *Cable Modem Declaratory Ruling and NPRM*, 17 FCC Rcd at 4848-54, paras. 96-112. To the extent that our inquiry here is duplicative of those questions, we ask commenters to refresh the record by filing comments in this instant proceeding in WC Docket No. 05-271.

[443] *See supra* paras. 108-111.

[444] Indeed, this Commission has already shown its willingness to rely on ancillary jurisdiction in the face of a demonstrated need. *See VoIP E911 Order* at paras. 26-32.

[445] 47 U.S.C. § 222(c)(1) (emphasis added). The Commission has adopted rules implementing section 222, including rules defining the scope of the phrase "telecommunications service" in section 222(c)(1)(A) as well as rules specifying which services are included in the phrase "services necessary to, or used in the provision of telecommunications service" in section 222(c)(1)(B). *See* 47 C.F.R. §§ 64.2001-64.2008; *see also Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, CC Docket No. 96-115, Third Report and Order and Third Further Notice of Proposed Rulemaking, 17 FCC Rcd 14860 (2002) (*CPNI Remand Order*).

[446] 47 U.S.C. § 222(c)(1).

customers' approval, information about their customers that they learn through the provision of their broadband Internet access service? We seek comment on what sort of customer proprietary information broadband Internet access providers possess, *e.g.*, information about consumers' service plans, installed equipment, or patterns of Internet access use. We note that long before Congress enacted section 222 of the Act, the Commission had recognized the need for privacy requirements associated with the provision of enhanced services and had adopted CPNI-related requirements in conjunction with other *Computer Inquiry* obligations.[447]

### B. Slamming

150. Section 258 of the Act prohibits telecommunications carriers from submitting or executing an unauthorized change in a subscriber's selection of a provider of telephone exchange service or telephone toll service, a practice commonly known as "slamming."[448] In a series of orders, the Commission adopted various rules to implement section 258, and concluded that state authorities should have primary responsibility for administering the rules.[449] By providing for state administration of slamming rules, the

---

[447] *See Computer III Phase II Order*, 2 FCC Rcd at 3094-95, paras. 152-56 (1987). Specifically, in the *Computer III* proceeding, the Commission adopted a framework governing CPNI not only to protect independent enhanced service providers from anticompetitive use of customers' local and long distance services information gained by the dominant telephone service providers to advance their enhanced services provisioning, but also to protect legitimate customer expectations of confidentiality. Under the pre-1996 Act CPNI framework, which was eliminated in its entirety when the Commission implemented section 222, customer information derived from the provision of enhanced services was not subject to CPNI protections. *See Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, CC Docket No. 96-115, Second Report and Order and Further Notice of Proposed Rulemaking, 13 FCC Rcd 8061, 8184-93, paras. 176-89 (1998) (*CPNI Order*), *on recon.*, 14 FCC Rcd 14409 (1999) (*CPNI Reconsideration Order*), *vacated sub nom. U.S. West v. FCC*, 182 F.3d 1224 (10th Cir. 1999), *cert. denied*, 530 U.S. 1213 (2000).

[448] 47 U.S.C. § 258(a) (mandating that "[n]o telecommunications carrier shall submit or execute a change in a subscriber's selection of a provider of telephone exchange service or telephone toll service except in accordance with such verification procedures as the Commission shall prescribe"). Prior to the adoption of section 258 of the Act, the Commission had recognized that slamming was a significant problem, and had taken various steps to address the issue; the adoption of section 258 expanded the Commission's authority in this area. *See, e.g., Policies and Rules Concerning Unauthorized Changes of Consumers' Long Distance Carriers*, CC Docket No. 94-129, Report and Order, 10 FCC Rcd 9560 (1995), *stayed in part*, 11 FCC Rcd 856 (1995); *Policies and Rules Concerning Changing Long Distance Carriers*, CC Docket No. 91-64, Report and Order, 7 FCC Rcd 1038 (1992), *recon. denied*, 8 FCC Rcd 3215 (1993); *Investigation of Access and Divestiture Related Tariffs*, CC Docket No. 83-1145, Phase I, Memorandum Opinion and Order, 101 FCC 2d 935, *recon.*, 102 FCC 2d 503 (1985); *see also, e.g., Cherry Communications*, File No. ENF-93-045, Order, 9 FCC Rcd 2086 (1994) (adopting consent decree enforcing the Commission's anti-slamming rules).

[449] *Implementation of the Subscriber Carrier Selection Changes Provisions of the Telecommunications Act of 1996; Policies and Rules Concerning Unauthorized Changes of Consumers' Long Distance Carriers*, CC Docket No. 94-129, Second Report and Order and Further Notice of Proposed Rulemaking, 14 FCC Rcd 1508 (1998) (*Second Report and Order*), *stayed in part, MCI WorldCom v. FCC*, No. 99-1125 (D.C. Cir. May 18, 1999) (*Stay Order*), *motion to dissolve stay granted, MCI WorldCom v. FCC*, No. 99-1125 (D.C. Cir. June 27, 2000) (*Order Lifting Stay*); *Implementation of the Subscriber Carrier Selection Changes Provisions of the Telecommunications Act of 1996; Policies and Rules Concerning Unauthorized Changes of Consumers' Long Distance Carriers*, CC Docket No. 94-129, First Order on Reconsideration, 15 FCC Rcd 8158 (2000) (*First Reconsideration Order*); *Implementation of the Subscriber Carrier Selection Changes Provisions of the Telecommunications Act of 1996; Policies and Rules Concerning Unauthorized Changes of Consumers' Long Distance Carriers*, CC Docket No. 94-129, Third Report and Order and Second Order on Reconsideration, 15 FCC Rcd 15996 (2000) (*Third Report and Order*); Errata, DA 00-2163 (rel. Sept. 25, 2000); Erratum, DA 00-292 (rel. Oct. 4, 2000); *Implementation of the* (continued . . .)

Commission recognized that state authorities are particularly well-equipped to handle such complaints because states are close to consumers and are familiar with trends in their regions.[450] The Commission also recognized, however, that all states may not have the resources available to handle slamming complaints.[451] Accordingly, the Commission's rules allow consumers in states that do not "opt-in" to administer the slamming rules to file slamming complaints with the Commission.[452]

151. We seek comment on whether we should exercise our Title I authority to impose similar requirements on providers of broadband Internet access service. Commenters should explain in what circumstances subscribers to broadband Internet access could get "slammed."[453] Is the provisioning process for broadband Internet access service such that an unauthorized change in provider is more likely in situations where the provider relies on third-party broadband transmission facilities?

### C. Truth-in-Billing

152. The Commission has adopted truth-in-billing rules to ensure that consumers receive accurate, meaningful information on their telecommunications bills that will allow consumers to better understand their bills, compare service offerings, and thereby promote a more efficient, competitive marketplace.[454] In general, the Commission's rules require that a telecommunication carrier's bill must: (1) be accompanied by a brief, clear, non-misleading, plain language description of the service or services rendered; (2) identify the service provider associated with each charge; (3) clearly and conspicuously identify any change in service provider; (4) identify those charges for which failure to pay will not result in disconnection of basic local service; and (5) provide a toll-free number for consumers to inquire or dispute any charges.[455] The Commission's rules on truth-in-billing are designed to reduce slamming,[456]

(continued from previous page)
*Subscriber Carrier Selection Changes Provisions of the Telecommunications Act of 1996, Policies and Rules Concerning Unauthorized Changes of Consumers' Long Distance Carriers*, CC Docket No. 94-129, Order, 16 FCC Rcd 4999 (2001); *Implementation of the Subscriber Carrier Selection Changes Provisions of the Telecommunications Act of 1996, Policies and Rules Concerning Unauthorized Changes of Consumers' Long Distance Carriers*, CC Docket No. 94-129, Third Order on Reconsideration and Second Further Notice of Proposed Rule Making, 18 FCC Rcd 5099 (2003) (*Third Reconsideration Order* and/or *Second FNPRM*). The rules adopted by the Commission to implement section 258 are codified in part 64. *See* 47 C.F.R. §§ 64.1100 *et seq.*

[450] *First Reconsideration Order*, 15 FCC Rcd at 8169-80, paras. 22-43.

[451] *Id.* at 8165-66, paras. 25-28.

[452] *Id.*

[453] Typically, in order to subscribe to broadband Internet access service, a consumer must install, or have installed, equipment (*i.e.*, a modem that the ISP provides to the consumer and that is specific to that ISP) that, along with a proprietary password, enables the consumer to utilize that particular ISP's Internet access service. We therefore seek comment on whether, given the manner in which broadband Internet access service is provisioned, slamming could actually occur from a technical perspective.

[454] *See* 47 C.F.R. §§ 64.2400-2401.

[455] 47 C.F.R. § 64.2401.

[456] *See supra* Part VIII.B.

cramming,[457] and other telecommunications fraud by setting standards for accuracy on bills for telecommunications service.[458]

153. We seek comment on whether we should exercise our Title I authority to impose requirements on broadband Internet access service providers that are similar to our truth-in-billing requirements or are otherwise geared toward reducing slamming, cramming, or other types of telecommunications-related fraud. For example, during 2005, the Commission's Consumer and Governmental Affairs Bureau has received complaints about the billing practices of broadband Internet access services providers, including complaints related to double billing, billing for unexplained charges, and billing for cancelled services.[459] Overall, parties should explain what problems customers of broadband Internet access service are likely to have with their bills and whether we should address these problems through truth-in-billing-type requirements.

### D. Network Outage Reporting

154. The Commission requires certain communications providers to notify the Commission of outages of thirty or more minutes that affect a substantial number of customers or involve major airports, major military installations, key government facilities, nuclear power plants, or 911 facilities.[460] We seek comment on whether we should exercise our Title I authority to impose any similar requirements on broadband Internet access service providers. Do the purposes of our network outage reporting requirements apply to outages of broadband Internet access service? Should we adopt requirements that differ depending on the nature of the facility or the type of customer served?

### E. Section 214 Discontinuance

155. Section 214 of the Act limits a telecommunications carrier's ability to discontinue unilaterally its service to customers.[461] The Commission's implementing rules generally require that domestic carriers wishing to "discontinue, reduce, or impair" services must first request authority to do so from the Commission[462] and must notify affected customers and others of their plans.[463]

---

[457] "Cramming" is the practice of placing unauthorized, misleading, or deceptive charges on a telecommunications bill. Cramming is most likely to occur when a carrier does not clearly or accurately describe all of the relevant charges on the consumer's bill.

[458] *See* 47 C.F.R. § 64.2400(a).

[459] Operations Support for Complaint Analysis and Resolution (OSCAR) System, Consumer & Governmental Affairs Bureau (Aug. 4, 2005).

[460] 47 C.F.R. § 63.100(a)-(e); *see also New Part 4 of the Commission's Rules Concerning Disruptions to Communications*, ET Docket No. 04-35, Report and Order and Further Notice of Proposed Rulemaking, 19 FCC Rcd 16830, 16867, para. 65 (2004).

[461] 47 U.S.C. § 214(a). Part 63 of the Commission's rules implements this section of the Act, establishing comprehensive rules with which telecommunications carriers must comply in seeking to discontinue telecommunications services. These rules vary depending on whether the carrier in question is a dominant or non-dominant provider of the telecommunications services it is seeking to discontinue. *See* 47 C.F.R. §§ 63.60 *et seq.*

[462] 47 U.S.C. § 63.71.

[463] 47 U.S.C. § 63.71(a).

156. We seek comment on whether we should exercise our Title I authority to impose discontinuance-type requirements on providers of broadband Internet access service. As customers grow more dependent on broadband Internet access services, does the need for notice to customers grow stronger?[464] Or do the multiplicity and availability of broadband Internet access providers mitigate the need for such notice?

**F. Section 254(g) Rate Averaging Requirements**

157. Finally, we seek to ensure that our actions today do not jeopardize the policies of section 254(g). That section required the Commission to adopt rules "to require that the rates charged by providers of interexchange telecommunications services to subscribers in rural and high cost areas . . . be no higher than the rates charged by each such provider to its subscribers in urban areas."[465] The provision further required that the rules "require that a provider of interstate interexchange telecommunications services . . . provide such services to its subscribers in each State at rates no higher than the rates charged to its subscribers in any other State."[466] The Commission has forborne from the requirements of section 254(g) with regard to private line services, of which DSL is one.[467] Because the policies underlying section 254(g) remain important, however, we ask whether we should exercise our Title I authority to impose any similar requirements on providers of broadband Internet access services, particularly as consumers substitute broadband services and applications for narrowband services that were covered by section 254(g).

**G. Federal and State Involvement**

158. We recognize that the states play an important role in ensuring that public safety and consumer protection goals are met. The Commission has recently announced the creation of a federal-state task force on VoIP E911 enforcement,[468] and we believe that this *Notice* may give rise to additional areas in which cooperation between this Commission and the states can achieve the best results. We note in this regard that NARUC has recently advocated for a "functional" approach to questions of federal and state jurisdiction, particularly with respect to consumer protection issues.[469] For example, with respect to CPNI, NARUC recommends that the Commission be primarily responsible for establishing rules, while state or local authorities assume responsibility for enforcing those rules.[470] To the extent that the

---

[464] For example, in 2001, a large provider of broadband Internet access services, @Home, sought bankruptcy court protection and announced plans to sell its high-speed network. Within a relatively brief period of time, the company requested and received permission from the United States Bankruptcy Court to shut down its network, causing its subscribers to switch to other providers. News reports described the many problems the subscribers encountered during the transition, including service outages, inadequate customer support, and loss of high-speed access. *See* Bill Bergstrom, *Comcast Fields Internet Complaints*, Tallahassee Democrat, Jan. 9, 2002; Bill Bergstrom, *Internet Switch Problems Annoy Comcast Customers*, Fort Wayne Journal-Gazette, Jan. 7, 2002.

[465] 47 U.S.C. § 254(g).

[466] *Id.*

[467] *See Policy and Rules Concerning the Interstate, Interexchange Marketplace*, Report and Order, 11 FCC Rcd 9564, 9577, para. 27 (1996) (forbearing from application of section 254(g) "to the extent necessary to permit carriers to depart from geographic rate averaging to offer . . . private line services").

[468] *See, e.g., FCC Announces Joint Federal/State VoIP Enhanced 911 Enforcement Task Force*, Press Release, 2005 Westlaw 1750445 (July 25, 2005).

[469] *See generally NARUC Legislative Task Force Report on Federalism and Telecom* (July 2005).

[470] *See id.* at 8.

Commission finds it necessary to impose consumer protection and related regulations on broadband Internet access service providers, we seek comment on how best to harmonize federal regulations with the states' efforts and expertise in these areas. Do commenters support NARUC's functional approach? In what other ways can the federal and state governments cooperate in order to ensure the best results for consumers?

### H. Consumer Options for Enforcement

159. We note that consumers have various methods of pursuing complaints with the Commission against entities subject to our jurisdiction. In particular, the Commission's informal complaint process permits consumers to submit complaints to the Commission by any reasonable means, including by telephone, facsimile, postal mail, email and an Internet complaint form. Consumer Center representatives, known as Consumer Advocacy and Mediation Specialists or CAMSs, are available to assist consumers in filing complaints if needed. CAMSs staff review complaints for subject matter content and determine appropriate handling of the complaints.

## IX. PROCEDURAL MATTERS

### A. Final Paperwork Reduction Act Analysis

160. This Report and Order does not contain any information collection subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. In addition, therefore, it does not contain any new or modified "information collection burden for small business concerns with fewer than 25 employees," pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. § 3506(c)(4).

### B. Regulatory Flexibility

161. As required by the Regulatory Flexibility Act, *see* 5 U.S.C. § 603, the Commission has prepared a Final Regulatory Flexibility Certification of the possible significant economic impact on small entities of the policies and rules addressed in this Report and Order. This certification is set forth in Appendix B.

162. As required by the Regulatory Flexibility Act, 5 U.S.C. § 603, the Commission has prepared an Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on small entities of the policies and rules addressed in this Notice of Proposed Rulemaking. The IRFA is set forth in Appendix B. Written public comments are requested on the IRFA. These comments must be filed in accordance with the same filing deadlines as comments filed in response to this Notice of Proposed Rulemaking and must have a separate and distinct heading designating them as responses to the IRFA.

### C. Other Procedural Matters

#### 1. Ex Parte Presentations

163. The rulemaking this Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[471] Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentations must contain summaries of the substance of the presentations and not merely a listing of the subjects discussed. More than a one or two sentence

[471] 47 C.F.R. §§ 1.200 *et seq.*

description of the views and arguments presented is generally required.[472] Other requirements pertaining to oral and written presentations are set forth in section 1.1206(b) of the Commission's rules.

### 2. Comment Filing Procedures

164. Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 C.F.R §§ 1.415, 1.419, interested parties may file comments and reply comments regarding the Notice of Proposed Rulemaking on or before the dates indicated on the first page of this document. **All filings related to this Notice of Proposed Rulemaking should refer to WC Docket No. 05-271 and need not reference the other docket numbers appearing in the caption to this document.** Comments may be filed using: (1) the Commission's Electronic Comment Filing System (ECFS), (2) the Federal Government's eRulemaking Portal, or (3) by filing paper copies. *See* Electronic Filing of Documents in Rulemaking Proceedings, 63 FR 24121 (1998).

- Electronic Filers: Comments may be filed electronically using the Internet by accessing the ECFS: http://www.fcc.gov/cgb/ecfs/ or the Federal eRulemaking Portal: http://www.regulations.gov. Filers should follow the instructions provided on the website for submitting comments.

  - ECFS filers must transmit one electronic copy of the comments for WC Docket No. 05-271. In completing the transmittal screen, filers should include their full name, U.S. Postal Service mailing address, and the applicable docket number. Parties may also submit an electronic comment by Internet e-mail. To get filing instructions, filers should send an e-mail to ecfs@fcc.gov, and include the following words in the body of the message, "get form." A sample form and directions will be sent in response.

- Paper Filers: Parties who choose to file by paper must file an original and four copies of each filing. Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail (although we continue to experience delays in receiving U.S. Postal Service mail). All filings must be addressed to the Commission's Secretary, Marlene H. Dortch, Office of the Secretary, Federal Communications Commission, 445 12th Street, S.W., Washington, D.C. 20554.

  - The Commission's contractor will receive hand-delivered or messenger-delivered paper filings for the Commission's Secretary at 236 Massachusetts Avenue, N.E., Suite 110, Washington, D.C. 20002. The filing hours at this location are 8:00 a.m. to 7:00 p.m. All hand deliveries must be held together with rubber bands or fasteners. Any envelopes must be disposed of before entering the building.

  - Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, Md. 20743.

  - U.S. Postal Service first-class, Express, and Priority mail should be addressed to 445 12th Street, S.W., Washington D.C. 20554.

165. Parties should send a copy of their filings to Janice Myles, Competition Policy Division, Wireline Competition Bureau, Federal Communications Commission, Room 5-C140, 445 12th Street, S.W.,

---

[472] *See* 47 C.F.R. § 1.1206(b)(2).

Washington, D.C. 20554, or by e-mail to janice.myles@fcc.gov. Parties shall also serve one copy with the Commission's copy contractor, Best Copy and Printing, Inc. (BCPI), Portals II, 445 12th Street, S.W., Room CY-B402, Washington, D.C. 20554, (202) 488-5300, or via e-mail to fcc@bcpiweb.com.

166. Documents in WC Docket No. 05-271 will be available for public inspection and copying during business hours at the FCC Reference Information Center, Portals II, 445 12th Street S.W., Room CY-A257, Washington, D.C. 20554. The documents may also be purchased from BCPI, telephone (202) 488-5300, facsimile (202) 488-5563, TTY (202) 488-5562, e-mail fcc@bcpiweb.com.

### 3. Accessible Formats

167. To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice) or 202-418-0432 (TTY). Contact the FCC to request reasonable accommodations for filing comments (accessible format documents, sign language interpreters, CART, etc.) by e-mail: FCC504@fcc.gov; phone: 202-418-0530 or TTY: 202-418-0432.

## X. ORDERING CLAUSES

168. Accordingly, IT IS ORDERED that, pursuant to Sections 1-4, 10, 201-205, 214, 222, 225, 251, 252, 254-256, 258, 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 160, 201-205, 214, 222, 225, 251, 252, 254-256, 258, 303(r), and Section 706 of the Telecommunications Act of 1996, 47 U.S.C. § 157 nt, the Report and Order and Notice of Proposed Rulemaking ARE ADOPTED.

169. IT IS FURTHER ORDERED, pursuant to Sections 1-4, 10, 201-205, 214, 222, 225, 251, 252, 254-256, 258, 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 160, 201-205, 214, 222, 225, 251, 252, 254-256, 258, 303(r), and Section 706 of the Telecommunications Act of 1996, 47 U.S.C. § 157 nt, that wireline broadband Internet access transmission providers ARE GRANTED blanket certification to discontinue the provision of common carrier broadband Internet access transmission services to existing customers as set forth and subject to the conditions stated in this Order.

170. IT IS FURTHER ORDERED, pursuant to Sections 1-4, 10, 201-205, 214, 222, 225, 251, 252, 254-256, 258, 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 160, 201-205, 214, 222, 225, 251, 252, 254-256, 258, 303(r), and Section 706 of the Telecommunications Act of 1996, 47 U.S.C. § 157 nt, that the Conditional Petition for Forbearance Under 47 U.S.C. § 160(c) filed by the Verizon Telephone Companies in WC Docket No. 04-242 on June 28, 2004, IS DENIED AS MOOT.

171. IT IS FURTHER ORDERED, pursuant to Sections 1-4, 10, 201-205, 214, 222, 225, 251, 252, 254-256, 258, 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 160, 201-205, 214, 222, 225, 251, 252, 254-256, 258, 303(r), and Section 706 of the Telecommunications Act of 1996, 47 U.S.C. § 157 nt, that the Petition for Declaratory Ruling or, Alternatively, for Interim Waiver filed in WC Docket No. 04-242 by the Verizon Telephone Companies on June 28, 2004, IS DISMISSED AS MOOT.

172. IT IS FURTHER ORDERED, pursuant to sections 1.103(a) and 1.427(b) of the Commission's rules, 47 C.F.R. §§ 1.103(a), 1.427(b), that this Report and Order SHALL BE EFFECTIVE 30 days after publication of the Report and Order in the FEDERAL REGISTER.

173. IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Order, including the Final

Regulatory Flexibility Certification, to the Chief Counsel for Advocacy of the Small Business Administration.

174. IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Notice of Proposed Rulemaking, including the Initial Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.[473]

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

[473] *See* 5 U.S.C. § 603(a).

## APPENDIX A
## LIST OF COMMENTERS

### Commenters
### WC Docket No. 02-33

| Comments | Abbreviation |
|---|---|
| Alcatel USA, Inc. | Alcatel |
| Allegiance Telecom, Inc. | Allegiance |
| Alvarion, Inc. | Alvarion |
| American Foundation for the Blind | AFB |
| American ISP Association | AISPA |
| American Public Power Association | APPA |
| AOL Time Warner Inc. | AOL |
| Arizona Consumer Council, Center for Digital Democracy, Citizen Action of Illinois, Citizens Utility Board of Oregon, Consumer Action, the Consumer Federation of America, Consumers Union, Democratic Process Center, Florida Consumer Action Network, Illinois Pirg, Massachusetts Consumer Coalition, Media Access Project, New Jersey Citizen Action, Texas Consumer Association, Texas Office of Public Utility Counsel, USAction | Arizona Consumer Council *et al.* |
| Association of Communications Enterprises | ASCENT |
| AT&T Corporation | AT&T |
| Beacon Telecommunications Advisors, LLC | Beacon |
| BellSouth Corporation | BellSouth |
| Big Planet, Inc. | Big Planet |
| Business Telecom, Inc., CTC Communications Corp., Florida Digital Network, Inc., Globalcom, Inc., and RCN Telecom Services, Inc. | Business Telecom *et al.* |
| California Internet Service Providers Association | CISPA |
| Catena Networks, Inc. | Catena |
| Cbeyond Communications, LLC, EL Paso Networks, LLC, Focal Communications Corporation, New Edge Network, Inc., and Pac-West Telecomm, Inc. | Cbeyond *et al.* |
| Charter Communications, Inc. | Charter |
| Cinergy Communications Company | Cinergy |
| Covad Communications Company | Covad |
| Cox Communications, Inc. | Cox |
| David R. Hughes | David R. Hughes |
| DirectTV Broadband, Inc. | DirectTV |
| DSLnet Communications, LLC | DSLnet |
| EarthLink, Inc. | EarthLink |
| Federal Bureau of Investigation (FBI) and Department of Justice | DOJ/FBI |
| Florida Public Service Commission | Florida Commission |
| Fred Williamson and Associates, Inc. | FW&A |
| General Communication Inc. | GCI |
| GVNW Consulting, Inc. | GVNW |
| Hugh Carter Donahue | Donahue |

| | |
|---|---|
| Hughes Network Systems, Inc., Hughes Communications, Inc., and Hughes Communications Galaxy, Inc. | Hughes |
| Illinois Commerce Commission | Illinois Commission |
| Independent Telephone and Telecommunications Alliance | ITTA |
| Information Technology Association of America | ITAA |
| Kenneth Arrow *et al.* | Arrow *et al.* |
| JMC Telecom and NuVox Communications | JMC/NuVox |
| McLeodUSA Telecommunications Services, Inc. | McLeodUSA |
| Mescalero Apache Telecom, Inc. | MATI |
| Michigan Public Service Commission | Michigan Commission |
| Minnesota Department of Commerce | Minnesota Commerce Dept. |
| Monet Mobile Networks, Inc. | Monet |
| Mpower Communications Corp. | Mpower |
| Mutual Data Services, Inc., | Mutual Data |
| National Association of Regulatory Utility Commissioners | NARUC |
| National Cable & Telecommunications Association | NCTA |
| National Exchange Carrier Association, Inc. | NECA |
| National Rural Telecom Association | NRTA |
| Nebraska Independent Companies | Nebraska Independents |
| New Hampshire ISP Association | New Hampshire ISPs |
| NewSouth Communications | NewSouth |
| New York State Department of Public Service | New York Commission |
| Office of the Attorney General of Texas, Consumer Protection Division | Texas Attorney General |
| Ohio Internet Service Providers Association, Texas Internet Services Providers Association, and Washington Association of Internet Service Providers | Ohio ISP Assoc. *et al.* |
| Oregon Public Utility Commission | Oregon Commission |
| Organization for the Promotion and Advancement of Small Telecommunications Companies | OPASTCO |
| Oregon Public Utility Commission | Oregon Commission |
| Part-15 Organization, Inc. | Part-15.Org |
| People of the State of California and the California Public Utilities Commission | California Commission |
| Pennsylvania Office of Consumer Advocate, Maine Public Advocate, Maryland Office of People's Counsel, Ohio Consumers' Counsel, Utility Reform Network, California Office of Ratepayer Advocates, Connecticut Office of Consumer Counsel, and New Hampshire Office of Consumer Advocate | Pennsylvania Consumer Advocate *et al.* |
| Public Service Commission of Wisconsin | Wisconsin Commission |
| Public Utilities Commission of Ohio | Ohio Commission |
| Public Utilities Commission of Texas | Texas Commission |
| Qwest Communications International Inc. | Qwest |
| Rehabilitation Engineering Research Center on Telecommunications Access | RERC-TA |
| Ruby Ranch Internet Cooperative Association | Ruby |
| SBC Communications Inc. | SBC |
| Secretary of Defense | Secretary of Defense |

| | |
|---|---|
| SES AMERICOM, Inc. | SES AMERICOM |
| Socket Holdings Corporation | Socket |
| Sprint Corporation | Sprint |
| State Members of the Federal-State Joint Board on Separations | Federal-State Joint Board |
| Statement of 43 Economists | Economists |
| SureWest Communications | SureWest |
| TDS Telecommunications Corporation, Madison River Communications, and North Pittsburgh Systems Inc. | TDS *et al.* |
| Telecommunications for The Deaf, Inc. | Telecom for the Deaf |
| TeleTruth | TeleTruth |
| Texas Office of Public Utility Counsel, Consumer Federation of America, Consumers Union, Media Access Project, and the Center for Digital Democracy | Texas Counsel *et al.* |
| Time Warner Telecom | Time Warner |
| Pennsylvania Office of Consumer Advocate, Maine Public Advocate, Maryland Office of People's Counsel, Ohio Consumers' Counsel, Utility Reform Network, California Office of Ratepayer Advocates, Connecticut Office of Consumer Counsel, and New Hampshire Office of Consumer Advocate | Pennsylvania Consumer Advocate *et al.* |
| United Church of Christ, Office of Communication,; Association of Independent Video and Filmmakers; National Association of Media Arts and Culture | United Church of Christ *et al.* |
| United States Internet Industry Association | USIIA |
| United States Telecom Association | USTA |
| US LEC Corp. | US LEC |
| Verizon telephone companies | Verizon |
| Verizon Wireless | Verizon Wireless |
| Vermont Public Service Board | Vermont Commission |
| WaveRider Communications Inc. | WaveRider |
| Western Alliance | Western Alliance |
| Whizwireless, LLC | Whizwireless |
| Wireless Communications Association International, Inc. | WCA |
| WorldCom, Inc., The Competitive Telecommunications Association, and the Association for Local Telecommunications Services | MCI *et al.* |
| Z-Tel Communications, Inc. | Z-Tel |

**Reply Commenters**
**WC Docket No. 02-33**

| Comments | Abbreviation |
|---|---|
| Ad Hoc Telecommunications Users Committee | Ad Hoc |
| Alaska Telephone Association | Alaska |
| Allegiance Telecom, Inc. | Allegiance |
| American Library Association | American Library |
| AOL Time Warner Inc. | AOL |
| Association for Local Telecommunication Services | ALTS |

| | |
|---|---|
| Association of Communications Enterprises, AT&T, Big Planet, Inc., Business Telecom, Inc., Cbeyond Communications, LLC, CTC Communications Corp., DSLNet Communications, LLC, El Paso Networks, LLC, Focal Communications Corporation, Florida Digital Network, New Edge Network, Inc., Pac-West Telecomm, Inc., RCN Telecom Services, Inc., and US LEC Corp. | ASCENT *et al.* |
| AT&T Corporation | AT&T |
| Attorney General to Texas, Consumer Protection Division | Texas Attorney General |
| Beacon Telecommunications Advisors, LLC | Beacon |
| BellSouth Corporation | BellSouth |
| Cablevision Systems Corporation | Cablevision |
| California Internet Service Providers Association | CISPA |
| Charter Communications, Inc. | Charter |
| City of Ketchikan d/b/a Ketchikan Public Utilities – Telephone Division | KPU |
| Comcast Corporation | Comcast |
| Communications Workers of America | CWA |
| Covad Communications Company | Covad |
| DirectTV Broadband, Inc. | DirectTV Broadband |
| DSLnet Communications, LLC | DSLnet |
| EarthLink, Inc. | EarthLink |
| Fred Williamson and Associates, Inc. | FW&A |
| General Communication Inc. | GCI |
| GVNW Consulting, Inc. | GVNW |
| High Tech Broadband Coalition | HTBC |
| Independent Telephone and Telecommunications Alliance | ITTA |
| Information Technology Association of America | ITAA |
| Kenneth Arrow *et al.* | Arrow *et al.* |
| KMC Telecom and NuVox Communications | KMC/NuVox |
| McLeodUSA Telecommunications Services, Inc. | McLeodUSA |
| Mescalero Apache Telecom, Inc. | MATI |
| National Association of Broadcasters | NAB |
| National Cable & Telecommunications Association | NCTA |
| National Rural Telecom Association | NRTA |
| National Telecommunications Cooperative Association | NTCA |
| Nebraska Independent Companies | Nebraska Independents |
| New York State Attorney General | New York Attorney General |
| New York State Department of Public Service | New York Commission |
| Next Level Communications | Next Level |
| Ohio Internet Service Providers Association, Texas Internet Services Providers Association, and Washington Association of Internet Service Providers | Ohio ISP Assoc. *et al.* |
| Organization for the Promotion and Advancement of Small Telecommunications Companies | OPASTCO |
| Pennsylvania Office of Consumer Advocate, Maine Public Advocate, Maryland Office of People's Counsel, Ohio Consumers' Counsel, Utility Reform Network, California Office of Ratepayer Advocates, and New Hampshire Office of Consumer Advocate | Pennsylvania Consumer Advocates *et al.* |
| Qwest Communications International Inc. | Qwest |

| | |
|---|---|
| Regulatory Commission of Alaska | Alaska Commission |
| SBC Communications Inc. | SBC |
| Satellite Industry Association | SIA |
| SES AMERICOM, Inc. | SES AMERICON |
| Sprint Corporation | Sprint |
| Time Warner Telecom | Time Warner |
| United States Internet Industry Association | USIIA |
| United States Telecom Association | USTA |
| Verizon telephone companies | Verizon |
| WorldCom, Inc., Competitive Telecommunications Association, and Association for Local Telecommunications Services | MCI *et al.* |
| XO Communications, Inc. | XO |

# APPENDIX B
# REGULATORY FLEXIBILITY ANALYSES

## I. FINAL REGULATORY FLEXIBILITY CERTIFICATION

1. The Regulatory Flexibility Act of 1980, as amended (RFA),[1] requires that a regulatory flexibility analysis be prepared for notice-and-comment rulemaking proceedings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[2] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[3] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[4] A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA).[5]

2. In the *Wireline Broadband NPRM*, the Commission sought comment generally on the appropriate statutory classification for wireline broadband Internet access service provided over a provider's own facilities, and on what regulatory requirements, if any, should be imposed on the telecommunications component of wireline broadband Internet access service.[6] Specifically, the Commission sought comment on whether the *Computer Inquiry* requirements should be modified or eliminated as applied to self-provisioned wireline broadband Internet access service, as well as how the Commission's tentative conclusion that wireline broadband Internet access service is an information service would affect the CALEA assistance capabilities, the USA PATRIOT Act, other national security or emergency preparedness obligations, network reliability and interoperability, and existing consumer protection requirements, such as section 214 of the Act, CPNI requirements under section 222 of the Act, and requirements for access to persons with disabilities under section 255 of the Act.[7] The Commission also sought comment on how to continue to meet the goals of universal service under section 254 of the Act in a marketplace where competing providers are deploying broadband Internet access, including how the regulatory status of wireline broadband Internet access could impact the system of assessments and contributions to universal service.[8] Finally, the *Wireline Broadband NPRM* also invited comment on the

---

[1] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. §§ 601-12, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] 5 U.S.C. § 605(b).

[3] 5 U.S.C. § 601(6).

[4] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[5] 15 U.S.C. § 632.

[6] *Wireline Broadband NPRM*, 17 FCC Rcd at 3029-48, paras. 17-64.

[7] *Id.* at 3035-47, paras. 30-61.

[8] *Id.* at 3043-54, paras. 54-78.

relationship between the statutory classification of wireline broadband Internet access service and an incumbent LEC's obligation to provide access to UNEs under sections 251 and 252.[9]

3. The Order eliminates the *Computer Inquiry* requirements on facilities-based carriers in their provision of wireline broadband Internet access service. Consequently, BOCs are immediately relieved of the separate subsidiary, CEI, and ONA obligations with respect to wireline broadband Internet access services. In addition, subject to a one-year transition period for existing wireline broadband transmission services, all wireline broadband Internet access service providers are no longer subject to the *Computer II* requirement to separate out the underlying transmission from wireline broadband Internet access service and offer it on a common carrier basis. We determine in this Order that wireline broadband Internet access service is an information service, as that term is defined in the statute. To the extent that the regulatory obligations discussed above apply to the transmission component of wireline broadband Internet access service when provided to ISPs or others on a stand-alone common carrier basis, these obligations will continue to apply when carriers offer broadband Internet access service transmission on a common carrier basis, both during the transition and thereafter.

4. The rule changes adopted in this Order apply, for the most part, only to BOCs (*Computer Inquiry* separate subsidiary, CEI, and ONA obligations with respect to wireline broadband Internet access services). In addition, all facilities-based wireline broadband Internet access service providers are no longer subject to the *Computer II* requirement to separate out the underlying transmission. Neither the Commission nor the SBA has developed a small business size standard specifically applicable to providers of incumbent local exchange service and interexchange services. The closest applicable size standard under the SBA rules is for Wired Telecommunications Carriers.[10] This provides that such a carrier is small entity if it employs no more than 1,500 employees.[11] None of the four BOCs that would be affected by amendment of these rules meets this standard. To the extent that any other wireline provider would be classified as a small entity, it would not be negatively affected by the regulatory relief we grant in this Order.

5. Therefore, we certify that the requirements of the Order will not have a significant economic impact on a substantial number of small entities. We note that one party, Teletruth, filed comments in response to the IFRAs in the *Wireline Broadband* and *Incumbent LEC Broadband* proceedings. Teletruth argues that that these IRFAs are deficient because they fail to assess the potential impact of the actions proposed in those proceedings on small ISPs and small competitive LECs and that our implementation of the RFA is otherwise deficient.[12] These arguments are identical to, and indeed filed as part of the same pleading as, arguments the Commission previously has rejected.[13] We therefore again reject these arguments for the reasons stated in our prior Orders responding to TeleTruth's comments.[14]

---

[9] *Id.* at 3047, para. 61.

[10] 13 C.F.R. § 121.201, NAICS code 517110.

[11] *Id.*

[12] *See* TeleTruth Comments *passim*.

[13] *See* TeleTruth Comments *passim*.

[14] *See* TeleTruth Comments *passim*.

6. The Commission will send a copy of the Order, including a copy of this Final Regulatory Flexibility Certification, in a report to Congress pursuant to the Congressional Review Act.[15] In addition, the Order and this final certification will be sent to the Chief Counsel for Advocacy of the SBA, and a summary of the Order and final certification will be published in the Federal Register.[16]

## II. INITIAL REGULATORY FLEXIBILITY ANALYSIS

7. As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[17] the Commission has prepared the present Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on small entities that might result from this *Notice*. Written public comments are requested on this IRFA. Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments on the *Notice* provided above. The Commission will send a copy of the *Notice*, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration.[18] In addition, the *Notice* and IRFA (or summaries thereof) will be published in the Federal Register.[19]

### A. Need for, and Objectives of, the Proposed Rules

8. The broadband marketplace before us today is an emerging and rapidly changing one. Nevertheless, consumer protection remains a priority for the Commission. We initiate this rulemaking to ensure that consumer protection objectives in the Act are met as the industry shifts from narrowband to broadband services. Through this *Notice*, the Commission's objective is to develop a framework for consumer protection in the broadband age – a framework that ensures that consumer protection needs are met by all providers of broadband Internet access service, regardless of the underlying technology.[20] The *Notice* seeks comment on whether the Commission should impose, for example, privacy requirements similar to the Act's CPNI requirements, slamming, truth-in-billing, network outage reporting, section 214 discontinuance, or section 254(g) rate averaging requirements on providers of broadband Internet access service. We also seek comment on how best to harmonize federal regulations with the states' efforts and expertise in consumer protection issues.

### B. Legal Basis

9. The legal basis for any action that may be taken pursuant to the *Notice* is contained in sections 1-4, 201-205, 251, 252, 254, 256, 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 201-205, 251, 252, 254, 256, 303(r), and Section 706 of the Telecommunications Act of 1996, 47 U.S.C. § 157 nt.

---

[15] *See* 5 U.S.C. § 801(a)(1)(A).

[16] *See* 5 U.S.C. § 605(b).

[17] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. §§ 601-12, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, 110 Stat. 857 (1996).

[18] *See* 5 U.S.C. § 603(a).

[19] *See* 5 U.S.C. § 603(a).

[20] *See supra Notice* at para. 146.

### C. Description and Estimate of the Number of Small Entities to Which the Proposed Rules May Apply

10. The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules.[21] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[22] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[23] A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA).[24]

11. *Small Businesses.* Nationwide, there are a total of approximately 22.4 million small businesses, according to SBA data.[25]

12. *Small* Organizations. Nationwide, there are approximately 1.6 million small organizations.[26]

13. *Small Governmental Jurisdictions.* The term "small governmental jurisdiction" is defined as "governments of cities, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[27] As of 1997, there were approximately 87,453 governmental jurisdictions in the United States.[28] This number includes 39,044 county governments, municipalities, and townships, of which 37,546 (approximately 96.2%) have populations of fewer than 50,000, and of which 1,498 have populations of 50,000 or more. Thus, we estimate the number of small governmental jurisdictions overall to be 84,098 or fewer.

14. We note that the list of potentially affected entities below is perhaps more expansive than is necessary. We have, for instance, included services that are apparently currently not a part of the Internet industry, as well as manufacturers.

---

[21] 5 U.S.C. §§ 603(b)(3), 604(a)(3).

[22] 5 U.S.C. § 601(6).

[23] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such terms which are appropriate to the activities of the agency and publishes such definitions(s) in the Federal Register."

[24] 15 U.S.C. § 632.

[25] *See* SBA, Programs and Services, SBA Pamphlet No. CO-0028, at page 40 (July 2002).

[26] Independent Sector, The New Nonprofit Almanac & Desk Reference (2002).

[27] 5 U.S.C. § 601(5).

[28] U.S. Census Bureau, Statistical Abstract of the United States: 2000, Section 9, pages 299-300, Tables 490 and 492.

## 1. Telecommunications Service Entities

### a. Wireline Carriers and Service Providers

15. We have included small incumbent local exchange carriers in this present RFA analysis. As noted above, a "small business" under the RFA is one that, *inter alia*, meets the pertinent small business size standard (*e.g.*, a telephone communications business having 1,500 or fewer employees), and "is not dominant in its field of operation."[29] The SBA's Office of Advocacy contends that, for RFA purposes, small incumbent local exchange carriers are not dominant in their field of operation because any such dominance is not "national" in scope.[30] We have therefore included small incumbent local exchange carriers in this RFA analysis, although we emphasize that this RFA action has no effect on Commission analyses and determinations in other, non-RFA contexts.

1. *Incumbent Local Exchange Carriers (LECs).* Neither the Commission nor the SBA has developed a small business size standard specifically for incumbent local exchange services. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[31] According to Commission data,[32] 1,303 carriers have reported that they are engaged in the provision of incumbent local exchange services. Of these 1,303 carriers, an estimated 1,020 have 1,500 or fewer employees and 283 have more than 1,500 employees. Consequently, the Commission estimates that most providers of incumbent local exchange service are small businesses that may be affected by our action. In addition, limited preliminary census data for 2002 indicate that the total number of wired communications carriers increased approximately 34 percent from 1997 to 2002.[33]

16. *Competitive Local Exchange Carriers, Competitive Access Providers (CAPs),* "Shared-Tenant Service Providers," and "Other Local Service Providers." Neither the Commission nor the SBA has developed a small business size standard specifically for these service providers. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[34] According to Commission data,[35]

---

[29] 15 U.S.C. § 632.

[30] Letter from Jere W. Glover, Chief Counsel for Advocacy, SBA, to William E. Kennard, Chairman, FCC (May 27, 1999). The Small Business Act contains a definition of "small-business concern," which the RFA incorporates into its own definition of "small business." *See* 15 U.S.C. § 632(a) (Small Business Act); 5 U.S.C. § 601(3) (RFA). SBA regulations interpret "small business concern" to include the concept of dominance on a national basis. *See* 13 C.F.R. § 121.102(b).

[31] 13 C.F.R. § 121.201, NAICS code 517110 (changed from 513310 in Oct. 2002).

[32] FCC, Wireline Competition Bureau, Industry Analysis and Technology Division, "Trends in Telephone Service" at Table 5.3, page 5-5 (June 2004) ("Trends in Telephone Service"). This source uses data that are current as of October 1, 2004.

[33] *See* U.S. Census Bureau, 2002 Economic Census, Industry Series: "Information," Table 2, Comparative Statistics for the United States (1997 NAICS Basis): 2002 and 1997, NAICS code 513310 (issued Nov. 2004). The preliminary data indicate that the total number of "establishments" increased from 20,815 to 27, 891. In this context, the number of establishments is a less helpful indicator of small business prevalence than is the number of "firms," because the latter number takes into account the concept of common ownership or control. The more helpful 2002 census data on firms, including employment and receipts numbers, will be issued in late 2005.

[34] 13 C.F.R. § 121.201, NAICS code 517110 (changed from 513310 in Oct. 2002).

769 carriers have reported that they are engaged in the provision of either competitive access provider services or competitive local exchange carrier services. Of these 769 carriers, an estimated 676 have 1,500 or fewer employees and 93 have more than 1,500 employees. In addition, 12 carriers have reported that they are "Shared-Tenant Service Providers," and all 12 are estimated to have 1,500 or fewer employees. In addition, 39 carriers have reported that they are "Other Local Service Providers." Of the 39, an estimated 38 have 1,500 or fewer employees and one has more than 1,500 employees. Consequently, the Commission estimates that most providers of competitive local exchange service, competitive access providers, "Shared-Tenant Service Providers," and "Other Local Service Providers" are small entities that may be affected by our action. In addition, limited preliminary census data for 2002 indicate that the total number of wired communications carriers increased approximately 34 percent from 1997 to 2002.[36]

17. *Local Resellers.* The SBA has developed a small business size standard for the category of Telecommunications Resellers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[37] According to Commission data,[38] 143 carriers have reported that they are engaged in the provision of local resale services. Of these, an estimated 141 have 1,500 or fewer employees and two have more than 1,500 employees. Consequently, the Commission estimates that the majority of local resellers are small entities that may be affected by our action.

18. *Toll Resellers.* The SBA has developed a small business size standard for the category of Telecommunications Resellers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[39] According to Commission data,[40] 770 carriers have reported that they are engaged in the provision of toll resale services. Of these, an estimated 747 have 1,500 or fewer employees and 23 have more than 1,500 employees. Consequently, the Commission estimates that the majority of toll resellers are small entities that may be affected by our action.

19. *Payphone Service Providers (PSPs).* Neither the Commission nor the SBA has developed a small business size standard specifically for payphone services providers. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[41] According to Commission data,[42] 654 carriers have reported that they are engaged in the provision of payphone services. Of these, an estimated 652 have 1,500 or fewer employees and two have more than 1,500 employees. Consequently, the Commission estimates that the majority of payphone service providers are small entities that may be affected by our

(continued from previous page)
[35] "Trends in Telephone Service" at Table 5.3.

[36] *See supra* note 33.

[37] 13 C.F.R. § 121.201, NAICS code 517310 (changed from 513330 in Oct. 2002).

[38] "Trends in Telephone Service" at Table 5.3.

[39] 13 C.F.R. § 121.201, NAICS code 517310 (changed from 513330 in Oct. 2002).

[40] "Trends in Telephone Service" at Table 5.3.

[41] 13 C.F.R. § 121.201, NAICS code 517110 (changed from 513310 in Oct. 2002).

[42] "Trends in Telephone Service" at Table 5.3.

action. In addition, limited preliminary census data for 2002 indicate that the total number of wired communications carriers increased approximately 34 percent from 1997 to 2002.[43]

20. *Interexchange Carriers (IXCs).* Neither the Commission nor the SBA has developed a small business size standard specifically for providers of interexchange services. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[44] According to Commission data,[45] 316 carriers have reported that they are engaged in the provision of interexchange service. Of these, an estimated 292 have 1,500 or fewer employees and 24 have more than 1,500 employees. Consequently, the Commission estimates that the majority of IXCs are small entities that may be affected by our action. In addition, limited preliminary census data for 2002 indicate that the total number of wired communications carriers increased approximately 34 percent from 1997 to 2002.[46]

21. *Operator Service Providers (OSPs).* Neither the Commission nor the SBA has developed a small business size standard specifically for operator service providers. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[47] According to Commission data,[48] 23 carriers have reported that they are engaged in the provision of operator services. Of these, an estimated 20 have 1,500 or fewer employees and three have more than 1,500 employees. Consequently, the Commission estimates that the majority of OSPs are small entities that may be affected by our action. In addition, limited preliminary census data for 2002 indicate that the total number of wired communications carriers increased approximately 34 percent from 1997 to 2002.[49]

22. *Prepaid Calling Card Providers.* Neither the Commission nor the SBA has developed a small business size standard specifically for prepaid calling card providers. The appropriate size standard under SBA rules is for the category Telecommunications Resellers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[50] According to Commission data,[51] 89 carriers have reported that they are engaged in the provision of prepaid calling cards. Of these, 88 are estimated to have 1,500 or fewer employees and one has more than 1,500 employees. Consequently, the Commission estimates that all or the majority of prepaid calling card providers are small entities that may be affected by our action.

23. *800 and 800-Like Service Subscribers.*[52] Neither the Commission nor the SBA has developed a small business size standard specifically for 800 and 800-like service ("toll free") subscribers. The

---

[43] *See supra* note 33.

[44] 13 C.F.R. § 121.201, NAICS code 517110 (changed from 513310 in Oct. 2002).

[45] "Trends in Telephone Service" at Table 5.3.

[46] *See supra* note 33.

[47] 13 C.F.R. § 121.201, NAICS code 517110 (changed from 513310 in Oct. 2002).

[48] "Trends in Telephone Service" at Table 5.3.

[49] *See supra* note 33.

[50] 13 C.F.R. § 121.201, NAICS code 517310 (changed from 513330 in Oct. 2002).

[51] "Trends in Telephone Service" at Table 5.3.

[52] We include all toll-free number subscribers in this category, including those for 888 numbers.

appropriate size standard under SBA rules is for the category Telecommunications Resellers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[53] The most reliable source of information regarding the number of these service subscribers appears to be data the Commission collects on the 800, 888, and 877 numbers in use.[54] According to our data, at the end of January, 1999, the number of 800 numbers assigned was 7,692,955; the number of 888 numbers assigned was 7,706,393; and the number of 877 numbers assigned was 1,946,538. We do not have data specifying the number of these subscribers that are not independently owned and operated or have more than 1,500 employees, and thus are unable at this time to estimate with greater precision the number of toll free subscribers that would qualify as small businesses under the SBA size standard. Consequently, we estimate that there are 7,692,955 or fewer small entity 800 subscribers; 7,706,393 or fewer small entity 888 subscribers; and 1,946,538 or fewer small entity 877 subscribers.

### b. International Service Providers

24. The Commission has not developed a small business size standard specifically for providers of international service. The appropriate size standards under SBA rules are for the two broad categories of Satellite Telecommunications and Other Telecommunications. Under both categories, such a business is small if it has $12.5 million or less in average annual receipts.[55] For the first category of Satellite Telecommunications, Census Bureau data for 1997 show that there were a total of 324 firms that operated for the entire year.[56] Of this total, 273 firms had annual receipts of under $10 million, and an additional 24 firms had receipts of $10 million to $24,999,999. Thus, the majority of Satellite Telecommunications firms can be considered small.

25. The second category – Other Telecommunications – includes "establishments primarily engaged in . . . providing satellite terminal stations and associated facilities operationally connected with one or more terrestrial communications systems and capable of transmitting telecommunications to or receiving telecommunications from satellite systems."[57] According to Census Bureau data for 1997, there were 439 firms in this category that operated for the entire year.[58] Of this total, 424 firms had annual receipts of $5 million to $9,999,999 and an additional six firms had annual receipts of $10 million to $24,999,990. Thus, under this second size standard, the majority of firms can be considered small.

### c. Wireless Telecommunications Service Providers

26. Below, for those services subject to auctions, we note that, as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Also, the Commission does not generally track

---

[53] 13 C.F.R. § 121.201, NAICS code 517310 (changed from 513330 in Oct. 2002).

[54] *See* FCC, Common Carrier Bureau, Industry Analysis Division, *Study on Telephone Trends*, Tables 21.2, 21.3, and 21.4 (Feb. 1999).

[55] 13 C.F.R. § 121.201, NAICS codes 517410 and 517910 (changed from 513340 and 513390 in Oct. 2002).

[56] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 513340 (issued Oct. 2000).

[57] Office of Management and Budget, North American Industry Classification System 513 (1997) (NAICS code 513390, changed to 517910 in Oct. 2002).

[58] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 513390 (issued Oct. 2000).

subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated.

27. *Wireless Service Providers.* The SBA has developed a small business size standard for wireless firms within the two broad economic census categories of "Paging"[59] and "Cellular and Other Wireless Telecommunications."[60] Under both SBA categories, a wireless business is small if it has 1,500 or fewer employees. For the census category of Paging, Census Bureau data for 1997 show that there were 1,320 firms in this category, total, that operated for the entire year.[61] Of this total, 1,303 firms had employment of 999 or fewer employees, and an additional 17 firms had employment of 1,000 employees or more.[62] Thus, under this category and associated small business size standard, the majority of firms can be considered small. For the census category Cellular and Other Wireless Telecommunications, Census Bureau data for 1997 show that there were 977 firms in this category, total, that operated for the entire year.[63] Of this total, 965 firms had employment of 999 or fewer employees, and an additional 12 firms had employment of 1,000 employees or more.[64] Thus, under this second category and size standard, the majority of firms can, again, be considered small. In addition, limited preliminary census data for 2002 indicate that the total number of paging providers decreased approximately 51 percent from 1997 to 2002.[65] In addition, limited preliminary census data for 2002 indicate that the total number of cellular and other wireless telecommunications carriers increased approximately 321 percent from 1997 to 2002.[66]

28. *Cellular Licensees.* The SBA has developed a small business size standard for wireless firms within the broad economic census category "Cellular and Other Wireless Telecommunications."[67] Under this SBA category, a wireless business is small if it has 1,500 or fewer employees. For the census category Cellular and Other Wireless Telecommunications firms, Census Bureau data for 1997 show that

---

[59] 13 C.F.R. § 121.201, NAICS code 513321 (changed to 517211 in October 2002).

[60] 13 C.F.R. § 121.201, NAICS code 513322 (changed to 517212 in October 2002).

[61] U.S. Census Bureau, 1997 Economic Census, Subject Series: "Information," Table 5, Employment Size of Firms Subject to Federal Income Tax: 1997, NAICS code 513321 (issued October 2000).

[62] *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is "Firms with 1000 employees or more."

[63] U.S. Census Bureau, 1997 Economic Census, Subject Series: "Information," Table 5, Employment Size of Firms Subject to Federal Income Tax: 1997, NAICS code 513322 (issued October 2000).

[64] *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is "Firms with 1000 employees or more."

[65] *See* U.S. Census Bureau, 2002 Economic Census, Industry Series: "Information," Table 2, Comparative Statistics for the United States (1997 NAICS Basis): 2002 and 1997, NAICS code 513321 (issued Nov. 2004). The preliminary data indicate that the total number of "establishments" decreased from 3,427 to 1,664. In this context, the number of establishments is a less helpful indicator of small business prevalence than is the number of "firms," because the latter number takes into account the concept of common ownership or control. The more helpful 2002 census data on firms, including employment and receipts numbers, will be issued in late 2005.

[66] *See* U.S. Census Bureau, 2002 Economic Census, Industry Series: "Information," Table 2, Comparative Statistics for the United States (1997 NAICS Basis): 2002 and 1997, NAICS code 513322 (issued Nov. 2004). The preliminary data indicate that the total number of "establishments" increased from 2,959 to 9,511. In this context, the number of establishments is a less helpful indicator of small business prevalence than is the number of "firms," because the latter number takes into account the concept of common ownership or control. The more helpful 2002 census data on firms, including employment and receipts numbers, will be issued in late 2005.

[67] 13 C.F.R. § 121.201, NAICS code 513322 (changed to 517212 in October 2002).

there were 977 firms in this category, total, that operated for the entire year.[68] Of this total, 965 firms had employment of 999 or fewer employees, and an additional 12 firms had employment of 1,000 employees or more.[69] Thus, under this category and size standard, the great majority of firms can be considered small. Also, according to Commission data, 437 carriers reported that they were engaged in the provision of cellular service, Personal Communications Service (PCS), or Specialized Mobile Radio (SMR) Telephony services, which are placed together in the data.[70] We have estimated that 260 of these are small, under the SBA small business size standard.[71]

29. *Common Carrier Paging.* The SBA has developed a small business size standard for wireless firms within the broad economic census category, "Cellular and Other Wireless Telecommunications."[72] Under this SBA category, a wireless business is small if it has 1,500 or fewer employees. For the census category of Paging, Census Bureau data for 1997 show that there were 1,320 firms in this category, total, that operated for the entire year.[73] Of this total, 1,303 firms had employment of 999 or fewer employees, and an additional 17 firms had employment of 1,000 employees or more.[74] Thus, under this category and associated small business size standard, the majority of firms can be considered small. In the Paging *Third Report and Order*, we developed a small business size standard for "small businesses" and "very small businesses" for purposes of determining their eligibility for special provisions such as bidding credits and installment payments.[75] A "small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $15 million for the preceding three years. Additionally, a "very small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues that are not more than $3 million for the preceding three years.[76] The SBA has approved these small business size standards.[77] An auction of Metropolitan Economic Area licenses commenced on February 24, 2000, and closed on March 2, 2000.[78] Of the 985 licenses auctioned, 440 were sold. Fifty-seven companies claiming small business status won. Also, according to

---

[68] U.S. Census Bureau, 1997 Economic Census, Subject Series: "Information," Table 5, Employment Size of Firms Subject to Federal Income Tax: 1997, NAICS code 513322 (issued October 2000).

[69] *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is "Firms with 1000 employees or more."

[70] "Trends in Telephone Service" at Table 5.3.

[71] *Id.*

[72] 13 C.F.R. § 121.201, NAICS code 513322 (changed to 517212 in October 2002).

[73] U.S. Census Bureau, 1997 Economic Census, Subject Series: "Information," Table 5, Employment Size of Firms Subject to Federal Income Tax: 1997, NAICS code 513321 (issued October 2000).

[74] *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is "Firms with 1000 employees or more."

[75] *Amendment of Part 90 of the Commission's Rules to Provide for the Use of the 220-222 MHz Band by the Private Land Mobile Radio Service*, PR Docket No. 89-552, Third Report and Order and Fifth Notice of Proposed Rulemaking, 12 FCC Rcd 10943, 11068-70, paras. 291-295, 62 FR 16004 (Apr. 3, 1997).

[76] *See* Letter to Amy Zoslov, Chief, Auctions and Industry Analysis Division, Wireless Telecommunications Bureau, FCC, from A. Alvarez, Administrator, SBA (Dec. 2, 1998) (SBA Dec. 2, 1998 Letter).

[77] *Revision of Part 22 and Part 90 of the Commission's Rules to Facilitate Future Development of Paging Systems*, Memorandum Opinion and Order on Reconsideration and Third Report and Order, 14 FCC Rcd 10030, paras. 98-107 (1999).

[78] *Id.* at 10085, para. 98.

Commission data, 375 carriers reported that they were engaged in the provision of paging and messaging services.[79] Of those, we estimate that 370 are small, under the SBA-approved small business size standard.[80]

30. *Wireless Communications Services*. This service can be used for fixed, mobile, radiolocation, and digital audio broadcasting satellite uses. The Commission established small business size standards for the wireless communications services (WCS) auction.[81] A "small business" is an entity with average gross revenues of $40 million for each of the three preceding years, and a "very small business" is an entity with average gross revenues of $15 million for each of the three preceding years. The SBA has approved these small business size standards.[82] The Commission auctioned geographic area licenses in the WCS service. In the auction, there were seven winning bidders that qualified as "very small business" entities, and one that qualified as a "small business" entity.

31. *Wireless Telephony*. Wireless telephony includes cellular, personal communications services (PCS), and specialized mobile radio (SMR) telephony carriers. As noted earlier, the SBA has developed a small business size standard for "Cellular and Other Wireless Telecommunications" services.[83] Under that SBA small business size standard, a business is small if it has 1,500 or fewer employees.[84] According to Commission data, 445 carriers reported that they were engaged in the provision of wireless telephony.[85] We have estimated that 245 of these are small under the SBA small business size standard.

32. *Broadband Personal Communications Service*. The broadband Personal Communications Service (PCS) spectrum is divided into six frequency blocks designated A through F, and the Commission has held auctions for each block. The Commission defined "small entity" for Blocks C and F as an entity that has average gross revenues of $40 million or less in the three previous calendar years.[86] For Block F, an additional classification for "very small business" was added and is defined as an entity that, together with its affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years."[87] These standards defining "small entity" in the context of broadband PCS auctions have been approved by the SBA.[88] No small businesses, within the SBA-approved small business size standards bid successfully for licenses in Blocks A and B. There were 90 winning bidders that qualified as small entities in the Block C auctions. A total of 93 small and very small business bidders won

[79] "Trends in Telephone Service" at Table 5.3.

[80] *Id.*

[81] Public Notice, "Auction of Wireless Communications Services, Auction Notes and Filing Requirements for 128 WCS Licenses Scheduled for April 15, 1997," DA 97-386, Feb. 21, 1997.

[82] SBA Dec. 2, 1998 Letter.

[83] 13 C.F.R. § 121.201, NAICS code 513322 (changed to 517212 in October 2002).

[84] *Id.*

[85] "Trends in Telephone Service" at Table 5.3.

[86] *See Amendment of Parts 20 and 24 of the Commission's Rules – Broadband PCS Competitive Bidding and the Commercial Mobile Radio Service Spectrum Cap*, WT Docket No. 96-59, Report and Order, 11 FCC Rcd 7824, 61 FR 33859 (July 1, 1996) (*PCS Order*); *see also* 47 C.F.R. § 24.720(b).

[87] *See PCS Order*, 11 FCC Rcd 7824.

[88] *See, e.g., Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, PP Docket No. 93-253, Fifth Report and Order, 9 FCC Rcd 5332, 59 FR 37566 (July 22, 1994).

approximately 40 percent of the 1,479 licenses for Blocks D, E, and F.[89] On March 23, 1999, the Commission re-auctioned 347 C, D, E, and F Block licenses. There were 48 small business winning bidders. On January 26, 2001, the Commission completed the auction of 422 C and F Broadband PCS licenses in Auction No. 35. Of the 35 winning bidders in this auction, 29 qualified as "small" or "very small" businesses. Subsequent events, concerning Auction 35, including judicial and agency determinations, resulted in a total of 163 C and F Block licenses being available for grant.

33. *Narrowband Personal Communications Services.* To date, two auctions of narrowband personal communications services (PCS) licenses have been conducted. For purposes of the two auctions that have already been held, "small businesses" were entities with average gross revenues for the prior three calendar years of $40 million or less. Through these auctions, the Commission has awarded a total of 41 licenses, out of which 11 were obtained by small businesses. To ensure meaningful participation of small business entities in future auctions, the Commission has adopted a two-tiered small business size standard in the *Narrowband PCS Second Report and Order*.[90] A "small business" is an entity that, together with affiliates and controlling interests, has average gross revenues for the three preceding years of not more than $40 million. A "very small business" is an entity that, together with affiliates and controlling interests, has average gross revenues for the three preceding years of not more than $15 million. The SBA has approved these small business size standards.[91] In the future, the Commission will auction 459 licenses to serve Metropolitan Trading Areas (MTAs) and 408 response channel licenses. There is also one megahertz of narrowband PCS spectrum that has been held in reserve and that the Commission has not yet decided to release for licensing. The Commission cannot predict accurately the number of licenses that will be awarded to small entities in future auctions. However, four of the 16 winning bidders in the two previous narrowband PCS auctions were small businesses, as that term was defined. The Commission assumes, for purposes of this analysis that a large portion of the remaining narrowband PCS licenses will be awarded to small entities. The Commission also assumes that at least some small businesses will acquire narrowband PCS licenses by means of the Commission's partitioning and disaggregation rules.

34. *220 MHz Radio Service – Phase I Licensees.* The 220 MHz service has both Phase I and Phase II licenses. Phase I licensing was conducted by lotteries in 1992 and 1993. There are approximately 1,515 such non-nationwide licensees and four nationwide licensees currently authorized to operate in the 220 MHz band. The Commission has not developed a small business size standard for small entities specifically applicable to such incumbent 220 MHz Phase I licensees. To estimate the number of such licensees that are small businesses, we apply the small business size standard under the SBA rules applicable to "Cellular and Other Wireless Telecommunications" companies. This category provides that a small business is a wireless company employing no more than 1,500 persons.[92] For the census category Cellular and Other Wireless Telecommunications, Census Bureau data for 1997 show that there were 977

[89] FCC News, Broadband PCS, D, E and F Block Auction Closes, No. 71744 (rel. Jan. 14, 1997); *see also Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licenses*, WT Docket No. 97-82, Second Report and Order, 12 FCC Rcd 16436, 62 FR 55348 (Oct. 24, 1997).

[90] *Amendment of the Commission's Rules to Establish New Personal Communications Services, Narrowband PCS*, Docket No. ET 92-100, Docket No. PP 93-253, Second Report and Order and Second Further Notice of Proposed Rulemaking, 15 FCC Rcd 10456, 65 FR 35875 (June 6, 2000).

[91] *See* SBA Dec. 2, 1998 Letter.

[92] 13 C.F.R. § 121.201, NAICS code 513322 (changed to 517212 in October 2002).

firms in this category, total, that operated for the entire year.[93] Of this total, 965 firms had employment of 999 or fewer employees, and an additional 12 firms had employment of 1,000 employees or more.[94] Thus, under this second category and size standard, the majority of firms can, again, be considered small. Assuming this general ratio continues in the context of Phase I 220 MHz licensees, the Commission estimates that nearly all such licensees are small businesses under the SBA's small business size standard. In addition, limited preliminary census data for 2002 indicate that the total number of cellular and other wireless telecommunications carriers increased approximately 321 percent from 1997 to 2002.[95]

35. *220 MHz Radio Service – Phase II Licensees.* The 220 MHz service has both Phase I and Phase II licenses. The Phase II 220 MHz service is a new service, and is subject to spectrum auctions. In the 220 MHz Third Report and Order, we adopted a small business size standard for "small" and "very small" businesses for purposes of determining their eligibility for special provisions such as bidding credits and installment payments.[96] This small business size standard indicates that a "small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $15 million for the preceding three years.[97] A "very small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues that do not exceed $3 million for the preceding three years. The SBA has approved these small business size standards.[98] Auctions of Phase II licenses commenced on September 15, 1998, and closed on October 22, 1998.[99] In the first auction, 908 licenses were auctioned in three different-sized geographic areas: three nationwide licenses, 30 Regional Economic Area Group (EAG) Licenses, and 875 Economic Area (EA) Licenses. Of the 908 licenses auctioned, 693 were sold.[100] Thirty-nine small businesses won licenses in the first 220 MHz auction. The second auction included 225 licenses: 216 EA licenses and 9 EAG licenses. Fourteen companies claiming small business status won 158 licenses.[101]

36. *800 MHz and 900 MHz Specialized Mobile Radio Licenses.* The Commission awards "small entity" and "very small entity" bidding credits in auctions for Specialized Mobile Radio (SMR) geographic area licenses in the 800 MHz and 900 MHz bands to firms that had revenues of no more than

93 U.S. Census Bureau, 1997 Economic Census, Subject Series: "Information," Table 5, Employment Size of Firms Subject to Federal Income Tax: 1997, NAICS code 513322 (issued October 2000).

94 *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is "Firms with 1000 employees or more."

95 *See* U.S. Census Bureau, 2002 Economic Census, Industry Series: "Information," Table 2, Comparative Statistics for the United States (1997 NAICS Basis): 2002 and 1997, NAICS code 513322 (issued Nov. 2004). The preliminary data indicate that the total number of "establishments" increased from 2,959 to 9,511. In this context, the number of establishments is a less helpful indicator of small business prevalence than is the number of "firms," because the latter number takes into account the concept of common ownership or control. The more helpful 2002 census data on firms, including employment and receipts numbers, will be issued in late 2005.

96 *220 MHz Third Report and Order*, 12 FCC Rcd 10943, 11068-70, paras. 291-295 (1997).

97 *Id.* at 11068, para. 291.

98 *See* Letter to D. Phythyon, Chief, Wireless Telecommunications Bureau, Federal Communications Commission, from A. Alvarez, Administrator, Small Business Administration (Jan. 6, 1998).

99 *See generally* Public Notice, "220 MHz Service Auction Closes," 14 FCC Rcd 605 (1998).

100 *See, e.g.*, Public Notice, "FCC Announces It is Prepared to Grant 654 Phase II 220 MHz Licenses After Final Payment is Made," 14 FCC Rcd 1085 (1999).

101 Public Notice, "Phase II 220 MHz Service Spectrum Auction Closes," 14 FCC Rcd 11218 (1999).

$15 million in each of the three previous calendar years, or that had revenues of no more than $3 million in each of the previous calendar years, respectively.[102] These bidding credits apply to SMR providers in the 800 MHz and 900 MHz bands that either hold geographic area licenses or have obtained extended implementation authorizations. The Commission does not know how many firms provide 800 MHz or 900 MHz geographic area SMR service pursuant to extended implementation authorizations, nor how many of these providers have annual revenues of no more than $15 million. One firm has over $15 million in revenues. The Commission assumes, for purposes here, that all of the remaining existing extended implementation authorizations are held by small entities, as that term is defined by the SBA. The Commission has held auctions for geographic area licenses in the 800 MHz and 900 MHz SMR bands. There were 60 winning bidders that qualified as small or very small entities in the 900 MHz SMR auctions. Of the 1,020 licenses won in the 900 MHz auction, bidders qualifying as small or very small entities won 263 licenses. In the 800 MHz auction, 38 of the 524 licenses won were won by small and very small entities.

37. *700 MHz Guard Band Licensees.* In the *700 MHz Guard Band Order*, we adopted a small business size standard for "small businesses" and "very small businesses" for purposes of determining their eligibility for special provisions such as bidding credits and installment payments.[103] A "small business" as an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $15 million for the preceding three years. Additionally, a "very small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues that are not more than $3 million for the preceding three years. An auction of 52 Major Economic Area (MEA) licenses commenced on September 6, 2000, and closed on September 21, 2000.[104] Of the 104 licenses auctioned, 96 licenses were sold to nine bidders. Five of these bidders were small businesses that won a total of 26 licenses. A second auction of 700 MHz Guard Band licenses commenced on February 13, 2001 and closed on February 21, 2001. All eight of the licenses auctioned were sold to three bidders. One of these bidders was a small business that won a total of two licenses.[105]

38. *Rural Radiotelephone Service.* The Commission has not adopted a size standard for small businesses specific to the Rural Radiotelephone Service.[106] A significant subset of the Rural Radiotelephone Service is the Basic Exchange Telephone Radio System (BETRS).[107] The Commission uses the SBA's small business size standard applicable to "Cellular and Other Wireless Telecommunications," *i.e.*, an entity employing no more than 1,500 persons.[108] There are approximately 1,000 licensees in the Rural Radiotelephone Service, and the Commission estimates that there are 1,000 or fewer small entity licensees in the Rural Radiotelephone Service that may be affected by the rules and policies adopted herein.

---

[102] 47 C.F.R. § 90.814(b)(1).

[103] *See Service Rules for the 746-764 MHz Bands, and Revisions to part 27 of the Commission's Rules*, WT Docket No. 99-168, Second Report and Order, 65 FR 17599 (Apr. 4, 2000).

[104] *See generally* Public Notice, "220 MHz Service Auction Closes," Report No. WT 98-36 (Oct. 23, 1998).

[105] Public Notice, "700 MHz Guard Band Auction Closes," DA 01-478 (rel. Feb. 22, 2001).

[106] The service is defined in section 22.99 of the Commission's Rules, 47 C.F.R. § 22.99.

[107] BETRS is defined in sections 22.757 and 22.759 of the Commission's Rules, 47 C.F.R. §§ 22.757 and 22.759.

[108] 13 C.F.R. § 121.201, NAICS code 517212.

39. *Air-Ground Radiotelephone Service.* The Commission has not adopted a small business size standard specific to the Air-Ground Radiotelephone Service.[109] We will use SBA's small business size standard applicable to "Cellular and Other Wireless Telecommunications," *i.e.*, an entity employing no more than 1,500 persons.[110] There are approximately 100 licensees in the Air-Ground Radiotelephone Service, and we estimate that almost all of them qualify as small under the SBA small business size standard.

40. *Aviation and Marine Radio Services.* Small businesses in the aviation and marine radio services use a very high frequency (VHF) marine or aircraft radio and, as appropriate, an emergency position-indicating radio beacon (and/or radar) or an emergency locator transmitter. The Commission has not developed a small business size standard specifically applicable to these small businesses. For purposes of this analysis, the Commission uses the SBA small business size standard for the category "Cellular and Other Telecommunications," which is 1,500 or fewer employees.[111] Most applicants for recreational licenses are individuals. Approximately 581,000 ship station licensees and 131,000 aircraft station licensees operate domestically and are not subject to the radio carriage requirements of any statute or treaty. For purposes of our evaluations in this analysis, we estimate that there are up to approximately 712,000 licensees that are small businesses (or individuals) under the SBA standard. In addition, between December 3, 1998 and December 14, 1998, the Commission held an auction of 42 VHF Public Coast licenses in the 157.1875-157.4500 MHz (ship transmit) and 161.775-162.0125 MHz (coast transmit) bands. For purposes of the auction, the Commission defined a "small" business as an entity that, together with controlling interests and affiliates, has average gross revenues for the preceding three years not to exceed $15 million dollars. In addition, a "very small" business is one that, together with controlling interests and affiliates, has average gross revenues for the preceding three years not to exceed $3 million dollars.[112] There are approximately 10,672 licensees in the Marine Coast Service, and the Commission estimates that almost all of them qualify as "small" businesses under the above special small business size standards.

41. *Fixed Microwave Services.* Fixed microwave services include common carrier,[113] private operational-fixed,[114] and broadcast auxiliary radio services.[115] At present, there are approximately 22,015 common carrier fixed licensees and 61,670 private operational-fixed licensees and broadcast auxiliary

---

[109] The service is defined in section 22.99 of the Commission's Rules, 47 C.F.R. § 22.99.

[110] 13 C.F.R. § 121.201, NAICS codes 517212.

[111] 13 C.F.R. § 121.201, NAICS code 513322 (changed to 517212 in October 2002).

[112] *Amendment of the Commission's Rules Concerning Maritime Communications*, PR Docket No. 92-257, Third Report and Order and Memorandum Opinion and Order, 13 FCC Rcd 19853 (1998).

[113] *See* 47 C.F.R. §§ 101 *et seq.* (formerly, Part 21 of the Commission's Rules) for common carrier fixed microwave services (except Multipoint Distribution Service).

[114] Persons eligible under parts 80 and 90 of the Commission's Rules can use Private Operational-Fixed Microwave services. *See* 47 C.F.R. Parts 80 and 90. Stations in this service are called operational-fixed to distinguish them from common carrier and public fixed stations. Only the licensee may use the operational-fixed station, and only for communications related to the licensee's commercial, industrial, or safety operations.

[115] Auxiliary Microwave Service is governed by Part 74 of Title 47 of the Commission's rules. *See* 47 C.F.R. Part 74. This service is available to licensees of broadcast stations and to broadcast and cable network entities. Broadcast auxiliary microwave stations are used for relaying broadcast television signals from the studio to the transmitter, or between two points such as a main studio and an auxiliary studio. The service also includes mobile television pickups, which relay signals from a remote location back to the studio.

radio licensees in the microwave services. The Commission has not created a size standard for a small business specifically with respect to fixed microwave services. For purposes of this analysis, the Commission uses the SBA small business size standard for the category "Cellular and Other Telecommunications," which is 1,500 or fewer employees.[116] The Commission does not have data specifying the number of these licensees that have more than 1,500 employees, and thus is unable at this time to estimate with greater precision the number of fixed microwave service licensees that would qualify as small business concerns under the SBA's small business size standard. Consequently, the Commission estimates that there are up to 22,015 common carrier fixed licensees and up to 61,670 private operational-fixed licensees and broadcast auxiliary radio licensees in the microwave services that may be small and may be affected by the rules and policies adopted herein. We noted, however, that the common carrier microwave fixed licensee category includes some large entities.

42. *Offshore Radiotelephone Service.* This service operates on several UHF television broadcast channels that are not used for television broadcasting in the coastal areas of states bordering the Gulf of Mexico.[117] There are presently approximately 55 licensees in this service. We are unable to estimate at this time the number of licensees that would qualify as small under the SBA's small business size standard for "Cellular and Other Wireless Telecommunications" services.[118] Under that SBA small business size standard, a business is small if it has 1,500 or fewer employees.[119]

43. *39 GHz Service.* The Commission created a special small business size standard for 39 GHz licenses – an entity that has average gross revenues of $40 million or less in the three previous calendar years.[120] An additional size standard for "very small business" is: an entity that, together with affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years.[121] The SBA has approved these small business size standards.[122] The auction of the 2,173 39 GHz licenses began on April 12, 2000 and closed on May 8, 2000. The 18 bidders who claimed small business status won 849 licenses. Consequently, the Commission estimates that 18 or fewer 39 GHz licensees are small entities that may be affected by the rules and polices adopted herein.

44. *Broadband Radio Service and Educational Broadband Service.* Broadband Radio Service comprises Multichannel Multipoint Distribution Service (MMDS) systems and Multipoint Distribution Service (MDS).[123] MMDS systems, often referred to as "wireless cable," transmit video programming to subscribers using the microwave frequencies of MDS and Educational Broadband Service (formerly

---

[116] 13 C.F.R. § 121.201, NAICS code 517212.

[117] This service is governed by Subpart I of Part 22 of the Commission's rules. *See* 47 C.F.R. §§ 22.1001-22.1037.

[118] 13 C.F.R. § 121.201, NAICS code 513322 (changed to 517212 in October 2002).

[119] *Id.*

[120] *See Amendment of the Commission's Rules Regarding the 37.0-38.6 GHz and 38.6-40.0 GHz Bands*, ET Docket No. 95-183, Report and Order, 63 Fed. Reg. 6079 (Feb. 6, 1998).

[121] *Id.*

[122] *See* Letter to Kathleen O'Brien Ham, Chief, Auctions and Industry Analysis Division, Wireless Telecommunications Bureau, FCC, from Aida Alvarez, Administrator, SBA (Feb. 4, 1998).

[123] *Amendment of Parts 1, 21 73, 74, and 101 of the Commission's Rules to Facilitate the Provision of Fixed and Mobile Broadband Access, Educational and Other Advanced Services in the 2150-2162 and 2500-2690 MHz Bands*, WT Docket No. 03-66, RM-10586, Report and Order and Further Notice of Proposed Rulemaking, 19 FCC Rcd 14165 (2004).

known as Instructional Television Fixed Service).[124] In connection with the 1996 MDS auction, the Commission established a small business size standard as an entity that had annual average gross revenues of less than $40 million in the previous three calendar years.[125] The MDS auctions resulted in 67 successful bidders obtaining licensing opportunities for 493 Basic Trading Areas (BTAs). Of the 67 auction winners, 61 met the definition of a small business. MDS also includes licensees of stations authorized prior to the auction. In addition, the SBA has developed a small business size standard for Cable and Other Program Distribution, which includes all such companies generating $12.5 million or less in annual receipts.[126] According to Census Bureau data for 1997, there were a total of 1,311 firms in this category, total, that had operated for the entire year.[127] Of this total, 1,180 firms had annual receipts of under $10 million and an additional 52 firms had receipts of $10 million or more but less than $25 million. Consequently, we estimate that the majority of providers in the Broadband Radio Service category are small businesses that may be affected by the rules and policies adopted herein. This SBA small business size standard also appears applicable to Educational Broadband Service. There are presently 2,032 Educational Broadband Service licensees. All but 100 of these licenses are held by educational institutions. Educational institutions are included in this analysis as small entities.[128] Thus, we tentatively conclude that at least 1,932 licensees are small businesses.

45. *Local Multipoint Distribution Service.* Local Multipoint Distribution Service (LMDS) is a fixed broadband point-to-multipoint microwave service that provides for two-way video telecommunications.[129] The auction of the 1,030 Local Multipoint Distribution Service (LMDS) licenses began on February 18, 1998 and closed on March 25, 1998. The Commission established a small business size standard for LMDS licenses as an entity that has average gross revenues of less than $40 million in the three previous calendar years.[130] An additional small business size standard for "very small business" was added as an entity that, together with its affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years.[131] The SBA has approved these small business size standards in the context of LMDS auctions.[132] There were 93 winning bidders that qualified as small entities in the LMDS auctions. A total of 93 small and very small business bidders won approximately 277 A Block licenses and 387 B Block licenses. On March 27, 1999, the Commission re-auctioned 161 licenses; there were 40 winning bidders. Based on this information, we conclude that the number of small LMDS licenses consists of the 93 winning bidders in the first auction and the 40 winning bidders in the re-auction, for a total of 133 small entity LMDS providers.

---

[124] *See id.*

[125] 47 C.F.R. § 21.961(b)(1).

[126] 13 C.F.R. § 121.201, NAICS code 513220 (changed to 517510 in October 2002).

[127] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)", Table 4, NAICS code 513220 (issued October 2000).

[128] In addition, the term "small entity" within SBREFA applies to small organizations (nonprofits) and to small governmental jurisdictions (cities, counties, towns, townships, villages, school districts, and special districts with populations of less than 50,000). 5 U.S.C. §§ 601(4)-(6). We do not collect annual revenue data on ITFS licensees.

[129] *See Local Multipoint Distribution Service*, Second Report and Order, 12 FCC Rcd 12545 (1997).

[130] *Id.*

[131] *See id.*

[132] *See* Letter to Dan Phythyon, Chief, Wireless Telecommunications Bureau, FCC, from Aida Alvarez, Administrator, SBA (Jan. 6, 1998).

46. *218-219 MHz Service.* The first auction of 218-219 MHz spectrum resulted in 170 entities winning licenses for 594 Metropolitan Statistical Area (MSA) licenses. Of the 594 licenses, 557 were won by entities qualifying as a small business. For that auction, the small business size standard was an entity that, together with its affiliates, has no more than a $6 million net worth and, after federal income taxes (excluding any carry over losses), has no more than $2 million in annual profits each year for the previous two years.[133] In the *218-219 MHz Report and Order and Memorandum Opinion and Order*, we established a small business size standard for a "small business" as an entity that, together with its affiliates and persons or entities that hold interests in such an entity and their affiliates, has average annual gross revenues not to exceed $15 million for the preceding three years.[134] A "very small business" is defined as an entity that, together with its affiliates and persons or entities that hold interests in such an entity and its affiliates, has average annual gross revenues not to exceed $3 million for the preceding three years.[135] We cannot estimate, however, the number of licenses that will be won by entities qualifying as small or very small businesses under our rules in future auctions of 218-219 MHz spectrum.

47. *24 GHz – Incumbent Licensees.* This analysis may affect incumbent licensees who were relocated to the 24 GHz band from the 18 GHz band, and applicants who wish to provide services in the 24 GHz band. The applicable SBA small business size standard is that of "Cellular and Other Wireless Telecommunications" companies. This category provides that such a company is small if it employs no more than 1,500 persons.[136] According to Census Bureau data for 1997, there were 977 firms in this category, total, that operated for the entire year.[137] Of this total, 965 firms had employment of 999 or fewer employees, and an additional 12 firms had employment of 1,000 employees or more.[138] Thus, under this size standard, the great majority of firms can be considered small. These broader census data notwithstanding, we believe that there are only two licensees in the 24 GHz band that were relocated from the 18 GHz band, Teligent[139] and TRW, Inc. It is our understanding that Teligent and its related companies have less than 1,500 employees, though this may change in the future. TRW is not a small entity. Thus, only one incumbent licensee in the 24 GHz band is a small business entity.

48. *24 GHz – Future Licensees.* With respect to new applicants in the 24 GHz band, the small business size standard for "small business" is an entity that, together with controlling interests and

[133] *Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, PP Docket No. 93-253, Fourth Report and Order, 59 Fed. Reg. 24947 (May 13, 1994).

[134] *Amendment of Part 95 of the Commission's Rules to Provide Regulatory Flexibility in the 218-219 MHz Service*, WT Docket No. 98-169, Report and Order and Memorandum Opinion and Order, 64 Fed. Reg. 59656 (Nov. 3, 1999).

[135] *Amendment of Part 95 of the Commission's Rules to Provide Regulatory Flexibility in the 218-219 MHz Service*, WT Docket No. 98-169, Report and Order and Memorandum Opinion and Order, 64 Fed. Reg. 59656 (Nov. 3, 1999).

[136] 13 C.F.R. § 121.201, NAICS code 513322 (changed to 517212 in October 2002).

[137] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Employment Size of Firms Subject to Federal Income Tax: 1997," Table 5, NAICS code 513322 (issued Oct. 2000).

[138] *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is "Firms with 1,000 employees or more."

[139] Teligent acquired the DEMS licenses of FirstMark, the only licensee other than TRW in the 24 GHz band whose license has been modified to require relocation to the 24 GHz band.

affiliates, has average annual gross revenues for the three preceding years not in excess of $15 million.[140] "Very small business" in the 24 GHz band is an entity that, together with controlling interests and affiliates, has average gross revenues not exceeding $3 million for the preceding three years.[141] The SBA has approved these small business size standards.[142] These size standards will apply to the future auction, if held.

### 2. Cable and OVS Operators

49. *Cable and Other Program Distribution.* This category includes cable systems operators, closed circuit television services, direct broadcast satellite services, multipoint distribution systems, satellite master antenna systems, and subscription television services. The SBA has developed small business size standard for this census category, which includes all such companies generating $12.5 million or less in revenue annually.[143] According to Census Bureau data for 1997, there were a total of 1,311 firms in this category, total, that had operated for the entire year.[144] Of this total, 1,180 firms had annual receipts of under $10 million and an additional 52 firms had receipts of $10 million or more but less than $25 million. Consequently, the Commission estimates that the majority of providers in this service category are small businesses that may be affected by the rules and policies adopted herein.

50. *Cable System Operators (Rate Regulation Standard).* The Commission has developed its own small business size standard for cable system operators, for purposes of rate regulation. Under the Commission's rules, a "small cable company" is one serving fewer than 400,000 subscribers nationwide.[145] The most recent estimates indicate that there were 1,439 cable operators who qualified as small cable system operators at the end of 1995.[146] Since then, some of those companies may have grown to serve over 400,000 subscribers, and others may have been involved in transactions that caused them to be combined with other cable operators. Consequently, the Commission estimates that there are now fewer than 1,439 small entity cable system operators that may be affected by the rules and policies adopted herein.

51. *Cable System Operators (Telecom Act Standard).* The Communications Act of 1934, as amended, also contains a size standard for small cable system operators, which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than 1 percent of all subscribers in the

---

[140] *Amendments to Parts 1,2, 87 and 101 of the Commission's Rules to License Fixed Services at 24 GHz*, Report and Order, 15 FCC Rcd 16934, 16967 (2000); *see also* 47 C.F.R. § 101.538(a)(2).

[141] *Amendments to Parts 1,2, 87 and 101 of the Commission's Rules to License Fixed Services at 24 GHz*, Report and Order, 15 FCC Rcd 16934, 16967 (2000); *see also* 47 C.F.R. § 101.538(a)(1).

[142] *See* Letter to Margaret W. Wiener, Deputy Chief, Auctions and Industry Analysis Division, Wireless Telecommunications Bureau, FCC, from Gary M. Jackson, Assistant Administrator, SBA (July 28, 2000).

[143] 13 C.F.R. § 121.201, North American Industry Classification System (NAICS) code 513220 (changed to 517510 in October 2002).

[144] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 513220 (issued October 2000).

[145] 47 C.F.R. § 76.901(e). The Commission developed this definition based on its determination that a small cable system operator is one with annual revenues of $100 million or less. *Implementation of Sections of the 1992 Cable Act: Rate Regulation,* Sixth Report and Order and Eleventh Order on Reconsideration, 10 FCC Rcd 7393 (1995), 60 FR 10534 (Feb. 27, 1995).

[146] Paul Kagan Associates, Inc., *Cable TV Investor*, February 29, 1996 (based on figures for December 30, 1995).

United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000."[147] The Commission has determined that there are 67,700,000 subscribers in the United States.[148] Therefore, an operator serving fewer than 677,000 subscribers shall be deemed a small operator, if its annual revenues, when combined with the total annual revenues of all its affiliates, do not exceed $250 million in the aggregate.[149] Based on available data, the Commission estimates that the number of cable operators serving 677,000 subscribers or fewer, totals 1,450.[150] The Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million,[151] and therefore are unable, at this time, to estimate more accurately the number of cable system operators that would qualify as small cable operators under the size standard contained in the Communications Act of 1934.

52. *Open Video Services.* Open Video Service (OVS) systems provide subscription services.[152] The SBA has created a small business size standard for Cable and Other Program Distribution.[153] This standard provides that a small entity is one with $12.5 million or less in annual receipts. The Commission has certified approximately 25 OVS operators to serve 75 areas, and some of these are currently providing service.[154] Affiliates of Residential Communications Network, Inc. (RCN) received approval to operate OVS systems in New York City, Boston, Washington, D.C., and other areas. RCN has sufficient revenues to assure that they do not qualify as a small business entity. Little financial information is available for the other entities that are authorized to provide OVS and are not yet operational. Given that some entities authorized to provide OVS service have not yet begun to generate revenues, the Commission concludes that up to 24 OVS operators (those remaining) might qualify as small businesses that may be affected by the rules and policies adopted herein.

### 3. Internet Service Providers

53. *Internet Service Providers.* The SBA has developed a small business size standard for Internet Service Providers (ISPs). ISPs "provide clients access to the Internet and generally provide related services such as web hosting, web page designing, and hardware or software consulting related to Internet connectivity."[155] Under the SBA size standard, such a business is small if it has average annual receipts

---

[147] 47 U.S.C. § 543(m)(2).

[148] *See FCC Announces New Subscriber Count for the Definition of Small Cable Operator*, Public Notice DA 01-158 (Jan. 24, 2001).

[149] 47 C.F.R. § 76.901(f).

[150] *See FCC Announces New Subscriber Count for the Definition of Small Cable Operators*, Public Notice, DA 01-0158 (rel. Jan. 24, 2001).

[151] The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(f) of the Commission's rules. *See* 47 C.F.R. § 76.909(b).

[152] *See* 47 U.S.C. § 573.

[153] 13 C.F.R. § 121.201, NAICS code 513220 (changed to 517510 in October 2002).

[154] *See* <http://www.fcc.gov/csb/ovs/csovscer.html> (current as of March 2002).

[155] U.S. Census Bureau, "2002 NAICS Definitions: 518111 Internet Service Providers" (Feb. 2004) <www.census.gov>.

of $21 million or less.[156] According to Census Bureau data for 1997, there were 2,751 firms in this category that operated for the entire year.[157] Of these, 2,659 firms had annual receipts of under $10 million, and an additional 67 firms had receipts of between $10 million and $24, 999,999. Consequently, we estimate that the majority of these firms are small entities that may be affected by our action. In addition, limited preliminary census data for 2002 indicate that the total number of Internet service providers increased approximately five percent from 1997 to 2002.[158]

### 4. Other Internet-Related Entities

54. *Web Search Portals.* Our action pertains to VoIP services, which could be provided by entities that provide other services such as email, online gaming, web browsing, video conferencing, instant messaging, and other, similar IP-enabled services. The Commission has not adopted a size standard for entities that create or provide these types of services or applications. However, the census bureau has identified firms that "operate web sites that use a search engine to generate and maintain extensive databases of Internet addresses and content in an easily searchable format. Web search portals often provide additional Internet services, such as e-mail, connections to other web sites, auctions, news, and other limited content, and serve as a home base for Internet users."[159] The SBA has developed a small business size standard for this category; that size standard is $6 million or less in average annual receipts.[160] According to Census Bureau data for 1997, there were 195 firms in this category that operated for the entire year.[161] Of these, 172 had annual receipts of under $5 million, and an additional nine firms had receipts of between $5 million and $9,999,999. Consequently, we estimate that the majority of these firms are small entities that may be affected by our action.

55. *Data Processing, Hosting, and Related Services.* Entities in this category "primarily . . . provid[e] infrastructure for hosting or data processing services."[162] The SBA has developed a small business size standard for this category; that size standard is $21 million or less in average annual receipts.[163] According to Census Bureau data for 1997, there were 3,700 firms in this category that

[156] 13 C.F.R. § 121.201, NAICS code 518111 (changed from previous code 514191, "On-Line Information Services," in Oct. 2002).

[157] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 514191 (issued Oct. 2000).

[158] *See* U.S. Census Bureau, 2002 Economic Census, Industry Series: "Information," Table 2, Comparative Statistics for the United States (1997 NAICS Basis): 2002 and 1997, NAICS code 514191 (issued Nov. 2004). The preliminary data indicate that the total number of "establishments" increased from 4,165 to 4,394. In this context, the number of establishments is a less helpful indicator of small business prevalence than is the number of "firms," because the latter number takes into account the concept of common ownership or control. The more helpful 2002 census data on firms, including employment and receipts numbers, will be issued in late 2005.

[159] U.S. Census Bureau, "2002 NAICS Definitions: 518112 Web Search Portals" (Feb. 2004) <www.census.gov>.

[160] 13 C.F.R. § 121.201, NAICS code 518112 (changed from 514199 in Oct. 2002).

[161] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 514199 (issued Oct. 2000). This category was created for the 2002 Economic Census by taking a portion of the superseded 1997 category, "All Other Information Services," NAICS code 514199. The data cited in the text above are derived from the superseded category.

[162] U.S. Census Bureau, "2002 NAICS Definitions: 518210 Data Processing, Hosting, and Related Services" (Feb. 2004) <www.census.gov>.

[163] 13 C.F.R. § 121.201, NAICS code 518210 (changed from 514210 in Oct. 2002).

operated for the entire year.[164] Of these, 3,477 had annual receipts of under $10 million, and an additional 108 firms had receipts of between $10 million and $24,999,999. Consequently, we estimate that the majority of these firms are small entities that may be affected by our action.

56. *All Other Information Services*. "This industry comprises establishments primarily engaged in providing other information services (except new syndicates and libraries and archives)."[165] Our action pertains to VoIP services, which could be provided by entities that provide other services such as email, online gaming, web browsing, video conferencing, instant messaging, and other, similar IP-enabled services. The SBA has developed a small business size standard for this category; that size standard is $6 million or less in average annual receipts.[166] According to Census Bureau data for 1997, there were 195 firms in this category that operated for the entire year.[167] Of these, 172 had annual receipts of under $5 million, and an additional nine firms had receipts of between $5 million and $9,999,999. Consequently, we estimate that the majority of these firms are small entities that may be affected by our action.

57. *Internet Publishing and Broadcasting.* "This industry comprises establishments engaged in publishing and/or broadcasting content on the Internet exclusively. These establishments do not provide traditional (non-Internet) versions of the content that they publish or broadcast."[168] The SBA has developed a small business size standard for this new (2002) census category; that size standard is 500 or fewer employees.[169] To assess the prevalence of small entities in this category, we will use 1997 Census Bureau data for a relevant, now-superseded census category, "All Other Information Services." The SBA small business size standard for that prior category was $6 million or less in average annual receipts. According to Census Bureau data for 1997, there were 195 firms in the prior category that operated for the entire year.[170] Of these, 172 had annual receipts of under $5 million, and an additional nine firms had receipts of between $5 million and $9,999,999. Consequently, we estimate that the majority of the firms in this current category are small entities that may be affected by our action.

58. *Software Publishers.* These companies may design, develop or publish software and may provide other support services to software purchasers, such as providing documentation or assisting in installation. The companies may also design software to meet the needs of specific users. The SBA has developed a small business size standard of $21 million or less in average annual receipts for all of the following pertinent categories: Software Publishers, Custom Computer Programming Services, and Other

---

[164] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 514210 (issued Oct. 2000).

[165] U.S. Census Bureau, "2002 NAICS Definitions: 519190 All Other Information Services" (Feb. 2004) <www.census.gov>.

[166] 13 C.F.R. § 121.201, NAICS code 519190 (changed from 514199 in Oct. 2002).

[167] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 514199 (issued Oct. 2000). This category was created for the 2002 Economic Census by taking a portion of the superseded 1997 category, "All Other Information Services," NAICS code 514199. The data cited in the text above are derived from the superseded category.

[168] U.S. Census Bureau, "2002 NAICS Definitions: 516110 Internet Publishing and Broadcasting" (Feb. 2004) <www.census.gov>.

[169] 13 C.F.R. § 121.201, NAICS code 516110 (derived from 514199 and other 1997 codes).

[170] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 514199 (issued Oct. 2000). This category was created for the 2002 Economic Census by taking portions of numerous 1997 categories.

Computer Related Services.[171] For Software Publishers, Census Bureau data for 1997 indicate that there were 8,188 firms in the category that operated for the entire year.[172] Of these, 7,633 had annual receipts under $10 million, and an additional 289 firms had receipts of between $10 million and $24, 999,999. For providers of Custom Computer Programming Services, the Census Bureau data indicate that there were 19,334 firms that operated for the entire year.[173] Of these, 18,786 had annual receipts of under $10 million, and an additional 352 firms had receipts of between $10 million and $24,999,999. For providers of Other Computer Related Services, the Census Bureau data indicate that there were 5,524 firms that operated for the entire year.[174] Of these, 5,484 had annual receipts of under $10 million, and an additional 28 firms had receipts of between $10 million and $24,999,999. Consequently, we estimate that the majority of the firms in each of these three categories are small entities that may be affected by our action.

### 5. Equipment Manufacturers

59. The equipment manufacturers described in this section are apparently merely indirectly affected by our current action, and therefore would not formally be a part of this RFA analysis. We have included them, however, to broaden the record in this proceeding and to alert them to our decisions.

60. *Wireless Communications Equipment Manufacturers*. The SBA has established a small business size standard for Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing. Examples of products in this category include "transmitting and receiving antennas, cable television equipment, GPS equipment, pagers, cellular phones, mobile communications equipment, and radio and television studio and broadcasting equipment"[175] and may include other devices that transmit and receive IP-enabled services, such as personal digital assistants (PDAs). Under the SBA size standard, firms are considered small if they have 750 or fewer employees.[176] According to Census Bureau data for 1997, there were 1,215 establishments[177] in this category that operated for the entire year.[178] Of those, there were 1,150 that had employment of under 500, and an additional 37 that had employment of

[171] 13 C.F.R. § 121.201, NAICS codes 511210, 541511, and 541519.

[172] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 511210 (issued Oct. 2000).

[173] U.S. Census Bureau, 1997 Economic Census, Subject Series: Professional, Scientific, and Technical Services, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4a, NAICS code 541511 (issued Oct. 2000).

[174] U.S. Census Bureau, 1997 Economic Census, Subject Series: Professional, Scientific, and Technical Services, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4a, NAICS code 541519 (issued Oct. 2000).

[175] Office of Management and Budget, North American Industry Classification System 308-09 (1997) (NAICS code 334220).

[176] 13 C.F.R. § 121.201, NAICS code 334220.

[177] The number of "establishments" is a less helpful indicator of small business prevalence in this context than would be the number of "firms" or "companies," because the latter take into account the concept of common ownership or control. Any single physical location for an entity is an establishment, even though that location may be owned by a different establishment. Thus, the numbers given may reflect inflated numbers of businesses in this category, including the numbers of small businesses. In this category, the Census breaks-out data for firms or companies only to give the total number of such entities for 1997, which were 1,089.

[178] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Industry Statistics by Employment Size," Table 4, NAICS code 334220 (issued Aug. 1999).

500 to 999. The percentage of wireless equipment manufacturers in this category was approximately 61.35%,[179] so we estimate that the number of wireless equipment manufacturers with employment of under 500 was actually closer to 706, with an additional 23 establishments having employment of between 500 and 999. Consequently, we estimate that the majority of wireless communications equipment manufacturers are small entities that may be affected by our action.

61. *Telephone Apparatus Manufacturing.* This category "comprises establishments primarily engaged primarily in manufacturing wire telephone and data communications equipment."[180] Examples of pertinent products are "central office switching equipment, cordless telephones (except cellular), PBX equipment, telephones, telephone answering machines, and data communications equipment, such as bridges, routers, and gateways."[181] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 1,000 or fewer employees.[182] According to Census Bureau data for 1997, there were 598 establishments in this category that operated for the entire year.[183] Of these, 574 had employment of under 1,000, and an additional 17 establishments had employment of 1,000 to 2,499. Consequently, we estimate that the majority of these establishments are small entities that may be affected by our action.

62. *Electronic Computer Manufacturing.* This category "comprises establishments primarily engaged in manufacturing and/or assembling electronic computers, such as mainframes, personal computers, workstations, laptops, and computer servers."[184] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 1,000 or fewer employees.[185] According to Census Bureau data for 1997, there were 563 establishments in this category that operated for the entire year.[186] Of these, 544 had employment of under 1,000, and an additional 11 establishments had employment of 1,000 to 2,499. Consequently, we estimate that the majority of these establishments are small entities that may be affected by our action.

63. *Computer Terminal Manufacturing.* "Computer terminals are input/output devices that connect with a central computer for processing."[187] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 1,000 or fewer employees.[188] According to Census

[179] *Id.* at Table 5.

[180] Office of Management and Budget, North American Industry Classification System 308 (1997) (NAICS code 334210).

[181] *Id.*

[182] 13 C.F.R. § 121.201, NAICS code 334210.

[183] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Telephone Apparatus Manufacturing," Table 4, NAICS code 334210 (issued Sept. 1999).

[184] Office of Management and Budget, North American Industry Classification System 306 (1997) (NAICS code 334111).

[185] 13 C.F.R. § 121.201, NAICS code 334111.

[186] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Electronic Computer Manufacturing," Table 4, NAICS code 334111 (issued Aug. 1999).

[187] Office of Management and Budget, North American Industry Classification System 307 (1997) (NAICS code 334113).

[188] 13 C.F.R. § 121.201, NAICS code 334113.

Bureau data for 1997, there were 142 establishments in this category that operated for the entire year, and all of the establishments had employment of under 1,000.[189] Consequently, we estimate that the majority or all of these establishments are small entities that may be affected by our action.

64. *Other Computer Peripheral Equipment Manufacturing.* Examples of peripheral equipment in this category include keyboards, mouse devices, monitors, and scanners.[190] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 1,000 or fewer employees.[191] According to Census Bureau data for 1997, there were 1061 establishments in this category that operated for the entire year.[192] Of these, 1,046 had employment of under 1,000, and an additional six establishments had employment of 1,000 to 2,499. Consequently, we estimate that the majority of these establishments are small entities that may be affected by our action.

65. *Fiber Optic Cable Manufacturing.* These establishments manufacture "insulated fiber-optic cable from purchased fiber-optic strand."[193] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 1,000 or fewer employees.[194] According to Census Bureau data for 1997, there were 38 establishments in this category that operated for the entire year.[195] Of these, 37 had employment of under 1,000, and one establishment had employment of 1,000 to 2,499. Consequently, we estimate that the majority of these establishments are small entities that may be affected by our action.

66. *Other Communication and Energy Wire Manufacturing.* These establishments manufacture "insulated wire and cable of nonferrous metals from purchased wire."[196] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 1,000 or fewer employees.[197] According to Census Bureau data for 1997, there were 275 establishments in this category that operated for the entire year.[198] Of these, 271 had employment of under 1,000, and four establishments had employment of 1,000 to 2,499. Consequently, we estimate that the majority or all of these establishments are small entities that may be affected by our action.

---

[189] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Computer Terminal Manufacturing," Table 4, NAICS code 334113 (issued Aug. 1999).

[190] Office of Management and Budget, North American Industry Classification System 307-08 (1997) (NAICS code 334119).

[191] 13 C.F.R. § 121.201, NAICS code 334119.

[192] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Other Computer Peripheral Equipment Manufacturing," Table 4, NAICS code 334119 (issued Aug. 1999).

[193] Office of Management and Budget, North American Industry Classification System 330 (1997) (NAICS code 335921).

[194] 13 C.F.R. § 121.201, NAICS code 335921.

[195] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Fiber Optic Cable Manufacturing," Table 4, NAICS code 335921 (issued Nov. 1999).

[196] Office of Management and Budget, North American Industry Classification System 331 (1997) (NAICS code 335929).

[197] 13 C.F.R. § 121.201, NAICS code 335929.

[198] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Other Communication and Energy Wire Manufacturing," Table 4, NAICS code 335929 (issued Nov. 1999).

67. *Audio and Video Equipment Manufacturing.* These establishments manufacture "electronic audio and video equipment for home entertainment, motor vehicle, public address and musical instrument amplifications."[199] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 750 or fewer employees.[200] According to Census Bureau data for 1997, there were 554 establishments in this category that operated for the entire year.[201] Of these, 542 had employment of under 500, and nine establishments had employment of 500 to 999. Consequently, we estimate that the majority of these establishments are small entities that may be affected by our action.

68. *Electron Tube Manufacturing.* These establishments are "primarily engaged in manufacturing electron tubes and parts (except glass blanks)."[202] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 750 or fewer employees.[203] According to Census Bureau data for 1997, there were 158 establishments in this category that operated for the entire year.[204] Of these, 148 had employment of under 500, and three establishments had employment of 500 to 999. Consequently, we estimate that the majority of these establishments are small entities that may be affected by our action.

69. *Bare Printed Circuit Board Manufacturing.* These establishments are "primarily engaged in manufacturing bare (i.e., rigid or flexible) printed circuit boards without mounted electronic components."[205] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 500 or fewer employees.[206] According to Census Bureau data for 1997, there were 1,389 establishments in this category that operated for the entire year.[207] Of these, 1,369 had employment of under 500, and 16 establishments had employment of 500 to 999. Consequently, we estimate that the majority of these establishments are small entities that may be affected by our action.

70. *Semiconductor and Related Device Manufacturing.* These establishments manufacture "computer storage devices that allow the storage and retrieval of data from a phase change, magnetic, optical, or magnetic/optical media."[208] The SBA has developed a small business size standard for this

[199] U.S. Census Bureau, "2002 NAICS Definitions: 334310 Audio and Video Equipment Manufacturing" (Feb. 2004) <www.census.gov>.

[200] 13 C.F.R. § 121.201, NAICS code 334310.

[201] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Audio and Video Equipment Manufacturing," Table 4, NAICS code 334310 (issued Aug. 1999).

[202] U.S. Census Bureau, "2002 NAICS Definitions: 334411 Electron Tube Manufacturing" (Feb. 2004) <www.census.gov>.

[203] 13 C.F.R. § 121.201, NAICS code 334411.

[204] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Electron Tube Manufacturing," Table 4, NAICS code 334411 (issued July 1999).

[205] U.S. Census Bureau, "2002 NAICS Definitions: 334412 Bare Printed Circuit Board Manufacturing" (Feb. 2004) <www.census.gov>.

[206] 13 C.F.R. § 121.201, NAICS code 334412.

[207] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Bare Printed Circuit Board Manufacturing," Table 4, NAICS code 334412 (issued Aug. 1999).

[208] U.S. Census Bureau, "2002 NAICS Definitions: 334413 Semiconductor and Related Device Manufacturing" (Feb. 2004) <www.census.gov>.

category of manufacturing; that size standard is 500 or fewer employees.[209] According to Census Bureau data for 1997, there were 1,082 establishments in this category that operated for the entire year.[210] Of these, 987 had employment of under 500, and 52 establishments had employment of 500 to 999.

71. *Electronic Capacitor Manufacturing.* These establishments manufacture "electronic fixed and variable capacitors and condensers."[211] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 500 or fewer employees.[212] According to Census Bureau data for 1997, there were 128 establishments in this category that operated for the entire year.[213] Of these, 121 had employment of under 500, and four establishments had employment of 500 to 999.

72. *Electronic Resistor Manufacturing.* These establishments manufacture "electronic resistors, such as fixed and variable resistors, resistor networks, thermistors, and varistors."[214] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 500 or fewer employees.[215] According to Census Bureau data for 1997, there were 118 establishments in this category that operated for the entire year.[216] Of these, 113 had employment of under 500, and 5 establishments had employment of 500 to 999.

73. *Electronic Coil, Transformer, and Other Inductor Manufacturing.* These establishments manufacture "electronic inductors, such as coils and transformers."[217] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 500 or fewer employees.[218] According to Census Bureau data for 1997, there were 448 establishments in this category that operated for the entire year.[219] Of these, 446 had employment of under 500, and two establishments had employment of 500 to 999.

---

[209] 13 C.F.R. § 121.201, NAICS code 334413.

[210] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Semiconductor and Related Device Manufacturing," Table 4, NAICS code 334413 (issued July 1999).

[211] U.S. Census Bureau, "2002 NAICS Definitions: 334414 Electronic Capacitor Manufacturing" (Feb. 2004) <www.census.gov>.

[212] 13 C.F.R. § 121.201, NAICS code 334414.

[213] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Electronic Capacitor Manufacturing," Table 4, NAICS code 334414 (issued July 1999).

[214] U.S. Census Bureau, "2002 NAICS Definitions: 334415 Electronic Resistor Manufacturing" (Feb. 2004) <www.census.gov>.

[215] 13 C.F.R. § 121.201, NAICS code 334415.

[216] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Electronic Resistor Manufacturing," Table 4, NAICS code 334415 (issued Aug. 1999).

[217] U.S. Census Bureau, "2002 NAICS Definitions: 334416 Electronic Coil, Transformer, and Other Inductor Manufacturing" (Feb. 2004) <www.census.gov>.

[218] 13 C.F.R. § 121.201, NAICS code 334416.

[219] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Electronic Coil, Transformer, and Other Inductor Manufacturing," Table 4, NAICS code 334416 (issued Aug. 1999).

74. *Electronic Connector Manufacturing.* These establishments manufacture "electronic connectors, such as coaxial, cylindrical, rack and panel, pin and sleeve, printed circuit and fiber optic."[220] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 500 or fewer employees.[221] According to Census Bureau data for 1997, there were 347 establishments in this category that operated for the entire year.[222] Of these, 332 had employment of under 500, and 12 establishments had employment of 500 to 999.

75. *Printed Circuit Assembly (Electronic Assembly) Manufacturing.* These are establishments "primarily engaged in loading components onto printed circuit boards or who manufacture and ship loaded printed circuit boards."[223] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 500 or fewer employees.[224] According to Census Bureau data for 1997, there were 714 establishments in this category that operated for the entire year.[225] Of these, 673 had employment of under 500, and 24 establishments had employment of 500 to 999.

76. *Other Electronic Component Manufacturing.* These are establishments "primarily engaged in loading components onto printed circuit boards or who manufacture and ship loaded printed circuit boards."[226] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 500 or fewer employees.[227] According to Census Bureau data for 1997, there were 1,835 establishments in this category that operated for the entire year.[228] Of these, 1,814 had employment of under 500, and 18 establishments had employment of 500 to 999.

77. *Computer Storage Device Manufacturing.* These establishments manufacture "computer storage devices that allow the storage and retrieval of data from a phase change, magnetic, optical, or magnetic/optical media."[229] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 1,000 or fewer employees.[230] According to Census Bureau data for

[220] U.S. Census Bureau, "2002 NAICS Definitions: 334417 Electronic Connector Manufacturing" (Feb. 2004) <www.census.gov>.

[221] 13 C.F.R. § 121.201, NAICS code 334417.

[222] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Electronic Connector Manufacturing," Table 4, NAICS code 334417 (issued July 1999).

[223] U.S. Census Bureau, "2002 NAICS Definitions: 334418 Printed Circuit Assembly (Electronic Assembly) Manufacturing" (Feb. 2004) <www.census.gov>.

[224] 13 C.F.R. § 121.201, NAICS code 334418.

[225] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Printed Circuit Assembly (Electronic Assembly) Manufacturing," Table 4, NAICS code 334418 (issued Sept. 1999).

[226] U.S. Census Bureau, "2002 NAICS Definitions: 334419 Other Electronic Component Manufacturing" (Feb. 2004) <www.census.gov>.

[227] 13 C.F.R. § 121.201, NAICS code 334419.

[228] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Other Electronic Component Manufacturing," Table 4, NAICS code 334419 (issued Aug. 1999).

[229] U.S. Census Bureau, "2002 NAICS Definitions: 334112 Computer Storage Device Manufacturing" (Feb. 2004) <www.census.gov>.

[230] 13 C.F.R. § 121.201, NAICS code 334112.

1997, there were 209 establishments in this category that operated for the entire year.[231] Of these, 197 had employment of under 500, and eight establishments had employment of 500 to 999

### D. Description of Projected Reporting, Recordkeeping and Other Compliance Requirements

78. Should the Commission decide to adopt any regulations to ensure that consumer protection needs are met by all providers of broadband Internet access service, the associated rules potentially could modify the reporting and recordkeeping requirements of certain broadband Internet access services providers. We could, for instance, require that broadband Internet access service providers must comply with slamming, truth-in-billing-type protections, or network outage reporting requirements. These proposals may impose additional reporting or recordkeeping requirements on entities. We seek comment on the possible burden these requirements would place on small entities. Also, we seek comment on whether a special approach toward any possible compliance burdens on small entities might be appropriate. Entities, especially small businesses, are encouraged to quantify the costs and benefits of any reporting requirement that may be established in this proceeding.

### E. Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered

79. The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include (among others) the following four alternatives: (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[232]

80. The Commission's primary objective is to develop a framework for consumer protection in the broadband era – a framework that ensures that consumer protection needs are met by all providers of broadband Internet access service, regardless of the underlying technology. We seek comment here on the effect the various proposals described in the *Notice*, and summarized below, will have on small entities, and on what effect alternative rules would have on those entities. We invite comment on ways in which the Commission can achieve its goal of protecting consumers while at the same time impose minimal burdens on small broadband Internet access service providers. With respect to any of our consumer protection regulations already in place, has the Commission adopted any provisions for small entities that we should similarly consider here?

81. *CPNI.* In this *Notice*, the Commission asks whether it should extend privacy requirements similar to the Act's CPNI requirements to providers of broadband Internet access services.[233] We ask, for example, whether we should forbid broadband Internet access providers from disclosing, without their customers' approval, information about their customers that they learn through the provision of their

---

[231] U.S. Census Bureau, 1997 Economic Census, Industry Series: Manufacturing, "Computer Storage Device Manufacturing," Table 4, NAICS code 334112 (issued July 1999).

[232] 5 U.S.C. § 603(c).

[233] *See supra Notice* at para. 149.

broadband Internet access service.[234] By developing the record with respect to privacy concerns, the Commission can appropriately determine whether providers of broadband Internet access services, including small entities, should be subject to similar privacy regulations.[235]

82. *Slamming.* We seek comment on whether we should impose slamming requirements on providers of broadband Internet access service and to explain in what circumstances subscribers to broadband Internet access could get "slammed."[236] We also ask whether the provisioning process for broadband Internet access service is such that an unauthorized change in provider is more likely in situations where the provider relies on third-party broadband transmission facilities.[237] We recognize that small broadband Internet access service providers may rely more on third-party broadband transmission facilities and could potentially inform the Commission as to whether slamming is likely to occur in those situations.

83. *Truth-in-Billing.* We invite comment on whether we should impose requirements on broadband Internet access service providers that are similar to our truth-in-billing requirements or are otherwise geared toward reducing slamming, cramming, or other types of telecommunications-related fraud.[238] We ask parties to explain what problems customers of broadband Internet access service are likely to have with their bills and whether we should address these problems through truth-in-billing-type requirements.[239] What effect will this proposal have on small entities, and are there alternatives to imposing truth-in-billing type regulations?

84. *Network Outage Reporting.* We seek comment as to whether broadband Internet access service providers should notify the Commission of outages of thirty or more minutes that affect a substantial number of customers or involve major airports, major military installations, key government facilities, nuclear power plants, or 911 facilities.[240] We encourage small entities to identify any alternatives that would protect consumers while at the same time minimizing any burden on small broadband Internet access providers.

85. *Section 214 Discontinuance.* In the *Notice,* the Commission stated that section 214 of the Act limits a telecommunications carrier's ability to discontinue unilaterally its service to customers.[241] The Commission's implementing rules generally require that domestic carriers wishing to "discontinue, reduce, or impair" services must first request authority to do so from the Commission and must notify affected customers and others of their plans. We ask whether the Commission should impose discontinuance-type requirements on providers of broadband Internet access service.[242]

86. *Section 254(g) Rate Averaging Requirements.* In the *Notice*, the Commission explains that section 254(g) required the Commission to adopt rules "to require that the rates charged by providers of

[234] *See id.* at para. 149.

[235] *See id.* at para. 149.

[236] *See id.* at para. 151.

[237] *See id.* at para. 151.

[238] *See id.* at para. 153.

[239] *See id.* at para. 153.

[240] *See id.* at para. 154.

[241] *See id.* at para. 155.

[242] *See id.* at para. 156.

interexchange telecommunications services to subscribers in rural and high cost areas . . . be no higher than the rates charged by each such provider to its subscribers in urban areas."[243] We ask, for example, whether we should adopt similar rate averaging requirements on providers of broadband Internet access services, particularly as consumers substitute broadband services and applications for narrowband services that were covered by section 254(g).[244]

87. In the *Notice*, we ask commenters to address whether the imposition of regulations pursuant to our ancillary jurisdiction, and the corresponding ability of consumers to take advantage of Commission avenues for resolution of consumer protection issues, is desirable and necessary as a matter of public policy, or whether we should rely on market forces to address some or all of the areas listed.[245] The option of relying on market forces may benefit entities, especially small entities, who may find it costly or burdensome to comply with Commission regulations. We also ask whether these types of regulations are more or less relevant in the context of broadband Internet access service than they are for traditional telephony services.[246] In addition, we ask commenters to describe any technical, economic, or other impediments that may affect the ability of broadband Internet access service providers to comply with such regulations. We also ask whether there are areas of consumer protection not listed above for which the Commission should impose regulations.[247]

88. *Federal and State Involvement.* To the extent that the Commission finds it necessary to impose consumer protection and related regulations on broadband Internet access service providers, we also seek comment on how best to harmonize federal regulations with the states' efforts and expertise in these areas.[248]

### F. Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules

89. None.

[243] *See id.* at para. 157.

[244] *See id.* at para. 157.

[245] *See id.* at para. 147.

[246] *See id.* at para. 147.

[247] *See id.* at para. 147.

[248] *See id.* at para. 158.

**STATEMENT OF**
**CHAIRMAN KEVIN J. MARTIN**

*Re:* *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities, Universal Service Obligations of Broadband Providers* (CC Docket No. 02-33), *Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services* (CC Docket No. 01-337), *Computer III Further Remand Proceedings: Bell Operating Company Provision of Enhanced Services; 1998 Biennial Regulatory Review – Review of Computer III and ONA Safeguards and Requirements* (CC Docket Nos. 95-20, 98-10), *Conditional Petition of the Verizon Telephone Companies for Forbearance Under 47 U.S.C. § 160(c) with Regard to Broadband Services Provided Via Fiber to the Premises; Petition of the Verizon Telephone Companies for Declaratory Ruling or, Alternatively, for Interim Waiver with Regard to Broadband Services Provided Via Fiber to the Premises* (WC Docket No. 04-242), *Consumer Protection in the Broadband Era* (WC Docket No. 05-271)

The Order that we adopt today is a momentous one. It ends the regulatory inequities that currently exist between cable and telephone companies in their provision of broadband Internet services. As I have said on numerous occasions, leveling the playing field between these providers has been one of my highest priorities. With this Order, wireline broadband Internet access providers, like cable modem service providers, will be considered information service providers and will no longer be compelled by regulation to unbundle and separately tariff the underlying transmission component of their Internet access service.

Most importantly, however, the actions we take in this Order are an explicit recognition that the telecommunications marketplace that exists today is vastly different from the one governed by regulators over 30 years ago. The *Computer Inquiry* requirements that were adopted several decades ago were based on the assumption that, without the imposition of strict regulation, telephone companies would be able to exert considerable market power over unaffiliated entities in the provision of information services. To the extent that this assumption was true at the time, it is no longer true in today's broadband market.

As the item recognizes, the broadband Internet access market today is characterized by multiple platforms that are vigorously competing for customers. Such changed market conditions require, as the Supreme Court in the *Brand X* decision phrased it, a "fresh analysis." I am pleased that the Commission so quickly undertook this analysis, and, in so doing, removed legacy regulation that applied to only one of the platform providers – the telephone companies.

Broadband deployment is vitally important to our nation as new, advanced services hold the promise of unprecedented business, educational, and healthcare opportunities for all Americans. Perpetuating the application of outdated regulations on only one set of Internet access providers inhibits infrastructure investment, innovation, and competition generally.

In taking these actions, we recognize that change is never easy. Nor can it be effectuated overnight. ISPs currently rely on the transmission offerings that the telephone companies have been compelled by regulation to make available. Such a transition is vital to the continuity of service for thousands of customers. To this end, we require the telephone companies to make their current transmission offerings available for one year from the effective date of this Order.

Similarly, we cannot permit the telephone companies to immediately cease contributing to the universal service fund on the portion of revenues derived from these tariffed Internet access offerings. We must ensure the stability of the fund. Accordingly, we require telephone companies to continue

contributing to the universal service fund on their Internet access services based on their current contribution levels for 270 days following the effective date of the Order or until we adopt new contribution rules, whichever comes first. Either way, the Commission will act diligently to ensure that there will be no adverse impact to the fund as a result of the holdings today.

Although we are confronting a changed marketplace, government will continue to have a role in this dynamic, new broadband marketplace. Together with our state colleagues, the Commission must vigilantly ensure that law enforcement and consumer protection needs continue to be met. To accomplish this, we adopt a Notice of Proposed Rulemaking seeking comment on the extent to which we need to develop a consumer protection framework that applies to all broadband Internet access platform providers, regardless of the underlying technology.

We also adopt today a vitally important companion item that confirms that facilities-based Internet access providers (as well as interconnection VoIP providers) are subject to the requirements of CALEA. Law enforcement agencies must have the ability to conduct electronic surveillance over broadband technologies.

The Commission also adopts today a Policy Statement that reflects each Commissioner's core beliefs about certain rights all consumers of broadband Internet access should have. Competition has ensured consumers have had these rights to date, and I remain confident that it will continue to do so.

I believe that, with the actions we take today, consumers will reap the benefits of increased Internet access competition and enjoy innovative high-speed services at lower prices. There is, however, more to do to stimulate infrastructure investment, broadband deployment, and competition in the broadband market. We intend to tackle these challenges in the upcoming months.

Finally, I want to thank my colleagues for their perseverance and commitment to work together to adopt this item today. It is an honor and a privilege to serve with such dedicated and capable public servants.

## STATEMENT OF
## COMMISSIONER KATHLEEN Q. ABERNATHY

*Re:* *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities, Universal Service Obligations of Broadband Providers* (CC Docket No. 02-33), *Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services* (CC Docket No. 01-337), *Computer III Further Remand Proceedings: Bell Operating Company Provision of Enhanced Services; 1998 Biennial Regulatory Review – Review of Computer III and ONA Safeguards and Requirements* (CC Docket Nos. 95-20, 98-10), *Conditional Petition of the Verizon Telephone Companies for Forbearance Under 47 U.S.C. § 160(c) with Regard to Broadband Services Provided Via Fiber to the Premises; Petition of the Verizon Telephone Companies for Declaratory Ruling or, Alternatively, for Interim Waiver with Regard to Broadband Services Provided Via Fiber to the Premises* (WC Docket No. 04-242), *Consumer Protection in the Broadband Era* (WC Docket No. 05-271)

Three and a half years ago, my colleagues and I made a promise to the American people: we promised that efforts to deploy twenty-first century broadband technologies for public use would not be crushed by the weight of 1930s-era regulations. To that end, we initiated a series of proceedings designed to reevaluate the role of traditional common carrier regulations in the blossoming market for broadband Internet access services.

We quickly determined that cable modem services should be free from the heavy burdens of Title II regulation. That determination was soon subject to legal challenge, and the resulting litigation effectively prevented action with regard to similar services provided over wireline facilities. In June's *NCTA v. Brand X* decision, the Supreme Court brought that period of uncertainty to a close, validating the Commission's authority to classify a broadband Internet access service as a Title I information service.

Today, with the benefit of the Court's guidance, we extend similar relief to providers of wireline broadband Internet access. Specifically, we clarify that wireline broadband Internet access services – like the cable modem services at issue in *Brand X* – are "information services," and thus not automatically subject to the full range of Title II requirements designed for a narrowband, analog, one-wire world. We also lift the so-called "*Computer Inquiry*" requirements, which were crafted to prevent companies that exercised substantial market power in the provision of telecommunications from leveraging that dominance into the provision of enhanced services. Requirements such as these were never meant to apply in a competitive, multi-platform communications market such as the market for high-speed Internet access services.

And let there be no doubt: competition among broadband providers is flourishing. The Commission's most recent statistics show that over 80 percent of zip codes in America are served by two or more high-speed providers, about two-thirds are served by three or more, and over half are served by four or more. Moreover, I fully expect that providers taking advantage of new platforms will soon offer consumers even more choices in even more areas. Over 1.2 million high-speed lines in service today use wireless, satellite, fiber-optic, and powerline technologies; that number is poised to rise dramatically in the very near future. The result of such competition will be better and better services at lower and lower prices, with offerings designed to match customers' needs rather than regulators' preferences.

Today's decision is *not*, however, the end of the story. Wireline broadband providers are not subject to Title II or to the *Computer Inquiry* requirements, but that does not mean that they are immune from *all* regulatory requirements. When the Commission first issued its tentative conclusion that these services were outside the scope of Title II, I emphasized my commitment to preserving any specific

regulatory requirements that are necessary for the furtherance of critical policy objectives. In June, the *Brand X* majority made clear that the Commission retains the prerogative to exercise its Title I "ancillary jurisdiction" to do just that. The Commission has already made clear its intention to ensure access to emergency services as Americans transition to packet-switched communications technologies, irrespective of how those services are classified under the Communications Act. As we make clear in today's *Notice*, we will now turn our attention to other "social policy" requirements, such as those involving disability access, slamming, and consumer privacy. Where action is warranted, we will act.

There is still work to be done as we endeavor to establish a new, minimally regulated framework for the digital era. But however we address the issues that remain before us, I expect that our decision today will spur future investment in broadband infrastructure and provide the flexibility to which companies in a competitive market and their customers are entitled.

In short, I am confident that today's Order does much to fulfill our promise to the American people, and I am happy to support this item.

**STATEMENT OF**
**COMMISSIONER MICHAEL J. COPPS,**
**CONCURRING**

Re: *In the Matter of Appropriate Framework for Broadband Access to the Internet over Wireline Facilities; Universal Service Obligations of Broadband Providers; Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services; Computer III Further Remand Proceedings: Bell Operating Company Provision of Enhanced Services; 1998 Biennial Regulatory Review—Review of Computer III and ONA Safeguards and Requirements; Conditional Petition of the Verizon Telephone Companies for Forbearance Under 47 U.S.C. § 160(c) with Regard to Broadband Services Provided via Fiber to the Premises; Petition of the Verizon Telephone Companies for Declaratory Ruling or, Alternatively, for Interim Waiver with Regard to Broadband Services Provided via Fiber to the Premises; Consumer Protection in the Broadband Era*, Report and Order and Notice of Proposed Rulemaking (CC Docket Nos. 02-33, 01-337, 95-20, 98-10, WC Docket No. 04-242)

My goal as a Commissioner has always been to advance the public interest as far as I can with the tools at my disposal at the time. I objected strenuously to our original reclassification of cable modem and our tentative reclassification of wireline broadband. But the Supreme Court has fundamentally changed the legal landscape. I personally find the jurisprudence of Justice Scalia far more persuasive than that of the Court majority, and I agree wholeheartedly with Justice Scalia's observation that the previous Commission chose to achieve its objectives "through an implausible reading of the statute, and has thus exceeded the authority given it by Congress."

But neither Justice Scalia's opinion nor my personal reading will guide the Commission's approach going forward. The handwriting is on the wall. DSL ***will*** be reclassified, either now or soon from now, whether I agree or not. This is not a situation of my making or my preference, and I believe that it does not inure to the benefit of this institution or to consumers across the land. But when fundamental responsibilities like homeland security, universal service, disabilities access, enterprise competition, and Internet discrimination protections are on the chopping block, I feel compelled to work hard and be creative to advance the public interest rather than throwing up my hands. I therefore will concur in this proceeding to protect our ability to meet these core responsibilities.

As we enter the world of Title I today, we all know what the FCC's goals must be. Among other things, we must continue to protect homeland security. We must meet our universal service responsibilities. We must maintain disabilities access. We must protect fledgling competition. And we must state clearly that innovators, technology companies, and consumers will not face unfair discrimination on the Internet by network providers.

Our ability to advance these critical goals should progress as we advance to broadband. They should not shrink as we fiddle with legalisms and parse definitions. This item is not an exercise in hair-splitting about telecommunications services and information services. It is about how we promote the deployment of advanced communications while still staying true to our core values. Nonetheless, in recent years this Commission has irresponsibly reclassified services without addressing the larger implications of its decisions.

Today we begin to face up to this shortfall. The Order is far from ideal. But our actions today

are infinitely better than they otherwise might have been because of the intensive discussions we have had among the Commissioners. We have avoided the unacceptable scenario of reclassifying DSL and then punting all of the critical responsibilities listed above to some uncertain future deliberation. I could not have been party to that approach. But in the end, we moved away from that and made progress on numerous important statutory obligations:

- *Homeland Security*: We ensure that law enforcement officials will have the tools that they need to protect our country through the Communications Assistance for Law Enforcement Act and the National Security Emergency Preparedness Telecommunications Service Priority System.

- *Universal Service*: In addition, we ensure the stability of the universal service contribution base until the Commission agrees on a path forward. Universal service is critical to the Nation and critical to Congress. It is one of the pillars upon which the Communications Act is built, and I would never be party to this agency abandoning this program and the millions of Americans who depend on it. Absent the *Brand X* decision, we would have more with which to work, but in order to shield the program in this specific item we put in place a nine-month stay on any changes to DSL universal service responsibilities, unless the full Commission agrees on a new system before that time. If we do not do so within nine months the Order states that: "the Commission will take *whatever action is necessary* to preserve existing funding levels, *including extending the [nine-month] period discussed above or expanding the contribution base*" (emphasis added). That is a firm and strong commitment from the Chairman and Commissioners that at the end of this period the program will be protected. We do not often commit to "take whatever action is necessary" and the promise that we will even expand the base if needed is a major achievement. I will continue to fight to keep rural America connected.

- *Disabilities*: But we had to protect more than homeland security and universal service. We had to craft protections for Americans with disabilities. I know this much: The disabilities communities did not fight for so many years to obtain "functional equivalency" and equal access to technology only to have their hard-won victories stolen by some regulatory sleight of hand. So I fought to ensure that the item guarantees accessible technologies for the 54 million Americans with disabilities.

- *Competition*: We also take significant action to protect competition. We ensure access to facilities and interconnection so that small and medium businesses can continue to enjoy the lower prices and increased choices that competition brings.

- *Internet Openness*: And critically, for the first time ever, the Commission has adopted a policy statement with principles that will guide our effort to preserve and promote the openness that makes the Internet so great.

I am especially pleased at my colleagues' adoption of this Statement of Policy on Internet openness. This is something I have been advocating for nearly two years. This Statement lays out a path forward under which the Commission will protect network neutrality so that the Internet remains a vibrant, open place where new technologies, business innovation and competition can flourish. We need a watchful eye to ensure that network providers do not become Internet gatekeepers, with the ability to dictate who can use the Internet and for what purpose. Consumers do not want to be told that they cannot use their DSL line for VoIP, for streaming video, to access a particular news website, or to play on a particular company's game machine. While I would have preferred a rule that we could use to bring enforcement action, this is a critical step. And with violations of our policy, I will take the next step and push for Commission action. A line has been drawn in the sand. I am particularly appreciative of the

Chairman's support of this item.

I also want to note that the Supreme Court's *Brand X* decision makes it clear that the Commission's ancillary authority can accommodate our work on homeland security, universal service, disabilities access, competition, and Internet discrimination protections—and more. But we have a ways to go. Today, in addition to our Order, we release a Notice of Proposed Rulemaking on consumer protection in the broadband era. I would have much preferred positive action on this now, but we at least put these issues squarely on the table and now we have a proceeding to deal with them. I believe that a combination of a strong record, good wide stakeholder input and Commission sensitivity to the priority Congress places on consumer issues can preserve such protections as privacy, truth-in-billing, and other safeguards for the communications tools our citizens rely upon no matter how they may be classified. Hard-won consumer protections must never be allowed to erode simply because we change the classification of the tools people rely upon to communicate with one another. So I think we come out here with a framework for consumer protection in a digital world—a framework accommodating and encouraging the expertise and authority that reside in our state public service commission counterparts. I look forward to the record that develops and to working with my colleagues and all stakeholders so that we can move ahead without further delay.

Let me sum up by reminding the Commission that we are saying today that we take the dramatic step of reclassifying DSL in order to spur broadband deployment and to help consumers. I want us to test that proposition a year from now. If by next year consumers have more broadband options, lower prices, higher speeds and better services, maybe this proposition holds true. If our broadband take-rate reverses course and the United States begins to climb up the ladder of broadband penetration rather than falling further behind so many other nations, then we'll have something to crow about. If we get no complaints about higher bills, loss of privacy and diminished access for the disability communities, we can take a bow. And critically, if we make progress on public safety and homeland security, we can be proud of our actions. So I hope next year the Commission will put its money where its mouth is and check to see if its theory yields real world results for American consumers. And if it doesn't achieve these results, I hope we'll admit it. I plan to keep tabs.

In closing, I want to thank Chairman Martin for not only permitting, but encouraging, open and genuine Commission dialogue on these difficult issues. I want to thank him, and Commissioners Adelstein and Abernathy, for their contributions to making this a better item. The Bureau toiled mightily with this proceeding and we are indebted to their diligence, hard work and creative thought all along the way. Our personal staffs performed with distinction. And I would be both ungrateful and remiss if I did not recognize the extraordinary—indeed, often heroic—exertions of my Legal Advisor Jessica Rosenworcel for helping ***all*** of us navigate these perilous waters and arrive at somewhat more tranquil shores.

**STATEMENT OF
COMMISSIONER JONATHAN S. ADELSTEIN
CONCURRING IN FCC 05-150, APPROVING IN FCC 05-153**

*Re: Appropriate Framework for Broadband Access to the Internet over Wireline Facilities, Universal Service Obligations of Broadband Providers* (CC Docket No. 02-33), *Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services* (CC Docket No. 01-337), *Computer III Further Remand Proceedings: Bell Operating Company Provision of Enhanced Services; 1998 Biennial Regulatory Review – Review of Computer III and ONA Safeguards and Requirements* (CC Docket Nos. 95-20, 98-10), *Conditional Petition of the Verizon Telephone Companies for Forbearance Under 47 U.S.C. § 160(c) with Regard to Broadband Services Provided Via Fiber to the Premises; Petition of the Verizon Telephone Companies for Declaratory Ruling or, Alternatively, for Interim Waiver with Regard to Broadband Services Provided Via Fiber to the Premises* (WC Docket No. 04-242), *Consumer Protection in the Broadband Era* (WC Docket No. 05-271) (Concurring)

*Re: Communications Assistance for Law Enforcement Act and Broadband Access and Services* First Report and Order and Further Notice of Proposed Rulemaking (ET Docket No. 04-295, RM-10865) (Approving)

The items before us are a real tribute to the consensus building dedication of Chairman Kevin Martin and all of my colleagues. It took extraordinary efforts by all of us because the stakes are so high, the consequences so far reaching, and the concerns so acute. And we did all of this work in an incredibly compressed time-frame.

Today, we implement the Supreme Court's guidance in the *Brand X* decision and embark on a new but uncharted path in its treatment of wireline broadband Internet access services, the high-speed DSL and fiber-to-the-home connections. These technologies are revolutionizing the way that consumers connect, learn, work, and socialize through the Internet. With the Broadband Reclassification Order and NPRM, we move toward a measured and technology-neutral approach to broadband regulation. Critical aspects of the reclassification approach, however, give me considerable pause.

Indeed, were the pen solely in my hand, these are not the precise items I would have drafted or the procedural framework I would have chosen. In the wake of the Supreme Court decision, however, this reclassification was inevitable. Moreover, the Broadband Reclassification Order reflects meaningful compromise by each of my colleagues, and I appreciate the efforts to address many of my concerns about issues including the stability of the universal service fund, access for persons with disabilities, and the ability of competitive carriers to access essential input facilities. What we've done here is ensure it was done in a fashion that protects, or holds the promise of addressing, many critical policy goals that Congress and the Commission have long held as fundamental to a "rapid, efficient, Nation-wide, and world-wide wire and radio communication service."

As we move to this less-regulated framework, I'm pleased that we take up the Supreme Court's invitation to use our Title I ancillary jurisdiction to address critical policy issues. Commissioner Copps and I have worked hard to address or lay the groundwork for addressing many important consumer and public policy concerns, and I appreciate Chairman Martin and Commissioner Abernathy's willingness to engage in a constructive discussion about a technology-neutral framework for policy in the broadband age. I'm particularly pleased that recent changes to the Broadband Reclassification Order reiterate our commitment to access for persons with disabilities and consumer protection, and provide for meaningful provisions to address the needs of carriers serving Rural America. I'm also pleased that we adopt a

companion Order applying the Communications Assistance for Law Enforcement Act (CALEA) to facilities-based broadband Internet access providers and providers of interconnected VoIP services. Finally, we adopt concurrently a companion Policy Statement that articulates a core set of principles for consumers' access to broadband and the Internet. Collectively, these provisions are essential for my support of this item.

We undertake these proceedings against the backdrop of the *Brand X* decision, in which the Supreme Court upheld the FCC's earlier determination that cable modem broadband services may be classified as information services, rather than as traditional telecommunications services. By doing so, the FCC defined these cable broadband services out of Title II of the Act, which applies to common carrier offerings. I was not at the Commission when this reclassification approach was first proposed, but the approach has always given me some grounds for real concern. By reclassifying broadband services outside of the existing Title II framework, the Commission steps away from some of the core legal protections and grounding afforded by Congress. This approach also gave a significant and articulate minority of the Supreme Court grounds for questioning whether the Commission had fundamentally misinterpreted the Communications Act. But, my reservations notwithstanding, the Supreme Court majority upheld the reclassification and we must respond to this changed landscape.

In fact, there is much to be said for a measured regulatory approach for broadband services. The applications that can ride over broadband services are bringing increased educational, economic, health, and social opportunities for consumers. I'm increasingly convinced that our global economic success will also be shaped by our commitment to ubiquitous advanced communications networks. Our challenge is to create an environment in which providers can invest in their networks and compete, application and content providers can innovate and reach consumers, and we can all maintain the core policy goals that we've worked hard to achieve.

The Broadband Reclassification Order acknowledges that the marketplace and technology of today's broadband Internet access services are markedly different from those that existed three decades ago, when most of the *Computer Inquiries'* requirements were first adopted. Although we adopt this new regulatory approach with the blessing of the Supreme Court, many of the implications for consumers are largely yet undefined. To some degree, we ask consumers to take a leap of faith based on our predictive judgment about the development of competition in an emerging and very fluid broadband marketplace.

It remains unclear whether the approach we have taken thus far has been a success. Not all consumers have a choice between affordable broadband providers, and Americans continue to pay relatively high prices for relatively limited bandwidth. As we move forward, I am pleased that the Commission adopts a one-year transition for independent ISPs and encourages parties to engage in prompt negotiations to facilitate the transition process. While this is helpful, we have a lot more work to do to establish a coherent national broadband policy that signifies the level of commitment we need as a nation to speed the deployment of affordable broadband services to all Americans. So we will have to monitor closely the development of the broadband market and the effectiveness of this approach. If results don't improve, I hope we will reconsider what measures are needed to spur the level of competition necessary to lower prices and improve services for consumers.

A critical aspect of our decision to eliminate existing access requirement for ISPs is the Commission's adoption of a companion Policy Statement that articulates a core set of principles for consumers' access to broadband and the Internet. These principles are designed to ensure that consumers will always enjoy the full benefits of the Internet. I am also pleased that these principles, which will inform the Commission's future broadband and Internet-related policymaking, will apply across the range

of broadband technologies. I commend in particular my colleague, Commissioner Copps, for his attention to this issue.

I am also pleased that changes were made to the Broadband Reclassification Order that affirm our authority under Title I to ensure access for those with disabilities. Through sections 225 and 255 of the Act, Congress codified important principles that have ensured access to functionally-equivalent services for persons with disabilities. Millions of Americans with disabilities can benefit from widely-available and accessible broadband services. Indeed, at last month's open meeting, the Commission recognized the importance of broadband services to persons with disabilities, and celebrated the 15th anniversary of the Americans with Disabilities Act (ADA), by adopting a series of orders that improved the quality of and access to important communications services for the deaf and hard of hearing community. I strongly believe that we must not relegate the ADA's important protections to the world of narrowband telephone service, and I appreciate my colleagues' willingness to address this concern.

I'm also particularly pleased that the Broadband Reclassification Order includes meaningful provisions to address the needs of carriers serving Rural America. By allowing rural providers to continue to offer their broadband services on a common carrier basis, and by allowing them to participate in the NECA pooling process, we maintain their ability to reduce administrative costs, minimize risk, and create incentives for investment in broadband facilities that are so crucial to the future of Rural America.

We also take important interim action in the Broadband Reclassification Order to preserve the stability of our universal service funding. Reclassifying broadband services as information services removes revenues from wireline broadband Internet access services from the mandatory contribution requirements of section 254, taking out a rapidly-growing segment of the telecommunications sector from the required contribution base. I would have preferred to exercise our permissive contribution authority now to address this potential decline in the contribution base permanently, but I am glad that we were able to agree to adopt an interim measure to preserve existing levels of universal service funding on a transitional basis. I also appreciate the Commission's commitment to take whatever action is necessary to preserve existing funding levels, including extending the transition or expanding the contribution base. These modifications to the Broadband Reclassification Order are critical to my support of the item.

The Commission will also need to assess how the reclassification of wireline broadband services might affect our ability to support broadband services through the universal service fund, should we decide to do so in the future. Given the growing importance of broadband services for our economy, public safety, and society, I hope that we can preserve our ability to support the deployment of these services for consumers that the market may leave behind.

I'm also glad that we've added an important Notice of Proposed Rulemaking that seeks comment on how we can ensure that we continue to meet our consumer protection obligations in the Act. On some issues, like consumer privacy, it would have been far wiser to act now. I'm troubled by the prospect that we might even temporarily roll back consumer privacy obligations in the Broadband Reclassification Order, particularly during this age in which consumers' personal data is under greater attack than ever. The Commission must move immediately to address these privacy obligations. We should also act quickly to assess the effect on our Truth-in-Billing rules and the rate averaging requirements of the Act, which ensure that charges for consumers in rural areas are not higher than those for consumers in urban areas. This Notice sets the foundation for our consumer protection efforts across all broadband technology platforms and I look forward to working with my colleagues as we move forward promptly to address these issues.

For all these reasons, I concur in today's Broadband Reclassification item and support the CALEA item.

I would like to thank my colleagues for their willingness to engage in constructive dialogue and to take meaningful steps to acknowledge many of my concerns. I also want to thank Tom Navin and the dedicated and professional staff of our Wireline Competition Bureau, who have worked many long hours to produce these companion items so quickly. All of our personal staffs have worked incredibly long hours with great dedication to speed this process along. I would like to acknowledge my personal gratitude to Scott Bergmann for his incredible stamina and persistence. I would be remiss if I didn't also thank his entire family for sacrificing their sacred time with him over these past few weeks. I look forward to working with you all as we moved forward together.