Alan M. Mansfield (SBN 125998)
alan@rosnerandmansfield.com
John W. Hanson (SBN 214771)
john@rosnerandmansfield.com
ROSNER & MANSFIELD, LLP
10085 Carroll Canyon Road
San Diego, CA 92131
Tel: (858) 348-1005
Fax: (858) 348-1150

Attorneys for Plaintiffs

Art Neill (SBN 246717)
art@ucan.org
UTILITY CONSUMERS' ACTION NETWORK
3100 Fifth Ave., Suite B
San Diego, CA 92103
Tel: 619-696-6966
Fax: 619-696-7477

Attorneys for UCAN

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UTILITY CONSUMERS' ACTION NETWORK and ERIC TAYLOR, on behalf of themselves, their members and/or all others similarly situated, as applicable,<br><br>Plaintiffs,<br><br>v.<br><br>SPRINT SOLUTIONS, INC.; et al.,<br><br>Defendants. | CASE NO. 07-CV-2231-W (LSP)<br><br>**CLASS ACTION**<br><br>DECLARATION OF ALAN M. MANSFIELD IN SUPPORT OF EX PARTE APPLICATION FOR ORDER PERMITTING EXPEDITED DISCOVERY PURSUANT TO FED. R. CIV. PROC. 26(a)<br><br>Date: N/A<br>Time: N/A<br>Courtroom: Hon. Thomas Whelan |

I, ALAN M. MANSFIELD, declare as follows:

1. I am an attorney at law licensed to practice in the State of California and one of the attorneys of record herein for Plaintiffs Eric Taylor and the Utility Consumers' Action Network. I have personal knowledge of the facts contained herein and, if called as a witness, could competently testify to such facts.

/ / /

2. Attached hereto as Exhibits 1-3 are true and correct copies of the discovery we request permission to serve and obtain expedited responses to in this action from defendants.

3. Based on my investigation and that of UCAN, on January 14, 2008, I sent a letter to James Mittermiller, counsel for Sprint, advising him of the issues raised in this Application and requesting we meet and confer over this issue to see if we could avoid the necessity of requesting injunctive relief from the Court, and also advising him of the complaints from Mr. Taylor and Ms. Friedrich described more fully in their Declarations. Due to the timing of this issue I asked for a response by January 18, 2008. On or about January 15, 2008, Mr. Mittermiller asked for an additional week to investigate this issue and provide me a response, which I gave him. A true and correct copy of my January 14, 2008 letter is attached hereto as Exhibit 4.

4. On Friday January 25, 2008 at approximately 4:15 p.m., Mr. Mittermiller's office e-mailed me a response letter on behalf of Sprint, advising me that Sprint would not honor requests for cancellation based on the imposition of two new fees except on a case-by-case basis (but now would agree Mr. Taylor could cancel service) and would not waive the 30-day cancellation window while we addressed these issues. We spoke later that afternoon, and I told Mr. Mittermiller based on that response we would consider asking for preliminary injunctive relief and a temporary restraining order, but agreed to talk further before doing so. A true and correct copy of Mr. Mittermiller's response letter is attached hereto as Exhibit 5.

5. On Monday January 28, 2008, Mr. Mittermiller and I spoke, and he confirmed that the time for the 30-day cancellation window to close would begin on February 1, 2008, and would be over by the end of February. I advised him we would likely be filing an application for a temporary restraining order.

6. On Tuesday, January 29, 2008, I advised Mr. Mittermiller that we would not be moving at this time for such an order but rather would be requesting expedited discovery based on numerous complaints UCAN had received over this issue. Mr. Millermiller asked for information UCAN had received from other consumers who expressed concerns over not being able to cancel service, similar to the complaints UCAN had received from Mr. Taylor and Ms. Friedrich. On January 31, 2008, I provided him the names of two additional persons who described experiences

similar to those of Mr. Taylor and Ms. Friedrich and who had authorized UCAN to provide their information to Sprint.

7. Mr. Mittermiller advised me in a phone call on February 5, 2008 that he had investigated UCAN's concerns, and that Sprint believed it had treated its consumers appropriately on this issue. Thus, there was not a need to further address these issues.

8. I was counsel for UCAN in another action back in July 2003, where Sprint had imposed a new fee and then would not let consumers out of their term contracts despite a provision in the Terms and Conditions of Service allowing customers to cancel service. On August 4, 2003, the Honorable Linda Quinn of the San Diego County Superior Court issued a temporary restraining order against Sprint enjoining it from refusing to recognize cancellation requests from consumers until a hearing on a preliminary injunction motion. That order was signed by the Court on August 11, 2003. A true and correct correct copy of that order is attached hereto as Exhibit 6.

9. A true and correct copy of Sprint's current Term and Conditions of Service is attached hereto as Exhibit 7.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on February 7th, 2008, at San Diego, California.

ALAN M. MANSFIELD

# EXHIBIT 1

Alan M. Mansfield (SBN 125998)
alan@rosnerandmansfield.com
John W. Hanson (SBN 214771)
john@rosnerandmansfield.com
ROSNER & MANSFIELD, LLP
10085 Carroll Canyon Road, Suite 100
San Diego, CA 92131
Tel: (858) 348-1005
Fax: (858) 348-1150

Attorneys for Plaintiffs

Art Neill (SBN 246717)
art@ucan.org
UTILITY CONSUMERS' ACTION NETWORK
3100 Fifth Avenue, Suite B
San Diego, CA 92103
Tel: (619) 696-6966
Fax: (619) 696-7477

Attorneys for UCAN

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE UTILITY CONSUMERS' ACTION NETWORK, and ERIC TAYLOR, on behalf of themselves, their members and/or all others similarly situated, as applicable,<br><br>Plaintiffs,<br><br>v.<br><br>SPRINT SOLUTIONS, INC., et al.,<br><br>Defendants. | CASE NO. 07-CV-2231-W (LSP)<br><br>PLAINTIFFS' FIRST SET OF SPECIAL INTERROGATORIES |

PROPOUNDING PARTY: PLAINTIFFS THE UTILITY CONSUMERS' ACTION NETWORK and ERIC TAYLOR

RESPONDING PARTY: DEFENDANTS SPRINT SOLUTIONS, INC. and SPRINT SPECTRUM, L.P.

SET NUMBER: ONE

///

///

EXHIBIT 1, Page 1

In answering these Interrogatories, please furnish all information that is available to you or within your control, including information in the possession of your attorneys or investigators for you or your attorneys, not merely information known to you or of your own personal knowledge. If you cannot answer the following Interrogatories in full, after exercising due diligence to secure the information, so state and answer to the extent possible, specifying your inability to answer the remainder and stating whatever information or knowledge you have concerning the unanswered portion.

## I. DEFINITIONS

1. "YOU" and "YOUR" means the party answering these interrogatory requests (either SPRINT SOLUTIONS, INC. or SPRINT SPECTRUM, L.P.).

2. "FEES" means the Administrative and Regulatory Fees imposed by YOU effective January 1, 2008.

3. "DOCUMENT" or "DOCUMENTS" includes written or printed matter of any kind, including the originals and all non-identical copies thereof, whether different from the original by reason of any notation made on such copies or otherwise including, but not limited to, the following: advertisements, booklets, brochures, pamphlets, circulars, notices, periodicals, papers, contracts, agreements, photographs, minutes, memoranda, messages, appraisals, analyses, reports, financial calculations and representations, invoices, accounting and diary entries, inventory sheets, diaries, appointment books or calendars, teletypes, facsimiles, ledgers, trial balances, correspondence, telegrams, press releases, notes, working papers, drawings, schedules, tabulations, projections, mails, information or programs stored in a computer (whether or not ever printed out or displayed), and all drafts, alterations, modifications, changes or amendments of any of the foregoing, and all graphic or manual records or representations of any kind including, but not limited to, the following: microfiche, microfilm, audiotapes, videotapes, recordings and motion pictures, and all electronic, mechanical or electronic records or representations of any kind including, but not limited to, the following: Tapes, cassettes, discs, magnetic cards and recordings. Note: This definition includes electronically stored information. All Electronically Stored Information should be produced as set forth in the accompanying document requests .

4. "REFER", "RELATE" or "RELATING" means all information that constitute, evidence, explicitly or implicitly refer to, discuss, evaluate, consider, review, report on, or were created as a result of, the subject matter of the request.

5. "PERSON" means any natural, business, legal or governmental entity, or association.

6. "COMMUNICATE" or "COMMUNICATION" means and includes every manner of disclosure, transfer or exchange of information, whether orally or by document or whether face-to-face, by telephone, e-mail, mail, facsimile, personal delivery, overnight delivery, or otherwise.

## II. RELEVANT TIME PERIOD

The relevant time period for these interrogatories is for the period from June 1, 2007 to the present.

## III. INTERROGATORIES

**SPECIAL INTERROGATORY NO. 1**:

Describe all COMMUNICATIONS or notices provided to with YOUR representatives, customer solutions specialists or customer retention department personnel regarding how to respond if customers call and made inquiry or request cancellation of service in response to the imposition of the FEES.

**SPECIAL INTERROGATORY NO. 2**:

Of YOUR customers who have indicated to YOU a desire to cancel service based on the imposition of the FEES, state the number of such CUSTOMERS who have received authorization to cancel their service without having a termination fee imposed.

**SPECIAL INTERROGATORY NO. 3**:

State the number of complaints YOU have received from any source RELATING to any claim that YOUR representatives are not recognizing customers' right to cancel service under the Terms and Conditions of Service.

**SPECIAL INTERROGATORY NO. 4**:

Describe the procedures YOU have had in place which customer service representatives are to follow in response to customer inquiries requesting cancellation of service in response to imposition of the FEES.

**<u>SPECIAL INTERROGATORY NO. 5</u>:**

Describe all procedures YOU have put in place in an attempt to ensure customers do not cancel their service based on the imposition of the FEES, including any incentives offered to customer service representatives or representatives in the retention department to reduce churn or cancellations.

**<u>SPECIAL INTERROGATORY NO. 6</u>:**

State the number of customers who have claimed to YOU that imposition of the FEES triggered their right to cancel service without having an early termination fee imposed, yet YOUR representatives have not provided them such relief.

**<u>SPECIAL INTERROGATORY NO. 7</u>:**

State how many of YOUR customers will have the FEES imposed on them absent cancellation of service under the Terms and Conditions of Service.

DATED: February __, 2008

ROSNER & MANSFIELD, LLP

By: ______________________________
Alan M. Mansfield

Art Neill
UTILITY CONSUMERS' ACTION NETWORK

Attorneys for Plaintiffs

EXHIBIT 1, Page 4

# EXHIBIT 2

Alan M. Mansfield (SBN 125998)
alan@rosnerandmansfield.com
John W. Hanson (SBN 214771)
john@rosnerandmansfield.com
ROSNER & MANSFIELD, LLP
10085 Carroll Canyon Road, Suite 100
San Diego, CA 92131
Tel: (858) 348-1005
Fax: (858) 348-1150

Attorneys for Plaintiffs

Art Neill (SBN 246717)
art@ucan.org
UTILITY CONSUMERS' ACTION NETWORK
3100 Fifth Avenue, Suite B
San Diego, CA 92103
Tel: (619) 696-6966
Fax: (619) 696-7477

Attorneys for UCAN

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

THE UTILITY CONSUMERS' ACTION NETWORK, and ERIC TAYLOR, on behalf of themselves, their members and/or all others similarly situated, as applicable,

Plaintiffs,

v.

SPRINT SOLUTIONS, INC., et al.,

Defendants.

CASE NO. 07-CV-2231-W (LSP)

PLAINTIFFS' FIRST SET OF DEMANDS FOR INSPECTION AND PRODUCTION OF DOCUMENTS

PROPOUNDING PARTY: PLAINTIFFS THE UTILITY CONSUMERS' ACTION NETWORK and ERIC TAYLOR

RESPONDING PARTY: DEFENDANTS SPRINT SOLUTIONS, INC. and SPRINT SPECTRUM, L.P.

SET NUMBER: ONE

/ / /

/ / /

EXHIBIT 2, Page 5

Plaintiff THE UTILITY CONSUMERS' ACTION NETWORK requests that Defendants SPRINT SOLUTIONS, INC. and SPRINT SPECTRUM, L.P. respond to these Requests within 30 days from the date of service hereof and produce all responsive documents, at 10085 Carroll Canyon Road, San Diego, California 92131, or at such other location as may be mutually agreeable.

## I. DEFINITIONS

1. "YOU" and "YOUR" means the party answering these interrogatory requests (either SPRINT SOLUTIONS, INC. or SPRINT SPECTRUM, L.P.).

2. "FEES" means the Administrative and Regulatory Fees imposed by YOU effective January 1, 2008.

3. "DOCUMENT" or "DOCUMENTS" includes written or printed matter of any kind, including the originals and all non-identical copies thereof, whether different from the original by reason of any notation made on such copies or otherwise including, but not limited to, the following: advertisements, booklets, brochures, pamphlets, circulars, notices, periodicals, papers, contracts, agreements, photographs, minutes, memoranda, messages, appraisals, analyses, reports, financial calculations and representations, invoices, accounting and diary entries, inventory sheets, diaries, appointment books or calendars, teletypes, facsimiles, ledgers, trial balances, correspondence, telegrams, press releases, notes, working papers, drawings, schedules, tabulations, projections, mails, information or programs stored in a computer (whether or not ever printed out or displayed), and all drafts, alterations, modifications, changes or amendments of any of the foregoing, and all graphic or manual records or representations of any kind including, but not limited to, the following: microfiche, microfilm, audiotapes, videotapes, recordings and motion pictures, and all electronic, mechanical or electronic records or representations of any kind including, but not limited to, the following: Tapes, cassettes, discs, magnetic cards and recordings. Note: This definition includes electronically stored information.

4. "REFER", "RELATE" or "RELATING" means all information that constitute, evidence, explicitly or implicitly refer to, discuss, evaluate, consider, review, report on, or were created as a result of, the subject matter of the request.

///

EXHIBIT 2, Page 6

5. "PERSON" means any natural, business, legal or governmental entity, or association.

6. "COMMUNICATE" or "COMMUNICATION" means and includes every manner of disclosure, transfer or exchange of information, whether orally or by document or whether face-to-face, by telephone, e-mail, mail, facsimile, personal delivery, overnight delivery, or otherwise.

## II. INSTRUCTIONS

1. DOCUMENTS produced pursuant to these requests shall be labeled to indicate the paragraph(s) to which they respond.

2. If any DOCUMENTS covered by these requests are withheld under a claim of privilege, furnish a list identifying each such DOCUMENT and the specific privilege which is claimed, as well as all information required to establish the existence of the privilege or privileges claimed, *i.e.*, general description of the type of DOCUMENT, author(s), recipient(s), a description of the general subject matter and date.

3. All DOCUMENTS must be produced in their original folder, binder or container unless that is not possible. Whenever a DOCUMENT or group of DOCUMENTS is removed from a file folder, binder or container, a copy of the label must be attached to the DOCUMENT. With respect to each DOCUMENT or group of DOCUMENTS, identify the department or subdivision where such DOCUMENT or DOCUMENTS were located and/or the name of the individual from whose files the DOCUMENT or group of DOCUMENTS was produced.

4. If a portion of any responsive DOCUMENT is protected from disclosure by privilege, work product or otherwise, any such DOCUMENT must be produced, with the portion claimed to be redacted, clearly identified as such.

5. Plaintiffs hereby request that all DOCUMENTS maintained in paper form be produced to plaintiffs on compact discs or digital video discs or "DVDs" in Group IV TIFF format with a resolution of 300 dpi. Plaintiffs further request that any electronically stored information not maintained as a paper document be produced in its native format, with all accompanying meta data produced in that format and also linked to the associated file in TIFF format.

///

///

EXHIBIT 2, Page 7

## III. RELEVANT TIME PERIOD

The relevant time period for these document requests is for the period from June 1, 2007 to the present.

## IV. DOCUMENT REQUESTS

**REQUEST NO. 1.:**

All DOCUMENTS that constitute or RELATE TO exemplars of any materials designed to disclose the imposition of the FEES to YOUR customers, including all drafts thereof.

**REQUEST NO. 2.:**

All DOCUMENTS that RELATE to any training given to YOUR customer service personnel RELATING to how to respond to inquiries regarding the FEES or requests for cancellation of service based on imposition of the FEES, including any notices or scripts provided to or to be used or referred to by YOUR customer service representatives.

**REQUEST NO. 3.:**

All DOCUMENTS setting forth all policies and procedures YOU follow to verify that all YOUR customer requests to cancel service based on the imposition of the FEES have been honored.

**REQUEST NO. 4.:**

All DOCUMENTS that would indicate the number of requests for cancellation of service YOU have received from YOUR customers since YOU notified them of the imposition of the FEES, and how many have been either honored or rejected.

**REQUEST NO. 5.:**

All DOCUMENTS that evidence any complaints YOU have received from any source RELATING to any claim that YOUR representatives are not recognizing customers' right to cancel service under the Terms and Conditions of Service.

**REQUEST NO. 6.:**

All DOCUMENTS setting forth all policies and procedures YOU instructed customer service representatives to follow when handling a dispute over the right to cancel service based on the imposition of the FEES, including any instructions to transfer such persons to YOUR Retention Department.

**REQUEST NO. 7.**

All notes created by Sprint representatives regarding accounts held by the following persons where the issue of cancelling service is discussed:

(a) Eric Taylor

(b) Carla Friedrich

(c) Sarah Sherman

(d) Rebecca Kennedy

DATED: February ___, 2008

ROSNER & MANSFIELD, LLP

By: ____________________
ALAN M. MANSFIELD
alan@rosnerandmansfield.com

Art Neill
art@ucan.org
UTILITY CONSUMERS' ACTION NETWORK

Attorneys for Plaintiffs

EXHIBIT 2, Page 9

# EXHIBIT 3

Alan M. Mansfield (SBN 125998)
alan@rosnerandmansfield.com
John W. Hanson (SBN 214771)
john@rosnerandmansfield.com
ROSNER & MANSFIELD, LLP
10085 Carroll Canyon Road, Suite 100
San Diego, CA 92131
Tel: (858) 348-1005
Fax: (858) 348-1150

Attorneys for Plaintiffs

Art Neill (SBN 246717)
art@ucan.org
UTILITY CONSUMERS' ACTION NETWORK
3100 Fifth Avenue, Suite B
San Diego, CA 92103
Tel: (619) 696-6966
Fax: (619) 696-7477

Attorneys for UCAN

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

THE UTILITY CONSUMERS' ACTION NETWORK, and ERIC TAYLOR, on behalf of themselves, their members and/or all others similarly situated, as applicable,

Plaintiffs,

v.

SPRINT SOLUTIONS, INC., et al.,

Defendants.

CASE NO. 07-CV-2231-W (LSP)

PLAINTIFFS' NOTICE OF DEPOSITIONS PURSUANT TO FED. R. CIV. PROC. 30(b)(6)

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. Proc. 30(b)(6), commencing on a date no later than February 19, 2008, at 9:00 a.m. at the offices of Rosner & Mansfield, LLP, located at 10085 Carroll Canyon Road, Suite 100, San Diego, California 92131, or such other dates or locations as may be agreed upon by the parties, plaintiffs shall take the deposition of SPRINT SOLUTIONS, INC. and SPRINT SPECTRUM, L.P. Such depositions begin with the first subject matter listed

///

EXHIBIT 3, Page 10

below and shall continue upon completion of that subject for each defendant, from day-to-day until completed.

Pursuant to Fed. R. Civ P. 30(b)(6), defendants are required to designate and produce those of its officers, directors, managing agents, employees or agents who are the most qualified to testify as to the following matters, to the extent of any information known or reasonably available to the defendants:

1. The procedures implemented by defendants to ensure that all persons who requested cancellation of their Terms and Conditions of Service based on the Regulatory Fee and Administrative Fee (collectively, the "Fees") imposed as of January 1, 2008 were permitted by customer service representatives to cancel service under the Terms and Conditions of Service.

2. Any complaints that Sprint or Nextel customers were attempting to cancel service based on the imposition of the Fees but such requests were being refused or required supervisorial approval, and any procedures implemented to respond to such complaints.

3. The sufficiency of the disclosures made by Sprint regarding the imposition of the Fees, including any discussion whether or not to include any disclosure in such notices of the customers' right to cancel that may be triggered upon imposition of the Fees contained in the Terms and Conditions of Service.

DATED: February , 2008

ROSNER & MANSFIELD, LLP

By: ______________________________
ALAN M. MANSFIELD
alan@rosnerandmansfield.com

Art Neill
art@ucan.org
UTILITY CONSUMERS' ACTION NETWORK

Attorneys for Plaintiffs

EXHIBIT 3, Page 11

**EXHIBIT "1"**

1. All documents that discuss any meeting or communication, whether formal or informal, of any of defendants' managerial employees relating to any aspect of the implementation or disclosure of the Fee.

2. All documents that discuss any meeting or communication, whether formal or informal, of any of defendants' managerial employees relating to whether or not to recognize customer requests for cancellation based upon the implementation or disclosure of the Fee.

3. All documents that relate to any communications between defendants' representatives and any customer regarding the Fee, including any communications relating to customer complaints over customers being advised that they could not cancel their service based upon the imposition of the Fee.

4. All documents, including organizational charts, that would identify defendants' employees, officers or directors involved in any aspect of the decision to impose or disclose the Fee, including any decision not to permit customers to cancel service based on the imposition of the Fee.

5. All documents relating to or supporting any claim by defendants or their representatives that the Fee could be the subject of federal tax or falls into the category of "taxes, Universal Service fees and other charges imposed by the government or based on government calculations" that would not trigger customers' rights to cancel service under Sprint PCS's Terms and Conditions of Service.

6. All documents relating to any communications or meetings relating to whether defendants should, as part of the disclosure of the Fee, advise customers of the right to cancel service under the Terms and Conditions of Service based upon the imposition of the Fee.

7. All documents that relate to any incentives provided to defendants' customer service representatives to attempt to convince customers not to cancel services based on the imposition of the Fee.

8. All documents that relate to any training given to defendants' customer service personnel relating to how to respond to inquiries regarding the Fee, including any scripts to be used

///

or referred to by defendants' customer service representatives or procedures to transfer such customers to Sprint's "Relations Department".

9. All documents setting forth all policies and procedures defendants followed to verify that all customer requests to cancel service based on the imposition of the Fee had been honored.

10. All documents that would indicate the number of requests for cancellation of service defendants have received from customers since defendants notified them of the imposition of the Fee.

11. All documents that constitute or relate to exemplars and all drafts thereof of any materials designed to disclose the Fee to customers.

12. All documents setting forth all policies and procedures defendants instructed customer service representative to follow when handling a dispute over the right to cancel service based on the imposition of the Fee.

13. All documents, including all notes created by Sprint representatives, regarding accounts held by the following customers, including any computerized notes of contacts between Sprint's customer care representatives and any of the following persons or their representatives:

Christina Mittendorff

Brian Greene

Maria Escalante

Michael or Yolva Meek

Nancy Marron

Debra Coker

Jordana Beebe

Richard Rubio

14. All documents that discuss or describe the reasons for the inclusion of the early termination fee in customers' Terms and Conditions of Service, including all documents provided to defendants' customer service representatives, in training or otherwise, which discuss any reason for imposing an early termination fee.

EXHIBIT 3, Page 13

# EXHIBIT 4

ROSNER & MANSFIELD, LLP

Hallen D. Rosner
Alan M. Mansfield
Hawk Barry

Attorneys at Law
10085 Carroll Canyon Road, Suite 100
San Diego, CA 92131
(858) 348-1005 • FAX (858) 348-1150
(800) 4No-Lemon (466-5366)

Gregory T. Babbitt
Virginia Y. Calderón
John W. Hanson
Sharon E. Glassey
Jennifer Daniel-Duckering
Michael R. Vachon

January 14, 2008

VIA FACSIMILE NO.: (619) 234-3815

James J. Mittermiller, Esq.
SHEPPARD MULLIN RICHTER & HAMPTON
501 West Broadway, 19th Fl.
San Diego, CA 92101-3598

Re: *UCAN/Taylor v. Sprint Solutions*
USDC Southern Dist. Case No.: 07 CV 2231 W (LSP)

Dear Jim:

Effective January 1, 2008, Sprint has apparently agreed to no longer assess the FPCR, Fed E911 and WLNP fees on Data Connection Card accounts. However, it is now replacing those charges with both an Administrative Fee and a Regulatory Fee, totaling $0.95 per account. It is apparently adding these fees to all wireless accounts as well, increasing the monthly financial obligation to these customers.

Sprint's Terms and Conditions of Service reads as follows:

Our Right To Change The Agreement & Your Related Rights

We may change any part of the Agreement at any time, including, but not limited to, rates, charges, how we calculate charges, or your terms of Service. We will provide you notice of material changes, and may provide you notice of non-material changes, in a manner consistent with this Agreement (see "Providing Notice To Each Other Under The Agreement" section). If a change we make to the Agreement is material and has a material adverse effect on Services under your Term Commitment, you may terminate each line of Service materially affected without incurring an Early Termination Fee only if you: (a) call us within 30 days after the effective date of the change; and (b) specifically advise us that you wish to cancel Services because of a material change to the Agreement that we have made. If you do not cancel Service within 30 days of the change, an Early Termination Fee will apply if you terminate Services before the end of any applicable Term Commitment.

---

This recently announced change leads to several questions that need to be resolved:

1 – It is plaintiffs' position that Sprint never should have imposed the discontinued charges in the first place on Data Connection Card accounts. Is Sprint construing this change as a "material adverse change" that triggers the above provision? If not, why not?

2 – Why are these charges proper to impose on customers that only have a Sprint Data Connection Card, since if you access the description of these charges at sprint.com/taxesandfees, the description of these new charges shows they are not applicable to these types of plans?

3 – Sprint's recent bill refers to the mailing of either a postcard or bill insert. Mr. Taylor has not received this postcard. When was it sent, and can you send a copy of it to me?

4 – Is Sprint willing to agree this change in billing invokes the above provision for cancellation purposes for all Sprint customers, both data and wireless?

5 – Is Sprint willing to waive the 30-day provision while we address these issues?

By this letter we request Sprint agree these new charges invoke the above 30-day provision and provide notice accordingly. If it refuses to do so, please be advised that we will seek injunctive relief to clarify these issues. This letter also serves as a request under Cal. Civ. Code Section 1781 and any other applicable laws that Sprint agree not to impose these two fees on all Data Connection Plan customers and/or refund any amounts collected with interest, and to let any Data Connection Plan or wireless account consumer out of their term plans without penalty based on the imposition of these charges, advise them of their right to do so and return all monies wrongfully collected with interest. We have been contacted by wireless consumers, such as Carla Friedrich, who believe this provision is properly invoked as these new fees adds to their monthly obligations from what we have been told. Sprint is refusing to do so, requiring such consumers to remain with Sprint and pay money to Sprint, which would not be due and owing if the 30-day cancellation provision was invoked. Alternatively, if Sprint believes this provision has been invoked, its representatives are advising customers to the contrary. Sprint therefore needs to correct this misstatement and provide clear and conspicuous notice of the right to opt out without penalty.

Because you represent Sprint we are sending this demand letter to you as their representative. However, if you believe we are required under the CLRA to send it to Sprint directly, let us know immediately and we will do so. In addition, due to the time sensitive nature

---

of this issue, we request you provide us a response by January 18, 2008 so that we can determine if immediate injunctive relief is required based on Sprint's position.

Sincerely,

ROSNER & MANSFIELD, LLP

Alan M. Mansfield

AMM:nlh/sc
cc: Art Neill, Esq.

# EXHIBIT 5

SHEPPARD MULLIN
SHEPPARD MULLIN RICHTER & HAMPTON LLP
ATTORNEYS AT LAW

501 West Broadway | 19th Floor | San Diego, CA 92101-3598
619-338-6500 *office* | 619-234-3815 *fax* | ***www.sheppardmullin.com***

Writer's Direct Line: 619-338-6525
jmittermiller@sheppardmullin.com

January 25, 2008

Our File Number: 0PFN-134624

***VIA E-MAIL alan@rosnerandmansfield.com***
***AND U.S. MAIL***

Alan M. Mansfield, Esquire
Rosner & Mansfield, LLP
10085 Carroll Canyon Road, Suite 100
San Diego, California 92100

Re: UCAN/Taylor v. Sprint Solutions, Inc., et al.

Dear Alan:

I am responding to your letters dated January 8, 14, and 21, 2008.

We are providing you the information contained in this letter to assist in the resolution of this lawsuit. This letter is therefore a settlement-related communication and is protected by Federal Rule of Evidence 408 and all other statutory and case authority pertaining to settlement communications. This letter may not be used as evidence for any purpose without written permission from Sprint's counsel. Nor may this letter or its contents be disclosed to any party without written permission from Sprint's counsel.

We do not intend to argue the merits of the case in this letter, or to respond to your allegations of wrongdoing or improper conduct. Sprint rejects those allegations.

**A. Your Letter of January 8, 2008.**

1. As of last month, Sprint credited its aircard customers (or refunded, in the case of former customers) the mistakenly charged surcharges, fees and taxes. The credits/refunds did not include the WLNP and the Federal E-911 charges, which have correctly appeared on bills throughout the time period in issue. Mr. Taylor's December 26, 2007 statement reflects the credit he received. Sprint is currently reviewing Mr. Taylor's account to address why any federal and state Universal Service Fund (USF) charge appeared on some of his invoices. Sprint is in the process of crediting Mr. Taylor's account and addressing any systems issues associated with these charges. In the event that other customers received these charges, Sprint will provide credits to those customers also.

2. Sprint did not make any money on these charges.

3. Mr. Taylor received credits for the two SMS message charges in the amounts of ten cents and fifteen cents, respectively. The previous billing system in which Mr. Taylor's account resided was adjusted to systematically block SMS messages to aircards. The new billing system is in the process of being similarly adjusted to block SMS messages to aircards so this issue will not recur. In any case, the service plan guide and other point of sale materials reflected the casual rate for SMS charges. The service plan guide is incorporated by reference into the general terms and conditions of service. Mr. Taylor's contract for service, therefore, would have contemplated Sprint's ability to charge for SMS messages and for these reasons, the charges were both proper and justified under Mr. Taylor's contract for service. To address the customer experience, however, Sprint has elected to implement a blocking solution for aircard customers.

4. You are in error about Mr. Taylor's CLRA claim. It is without merit. It is also the subject of Sprint's motion to dismiss.

**B. <u>Your Letter of January 14, 2008</u>.**

1. The charges discontinued by Sprint as of January 1, 2008 were proper. The new charges also are proper. With regard to whether these charges trigger a customer's rights under the Sprint Terms and Conditions, Sprint evaluates each customer's contractual relationship on a case by case basis to determine whether or not "the change . . . [made] to the Agreement is material and has a material adverse effect on the Services under [the customer's] Term Commitment." (See Sprint Terms and Conditions: Our Right to Change The Agreement & Your Related Rights.) If the change does have a material adverse effect, a customer "may terminate each line of Service materially affected without incurring an Early Termination Fee," provided the customer follows the procedures set forth in the Sprint Terms and Conditions of Service. *Id.* In reviewing Mr. Taylor's account, Sprint has determined that this change would have a materially adverse effect on the Services under his Term Commitment with Sprint. Thus, he has thirty days from the "effective date of the change" to contact Sprint and advise that he wishes to "cancel Services because of the material adverse change to the Agreement." The effective date of the change is the first billing date when the charges appeared on the customer's bill. For Mr. Taylor, this should be the billing date reflected on his January invoice.

2. The new charges are applicable to data card plans and are proper.

3. All customers received a bill message in the "Sprint News and Notices" section of their invoices, at a minimum. We have confirmed that Mr. Taylor received the bill message on his December 26, 2007 invoice. In addition, customers receiving mailed paper invoices received a more detailed explanation of the charges through a bill insert and the remaining base of customers received the same detailed explanation on a postcard. The content of the bill insert

and the postcard were identical. The bill message, bill inserts, and postcards were provided to customers thirty (30) days in advance of the effective date of the change.

4. Sprint is not willing to waive the thirty-day provision for all customers. However, it is Sprint's position that the thirty days commence with the date of the bill for the new charges. In Mr. Taylor's case, the thirty-day period will commence on January 26, 2008.

5. Sprint believes it is implementing the change appropriately. You assert that customers are being given information inconsistent with the information in this letter. We would be interested to know what facts, if any, you believe support your assertion.

**C. Your Letter of January 21, 2008.**

As we have discussed, your assertion that I made a misrepresentation to you is simply wrong. I will not belabor the point. You know how I feel about it.

**D. Conclusion.**

1. The one-time billing mistake that occurred on Mr. Taylor's bill was corrected (as it was for others).

2. Mr. Taylor may terminate his contract if he so chooses, in accordance with his contract terms.

We request that Mr. Taylor take appropriate measures to dismiss this action. Thank you in advance for your courtesy and cooperation.

Sincerely,

James J. Mittermiller

for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-WEST:DN4\400690142.2

# EXHIBIT 6

COPY

FILED
Clerk of the Superior Court
AUG 1 1 2003
By: C. REIN, Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SAN DIEGO**

| | |
|---|---|
| UTILITY CONSUMERS' ACTION NETWORK, on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>SPRINT SPECTRUM L.P., SPRINT SPECTRUM HOLDING COMPANY L.P., and DOES 1 through 25 inclusive,<br><br>Defendants. | **CASE NO. GIC 814461**<br><br>**[[redacted]] ORDER GRANTING PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>DATE: August 5, 2003<br>TIME: 8:30 a.m.<br>DEPT: 74<br>I/C JUDGE: Hon. Linda B. Quinn<br><br>Complaint Filed: July 16, 2003 |

On August 5, 2003 at 8:30 a.m. before this Court, Plaintiff UTILITY CONSUMERS' ACTION NETWORK ("UCAN") made an *ex parte* application requesting the Court, pursuant to C.C.P. Section 527, issue a Temporary Restraining Order and an Order to Show Cause why a preliminary injunction should not issue and for expedited discovery. Alan M. Mansfield appeared for plaintiff; Mark Hinderks and David Eaton appeared for defendants.

Based upon the Application and the accompanying Memorandum of Points and Authorities and Declarations, the arguments and evidence submitted by both sides (with the

exception of certain Declarations attached to the Biddle Declaration submitted with the reply papers to which defendants objected ) and the pleadings on file, and the arguments presented at the hearing on the Application, for the reasons set forth by the Court on the record during the hearing on the Application, the Court finds that good cause exists to grant this Application, and therefore hereby orders as follows:

1. Until a hearing may be held on plaintiff's motion for a preliminary injunction, this Court hereby restrains and enjoins defendants SPRINT SPECTRUM L.P. and SPRINT SPECTRUM HOLDING COMPANY (collectively, "Sprint") and their agents, employees and all those acting in concert with them from:

(a) advising any persons in the State of California who contact Sprint PCS that the recently imposed "Federal Wireless Number Pooling and Portability Fee" or the modified "Federal E911 Fee" (collectively, the "Fee") is a government imposed fee that does not trigger the right to cancel customers' terms and conditions of service; and

(b) Refusing to accept customers' cancellation requests where customers attempt to cancel Sprint PCS service based upon the imposition of the Fee.

2. The hearing on plaintiff's motion for issuance of a preliminary injunction shall be set for telephonic ruling on October 3, 2003 or at such other later date as may be agreed to by the parties and approved by the Court, and shall be briefed per the requirements of the California Code of Civil Procedure.

3. The parties have agreed, and are directed to, meet and confer on plaintiff's requests for discovery, attached to the Declaration of Alan M. Mansfield as Exhibits 2 through 4. Any disputes regarding discovery for the preliminary injunction motion by any party are to be presented to the Court for resolution by appropriate motion or application.

IT IS SO ORDERED, this 11 day of August, 2003.

JUDGE LINDA B. QUINN

The Hon. Linda B. Quinn
Judge of the Superior Court

Submitted By:

Alan M. Mansfield
ROSNER, LAW & MANSFIELD
10085 Carroll Canyon Road, First Floor
San Diego, California 92131
(858) 348-1005
(858) 348-1150

W. Lee Biddle
UTILITY CONSUMERS' ACTION NETWORK
3100 Fifth Avenue, Suite B
San Diego, CA 92103
(619)696-6966
(619)696-7477

Attorneys for Plaintiff

# PROOF OF SERVICE BY MAIL

(Sections 1013a, 2015.5 C.C.P.)

***UCAN v. Sprint Spectrum L.P.; Sprint Spectrum Holding Company, L.P.***
**San Diego Superior Court Case No. GIC 814461**

I am employed in the County of San Diego, State of California. I am over the age of 18 and not a party to the within action. My business address is: 10085 Carroll Canyon Road, First Floor, San Diego, California 92131.

On the date shown below, I served the foregoing document(s) described as:

**ORDER GRANTING PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**

on the interested parties in this action by mail at San Diego, California addressed as follows:

| | |
|---|---|
| Mark D. Hinderks, Esq.<br>Dan Crabtree, Esq.<br>STINSON MORRISON & HECKER<br>9200 Indian Creek Parkway, Suite 450<br>Overland Park, KS 66210<br>Tel: (913) 344-8000<br>Tel. (913) 344-6706 (Hinderks Direct<br>FAX: (913) 451-6352<br><br>**Co-counsel for Sprint Spectrum L.P. and Sprint Spectrum Holding Company L.P.** | Daniel E. Eaton<br>Lance Gordon Isen<br>SELTZER CAPLAN McMAHON VITEK<br>750 B Street Ste. 2100<br>San Diego, CA 92101<br>Tel: (619) 685-3003<br>Tel: (619) 685-3052 (Eaton Direct)<br>FAX (619) 702-6880 - Eaton<br>Tel: (619) 685-3152 (Isen Direct)<br>FAX: (619) 702-6843 - Isen<br><br>**Co-counsel for Sprint Spectrum L.P. and Sprint Spectrum Holding Company L.P.** |

[x] **(BY MAIL)** The envelope was mailed with postage thereon fully prepaid. As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at San Diego, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ] **(BY PERSONAL SERVICE)** I caused to be delivered such envelope by hand to the addressee.

[x ] **(BY FACSIMILE)** The document(s) were transmitted by facsimile transmission to each of the parties at the facsimile number(s) listed above and the transmission(s) reported as complete and without error.

[x ] **(STATE)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[ ] **(FEDERAL]** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on August 14, 2003, at San Diego, California.

MARIAN L. GREENBERG

# EXHIBIT 7

## General Terms and Conditions of Service

Subscriber Agreement: General Terms and Conditions of Service
Para solicitar esta literatura en español, por favor contactar a 1-800-777-4681.

## Basic Definitions

In this document:
(1) "we," "us," "our," "Nextel," and "Sprint" mean Sprint Solutions, Inc. and its affiliates doing business as Sprint, Sprint PCS or Nextel;
(2) "you," "your," "customer," and "user" mean an account holder or user with us;
(3) "Device" means any phone, device, accessory or other product we sell to you or that is active on your account with us; and
(4) "Service" means our offers, rate plans, options, wireless services or Devices on your account with us.

## The Subscriber Agreement

The Subscriber Agreement ("Agreement") is a contract under which we provide and you accept our Services. In addition to these Terms and Conditions of Service ("Ts&Cs"), there are several parts to the Agreement, including, but not limited to, the detailed plan or other information on Services we provide or refer you to during the sales transaction, and any confirmation materials we may provide you. It is important that you carefully read all of the terms of the Agreement.

## Services Covered By These Ts&Cs & Additional Terms

These Ts&Cs apply to our standard wireless Services and any other Service we offer you that references these Ts&Cs. Different terms will apply to most business accounts. Additional terms will apply when you use certain Services, typically those you can access online (for example, picture/video Services, online forums, etc.). Additional terms will also apply if you activate Services as part of a bundle with another company's services (for example, cable services, home phone services, etc.). The additional terms for bundled Services may either modify or replace certain provisions in these Ts&Cs, including terms relating to activation, invoicing/payment, and disputing charges. Also, a different dispute resolution provision may apply to services provided by another company (the dispute resolution provisions in this Agreement still apply to our Services). You will be provided details on any additional terms with your selection of any bundled Service.

## Our Policies

Services are subject to our business policies, practices and procedures ("Policies"), including, but not limited to, our Privacy Policy and Acceptable Use Policy and Visitor Agreement - both available at our website. You agree to all of our Policies when you use our Services. Our Policies are subject to change at anytime with or without notice.

**When You Accept The Agreement**

You must have the legal capacity to accept the Agreement. You accept the Agreement when you do any of the following: (a) sign a contract with us on paper or electronically; (b) accept Agreement through an oral or electronic statement; (c) attempt to or in any way use the Services; (d) pay for the Services; or (e) open any package or start any program that says you are accepting the Agreement when doing so. If you don't want to accept the Agreement, don't do any of these things.

**Term Commitments & Early Termination Fees**

Many of the Services (for example, rate plans and Device discounts) that we offer require you to maintain certain Services with us for a minimum term, usually 1 or 2 years ("Term Commitment"). You will be charged a fee ("Early Termination Fee") for each line of Service that you terminate early (i.e., prior to satisfying the Term Commitment) or for each line of Service that we terminate early for good reason (for example, violating the payment or other terms of the Agreement). Early Termination Fees are a part of our rates. Your exact Term Commitment and Early Termination Fee may vary based on the Services you select and will be disclosed to you during the sales transaction. Carefully review any Term Commitment and Early Termination Fee requirements prior to selecting Services. After you have satisfied your Term Commitment, your Services continue on a month-to-month basis without any Early Termination Fee, unless you agree to extend your Term Commitment or agree to a new Term Commitment. As explained directly below, there are instances when you will not be responsible for an Early Termination Fee for terminating Services early.

**When You Don't Have To Pay An Early Termination Fee**

You aren't responsible for paying an Early Termination Fee when terminating Services: (a) provided on a month-to-month basis; (b) consistent with our published trial period return policy; or (c) in response to a materially adverse change we make to the Agreement as described directly below.

**Our Right To Change The Agreement & Your Related Rights**

We may change any part of the Agreement at any time, including, but not limited to, rates, charges, how we calculate charges, or your terms of Service. We will provide you notice of material changes, and may provide you notice of non-material changes, in a manner consistent with this Agreement (see "Providing Notice To Each Other Under The Agreement" section). If a change we make to the Agreement is material and has a material adverse effect on Services under your Term Commitment, you may terminate each line of Service materially affected without incurring an Early Termination Fee only if you: (a) call us within 30 days after the effective date of the change; and (b) specifically advise us that you wish to cancel Services because of a material change to the Agreement that we have made. If you do not cancel Service within 30 days of the change, an Early Termination Fee will apply if you terminate Services before the end of any applicable Term Commitment.

**Our Right To Suspend Or Terminate Services**

We can, without notice, suspend or terminate any Service at any time for any reason, including, but not limited to: (a) late payment; (b) exceeding an Account Spending Limit ("ASL"); (c) harassing/threatening our employees or agents; (d) providing false information; (e) interfering with our operations; (f) using/suspicion of using Services in any manner restricted by or inconsistent with the Agreement; (g) breaching the Agreement, including our Policies; (h) providing false, inaccurate, dated or unverifiable identification or credit information, or becoming insolvent or bankrupt; (i) modifying a Device from its manufacturer specifications; or (j) if we believe the action protects our interests, any customer's interests or our network.

**Your Ability To Change Services & When Changes Are Effective**

You typically can change Services upon request. In some instances, changes may be conditioned on payment of an Early Termination Fee or certain other charges, or they may require you to accept a new Term Commitment. Changes to Services are usually effective at the start of your next full invoicing cycle. If the changes take place sooner, your invoice may reflect pro-rated charges for your old and new Services.

**Your Right To Terminate Services**

You can terminate Services at any time by calling us and requesting that we deactivate all Services. You are responsible for all charges billed or incurred prior to deactivation. If Services are terminated before the end of your invoicing cycle, we won't prorate charges to the date of termination and you won't receive a credit or refund for any unused Services. Except as provided above, you must also pay us an Early Termination Fee for each line of Service that you terminate early.

**Credit Checks & Credit Information**

We agree to provide you Services on the condition you have and maintain satisfactory credit according to our standards and policies. You agree to provide information we may request or complete any applications we may provide you to facilitate our review. We rely on the credit information you furnish, credit bureau reports or other data available from commercial credit reference services, and other information (such as payment history with us) to determine whether to provide or continue to provide you Services. The Services we offer you can vary based on your credit history. We may at any time, based on your credit history, withdraw or change Services, or place limits or conditions on the use of our Services. You agree to provide us updated credit information upon request. We may provide your payment history and other account billing/charge information to any credit reporting agency or industry clearinghouse.

**Account Spending Limits ("ASL")**

An ASL is a temporary or permanent limit (typically based on credit history, payment history, or to prevent fraud) we place on the amount of unpaid charges you can accumulate on your account,

regardless of when payment on those charges is due. We reserve the right to determine which charges count towards an ASL. If you have an ASL, we may suspend your Services without prior notice if your account balance reaches the ASL, even if your account is not past due. We may impose or increase an ASL at any time with notice. An ASL is for our benefit only and should not be relied on by you to manage usage.

**Deposits & Returning Deposits**

We may at any time require a deposit, as a guarantee of payment, for you to establish or maintain Service ("Deposit"). By providing us a Deposit, you grant us a security interest for all current or future amounts owed to us. We may change the Deposit at any time with notice. You can't use a Deposit to make or delay payments. The Deposit, the length of time we hold the Deposit, and changes to the Deposit are determined based on your credit history, payment history and other factors. Unless prohibited by law, we may mix Deposits with our other funds and it won't earn interest and we reserve the right to return the Deposit as a credit on your invoice at anytime. If your Services are terminated for any reason, we may keep and apply your Deposit to any outstanding charges. We'll send any remaining portion of the Deposit to your last known address within 90 days after your final invoice - if it is returned to us, we will forward it on to the appropriate state authorities to the extent required by law.

**Restrictions On Using Services**

You can't use our Services: (a) to transmit content/messages that are, or in any manner that is, illegal, fraudulent, threatening, abusive, defamatory, or obscene; (b) in a way that could cause damage or adversely affect our customers, reputation, network, property or Services; (c) to communicate any unsolicited commercial voice, text, SMS, or other message; (d) to infringe on the copyright of another, or upload or transmit any "virus," "worm," or malicious code; or (e) in any way prohibited by the terms of our Services, the Agreement or our Policies.

**Your Device, Number & E-mail Address; Caller ID**

We don't manufacture any Device we might sell to you or that is associated with our Services, and we aren't responsible for any defects, acts or omissions of the manufacturer. The only warranties on your Device are the limited warranties given to you by the manufacturer directly or that we pass through. Your Device is designed to be activated on the Sprint network and in other coverage areas we make available to you. As programmed, it will not accept wireless service from another carrier. Except for any legal right you may have to port/transfer your phone number to another carrier, you have no and cannot gain any (for example, through publication, use, etc.) proprietary, ownership or other rights to any phone number, identification number, e-mail address or other identifier we assign to you, your Device or your account. We'll notify you if we decide to change or reassign them. Your CDMA Sprint PCS phone has a software programming lock that protects certain of the handset's operating parameters against unauthorized reprogramming. If you wish to obtain the software program lock code for your CDMA Sprint PCS phone, please visit Sprint.com or call 1-888-211-4727 for information and eligibility requirements.

**Porting/Transferring Phone Numbers**

We don't guarantee that number transfers to or from us will be successful. If you authorize another carrier to transfer a number away from us, that is considered a request by you to us to terminate all of the Services associated with that number. You're responsible for all charges billed or incurred prior to deactivation and for any applicable Early Termination Fees.

**Coverage; Where Your Device Will Work**

Our coverage maps are available at our stores and on our website. The specific network coverage you get will depend on the radio transmissions your Device can pick up and Services you've chosen. Our coverage maps provide high level estimates of our coverage areas when using Services outdoors under optimal conditions. Coverage isn't available everywhere. Estimating wireless coverage and signal strength is not an exact science. There are gaps in coverage within our estimated coverage areas that, along with other factors both within and beyond our control (network problems, software, signal strength, your Device, structures, buildings, weather, geography, topography, etc.), may result in dropped and blocked connections, slower data speeds, or otherwise impact the quality of Service. Services that rely on location information, such as E911 and GPS navigation, depend on your Device's ability to acquire satellite signals (typically not available indoors) and network coverage.

**Roaming**

"Roaming" typically refers to coverage on another carrier's network that we make available to you based on our agreements with other carriers. These agreements may change from time to time and roaming coverage is subject to change. Your ability to receive roaming coverage depends on the radio transmissions your Device can pick up. You can pick up roaming coverage both within and outside our network coverage areas. Your Device will generally indicate when you're roaming. Depending on your Services, separate charges or limits on the amount of minutes used while roaming may apply. Certain Services may not be available or work the same when roaming (including data Services, voicemail, call waiting, etc.).

**About Data Services & Content**

Our data Services and your Device may allow you to access the internet, text, pictures, video, games, graphics, music, email, sound and other materials ("Data Content") or send Data Content elsewhere. Some Data Content is available from us or our vendors, while other Data Content can be accessed from others (third party websites, games, ringers, etc.). We make absolutely no guarantees about the Data Content you access on your Device. Data Content may be: (1) unsuitable for children/minors; (2) unreliable or inaccurate; or (3) offensive, indecent or objectionable. You're solely responsible for evaluating the Data Content accessed by you or anyone on your account. We strongly recommend you monitor data usage by children/minors. Data Content from third parties may also harm your Device or its software. To protect our network, Services, or for other reasons, we may place restrictions on accessing certain Data Content (such as certain websites, applications, etc.), impose separate charges, limit throughput

or the amount of data you can transfer, or otherwise limit or terminate Services. If we provide you storage for Data Content you have purchased, we may delete the Data Content with notice or place restrictions/limits on the use of storage areas. You may not be able to make or receive voice calls while using data Services.

**Specific Terms & Restrictions On Using Data Services**

In addition to the rules for using all of our other Services, unless we identify the Service or Device you have selected as specifically intended for that purpose (for example, wireless routers, Data Link, etc.), you can't use our data Services: (1) with server devices or host computer applications, or other systems that drive continuous heavy traffic or data sessions; and (2) as a substitute or backup for private lines or frame relay connections. We reserve the right to limit, suspend or constrain any heavy, continuous data usage that adversely impacts our network performance or hinders access to our network. If your Services include web or data access, you also can't use your Device as a modem for computers or other equipment, unless we identify the Service or Device you have selected as specifically intended for that purpose (for example, with "phone as modem" plans, Sprint Mobile Broadband card plans, wireless router plans, etc.).

**Activation & Miscellaneous Charges**

Based on our Policies, we may charge activation, prepayment, reactivation, program or other fees to establish or maintain Services. Certain transactions may also be subject to a charge (for example, convenience payment, changing phone numbers, handset upgrades, etc.). You will be provided notice of these types of fees before we complete the requested transaction.

**Account & Service Charges; Pro-rating; Unused Minutes**

You are responsible for all charges associated with your account and the Services on your account, no matter who adds or uses the Services. Charges include, but are not limited to, the monthly recurring charges, usage charges, taxes, surcharges and fees associated with your Services. These charges are described or referred to during the sales transaction, in our marketing materials, and in confirmation materials we may send to you. If you (the account holder) allow end users to access or use your Devices, you authorize end users to access, download and use Services.

**How We Calculate Your Charges For Billing Purposes**

Regular Voice Calls: We round up partial minutes of use to the next full minute. Time starts when you press "Talk" or your Device connects to the network and stops when you press "End" or the network connection otherwise breaks. You're charged for all calls that connect, even to answering machines. You won't be charged for unanswered calls or if you get a busy signal. For incoming calls answered, you're charged from the time shortly before the Device starts ringing until you press END or the network connection otherwise breaks. If charges vary depending on the time of day that you place or receive calls (e.g., Nights and Weekend plans), you're charged for the entire call based on the rate that applies to the time period in which the call starts.

Walkie-Talkie Charges: Charges for walkie-talkie calls are billed to the person who starts the call and calculated by multiplying the duration of the call by the applicable rate and number of participants. You're charged at least 6 seconds of airtime for each call you start; subsequent communications in the same call are rounded up to and billed to the next second. Time begins when you press any button to start a walkie-talkie call and ends approximately 6 seconds after completion of a communication to which no participant responds - subsequent walkie-talkie communications are considered new calls. Depending on your plan, nationwide, international or group walkie-talkie calls may use the local walkie-talkie minutes in your plan and result in additional charges. Responses to call alert transmissions are treated as new walkie-talkie transmissions even when responding within 6 seconds of receiving the alert. Walkie-talkie billing methods are subject to change as we introduce new walkie-talkie Services.

Data Usage: Unless we specifically tell you otherwise, data usage is measured in bytes, kilobytes and megabytes - not in minutes/time. 1024 bytes equals 1 kilobyte ("KB"), and 1024 KB equals 1 megabyte. Bytes are rounded up to kilobytes, so you will be charged at least 1 KB for each data usage session ("data session"). Rounding occurs at the end of each data session, and sometimes during a data session. Depending on your data Services, usage may be charged against an allowance or on a fixed price per KB. If you are charged on a fixed price per KB, any fractional cents will be rounded up to the next cent. You are charged for all data directed to your Device's internet address, including data sessions you did not initiate and for incomplete transfers. As long as your Device is connected to our data network, you may incur data charges. Examples of data you will be charged for includes the size of a requested file or Data Content (game, ringer, etc.), web page graphics (logos, pictures, banners, advertisement, etc.), additional data used in accessing, transporting and routing the file on our network, data from partial or interrupted downloads, re-sent data, and data associated with unsuccessful attempts to reach websites or use applications. These data charges are in addition to any charges for the Data Content itself (game, ringer, etc.). Data used and charged to you will vary widely, even between identical actions or data sessions. Estimates of data usage - for example, the size of downloadable files - are not reliable predictors of actual usage. Your bill won't separately list the number of KB attributed to a specific action/data session.

**Your Bill**

Your bill provides you notice of your charges. It reflects monthly recurring charges (usually billed one bill cycle in advance) and usage/transaction specific charges (usually billed in the bill cycle in which they're incurred). Some usage charges, such as those that depend on usage information from a third party, may be billed in subsequent bill cycles and result in higher than expected charges for that month. Bill cycles and dates may change from time to time. Your bill may also include other important notices (for example, changes to this Agreement, to your Service, legal notices, etc.). Your paper bill may not include individual call detail. Your call detail is available online. Paper bills with call detail may be subject to an additional charge. If you choose internet billing, you will not receive paper bills.

**Your Payments; Late Fees**

Payment is due in full as stated on your bill. If we do not receive payment in full by the date specified on your bill, a late payment charge, which may be charged at the highest rate permissible by law, may be applied to the total unpaid balance. We may also charge you any costs we pay to a collection agency to collect unpaid balances from you. If we bill you for amounts on behalf of a third party, payments received are first applied to our charges. You may be charged additional fees for certain methods of payment. We may charge you, up to the highest amount permitted by law, for returned checks or other payments paid by you and denied for any reason by a financial institution. Acceptance of payments (even if marked "paid in full") does not waive our right to collect all amounts that you owe us. We may restrict your payment methods to cashier's check, money order, or other similar secure form of payment at any time for good reason.

**Taxes & Government Fees**

You agree to pay all federal, state and local taxes, fees and other assessments that we're required by law to collect and remit to the government on the Services we provide to you. These charges may change from time to time without advance notice. If you're claiming any tax exemption, you must provide us with a valid exemption certificate. Tax exemptions generally won't be applied retroactively.

**Surcharges**

You agree to pay all surcharges ("Surcharges"), which include, but are not limited to: Federal Universal Service, various regulatory fees, Sprint administrative charges, gross receipts charges, and charges for the costs we incur in complying with governmental programs. Surcharges are not taxes and are not required by law. They are rates we choose to collect from you and are kept by us in whole or in part. The number and type of Surcharges may vary depending upon the location of your primary billing address and can change over time. We determine the rate for these charges and these amounts are subject to change as are the components used to calculate these amounts. We will provide you notice of any changes to Surcharges in a manner consistent with this Agreement (see "Providing Notice To Each Other Under The Agreement" section). However, since some Surcharges are based on amounts set by the government or based on government formulas, it will not always be possible to provide advance notice of new Surcharges or changes in the amount of existing Surcharges. Information on Surcharges is provided during the sales transaction and is available on our website.

**Disputing Charges - You Must Still Pay Undisputed Charges**

Any dispute to a charge on your bill must be made within 60 days of the date of the bill that initially contained the charge. Disputes can only be made by calling or writing us as directed on your invoice or elsewhere. You accept all charges not properly disputed within the above time period - undisputed charges must still be paid as stated on your bill.

**Protecting Our Network & Services**

We can take any action to: (1) protect our network, our rights and interests, or the rights of others; or (2) optimize or improve the overall use of our network and Services. Some of these actions may interrupt or prevent legitimate communications and usage - for example, message filtering/blocking software to prevent SPAM or viruses, limiting throughput, limiting access to certain websites, applications or other Data Content, etc. For additional information on what we do to protect our customers, network, Services and equipment, see our Acceptable Use Policy and Visitor Agreement at our website.

**Your Privacy**

You agree to the terms of our Privacy Policy, available at our website, when you use our Services. This policy may change from time to time, so review this policy with regularity and care. Among other things, the policy includes important information on what information we collect about you, how we use that information, and with whom we share that information (for example, to provide you certain Services, to protect our rights and interests, to respond to legal process, to facilitate a merger, etc.). Also, to ensure the quality of our Services and for other lawful purposes, we may also monitor or record calls between us (for example, your conversations with our customer service or sales departments). If you do not agree with the terms of our Privacy Policy, do not purchase or use our Services.

We encourage you (the account holder) to protect the privacy of your account information by establishing passwords (including for your online accounts), which may include an answer to a backup shared secret question. These authenticators will be used when you access your account. This is the most effective way for you to protect your account. We treat the holder of your password(s) and/or your answer to a backup shared secret question as an authorized person on your account. Please do not share your authentication information with anyone that you do not wish to have access to your account. You agree that we may contact you in our discretion about important account related matters through the contact information you provide, through the Services or Devices to which you subscribe or through other available means. We also may allow you to set preferences for your preferred means of contact.

As we provide telecommunications Products and Services to you (the account holder), we develop information about the quantity, technical configuration, type and destination of telecommunications Products and Services you use, as well as some other information found on your bill ("CPNI"). Under federal law, you have the right, and we have a duty, to protect the confidentiality of your CPNI. For example, we implement safeguards that are designed to protect your CPNI, including authentication procedures when you contact us. For some accounts with a dedicated Sprint representative, we may rely on contacting your pre-established point of contact as the standard authentication measure.

**Location Based Services**

Our network generally knows the location of your Device when it is outdoors and/or turned on.

By using various technologies to locate your Device, we can provide enhanced emergency 911 services, and optional location-sensitive services provided by us or a third party. Environmental factors (such as structures, buildings, weather, geography, landscape, and topography) can significantly impact the ability to access your Device's location information and use of location-sensitive services. The terms and conditions of any location-sensitive service that you purchase from us may provide more information about how location information is used and disclosed. Use of some of location-sensitive services may require network coverage. If any Device on your account uses a location-sensitive service, you (the account holder) authorize the end user to download, access and use location sensitive services and agree to clearly and regularly notify the end user of your Device that their location may be tracked or discovered. For additional information on location-sensitive services, see our Privacy Policy at our website.

**911 Or Other Emergency Calls**

Public Safety Officials advise that when making 911 or other emergency calls, you should always be prepared to provide your location information. Unlike traditional wireline phones, depending on a number of factors (e.g., whether your Device is GPS enabled, where you are, whether local emergency service providers have upgraded their equipment, etc.), 911 operators may not know your phone number, your location or the location of your Device. In certain circumstances, an emergency call may be routed to a state patrol dispatcher or alternative location set by local emergency service providers. Enhanced 911 service ("E911"), where enabled by local emergency authorities, uses GPS technology to provide location information. Even when available, however, E911 does not always provide accurate location information. If your Device is indoors or for some other reason cannot acquire a satellite signal, you may not be located. Some Devices have a safety feature that prevents use of the keypad after dialing 911 - you should follow voice prompts when interacting with emergency service providers employing IVR systems to screen calls.

**If Your Device Is Lost or Stolen**

Call us immediately if your Device is lost or stolen because you may be responsible for usage charges before you notify us of the alleged loss or theft. You agree to cooperate if we choose to investigate the matter (provide facts, sworn statements, etc.). We may not waive any Early Termination Fees if you choose to terminate Services as a result of loss or theft of your Device.

**Disclaimer of Warranties**

WE MAKE NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING (TO THE EXTENT ALLOWED BY LAW) ANY IMPLIED WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE CONCERNING YOUR SERVICES (INCLUDING YOUR DEVICE). WE DON'T PROMISE UNINTERRUPTED OR ERROR-FREE SERVICES AND DON'T AUTHORIZE ANYONE TO MAKE WARRANTIES ON OUR BEHALF.

**You Agree We Are Not Responsible For Certain Problems**

You agree that neither we nor our vendors, suppliers or licensors are responsible for any damages resulting from: (a) anything done or not done by someone else; (b) providing or failing to provide Services, including, but not limited to, deficiencies or problems with a Device or network coverage (for example, dropped, blocked, interrupted calls/messages, etc.); (c) traffic or other accidents, or any health-related claims relating to our Services; (d) Data Content or information accessed while using our Services; (e) an interruption or failure in accessing or attempting to access emergency services from a Device, including through 911, Enhanced 911 or otherwise; (f) interrupted, failed, or inaccurate location information services, (g) information or communication that is blocked by a spam filter, or (h) things beyond our control, including acts of God (for example, weather-related phenomena, fire, earthquake, hurricane, etc.), riot, strike, war, terrorism or government orders or acts.

**You Agree Our Liability Is Limited - No Consequential Damages.**

TO THE EXTENT ALLOWED BY LAW, OUR LIABILITY FOR MONETARY DAMAGES FOR ANY CLAIMS YOU MAY HAVE AGAINST US IS LIMITED TO NO MORE THAN THE PROPORTIONATE AMOUNT OF THE SERVICE CHARGES ATTRIBUTABLE TO THE AFFECTED PERIOD. UNDER NO CIRCUMSTANCES ARE WE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES OF ANY NATURE WHATSOEVER ARISING OUT OF OR RELATED TO PROVIDING OR FAILING TO PROVIDE SERVICES IN CONNECTION WITH A DEVICE, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, LOSS OF BUSINESS, OR COST OF REPLACEMENT PRODUCTS AND SERVICES.

**DISPUTE RESOLUTION**

We Agree To First Contact Each Other With Any Disputes
We each agree to first contact each other with any disputes and provide a written description of the problem, all relevant documents/information and the proposed resolution. You agree to contact us with disputes by calling or writing us as instructed on your invoice. We will contact you by letter to your billing address or on your Device.

Instead Of Suing In Court, We Each Agree To Arbitrate Disputes
We each agree to finally settle all disputes (as defined and subject to any specific exceptions below) only by arbitration. In arbitration, there's no judge or jury and review is limited. However, just as a court would, the arbitrator must honor the terms and limitations in the Agreement and can award the same damages and relief, including any attorney's fees authorized by law. The arbitrator's decision and award is final and binding, with some exceptions under the Federal Arbitration Act ("FAA"), and judgment on the award may be entered in any court with jurisdiction. We each also agree as follows:

(1) "Disputes" are any claims or controversies against each other related in any way to our Services or the Agreement, including, but not limited to, coverage, Devices, privacy, or

advertising, even if it arises after Services have terminated - this includes claims you bring against our employees, agents, affiliates or other representatives, or that we bring against you.
(2) If either of us wants to arbitrate a dispute, we agree to send written notice to the other providing a description of the dispute, previous efforts to resolve the dispute, all supporting documents/information, and the proposed resolution. Notice to you will be sent to your billing address and notice to us will be sent to: General Counsel; Arbitration Office; 2001 Edmund Halley Drive VARESP0513-502; Reston, Virginia 20191. We agree to make attempts to resolve the dispute. If we cannot resolve the dispute within forty-five (45) days of receipt of the notice to arbitrate, then we may submit the dispute to formal arbitration.
(3) The FAA applies to this Agreement and arbitration provision. We each agree the FAA's provisions, not state law, govern all questions of whether a dispute is subject to arbitration.
(4) The arbitration will be administered by the National Arbitration Forum ("NAF") under its arbitration rules. If any NAF rule conflicts with the terms of the Agreement, the terms of the Agreement apply. You can obtain procedures, rules, and fee information from the NAF at 1-800-474-2371 or www.adrforum.com.
(5) Unless we each agree otherwise, the Arbitration will be conducted by a single neutral arbitrator and will take place in the county of your last billing address. The federal or state law that applies to the Agreement will also apply during the arbitration.
(6) We each agree not to pursue arbitration on a classwide basis. We each agree that any arbitration will be solely between you and us (not brought on behalf of or together with another individual's claim). If for any reason any court or arbitrator holds that this restriction is unconscionable or unenforceable, then our agreement to arbitrate doesn't apply and the dispute must be brought in court.
(7) We each are responsible for our respective costs relating to counsel, experts, and witnesses, as well as any other costs relating to the arbitration. However, we will cover any arbitration administrative or filing fees above: (a) $25 if you are seeking less than $1,000 from us; or (b) the equivalent court filing fees for a court action in the appropriate jurisdiction if you are seeking $1,000 or more from us.

Exceptions To Our Agreement To Arbitrate Disputes
Either of us may bring qualifying claims in small claims court. In addition, this arbitration provision does not prevent you from filing your dispute with any federal, state or local government agency that can, if the law allows, seek relief against us on your behalf.

No Class Actions

TO THE EXTENT ALLOWED BY LAW, WE EACH WAIVE ANY RIGHT TO PURSUE DISPUTES ON A CLASSWIDE BASIS; THAT IS, TO EITHER JOIN A CLAIM WITH THE CLAIM OF ANY OTHER PERSON OR ENTITY, OR ASSERT A CLAIM IN A REPRESENTATIVE CAPACITY ON BEHALF OF ANYONE ELSE IN ANY LAWSUIT, ARBITRATION OR OTHER PROCEEDING.

No Trial By Jury

TO THE EXTENT ALLOWED BY LAW, WE EACH WAIVE ANY RIGHT TO TRIAL BY

JURY IN ANY LAWSUIT, ARBITRATION OR OTHER PROCEEDING.

**Indemnification**

You agree to indemnify, defend and hold us harmless from any claims arising out of your actions, including, but not limited to, failing to provide appropriate notices regarding location-sensitive services (see "Location Based Services" section), failure to safeguard your passwords, backup question to your shared secret question or other account information, or violating this Agreement, any applicable law or regulation or the rights of any third party.

**Providing Notice To Each Other Under The Agreement**

Except as the Agreement specifically provides otherwise, you must provide us notice by calling or writing us as instructed on your invoice. We will provide you notice in your bill, correspondence to your last known billing address, to any fax number or e-mail address you've provided us, by calling you on your home phone or Device, by voice message on your Device or home phone, or by text message on your Device.

**Other Important Terms**

Subject to federal law or unless the Agreement specifically provides otherwise, this Agreement is governed solely by the laws of the state encompassing the area code assigned to your Device, without regard to the conflicts of law rules of that state. If either of us waives or doesn't enforce a requirement under this Agreement in an instance, we don't waive our right to later enforce that requirement. Except as the Agreement specifically provides otherwise, if any part of the Agreement is held invalid or unenforceable, the rest of this Agreement remains in full force and effect. This Agreement isn't for the benefit of any 3rd party except our corporate parents, affiliates, subsidiaries, agents, and predecessors and successors in interest. You can't assign the Agreement or any of your rights or duties under it. We can assign the Agreement. The Agreement and the documents it incorporates make up the entire agreement between us and replaces all prior written or spoken agreements - you can't rely on any contradictory documents or statements by sales or service representatives. The rights, obligations and commitments in the Agreement that, by their nature, would logically continue beyond the termination of Services (including, but not limited to, those relating to billing, payment, 911, dispute resolution, no class action, no jury trial), survive termination of Services.