Alan M. Mansfield (SBN 125998)
alan@rosnerandmansfield.com
John W. Hanson (SBN 214771)
john@rosnerandmansfield.com
ROSNER & MANSFIELD, LLP
10085 Carroll Canyon Road, Suite 100
San Diego, CA 92131
Tel: (858) 348-1005
Fax: (858) 348-1150

Attorneys for Plaintiffs

Art Neill (SBN 246717)
art@ucan.org
UTILITY CONSUMERS' ACTION NETWORK
3100 Fifth Avenue, Suite B
San Diego, CA 92103
Tel: (619) 696-6966
Fax: (619) 696-7477

Attorneys for UCAN

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

THE UTILITY CONSUMERS' ACTION NETWORK, and ERIC TAYLOR, on behalf of themselves, their members and/or all others similarly situated, as applicable,

Plaintiffs,

v.

SPRINT SOLUTIONS, INC., et al.,

Defendants.

CASE NO. 07-CV-2231-W (LSP)

PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR ALTERNATIVELY, MOTION TO STRIKE

Date: March 10, 2008
Time: 10:30 a.m.
Judge: Hon. Thomas J. Whelan
Courtroom: Seven

Pursuant to Federal Rules of Evidence 201, plaintiffs request the Court take judicial notice of the following documents:

Exhibit 1 - Letters from James J. Mittermiller to Alan M. Mansfield dated January 4, 2008

Exhibit 2 - Letter from Alan M. Mansfield to James J. Mittermiller dated January 8, 2008

Exhibit 3 - FCC Declaratory Ruling dated March 22, 2007 *In the Matter of Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*

Exhibit 4 - Official Report, Assembly Committee on Utilities and Commerce for S.B. 378 (Pub. Util. Code §2890) as amended June 22, 1998, dated June 29, 1998

As to Exs. 1 and 2, as defendants have asked the Court to take judicial notice of plaintiffs' demand letter in support of their Motion, the Court must also consider Sprint's reply letter and plaintiffs' explanation to Sprint's counsel why that reply is deficient. There is no dispute as to the authenticity of such letters. Thus, if the Court grants Sprint's Request for Judicial Notice under the authorities referenced in its Request, to have a complete record the Court must also grant plaintiffs' Request as well. As to Exs. 3 and 4, these documents are an official report of the Federal Communications Commission and an excerpt from the official legislative history of Public Utilities Code §2980. As these are official government records, the Court may properly take judicial notice of these exhibits.

DATED: February 20, 2008

ROSNER & MANSFIELD, LLP

By: ______________________
ALAN M. MANSFIELD
alan@rosnerandmansfield.com

Art Neill
art@ucan.org
UTILITY CONSUMERS' ACTION NETWORK

Attorneys for Plaintiffs

# EXHIBIT 1

SHEPPARD MULLIN
SHEPPARD MULLIN RICHTER & HAMPTON LLP
ATTORNEYS AT LAW

501 West Broadway | 19th Floor | San Diego, CA 92101-3598
619-338-6500 *office* | 619-234-3815 *fax* | ***www.sheppardmullin.com***

Writer's Direct Line: 619-338-6525
jmittermiller@sheppardmullin.com

January 4, 2008

Our File Number: 0PFN-134624

**VIA EMAIL alan@rosnerandmansfield.com**
**AND U.S. MAIL**

Alan M. Mansfield, Esq.
Rosner & Mansfield, LLP
10085 Carroll Canyon Road, Suite 100
San Diego, CA 92100

Re: UCAN, et al. v. Sprint Solutions, Inc., et al.

Dear Alan:

Following up my letter to you of December 19, 2007, this letter responds to yours of December 5, 2007.

First, as discussed more fully in my separate letter to you of this date, addressing Mr. Taylor's claims, Sprint is in the process of providing credits/refunds to customers who were mistakenly assessed certain charges, fees, and taxes when Sprint changed billing systems in the May 2007 timeframe. There is no basis for an accounting or the imposition of a constructive trust. We will provide you with information about the total amount of refunds once the process is completed.

Second, as I also explain in my separate letter to you of this date, Sprint has an existing procedure to block text messages sent to air card data connections billed under Sprint's old billing system. Sprint is currently extending this procedure to air card data connections, like Mr. Taylor's, that recently migrated into Sprint's new billing system. There is no basis for an injunction.

If you would like to discuss these matters, please call.

Sincerely,

James J. Mittermiller

for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-WEST:DN4\400647872.1

SHEPPARD MULLIN
SHEPPARD MULLIN RICHTER & HAMPTON LLP
ATTORNEYS AT LAW

501 West Broadway | 19th Floor | San Diego, CA 92101-3598
619-338-6500 *office* | 619-234-3815 *fax* | ***www.sheppardmullin.com***

Writer's Direct Line: 619-338-6525
jmittermiller@sheppardmullin.com

January 4, 2008

Our File Number: 0PFN-134624

**VIA EMAIL alan@rosnerandmansfield.com**
**AND U.S. MAIL**

Alan M. Mansfield, Esq.
Rosner & Mansfield, LLP
10085 Carroll Canyon Road, Suite 100
San Diego, CA 92100

Re: UCAN, et al. v. Sprint Solutions, Inc., et al.

Dear Alan:

Following up my letter to you of December 19, 2007, this letter will respond to Eric Taylor's letter dated November 20, 2007, addressed to Stephen Kukta at Sprint Nextel Corporation. Initially, I note that your client, Mr. Taylor, apparently sent his letter one day before he filed his Complaint in this matter. The Complaint was then served on November 30, 2007. Since we know Mr. Taylor is represented by counsel, we are responding to you rather than to Mr. Taylor directly.

Second, as we have discussed, Sprint Nextel Corporation had no involvement in this matter. This response is made on behalf of our clients Sprint Solutions, Inc. and Sprint Spectrum L.P. (collectively, "Sprint").

Third, Sprint denies that it violated the Consumer Legal Remedies Act or any other law or regulation. As Sprint has previously explained to your clients, certain charges, fees, and taxes were mistakenly assessed in Mr. Taylor's bill dated May 26, 2007. Even though it may have been appropriate to assess such charges, fees, and taxes, Sprint nevertheless did not intend to assess them. The mistake occurred because of a change of Sprint's billing systems. It happened for only one month. (The subsequent 1¢ charges for "Federal - Univ Serv Assess Non-LD" and "California State - CA High Cost Part B" are appropriate, but Sprint is nonetheless in the process of implementing billing changes which will also eliminate these fees.)

Sprint is currently in the process of identifying all of its customers affected by its billing mistake, and is crediting or refunding the mistakenly assessed charges for all affected customers. Sprint anticipates that this process will be completed within the next two months.

Sprint has had a procedure in place to block text messages sent to air card data connections under Sprint's old billing system. Sprint is now in the process of extending that procedure to air card data connections, like Mr. Taylor's, which recently migrated into Sprint's new billing system. Sprint anticipates that the implementation of this procedure will be completed within the next two months. In any case, Mr. Taylor has received credits for the two charges (10¢ and 15¢, respectively) for text messages for which he has been billed.

In light of the foregoing, and as provided in California Civil Code § 1782(b), no action for damages may be maintained under the Consumer Legal Remedies Act.

Finally, Mr. Taylor did not comply with Civil Code § 1782(a), which requires that notice of alleged Consumer Legal Remedies Act violations must be sent 30 days or more prior to the commencement of an action for damages under the CLRA. This failure to comply renders Mr. Taylor's CLRA claim for damages fatally defective. Von Grabe v. Sprint PCS, 312 F.Supp.2d 1285, 1303-04 (S.D. Cal. 2003).

If you would like to discuss any of the foregoing, please call me. Given Sprint's position in this matter, there should be no reason for the plaintiffs to proceed with this case.

Sincerely,

James J. Mittermiller

James J. Mittermiller

for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-WEST:DN4\400647482.1

# EXHIBIT 2

ROSNER & MANSFIELD, LLP

Hallen D. Rosner
Alan M. Mansfield
Hawk Barry

Attorneys at Law
10085 Carroll Canyon Road, Suite 100
San Diego, CA 92131
(858) 348-1005 • FAX (858) 348-1150
(800) 4No-Lemon (466-5366)

Gregory T. Babbitt
Virginia Y. Calderón
John W. Hanson
Sharon E. Glassey
Jennifer Daniel-Duckering
Michael R. Vachon

January 8, 2008

VIA FACSIMILE NO.: (619) 234-3815

James J. Mittermiller, Esq.
Sheppard Mullin Richter & Hampton
501 West Broadway, 19th Floor
San Diego, CA 92101

Re: *UCAN/Eric Taylor v. Sprint Solutions, Inc., et al.*
U.S. District Court, Southern District of Calif. Case No. 07-cv-2231-W (LSP)

Dear Jim:

Thank you for your two most recent letters. While we are pleased to learn that in response to plaintiffs' actions Sprint has now committed in writing to provide refunds of certain amounts that it collected last year, please appreciate that since UCAN was informed almost seven months ago these credits would be promptly issued and Sprint has still not done so, we reserve judgment on Sprint's commitments outlined in your letter. Injunctive relief for an accounting and to impose a constructive trust over such monies may still be appropriate, since your letter contains no specifics upon which we can rely to make an informed assessment of the situation.

Your letters leave several questions unanswered, and in several respects show the deficiency of Sprint's response:

1. Your letter fails to state how much and which specific charges, fees and taxes are being refunded or credited by Sprint and to whom, whether these monies have been specifically identified and segregated, whether these refunds or credits will be made with interest as requested or just the amount paid, how Sprint will identify all persons entitled to such credits, and why it will take two more months to do so when Sprint said it would do so almost seven months ago. The fact you promise to provide an accounting after the fact indicates at this point Sprint has not even started to undertake such an accounting, despite having had many months to do so. You also fail to include any explanation why you think the charges in question were appropriate to assess in the first place and/or are only being eliminated on an ongoing basis. Your letter also does not appear to address all of the charges that are at issue in this action.

2. Your letter fails to state what Sprint is intending to do with the monies it made on these mistakenly charged amounts, in terms of returning it to consumers or retaining it.

---

3. Your letter fails to state what Sprint is doing about identifying and providing refunds to those persons who have since left Sprint between the time these amounts were imposed and the time refunds or credits are provided. At least from your letter, it does not appear to be Sprint's intent to both identify all such persons and mail to such persons refund checks with interest and an explanatory letter.

4. Your letter fails to indicate if Sprint is sending a separate letter to all affected customers, both present and former, notifying them of this credit and why it is being given, or whether the credit will just appear on a bill in a few months with no explanation.

5. Mr. Taylor repeatedly asked for text message blocking and was told it could not be done. Now you are saying it can be done. Your letter fails to provide any detailed explanation regarding this change in practice and why it will take two months of people continuing to be erroneously charged to fix this problem. Your letter also seems to presume this was due to a migration system error. It was not, since this happened to Mr. Taylor *before* the Sprint and Nextel systems were combined. Your letter also fails to include what information Sprint is providing its customer service representatives to make sure accurate information is being conveyed regarding this practice. Absent this information, we cannot assess whether Sprint has made the changes necessary to immediately obviate the need to obtain injunctive relief on the text messaging issue. In addition, it also does not appear from your letter that Sprint is providing all other customers a credit for such charges, since it seems to only be agreeing to provide credits to Mr. Taylor. It also does not appear that Sprint is advising its customers of this policy change or the availability of a credit for such charges – which may also be an appropriate subject for injunctive relief.

6. Your letter fails to indicate what procedures Sprint has presently put in place to ensure such practices have ceased and will not recur.

Your procedural claim about the CLRA is in error. Mr. Taylor and UCAN had made several pre-litigation demands that went unanswered; the letter Sprint received merely summarized these demands. Moreover, your letter only deals with some of the issues raised by Mr. Taylor rather than resolve all the issues he had previously raised and that are raised in the Complaint, and does not offer to provide all the relief requested. Thus, Sprint's response is not the complete offer required under Cal. Civ. Code Section 1782(c) that could even arguably be construed as precluding Mr. Taylor from seeking all appropriate remedies under the CLRA.

Contrary to the suggestion in your letter, the original CLRA cause of action did not seek damages – rather it sought injunctive relief and other non-damages remedies. In fact, plaintiffs specifically alleged in that Complaint that if Sprint did not provide a timely response to the CLRA

---

letter, the Complaint *would be amended* to seek damages under the CLRA. This is the proper procedure under Cal. Civ. Code Section 1782(d). After compliance with the provisions of Section 1782(a), and the passage of the 30-day time period you reference when Sprint did not respond in the matter provided for under the CLRA, the CLRA cause of action was amended to include a claim for damages. This is fundamentally different than in *VonGrabe v. Sprint*, where the party initially filed a damages claim under the CLRA *without* attempting to engage in any such compliance. It was that fact the court found was error in that case. The fact damages are sought in other causes of action is irrelevant, since Cal. Civ. Code Section 1752 specifically provides that the remedies and procedures set forth under the CLRA are not exclusive but rather are in addition to any other remedies that may be provided for under the law. Thus, we have fully complied with the requirements of the CLRA. It is Sprint that failed to timely offer an appropriate correction or other remedy, despite having been repeatedly given the opportunity to do so.

In light of the above, it is appropriate for this action to proceed since Sprint has failed to agree to promptly remedy all of the issues raised in the First Amended Complaint. In addition, it may very well be that injunctive relief and expedited discovery is still appropriate. Indeed, your letters show why such relief is still necessary in light of the deficiencies detailed above, and since you provide no support for the claims made about what Sprint will do at some point in the future. Thus, we look forward to receiving your Answer to the First Amended Complaint (at this point, no further extensions will be granted). We also look forward to discussing with you in the next week the issues raised in this letter so that we can determine whether preliminary injunctive relief remains appropriate and so we are all clear as to what issues Sprint has committed to resolve and what issues remain outstanding – since as we read your letter, Sprint has *not* agreed to comprehensively resolve all the claims asserted in the First Amended Complaint. If you believe Sprint has agreed to do so, perhaps a prompt mediation or Early Neutral Evaluation Conference is in order. But if you believe your letter summarizes all Sprint will say on these subjects, please be advised there is an appropriate basis for seeking an injunction and expedited discovery, and we will promptly do so.

Sincerely,

ROSNER & MANSFIELD, LLP

Alan M. Mansfield

AMM:sc
cc: Art Neill, Esq.

# EXHIBIT 3

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of<br><br>Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | WT Docket No. 07-53 |

# DECLARATORY RULING

**Adopted: March 22, 2007** **Released: March 23, 2007**

By the Commission: Chairman Martin and Commissioners Tate and McDowell issuing separate statements; and Commissioners Copps and Adelstein concurring and issuing separate statements.

## TABLE OF CONTENTS


Heading Paragraph #

I. INTRODUCTION ........ 1
II. BACKGROUND ........ 3
A. Commission Classification of Broadband Internet Access Services ........ 3
B. Prior Proceedings Considering Issues Pertaining to Wireless Broadband ........ 8
C. Current Wireless Broadband Internet Access Services and Technologies ........ 11
III. DISCUSSION ........ 18
A. Classification of Wireless Broadband Internet Access Service as Information Service ........ 19
B. Classification of the Transmission Component of Wireless Broadband Internet Access Service as "Telecommunications" and not "Telecommunications Service" ........ 29
C. Continued Applicability of Title III Licensing Provisions ........ 35
D. Applicability of the "Commercial Mobile Service" Provisions of Section 332 of the Act ........ 37
E. Applicability of Other Statutory Provisions ........ 57
1. Access by Persons with Disabilities ........ 58
2. Pole Attachments and Local Authority over Zoning ........ 60
3. Rights and Obligations related to Interconnection ........ 66
4. Consumer Protection Obligations ........ 69
IV. ORDERING CLAUSES ........ 71


## I. INTRODUCTION

1. In this Declaratory Ruling, we find that wireless broadband Internet access service is an information service under the Communications Act of 1934, as amended (Communications Act or Act).[1] We also find that the transmission component of wireless broadband Internet access service is

[1] 47 U.S.C. §§ 151 et seq. We note that this order addresses terrestrial wireless broadband and does not address satellite broadband services.

"telecommunications" and that the offering of the telecommunications transmission component as part of a functionally integrated Internet access service offering is not "telecommunications service" under section 3 of the Act. Further, we find that neither the Communications Act nor relevant precedent mandates that broadband transmission be a "telecommunications service" when provided to an Internet Service Provider (ISP) as a wholesale input for the ISP's own wireless broadband Internet access service offering, but the provider may choose to offer it as such. Finally, we find that mobile wireless broadband Internet access service is not a "commercial mobile service" under section 332 of the Act.[2]

2. In making these determinations, we provide regulatory certainty regarding the classification of wireless broadband Internet access service.[3] This approach is consistent with the framework that the Commission established for cable modem Internet access service,[4] wireline broadband Internet access service,[5] and Broadband over Power Line (BPL)-enabled Internet access service[6] and it establishes a minimal regulatory environment for wireless broadband Internet access service that promotes our goal of ubiquitous availability of broadband to all Americans.[7] Addressing the appropriate regulatory classification of wireless broadband Internet access also furthers our efforts to establish a consistent regulatory framework across broadband platforms by regulating like services in similar manner.[8]

## II. BACKGROUND

### A. Commission Classification of Broadband Internet Access Services

3. The Commission has not previously considered the appropriate classification of wireless

---

[2] *See* 47 U.S.C. § 332(d)(1).

[3] Commission rule 1.2 provides the Commission with the authority to issue declaratory rulings to remove an uncertainty. *See* 47 C.F.R. § 1.2; *see also* 5 U.S.C. § 554(e) (stating that an agency, "in its sound discretion, may issue a declaratory order to . . . remove uncertainty.").

[4] Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities; Internet Over Cable Declaratory Ruling; Appropriate Regulatory Treatment for Broadband Access to the Internet Over Cable Facilities, *Declaratory Ruling and Notice of Proposed Rulemaking*, 17 FCC Rcd 4798, 4801, para. 4 (2002) (*Cable Modem Declaratory Ruling*), *aff'd, Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 125 S. Ct. 2688 (2005) (*NCTA v. Brand X*).

[5] Appropriate Framework for Broadband Access to the Internet over Wireline Facilities; Universal Service Obligations of Broadband Providers; Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services; Computer III Further Remand Proceedings: Bell Operating Company Provision of Enhanced Services; 1998 Biennial Regulatory Review – Review of Computer III and ONA Safeguards and Requirements; Conditional Petition of the Verizon Telephone Companies for Forbearance Under 47 U.S.C. § 160(c) with Regard to Broadband Services Provided via Fiber to the Premises; Petition of the Verizon Telephone Companies for Declaratory Ruling or, Alternatively, for Interim Waiver with Regard to Broadband Services Provided via Fiber to the Premises; Consumer Protection in the Broadband Era, *Report and Order and Notice of Proposed Rulemaking*, 20 FCC Rcd 14853, 14855, para. 1 (2005) (respectively *Wireline Broadband Internet Access Services Order* and *Consumer Protection in the Broadband Era NPRM*), *petitions for review pending, Time Warner Telecomms. v. FCC*, No. 05-4769 (and consolidated cases) (3rd Cir. filed Oct. 26, 2005).

[6] In the Matter of United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service, WC Docket No. 06-10, *Memorandum Opinion and Order*, 21 FCC Rcd 13281 (2006) (*BPL-Enabled Internet Access Services Order*).

[7] *See* 47 U.S.C. § 157.

[8] *See Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14862, para. 11 n.30 (stating that while the Commission was not addressing classification issues of other non-wireline broadband Internet access services in the *Wireline Broadband Internet Access Services Order*, it will act consistent with the analysis and conclusions reached therein).

broadband Internet access service. Title III of the Act generally provides the Commission with authority to regulate "radio communications" and "transmission of energy by radio."[9] Among other provisions, Title III allows the Commission to make such rules and regulations and prescribe such restrictions and conditions as may be necessary to carry out the provisions of the Act.[10] The Act also distinguishes between fixed and mobile services.[11] Fixed wireless telecommunications services provided on a common carrier basis are generally subject to regulation under Title II of the Act. Section 332 of the Act provides the regulatory scheme for mobile services, differentiating between private and commercial mobile services and requiring that commercial mobile radio service (CMRS) providers be regulated as common carriers under Title II of the Act.[12]

4. In proceedings involving cable, wireline, and BPL, the Commission has examined the regulatory classification applicable to certain broadband services and determined to adopt a pro-competitive, deregulatory regime for these services. In particular, the Commission has classified cable, wireline, and BPL broadband Internet access services as "information services," thus reducing regulatory requirements and uncertainties that could have slowed development of these broadband services.

5. The Commission released the *Cable Modem Declaratory Ruling* in 2002, classifying cable modem service as an interstate information service, which includes no separate offering of a telecommunications service.[13] The Commission found that the classification of cable modem service depended on the nature of the functions that the end user is offered and that cable modem service, in fact, combined "the transmission of data with computer processing, information provision, and computer interactivity, enabling end users to run a variety of applications."[14] As a part of the classification, the Commission determined that the *Computer Inquiry* obligation to offer the transmission underlying any information service on a common carrier basis did not apply to information services provided over cable facilities.[15] In *NCTA v. Brand X* the Supreme Court upheld, as a lawful construction of the Act, the Commission's conclusion that cable companies that sell broadband Internet service do not provide "telecommunications services" and therefore are exempt from mandatory Title II common carrier regulation.[16]

6. On September 23, 2005, the Commission issued the *Wireline Broadband Internet Access Services Order*, which, among other things, established a regulatory framework for broadband Internet

---

[9] *See* Title III - Provisions Relating to Radio, 47 U.S.C. §§ 301 et seq. The term "radio communication" or "communication by radio" means the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." 47 U.S.C. § 153 (33).

[10] 47 U.S.C. § 303(r).

[11] *See* 47 U.S.C. § 153 (27) (defining "mobile service").

[12] "Commercial mobile service" is defined to mean "any mobile service . . . that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public." 47 U.S.C. § 332(d)(1). *See infra* Section III.D. for further discussion of the regulatory requirements applicable to CMRS.

[13] *See Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4802, para. 7.

[14] *Id.*, 17 FCC Rcd at 4822, para. 38.

[15] *Id.*, 17 FCC Rcd at 4825-26, paras. 43-46 (finding that the *Computer II* obligations have only been applied to traditional wireline services and facilities, which the Commission has explicitly limited to services provided over the infrastructure of traditional telephone networks, and declining to extend such obligations to information services provided over cable facilities).

[16] *See NCTA v. Brand X*, 125 S. Ct. at 2695, 2702-10.

access services offered by wireline facilities-based providers.[17] The Commission acted to further its goal of "developing a consistent regulatory framework across platforms by regulating like services in a similar functional manner."[18] There, the Commission found that wireline broadband Internet access is an information service because it offers end users "the capability for 'generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications.'"[19] The Commission also determined that neither the Communications Act nor relevant precedent mandated that broadband transmission be a telecommunications service when provided to an ISP, but the provider may choose to offer it as such.[20] The Commission further determined that the use of the transmission component of wireline broadband Internet access service as part of a facilities-based provider's offering of that service to end users using its own transmission facilities is "telecommunications" and not a "telecommunications service" under the Act.[21] Additionally, the Commission noted that the broadband Internet access market had several emerging platforms and providers in most areas of the country.[22] The Commission also eliminated the *Computer Inquiry* requirements applicable to wireline broadband Internet access services offered by facilities-based providers.[23]

7. On November 7, 2006, the Commission released the *BPL-Enabled Internet Access Services Order*, classifying BPL-enabled Internet access service as information service. The Commission found that BPL-enabled Internet access service is an information service because it offers a single, integrated service (*i.e.*, Internet access) to end users, in that BPL-enabled Internet access service combines computer processing, information provision, and computer interactivity with data transport, enabling end users to run a variety of applications (*e.g.*, e-mail, web pages, and newsgroups).[24] The Commission also determined that the transmission component underlying BPL-enabled Internet access service is "telecommunications" and that the offering of the telecommunications transmission component as part of a functionally integrated finished BPL-enabled Internet access service offering is not a "telecommunications service" under the Act."[25] The Commission noted that its determination regarding BPL-enabled Internet access service would remove regulatory uncertainty regarding the classification of the service and would further the Commission's goal of developing a consistent regulatory framework across broadband platforms by regulating like services in a similar manner.[26]

### B. Prior Proceedings Considering Issues Pertaining to Wireless Broadband

8. The Commission has received comments regarding the appropriate regulatory classification of wireless broadband Internet access services in the context of the *IP-enabled Services NPRM*, the Wireless Broadband Access Task Force Report, and the *Consumer Protection in the Broadband Era NPRM*.

---

[17] *See Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14853.

[18] *Id.*, 20 FCC Rcd at 14855, para. 1.

[19] *Id.*, 20 FCC Rcd at 14863, para. 14 (quoting 47 U.S.C. § 153(20)).

[20] *Id.*, 20 FCC Rcd at 14909-10, para. 103.

[21] *Id.*, 20 FCC Rcd at 14909-11, para. 104.

[22] *Id.*, 20 FCC Rcd at 14856, para. 3.

[23] *Id.*, 20 FCC Rcd at 14857, 14872-98, paras. 4, 32-85.

[24] *BPL-Enabled Internet Access Services Order*, 21 FCC Rcd at 13286-87, para. 9.

[25] *Id.* 21 FCC Rcd at 13288, para. 12.

[26] *Id.* 21 FCC Rcd at 13281-82, para. 2.

9. Commenting in response to the *IP-enabled Services NPRM*,[27] both CTIA and Virgin Mobile recommended generally that wireless broadband be regulated with a light touch and only at the federal level.[28] In response to the Wireless Broadband Access Task Force Report,[29] commenters consistently endorsed a national approach for wireless broadband that has a light regulatory touch, with at most a limited state role.[30] Cingular Wireless & Bellsouth (filing jointly), CTIA, T-Mobile, and Microsoft all asserted that wireless broadband should be classified as an interstate service,[31] regardless of whether it was deemed a telecommunications service or information service.[32] In addition, Cingular Wireless & BellSouth and Cisco contended that wireless broadband Internet access service should be classified as an information service, asserting that the deregulatory features of CMRS allowed under section 332 were not sufficient.[33] Finally, NextG recommended that the Commission carefully consider all of the ramifications of classifying wireless broadband Internet access service as an information service, noting that if an entity is classified as providing only information services, it may face even greater hurdles in accessing utility poles and public rights-of-way -- two elements that NextG maintains are critical to the deployment of wireless broadband infrastructure.[34]

10. In response to the *Consumer Protection in the Broadband Era NPRM*,[35] both Cingular Wireless and CTIA commented on matters associated with the classification of wireless broadband services. Cingular Wireless asserted that broadband Internet access services, including those provided over wireless networks, were interstate in nature.[36] In addition, Cingular Wireless noted that, because the CMRS industry was already robustly competitive and bound by consumer protection rules that protected the public interest, there was no need to extend wireline consumer protection policies to wireless broadband Internet access services.[37] Cingular Wireless also argued that there is a statutory basis for not applying generic broadband regulation to CMRS operators. Section 332, it argued, differentiates CMRS from other delivery technologies by limiting state authority and requiring the Commission to forbear from unnecessary common carrier regulation.[38] A CMRS operator's broadband Internet access service, it asserted, is part of a CMRS service offering and cannot be subjected to levels of regulation that the

[27] *See* IP-Enabled Services, WC Docket No. 04-36, *Notice of Proposed Rulemaking*, 19 FCC Rcd 4863, 4908 (2004) (*IP-enabled Services NPRM*).

[28] CTIA Comments at ii; Virgin Mobile Comments at 4.

[29] *See* Wireless Broadband Access Task Force Report, GN Docket No. 04-163, at 66-73 (Feb. 2005) (*WBATF Report*) *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-257247A1.doc We note that this is not a Commission report, but a staff report.

[30] *See, e.g.*, Cingular Wireless & BellSouth Comments at 10; CTIA Comments at 16; Microsoft Comments at 8-9; T-Mobile Reply Comments at 6.

[31] Cingular Wireless & BellSouth Comments at 6-7; CTIA Comments at 15; Cisco Reply Comments at 7.

[32] Cingular Wireless & BellSouth Comments at 9-10; CTIA Comments at 15.

[33] Cingular Wireless & BellSouth Comments at 6-10; Cisco Reply Comments 3-6 (noting that certain deregulatory features of section 332(c) apply to CMRS services, but not fixed services, which also should benefit from a deregulatory approach).

[34] NextG Networks Comments at 15-17 (noting that section 332(c)(7) has assisted in the expeditious deployment of wireless broadband infrastructure and services).

[35] *Consumer Protection in the Broadband Era NPRM*, 20 FCC Rcd at 14929.

[36] Cingular Wireless Comments at 7-11.

[37] *Id.*

[38] *Id.* at 12-13.

Commission finds appropriate for other providers.[39] Meanwhile, CTIA stated that broadband Internet access, including wireless, was an interstate service,[40] and argued that the Commission should regulate wireless with a light regulatory touch (if it regulates at all), "regulating down" to the least regulated element of that service.[41]

### C. Current Wireless Broadband Internet Access Services and Technologies

11. Wireless broadband Internet access services use spectrum, wireless facilities and wireless technologies to provide subscribers with high speed Internet access capabilities.[42] Some wireless network technologies, such as CDMA 1xRTT and GPRS, transmit data at speeds less than 200 kbps in one direction and provide customers with access to mobile data applications such as text messaging, e-mail, and ring tone downloads. Wireless *broadband* networks, on the other hand – such as CDMA 1x EV-DO (EV-DO), Wideband CDMA (WCDMA) with High Speed Downlink Packet Access (HSDPA), and Wi-Fi – transmit data at speeds greater than 200 kbps in at least one direction and provide access to the applications available on the slower networks as well as services that require greater bandwidth, such as video programming, music downloads, and high-resolution games. Wireless broadband service providers also offer Internet access, although wireless broadband Internet access service is offered in different ways depending on the provider and the end user's device. Some wireless broadband Internet access services offer full and unrestricted access to the Internet, such as those which consumers can receive using a laptop computer with a Wi-Fi or EV-DO connection. Other wireless broadband Internet access services, such as those available with a cell phone, enable users to access a limited selection of web sites.[43] Wireless broadband Internet access services can be provided using mobile, portable, or fixed technologies,[44] and wireless broadband technologies can transmit data over short, medium, or long ranges, and can be used both through the licensed use of spectrum and unlicensed devices.

12. Several mobile telephone carriers currently provide, in certain locations, wireless broadband Internet access through mobile broadband technologies and the licensed use of spectrum. For example, EV-DO and WCDMA with HSPDA are potentially capable of providing wireless broadband Internet access at speeds ranging from 400-800 kbps.[45] These technologies can enable subscribers to access the Internet while in motion (traveling at high speeds) via, for example, a smartphone, or a wireless

---

[39] *Id.* at ii. Cingular noted that "the Commission must recognize the unique nature of CMRS, which has long involved the joint provision of telecommunications and information services." *Id.* at 12-13.

[40] CTIA Comments at 8-10 (asserting that the Commission should continue to promote the competitive market for Internet services by developing a deregulatory national framework for broadband Internet access services).

[41] *Id.* at 8-9. As an example, CTIA noted that a consumer could use a mobile handset with CMRS voice capability, along with Wi-Fi technology, that could work seamlessly between the consumer's cellular or PCS service and VoIP service provided over a wireless router and a wireline broadband connection in the home. It proposed regulating such a converged service on the basis of the least regulated technology.

[42] *See* Section III.A., *infra* (defining "wireless broadband Internet access service" and explaining that the term "high speed" means infrastructure capable of delivering a speed in excess of 200 kbps in at least one direction).

[43] For more information on wireless broadband data services, *see* Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions with Respect to Commercial Mobile Services, *Eleventh Report*, 21 FCC Rcd 10947 (2006).

[44] Mobile broadband services typically use smaller devices, feature seamless handoff in the network, and can be used at while in motion at a variety of locations, while portable broadband services generally use larger devices, such as laptops, and offer more limited mobility.

[45] We note that the maximum speeds for these technologies are higher. For example, CDMA2000 Revision A 1xEV-DO can have a downlink speed up to 3.09 Mbps. HSDPA can have a downlink speed of 14.4 Mbps.

modem card connected to a laptop computer or PDA.[46]

13. Wireless broadband Internet access services that are often considered "portable" in nature are currently offered, for example, by providers through Orthogonal Frequency Division Multiplexing (OFDM) technology and the licensed use of spectrum.[47] These providers enable their subscribers to access the Internet with "plug-and-play" modem devices that attach to a desktop or laptop computer. Customers can transport these modem devices to other locations in the provider's coverage area where a network signal is available, though they may not have the ability to maintain a connection while in motion (traveling at high speeds). These devices are currently manufactured in accordance with vendor-specific, proprietary standards. However, standardized 802.16 WiMAX equipment is being developed.[48] Typical downstream speeds for the wireless Internet access services, offered using portable broadband technologies, range from 768 kbps to 1.5 Mbps, and networks can extend five to 30 miles.[49]

14. Wireless broadband Internet access services offered using fixed wireless broadband technologies allow consumers to access the Internet from a fixed point while stationary and often require a direct line-of-sight between, for example, the wireless rooftop antenna and the network transmitter. These services have been offered through both the licensed use of spectrum and unlicensed devices. For example, thousands of small Wireless Internet Services Providers (WISPs) provide such wireless broadband Internet access at speeds of around one Mbps using unlicensed devices, often in rural areas not served by cable or wireline broadband networks.[50] These networks typically have a reach of one to five miles, and customers often must have a rooftop antenna that can establish a line-of-sight connection with the network transmitter.

15. Consumers also access the Internet through Wireless Local Area Networks (WLANs). WLANs are widely deployed and enable consumers to obtain wireless broadband Internet access within 100 to 300 feet of a wireless access point. The most prevalent WLAN technology is equipment manufactured in accordance with the IEEE 802.11 family of standards, commonly known as "Wi-Fi," short for wireless fidelity. Wi-Fi networks use unlicensed devices and feature data transfer rates at speeds of up to 11 Mbps for 802.11b and up to 54 Mbps for 802.11a and 802.11g. Wi-Fi networks often must rely on another type of broadband connection, whether wireline, cable, or wireless, for access to the Internet. Wi-Fi allows consumers to extend, for example, the reach of a landline broadband connection

---

[46] *See, e.g.,* Cingular Wireless, *Media and Entertainment,* www.cingular.com (last visited January 29, 2007); Sprint, *Sprint Mobile Broadband Solutions on the Power Vision Network,* www.sprint.com (last visited January 29, 2007).

[47] Currently these services are being provided using spectrum in the WCS and BRS/EBS bands. *See*, note 49, *infra.*

[48] The IEEE 802.16 standard, first developed in 2001 for fixed wireless systems (e.g., backhaul) operating in the 11-16 GHz frequency range of licensed "upper" bands, continues to evolve. In 2003, IEEE 802.16(a) – commonly referred to as WiMax – was developed for operations in lower frequencies in the 2-11 GHz range, including licensed bands as well as bands that permit use of unlicensed wireless devices. More recently, the IEEE 802.16(a) standard has been extended to include 802.16(d), which is also for fixed wireless broadband applications. *See* Richard Shim, WiMax in the Wings, CNet News.Com, June 25, 2004, available at http://news/zdnet.com/2100-9584_22-5247984.html.

[49] Clearwire, for example, has launched wireless broadband service in 29 U.S. cities using Orthogonal Frequency Division Multiplexing (OFDM) and Time Division Duplex (TDD) technology, and spectrum in the 2.5 GHz BRS/EBS band. *See* Clearwire Corporation, SEC Form S-1, at 53, filed May 11, 2006. BellSouth currently offers a non-line-of-sight, portable wireless broadband service using OFDM technology in five southern cities that allows wireless high-speed Internet access at speeds ranging from 384 kbps to 1.5 Mbps. BellSouth, *Wireless Broadband Service - Products*, http://www.wirelessbb.bellsouth.net/sales/asp/wbb_Products.asp (last visited January 29, 2007).

[50] *See, WBATF Report* at 31-32; *see also*, Wireless Internet Service Providers Association (WISPA), Part 15.org, and ISP-Market, *Broadband Wireless Access 2002: Service Provider Profiles, Market Drivers and Spending Projections*, ISP-Market LLC Industry Report (2002).

within their home or to connect to the Internet at public "hot spots," such as restaurants, coffee shops, hotels, airports, convention centers, and city parks, using a laptop computer or smartphone with an internal or external Wi-Fi modem.[51] Some mobile telephone carriers use Wi-Fi hot spots to complement their mobile data services provided through the licensed use of spectrum.[52]

16. Wireless broadband service providers offer access to different types of content and applications based on the speed and capabilities of the technology used to provide the service and the type of end user device. For instance, many of the mobile telephone carriers that provide mobile wireless broadband service for mobile handsets offer a range of IP-based multimedia content and services – including ring tones, music, games, video clips and video streaming – that are specially designed to work with the small screens and limited keypads of mobile handsets.[53] This content is typically sold through a carrier-branded, carrier-controlled portal. Mobile handsets typically enable users to access a limited selection of web sites; in some cases, providers use filters to limit the web sites that a customer can access, and, in other cases, subscribers can enter any URL using a handset but the site may not be viewable due to software, processing, or other constraints of the device. On the other hand, wireless broadband Internet access services for laptop and desktop computers typically allow consumers to access the same applications they would have with a cable or wireline broadband Internet access connection, including full Internet access, e-mail, Internet file downloads, and corporate server access.

17. The number of reported subscribers to wireless broadband Internet access service continues to grow.[54] Wireless broadband technologies and the business models for their deployment continue to evolve at a rapid pace. There have been significant technical advances in recent years, and more are anticipated over the next few years. Further, we expect that wireless broadband will play a critical role in ensuring that broadband reaches rural and underserved areas, where it may be the most efficient means of delivering these services.

## III. DISCUSSION

18. For the reasons discussed below, we classify wireless broadband Internet access service as an information service. We also find that the transmission component of wireless broadband Internet

---

[51] These hot spots usually function as an extension of another broadband Internet access network end point (*e.g.*, wireline broadband Internet access or cable modem Internet access end point).

[52] In the past year, mobile carriers continued to extend their Wi-Fi coverage by entering into agreements with other carriers. *See, e.g.*, T-Mobile, *T-Mobile Hotspot U.S. Location Map*, http://locations.hotspot.t-mobile.com (last visited January 29, 2007) (T-Mobile claims it has 8,283 hotspots where its customers can get connectivity).

[53] In addition, some wireless carriers are providing broadcast-like mobile video content. For example, via MobiTV, Sprint and Cingular provide streaming of existing cable channels over their 1xRTT and GPRS/EDGE networks, respectively. Verizon Wireless, via VCAST, plans to provide streaming clips over their 1x EV-DO. Both Qualcomm and Crown Castle are planning Multicast video using MediaFLO and DVB-H, respectively. *See, e.g.*, Jefferson Graham, *TV on Cellphones? Funny but Profitable*, USA TODAY, Sept. 27, 2005; Verizon, *On Demand In the Palm of Your Hand: Verizon Wireless Launches "VCast" – Nation's First and Only Consumer 3G Multimedia Service*, Jan. 7, 2005, *available at* http://news.vzw.com/news/2005/01/pr2005-01-07.html.

[54] As of June 30, 2006, satellite and wireless (both fixed and mobile) and powerline constituted 18.4 percent of high-speed lines, compared to 44.1% for cable, 34.9% for wireline ADSL, 1.5% for other wireline, and 1.1% for fiber. With regard to advanced services, satellite, wireless, and powerline constituted a far lower percentage – 4.5%, compared to 55.9% for cable, 36.3% for wireline ADSL, 1.9% for other wireline, and 1.4% for fiber. *See* "High Speed Services for Internet Access: Status as of June 30, 2006," Report from the Industry Analysis and Technology Division, Wireline Competition Bureau, (rel. Jan. 2007). The mobile wireless subscriber percentages include some mobile telephone subscribers whose handset is enabled to operate on a high-speed (e.g., EV-DO or WCDMA/HSPDA) wireless network but who do not subscribe to mobile wireless high-speed Internet access service on a month-to-month or longer term basis.

access service is "telecommunications" and that the offering of the telecommunications transmission component as part of a functionally integrated Internet access service offering is not "telecommunications service" under section 3 of the Act. Further, we find that neither the Communications Act nor relevant precedent mandates that broadband transmission be a "telecommunications service" when provided to an ISP as a wholesale input for the ISP's own wireless broadband Internet access service offering, but that the provider may choose to offer it as such. We also find that mobile wireless broadband Internet access service is not a "commercial mobile service" under section 332 of the Act. Finally, we conclude that wireless broadband Internet access service is jurisdictionally interstate.

### A. Classification of Wireless Broadband Internet Access Service as Information Service

19. *Definition.* For purposes of this proceeding, we define wireless broadband Internet access service as a service that uses spectrum, wireless facilities and wireless technologies to provide subscribers with high-speed (broadband) Internet access capabilities.[55] The definition we adopt here is consistent with the definition of broadband Internet access service that the Commission previously has adopted in the wireline and cable contexts.

20. In both the cable and wireline contexts, the Commission focused on the end-user's experience in defining cable modem and wireline broadband Internet access service.[56] The Supreme Court upheld this approach in *Brand X*.[57] In the *Cable Modem Order*, the Commission stated that cable modem service was "a service that uses cable system facilities to provide residential subscribers with high-speed Internet access, as well as many applications or functions that can be used with high-speed Internet access."[58] In the *Wireline Broadband Internet Access Order*, the Commission defined wireline broadband Internet access service as "a service that uses existing or future wireline facilities of the telephone network to provide subscribers with [broadband] Internet access capabilities."[59]

21. We adopt a similar definition for wireless broadband Internet access and define wireless broadband Internet access service as a service that uses spectrum, wireless facilities and wireless technologies to provide subscribers with high-speed (broadband) Internet access capabilities. As with both cable and wireline Internet access, this definition appropriately focuses on the end user's experience, factoring in both the functional characteristics and speed of transmission associated with the service.

22. *Information Service.* We determine that wireless broadband Internet access service,

---

[55] This proceeding is limited to broadband Internet access services and does not implicate narrowband data services (*e.g.*, one-way paging). For purposes of this proceeding, we define the line between broadband and narrowband consistent with the Commission's definition in other contexts (*i.e.*, services with over 200 kbps capability in at least one direction). *See e.g.*, *Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14860 n.15; In the Matter of Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion, and Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996, CC Docket No. 98-146, *Second Report*, 15 FCC Rcd 20913, 20919-20 (2000) (*Second 706 Report*) (defining the term "high speed" to mean infrastructure capable of delivering a speed in excess of 200 kbps in at least one direction). Although this definition remains in effect today, the Commission may examine and modify it for future purposes. *Cf. Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14860 n.15.

[56] *See Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4799; *Wireless Broadband Internet Access Services Order*, 20 FCC Rcd at 14860.

[57] *NCTA v. Brand X*, 125 S. Ct. at 2703-05.

[58] *See Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4819. *See Second 706 Report*, 15 FCC Rcd at 20919-20 (defining the term "high speed" to mean infrastructure capable of delivering a speed in excess of 200 kbps in at least one direction).

[59] *Wireless Broadband Internet Access Services Order*, 20 FCC Rcd at 14860, para. 9.

whether offered using mobile, portable, or fixed technologies, is an "information service" under the Communications Act. This finding is consistent with the Commission's classification of broadband Internet access services provided over cable, wireline, and BPL networks, and the Supreme Court's *Brand X* decision.

23. Under the Act, a service is subject to different regulatory frameworks depending on whether it constitutes an "information service" or a "telecommunications service." The Act defines "information service" as

> the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.[60]

24. The Act defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used"[61] and "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."[62]

25. In the *Cable Modem Declaratory Ruling*, the *Wireline Broadband Internet Access Services Order*, and the *BPL-Enabled Internet Access Services Order*, the Commission addressed the proper classification for broadband Internet access service provided over cable system facilities, wireline facilities, and BPL facilities, respectively.[63] In each case, the Commission determined that the broadband Internet access service in question should be classified as an information service.[64] The Commission determined that cable, wireline, and BPL providers offered broadband Internet access as a single, integrated service (*i.e.*, Internet access) that inextricably combined the transmission of data over cable or wireline networks with computer processing, information provision, and computer interactivity, enabling end users to run a variety of Internet applications such as email, newsgroups, and interaction with or hosting of web pages.[65] These applications, the Commission held, "encompass the capability for 'generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications,' and taken together constitute an information service as defined by the Act."[66] In *Brand X*, the Supreme Court upheld the Commission's findings that broadband Internet

---

[60] 47 U.S.C. § 153(20).

[61] 47 U.S.C. § 153(46).

[62] 47 U.S.C. § 153(43).

[63] *See Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4818-24, paras. 31-41; *Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14862-65, paras. 12-17; *BPL-Enabled Internet Access Services Order*, 21 FCC Rcd at 13285-90, paras. 17-15.

[64] *See Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4822, para 38; *Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14862, para. 12; *BPL-Enabled Internet Access Services Order*, 21 FCC Rcd at 13285, para. 8.

[65] *See Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4822, para. 38; *Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14863, para. 14; *BPL-Enabled Internet Access Services Order*, 21 FCC Rcd at 13285-87, para. 9. *See also NCTA v. Brand X*, 125 S. Ct. at 2704 (stating that the key question in classifying offerings with both telecommunications and information service capabilities is whether the telecommunications transmission capability is "sufficiently integrated" with the information service component "to make it reasonable to describe the two as a single, integrated offering").

[66] *See Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14863-64, para. 14.

access service offered via cable modem is an integrated information service, and that the transmission component of that service is not a telecommunications service.[67]

26. In view of the statutory provisions, Commission precedent, and the *Brand X* decision, we find that wireless broadband Internet access service is similarly an "information service." Like cable modem service, wireline broadband Internet access service, and BPL-enabled Internet access service, wireless broadband Internet access service offers a single, integrated service to end users, Internet access, that inextricably combines the transmission of data with computer processing, information provision, and computer interactivity, for the purpose of enabling end users to run a variety of applications.[68] These applications, identical to those provided by cable modem service, wireline broadband Internet access, or BPL-enabled Internet access, "taken together constitute an information service as defined by the Act." Accordingly, we find that wireless broadband Internet access service meets the statutory definition of an information service under the Act.

27. In addition, we find that classifying wireless broadband Internet access service as an information service furthers the goals of sections 7 and 230(b)(2) of the Communications Act, and section 706 of the Telecommunications Act of 1996.[69] As noted above, wireless broadband Internet access technologies continue to evolve at a rapid pace. Through this classification, we provide the regulatory certainty needed to help spur growth and deployment of these services. Particularly, the regulatory certainty we provide through this classification will encourage broadband deployment in rural and underserved areas, where wireless broadband may be the most efficient broadband option. Additionally, we believe that wireless broadband Internet access service can provide an important homeland security function by creating redundancy in our nation's communications infrastructure. As with the Commission's determination when classifying wireline broadband Internet access services, we similarly find that our actions in this Declaratory Ruling will not affect the government's implementation or enforcement of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept or Obstruct Terrorism Act of 2001 (USA Patriot Act),[70] or the Commission's rules implementing the National Security Emergency Preparedness Telecommunications Service Priority System.[71]

28. Having concluded that wireless broadband Internet access service is an information service, we also find that the service is jurisdictionally interstate.[72]

---

[67] *NCTA v. Brand X*, 125 S. Ct. at 2703-10.

[68] *See id.* at 2704-05 ("The question, then, is whether the transmission component of cable modem service is sufficiently integrated with the finished service to make it reasonable to describe the two as a single, integrated offering. We think that they are sufficiently integrated. . . .") (citation omitted).

[69] *See* 47 U.S.C. § 157 (directing that the Commission shall encourage the deployment of advanced telecommunications capability to all Americans); 47 U.S.C. § 230(b)(2) (stating that it is the policy of the United States "to preserve the vibrant and competitive free market that presently exists for the Internet"); and § 706, Pub. L. 104-104, Title VII, Feb. 8, 1996, 110 Stat. 153, reproduced in the notes under 47 U.S.C. § 157.

[70] Pub. L. No. 107-56, 115 Stat. 272 (2001) (codified in scattered sections of 18 U.S.C., 47 U.S.C., and 50 U.S.C.).

[71] 47 C.F.R. Part 64, App. A. *See Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14917-18, paras. 115-18. We also note that because we classify wireless broadband Internet access service as an information service, section 222 has no bearing on the obligation of providers of that service to make reports of suspected child pornography to the CyberTipLine pursuant to 42 U.S.C. § 13032. *See* 47 U.S.C. § 222.

[72] *See e.g., Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4832, para. 59 (using the end-to-end analysis to determine that cable modem Internet access service is jurisdictionally interstate); *Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14853; *BPL-Enabled Internet Access Services Order* 21 FCC Rcd at 13288, para. 11; *see also* GTE Tel. Operating Cos., *Memorandum Opinion and Order*, 13 FCC Rcd 22466 (1998) (finding GTE's ADSL service to be properly tariffed as an interstate service), *recon. denied*, 17 FCC Rcd 27409 (1999).

### B. Classification of the Transmission Component of Wireless Broadband Internet Access Service as "Telecommunications" and not "Telecommunications Service"

29. We determine that the transmission component of wireless broadband Internet access service is properly classified as "telecommunications" and not "telecommunications service."[73] That is, we find that the transmission component of wireless broadband Internet access service is telecommunications[74] and the offering of this telecommunications transmission component as part of a functionally integrated, finished Internet access service offering is not "telecommunications service" under section 3 of the Act.

30. The Commission has already recognized that "[a]ll information services require the use of telecommunications to connect customers to the computers or other processors that are capable of generating, storing, or manipulating information."[75] The Commission has also determined that the transmission of information may constitute "telecommunications," but that it is not necessarily a "telecommunications service."[76] As stated above, the definition of a "[t]elecommunications service" requires that the telecommunications be "offer[ed] for a fee directly to the public, or to such classes of users as to be effectively available to the public, regardless of the facilities used."[77] Thus, in the *Cable Modem Declaratory Ruling*, the Commission determined that the transmission component of cable modem service was "telecommunications" but not a "telecommunications service" because, as provided to the user, the transmission component was "part and parcel of cable modem service" and was not being offered as a stand-alone offering of transmission for a fee directly to the public, or to such classes of users as to be effectively available directly to the public.[78] Similarly, in the *Wireline Broadband Internet Access Order*, the Commission found that the transmission capability of wireline broadband Internet access "is part and parcel of, and integral to, the Internet access service capabilities" and therefore that wireline broadband Internet access service does not include the provision of a telecommunications service to the end user.[79] Finally, in the *BPL-Enabled Internet Access Services Order*, the Commission found that the transmission component underlying BPL-enabled Internet access service is not a separate "telecommunication service" because an "end user subscribing to BPL-enabled Internet access service

---

[73] For purposes of this proceeding, we define the "transmission component" of wireless broadband Internet access service as the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received, over facilities-based wireless communications systems.

[74] As noted above, the Act's definition of "information service" includes a transmission / telecommunications component. The Act defines "information service" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information (continued ...)
(Continued from previous page) *via telecommunications*, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(20) (emphasis added). *See also* 47 U.S.C. § 153(43) (defining "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received").

[75] *See* Implementation of the Non-Accounting Safeguards of Section 271 and 272 of the Communications Act of 1934, as amended, *Order on Remand*, 16 FCC Rcd 9751, 9770, para. 36 (2001) (*Non-Accounting Safeguards Remand*).

[76] *See* Federal-State Joint Board on Universal Service, *Report and Order*, 12 FCC Rcd 8776, 9179-80, paras. 788-90 (1997) (finding that information services are not inherently telecommunications services simply because they are offered via telecommunications); *see also Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4823, para. 40.

[77] 47 U.S.C. § 153(46).

[78] *See Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4823, paras. 39-40.

[79] *Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14910-11, para. 104.

expects to receive (and pay for) a finished, functionally integrated service that provides access to the Internet, rather than receive (and pay for) two distinct services – Internet access service and a distinct transmission service."[80]

31. We find that the transmission component used for wireless broadband Internet access is "telecommunications" because it provides "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."[81] We conclude, consistent with the Commission's finding in the *Cable Modem Declaratory Ruling, Wireline Broadband Internet Access Services Order*, and *BPL-Enabled Internet Access Services Order*, and the Supreme Court's decision in *Brand X*, that the use of this telecommunications transmission component as part of a provider's offering of wireless broadband Internet access service to end users using its own transmission facilities is not a "telecommunications service" because it is part and parcel of the Internet access service's information service capabilities.[82] Specifically, we find that an end user subscribing to wireless broadband Internet access service expects to receive (and pay for) a finished, functionally integrated service that provides access to the Internet, rather than receive (and pay for) two distinct services – Internet access service and a distinct transmission service.

32. We further determine that neither the Communications Act nor relevant precedent mandate that broadband transmission be a "telecommunications service" when provided to an ISP as a wholesale input for the ISP's own broadband Internet access service offering.[83] Indeed, neither the Communications Act nor relevant precedent require a wireless broadband Internet access provider to offer the transmission component of wireless broadband Internet access service as a telecommunications service to anyone.[84] However, the wireless broadband Internet access provider may choose to offer the transmission component as a telecommunications service. We note that the transmission component of wireless broadband Internet access service is a telecommunications service only if the entity that provides the transmission voluntarily undertakes to provide it indifferently on a common carrier basis.[85]

33. Should the facility provider choose to offer the transmission component of wireless broadband Internet access as a telecommunications service, the regulatory regime appropriate to the

[80] *BPL-Enabled Internet Access Services Order,* 21 FCC Rcd at 13289, para. 14.

[81] 47 U.S.C. § 153(43).

[82] *See NCTA v. Brand X,* 125 S. Ct. at 2705 ("transmission is a necessary component of Internet access"); *Wireline Broadband Internet Access Services Order,* 20 FCC Rcd at 14910-11, para. 104 (finding that the use of the transmission component as part and parcel of a facilities-based provider's offering to end users of wireline broadband Internet access service using its own transmission facilities is "telecommunications" and not a "telecommunications service").

[83] *See NCTA v. Brand X,* 125 S. Ct. at 2708 ("The Act's definition of 'telecommunications service' says nothing about imposing more stringent regulatory duties on facilities-based information-service providers").

[84] *Cf. Wireline Broadband Internet Access Services Order,* 20 FCC Rcd at 14909, para. 103 (finding that nothing compels provider of *wireline* broadband Internet access to offer transmission component as a telecommunications service to anyone).

[85] *Id.*, 20 FCC Rcd at 14910, para. 103. *See also*, Time Warner Cable Request for Declaratory Ruling that Competitive Local Exchange Carriers May Obtain Interconnection Under Section 251 of the Communications Act of 1934, as Amended, to Provide Wholesale Telecommunications Service to VoIP Providers, WC Docket No. 06-55, *Memorandum Opinion and Order*, DA 07-709, para. 11 (rel. March 1, 2007) ("It is clear under the Commission's precedent that the definition of 'telecommunications service' is not limited to retail services, but also includes wholesale services when offered on a common carrier basis.").

nature of the telecommunications service will apply.[86] For example, if a wireless broadband Internet access provider chooses to offer the telecommunications transmission component as a telecommunications service, then it is a common carrier service subject to Title II.[87] In addition, a mobile wireless Internet access provider that chooses to offer the telecommunications transmission component as a telecommunications service may also be subject to the "commercial mobile service" provisions of the Act, depending on whether that transmission service falls within the definition of CMRS in the Act.[88]

34. We also make clear that no aspect of the *Computer Inquiry* regime applies to the provision of wireless broadband Internet access service.[89] In particular, as noted above, no provider of wireless broadband Internet access service has an obligation to provide the transmission component of that service as a common carrier service, regardless of whether the provider is otherwise a common carrier.[90] We conclude that, for the reasons explained in the *Cable Modem Declaratory Ruling* in reference to the cable modem service, subjecting wireless broadband Internet access service providers to these obligations would disserve the goals of section 706 of the Telecommunications Act of 1996.[91]

### C. Continued Applicability of Title III Licensing Provisions

35. Our decision today to classify wireless broadband Internet access service as an information service does not affect the general applicability of the spectrum allocation and licensing provisions of Title III and the Commission's rules to this service. These provisions and rules continue to apply because the service is using radio spectrum.

36. Title III generally provides the Commission with authority to regulate "radio communications" and "transmission of energy by radio."[92] Among other provisions, Title III gives the

---

[86] We note that to be a "telecommunications service," the offering in question must also, of course, satisfy the definition of "telecommunications." Thus, for example, the leasing of excess capacity on a wireless network has been found to be telecommunications and, if offered on a common carrier basis, a "telecommunications service." *See* Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, CC Docket No. 96-98, *First Report and Order*, 11 FCC Rcd 15499, 15990, para. 994 (1996) (*Local Competition Order*). By comparison, the Commission found that satellite providers that merely leased bare "transponder capacity" do not provide "telecommunications" because they do not transmit information when they lease bare transponder capacity. *Cf.* Federal-State Joint Board on Universal Service, Access Charge Reform, Price Cap Performance Review for Local Exchange Carriers, Transport Rate Structure and Pricing, End User Common Line Charge, CC Docket Nos. 96-45, 96-262, 94-1, 91-213, and 95-72, *Fourth Order on Reconsideration in CC Docket No. 96-45, Report and Order in CC Docket Nos. 96-45, 96-262, 94-1, 91-213, 95-72*, 13 FCC Rcd 5318, 5479 (1997).

[87] *See Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14909-10, para. 103 (finding that a provider of the transmission component for wireline broadband Internet access service may offer the transmission on a common carrier basis if it chooses to, thus subjecting it to Title II common carrier regulations).

[88] *See e.g.*, 47 U.S.C. §§ 332(c)(1). *See also*, 47 C.F.R. Part 20. *See* further discussion of wireless broadband Internet access service as it relates to CMRS in Section III.D., *infra*.

[89] *See NCTA v. Brand X*, 125 S. Ct. at 2708 ("We think it improbable that the Communications Act unambiguously freezes in time the *Computer II* treatment of facilities-based information-service providers").

[90] *See Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4825, para. 43 & n.169 (finding that the *Computer II* obligations have only been applied to traditional wireline services and facilities, which the Commission has explicitly limited to services provided over the infrastructure of traditional telephone networks, and declining to extend such obligations to information services provided over cable facilities).

[91] *See Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4826, para. 47.

[92] *See* Title III - Provisions Relating to Radio, 47 U.S.C. §§ 301 et seq. *See also IP-Enabled Services NPRM*, 19 FCC Rcd at 4918.

Commission the authority to adopt rules preventing interference and allows it to classify radio stations.[93] It also establishes the basic licensing scheme for radio stations, allowing the Commission to grant, revoke, or modify licenses.[94] Title III further allows the Commission to make such rules and regulations and prescribe such restrictions and conditions as may be necessary to carry out the provisions of the Act.[95] Application of provisions governing access to and use of spectrum (and their corresponding Commission rules) is not affected by whether the service using the spectrum is classified as a telecommunications or information service under the Act. Accordingly, our decision today to classify wireless broadband Internet access services as information services does not affect the applicability of Title III provisions and corresponding Commission rules to these services. Further, nothing in this order should be construed as modifying any spectrum use authorizations and service rule obligations arising out of license conditions or rules governing unlicensed use of the spectrum.

### D. Applicability of the "Commercial Mobile Service" Provisions of Section 332 of the Act

37. Having determined that wireless broadband Internet access service, regardless of whether offered using mobile, portable, or fixed technologies, is an information service under the Act, we now address the applicability of the "commercial mobile service" provision of section 332 of the Act to this broadband service. As discussed below, we find that "mobile wireless broadband Internet access service"[96] is not a "commercial mobile service" as that term is defined in the Act and as implemented in the Commission's rules.[97]

38. Section 332 of Title III, enacted by Congress as part of the Omnibus Budget Reconciliation Act of 1993 (the Budget Act),[98] provides a specific framework that applies to providers of "commercial mobile service."[99] The section defines "commercial mobile service" to mean:

any mobile service . . . that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public.[100]

39. It distinguishes commercial mobile service from "private mobile service," which is defined as "any mobile service . . . that is not a [commercial mobile service] or the functional equivalent of a commercial mobile service."[101] Section 332(c)(1)(A) requires that providers of commercial mobile service be treated as common carriers under Title II of the Act but also authorizes the Commission to

---

[93] 47 U.S.C. §§ 302, 303.

[94] 47 U.S.C. §§ 307-309, 312, 316.

[95] 47 U.S.C. § 303(r). *See, e.g.,* Interconnection and Resale Obligations Pertaining to Commercial Mobile Radio Services, CC Docket No. 94-54, *Memorandum Opinion and Order on Reconsideration,* 14 FCC Rcd 16340, para. 27 (1999) (the Commission using its licensing authority under Title III to extend resale requirements to enhanced services provided by CMRS carriers).

[96] "Mobile wireless broadband Internet access service" is wireless broadband Internet access service that meets the "mobile service" definition contained in the Act and the Commission's rules. 47 U.S.C. § 153(27); 47 C.F.R. § 20.3 (defining "mobile service").

[97] 47 U.S.C. § 332. *See also* 47 C.F.R. § 20.3 (defining "commercial mobile radio service" (CMRS)).

[98] Pub. L. No. 103-66, 107 Stat. 312 (1993).

[99] 47 U.S.C. § 332.

[100] 47 U.S.C. § 332(d)(1); 47 C.F.R. § 20.3.

[101] 47 U.S.C. § 332(d)(3).

forbear from applying most Title II provisions if it makes certain findings.[102] The commercial mobile service provisions of the Act are implemented under section 20.3 of the Commission's rules, which employs the term "commercial mobile radio service" (CMRS).[103]

40. Three years after adding section 332 to the Act, Congress passed the Telecommunications Act of 1996.[104] Among the revisions to the Act were amendments to section 3 of the Act that defined the following terms: "telecommunications carriers" (section 3(44)), "telecommunications service" (section 3(46)), and "information service" (section 3(20)).[105] In defining these terms, Congress noted that the definition of "telecommunications service" was intended to include commercial mobile service.[106]

41. As discussed below, we find that mobile wireless broadband Internet access service is not a "commercial mobile radio service" as that term is defined in the Act and implemented in the Commission's rules. We find first that mobile wireless broadband Internet access service does not fit within the definition of "commercial mobile service" because it is not an "interconnected service" within the meaning of section 332 of the Act and the Commission's "commercial mobile radio service" rules. Even if this service were an "interconnected service" for purposes of section 332, we find for the reasons set out below that it would be unreasonable to classify mobile wireless broadband Internet access service as commercial mobile service because that would result in an internal contradiction within the statutory scheme. Concluding that mobile wireless broadband Internet access service, as an information service, should not be included in the CMRS definition or subject to Title II common carrier obligations applicable to telecommunications service providers is most consistent with Congressional intent to maintain a regime in which information service providers are not subject to Title II regulations as common carriers.

42. *Mobile Wireless Broadband Internet Access Service Is Not an "Interconnected Service" Under Section 332 and the Commission's Regulations.* We find first that mobile wireless broadband Internet access service does not meet the definition of "commercial mobile service" within the meaning of section 332 of the Act as implemented by the Commission's CMRS rules because such broadband service is not an "interconnected service," as defined in the Act and the Commission's rules.

43. Section 332(d)(2) states that "the term 'interconnected service' means service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission) . . . ."[107] Under the Commission's Part 20 CMRS rules, "interconnected service" is defined as "a service that is interconnected with the public switched network, or interconnected with the public switched network through an interconnected service provider, that gives subscribers the capability to communicate to or receive communication from all other users on the public switched network."[108] This definition focuses on the service provided to end users[109] and specifically does not include "any interface

[102] 47 U.S.C. § 332(c)(1).

[103] 47 C.F.R. § 20.3.

[104] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996).

[105] *Id.*

[106] H.R. Conf. Report 104-458.

[107] 47 U.S.C. § 332(d)(2).

[108] 47 C.F.R. § 20.3.

[109] The term "interconnected service" is defined functionally as "a service that is interconnected with the public switched network, or interconnected with the public switched network through an interconnected service provider, *that gives subscribers the capability to communicate to or receive communication from all other users on the public switched network . . . .*" *See* 47 C.F.R. § 20.3 (emphasis added).

between a licensee's facilities and the public switched network exclusively for a licensee's internal control purposes."[110] The term "public switched network" is defined under our CMRS rules to mean "[a]ny common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers, that use the North American Numbering Plan in connection with the provision of switched services."[111]

44. In adopting the definitions of "interconnected service" and "public switched network" with regard to commercial mobile service provision of the Act, the Commission stated "that by using the phrase 'interconnected service,' Congress intended that mobile services should be classified as commercial services if they make interconnected service broadly available through their use of the public switched network."[112] Congress's purpose, the Commission concluded, was "to ensure that a mobile service that gives its customers the capability to communicate to or receive communication from other users of the public switched network should be treated as a common carriage offering . . . ."[113] In addition, the Commission determined that "any switched common carrier service that is interconnected with the traditional local exchange or interexchange switched network will be defined as part of that network for purposes of our definition of 'commercial mobile radio services.'"[114] The Commission also concluded that "use of the North American Numbering Plan by carriers providing or obtaining access to the public switched network is a key element in defining the network because participation in the North American Numbering Plan provides the participant with ubiquitous access to all other participants in the Plan." The Commission found that another important element is switching capability, which means "any common carrier switching capability."[115]

45. Based on foregoing, we conclude that mobile wireless broadband Internet access service does not meet the definition of "interconnected service" under the Commission's rules implementing section 332 of the Act. Mobile wireless broadband Internet access services do not "give subscribers the capability to communicate to or receive communications from *all other users* on the public switched network."[116] The definition of "interconnected service" applicable to commercial mobile service focuses on the service provided to the end users. Under this definition, "interconnected service" has to give "subscribers the capability to communicate to or receive communication from all other users on the public switched network."[117] Mobile wireless broadband Internet access service in and of itself does not provide this capability to communicate with all users of the public switched network. For example, mobile wireless broadband Internet access services do not use the North American Numbering Plan to access the Internet, which limits subscribers' ability to communicate to or receive communications from *all* users in

---

[110] *Id.*

[111] *Id.*

[112] Second Report and Order Implementing Section 3(n) and 332 of the Communications Act as amended by Section 6002(b) of the Omnibus Reconciliation Act of 1993, 9 FCC Rcd 1411, 1434, para. 54 (1994) (*CMRS Second Report and Order*).

[113] *Id. See also Calling Party Pays Memorandum Order and Opinion*, 16 FCC Rcd 8297, para. 15 (stating that "for a service to be interconnected, our rules merely require the technical capability to communicate or receive calls from other users of the Public Switched Telephone Network."

[114] *CMRS Second Report and Order*, 9 FCC Rcd at 1436-37, para. 59.

[115] *Id.* 9 FCC Rcd at 1437, para. 60.

[116] *See* 47 C.F.R. § 20.3 (interconnected service definition) (emphasis added).

[117] The term "interconnected service" is defined as "a service that is interconnected with the public switched network, or interconnected with the public switched network through an interconnected service provider, *that gives subscribers the capability to communicate to or receive communication from all other users on the public switched network* . . . ." *See* 47 C.F.R. § 20.3 (emphasis added).

the public switched network.[118] Instead, users of a mobile wireless broadband Internet access service need to rely on another service or application, such as certain voice over Internet Protocol (VoIP) services that rely in part on the underlying Internet access service, to make calls to, and receive calls from, "all other users on the public switched network." Therefore, mobile wireless broadband Internet access service itself is not an "interconnected service" as the Commission has defined the term in the context of section 332.[119]

46. Of course, our conclusion that mobile wireless broadband Internet access service is not an "interconnected service" for purposes of section 332 does not decide whether other services or applications may be "interconnected service" under section 332 and its implementing regulations. For instance, we do not here address the question whether "interconnected VoIP" service is an "interconnected service" under section 332. Such "interconnected VoIP" services have been recognized as services separate from broadband Internet access service, and the Commission has imposed certain obligations on interconnected VoIP, such as Enhanced 911 (E911) obligations, that it has not imposed on broadband Internet access service.[120]

47. Nor does our interpretation of section 332 of the Communications Act and its implementing regulations here alter either our decision in the *CALEA* proceeding to apply CALEA obligations to all wireless broadband Internet access providers, including mobile wireless providers, or our interpretations of the provisions of CALEA itself. As the Commission found, and the U.S. Court of Appeals for the D.C. Circuit affirmed, the purposes and intent of CALEA are strikingly different than those of the 1996 Telecommunications Act, which is embedded in the Communications Act. As the Court noted, "CALEA--unlike the 1996 Act--is a law-enforcement statute . . . (requiring telecommunications carriers to enable 'the government' to conduct electronic surveillance) . . . . The

---

[118] *Id.* See also 47 C.F.R. § 20.3 (defining the "public switched network" as "[a]ny common carrier switched network . . . that use[s] the North American Numbering Plan in connection with the provision of switched services."). We note that common carrier switched networks that use the North American Numbering Plan to reach the Internet switch traffic at less than broadband speeds. As the Commission explained in 2002, narrowband Internet access services utilize the public switched telephone network and North American Numbering Plan. *See Wireline Broadband Internet Access NPRM*, 17 FCC Rcd at 3025-26, para. 11, n. 18 (stating that "[d]ial-up or narrowband Internet access utilizes the same public switched telephone network (PSTN) infrastructure that telephone subscribers use to place traditional circuit-switched voice calls."). By contrast, mobile wireless broadband Internet access service routes broadband data traffic directly to the Internet through data serving nodes, gateways, or other forms of data routers.

[119] While the Commission interpreted "the public switched network" in section 332 as continuing to encompass "the network" as it is "continuously growing and changing because of new technology and increasing demand," we find that section 332 and our implementing rules did not contemplate wireless broadband Internet access service as provided today. In fact, the Commission found that "commercial mobile service" must still be interconnected with the local exchange or interexchange switched network as it evolves: "any switched common carrier service that is interconnected with the traditional local exchange or interexchange switched network will be defined as part of that network for purposes of our definition of 'commercial mobile radio services.'" *CMRS Second Report and Order*, 9 FCC Rcd at 1436-37, para. 59.

[120] The Commission has determined that VoIP services are interconnected in other contexts if they "(1) enable real-time, two-way voice communications; (2) require a broadband connection from the user's location; (3) require IP-compatible customer premises equipment; and (4) permit users to receive calls from and terminate calls to the PSTN." *See* In the Matter of Communications Assistance for Law Enforcement Act and Broadband Access and Services, Docket No. 04-295, *First Report and Order and Further Notice of Proposed Rulemaking*, 20 FCC Rcd 14989, 15008, para. 39 (2005) (*CALEA Order*), *aff'd American Council on Education v. FCC & USA*, 451 F.3d 226 (D.C. Cir. 2006) (*American Council on Education v. FCC & USA*); In the Matter of E911 Requirements for IP-Enabled Service Providers, WC Docket No. 05-196, *First Report and Order and Notice of Proposed Rulemaking*, 20 FCC Rcd 10245, 10257-58, para. 24 (2005).

Communications Act (of which the Telecom Act is part), by contrast, was enacted '[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio' . . . . The Commission's interpretation of CALEA reasonably differs from its interpretation of the 1996 Act, given the differences between the two statutes."[121] Thus, our interpretation of the separate statutory provisions in section 332 of the Communications Act, whose purposes closely track those of the Telecommunications Act of 1996 and the Communications Act generally, in no way affects our determination that mobile wireless broadband Internet access service providers are subject to the CALEA statute.[122]

48. *Mobile Wireless Broadband Internet Access Service is Not a "Commercial Mobile Service" Even if It Were an "Interconnected Service" for Purposes of Section 332 and its Implementing Regulations.* If mobile wireless broadband Internet access service were an "interconnected service" for purposes of section 332, we find there to be ambiguity in the statutory framework. One possible interpretation of section 332, looking solely at its definitions, is that such service would qualify as a "commercial mobile service" while also being an "information service." We find, however, that such a reading results in an internal contradiction in the statutory framework, and that the alternate reading that mobile wireless broadband Internet access service is not a "commercial mobile service" avoids the contradiction and is a reading fully consistent with the purposes of section 332 and the Communications Act in general.

49. The contradiction in the statutory framework arising from classifying mobile wireless broadband Internet access service as both an information service and a commercial mobile service occurs in the very common situation where a service provider is providing not only mobile wireless broadband Internet access service, but also a separate service that is undoubtedly a CMRS service that is also a telecommunication service under the Act, such as traditional mobile voice service.

50. Under those circumstances, the service provider would qualify as a telecommunications carrier as a result of its provision of its traditional mobile voice service. The definition of "telecommunications carrier" in section 3 of the Act states "[a] telecommunications carrier shall be treated as a common carrier under this Act *only to the extent that it is engaged in providing telecommunications service.*"[123] Accordingly, under Section 3, that service provider is to be treated as a common carrier for the telecommunications services it provides, but it cannot be treated as a common carrier with respect to other, non-telecommunications services it may offer, including information services. As discussed above, mobile wireless broadband Internet access service is an information service.

51. Yet, under this reading, the service provider's offering of a CMRS information service – *i.e.,* its mobile wireless broadband Internet access service - would also mean that section 332 would apply; and the terms of section 332 expressly require that a service provider would be treated as a common carrier when it offers that "commercial mobile service."[124] In short, under this interpretation of

---

[121] *American Council on Education v. FCC & USA, 451 F.3d at* 232.

[122] Similarly, the meaning of the term "the public switched network" in section 332 and implementing regulations has no impact on our interpretation of a similar term – "a publicly switched network" – found in the House Report on CALEA. Quoting language in the House Report expressly stating Congress's intent to provide for interception of communications over the Internet and to prevent the Internet from offering "a safe haven for illegal activity," we found that the Internet backbone network is "*a* publicly switched network" for purposes of CALEA in support of our intermediate finding that broadband Internet access service replaces a substantial portion of the local telephone exchange service and our ultimate finding that such service is subject to CALEA under the statute's Substantial Replacement Provision (SRP). *See CALEA Order*, 20 FCC Rcd at 15003, para. 9 (quoting House Report) and 15004, para. 12 (emphasis in original).

[123] 47 U.S.C. § 153(44) (emphasis added).

[124] 47 U.S.C. § 332(c)(1)(A).

section 332, that section would require that the service provider be treated as a common carrier insofar as it provides mobile wireless broadband Internet access service, while section 3 clearly would prohibit the application of common carrier regulation of such a service provider's provision of that service.

52. These contradictory statutory directives demonstrate an ambiguity in the Act – one that we conclude is best resolved by finding that mobile wireless broadband Internet access service, as an information service, is not included in the commercial mobile service definition. If we were to interpret section 332 to include this type of Internet access service within the CMRS definition, the above-described ambiguity could only be resolved by concluding that one of the two sections (section 3 or section 332) should trump the other. We do not discern any reasonable basis for giving more weight to one section than the other, however.

53. Moreover, construing the CMRS definition to include mobile wireless broadband Internet access service, as CMRS information service, could lead to absurd results. For example, we could give effect to section 3's express common carrier exemption of a telecommunication carrier's so-called CMRS information service – and thereby override section 332's express mandate to treat CMRS providers as common carriers. Then, however, a company engaging solely in the provision of CMRS information services would not qualify for the section 3 exemption (available only to telecommunications carriers) and therefore would be subject to common carrier regulation under section 332, while a telecommunications carrier who provided the exact same service in addition to its telecommunications services would escape such common carrier regulation of its information service under the section 3 exemption. Such disparate treatment appears to have no rational basis and would introduce competitive distortions into the marketplace. Nor could we avoid this result by exercising our forbearance authority under section 10 of the Communications Act. Although section 10 specifically requires the Commission to override Section 332's application of common carrier regulations to CMRS providers if it determines that a three-part test is satisfied,[125] this mandate applies only to telecommunications carriers and telecommunications services. Thus, if a non-telecommunications provider of mobile wireless broadband Internet access service is deemed a CMRS provider, we would not be authorized by section 10 to forbear from applying any applicable common carrier regulations to that provider. And while section 332 itself grants the Commission some authority to forbear from applying Title II common carrier requirements to CMRS providers (whether or not deemed telecommunications carriers), this statutory forbearance authority is limited. It does not extend to a number of significant Title II provisions (including sections 201, 202, and 208 of the Act).[126]

54. By contrast, construing the CMRS definition to exclude mobile wireless broadband Internet access service avoids absurd results while resolving the statutory ambiguity in a manner consistent with the intent and goals of the Act. For one, the exclusion is consistent with and furthers the Act's overall intent to allow information services to develop free from common carrier regulations. A contrary approach would single out a significant segment of information service provider for such regulation and thereby work at cross purposes with Congress's intent to maintain a regime in which

[125] Section 10 states that "[n]otwithstanding section 332(c)(1)(A) of this Act, the Commission shall forbear from applying any regulation or any provision of this Act to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services . . . if the Commission determines that – (1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory; (2) enforcement of such regulation or provision is not necessary for the protection of consumers; and (3) forbearance from applying such provision or regulation is consistent with the public interest." 47 U.S.C. § 160(a).

[126] *See* 47 U.S.C. § 332(c)(1)(A).

information service providers can develop without the impediments of common carrier regulation.[127]

55. Second, our interpretation of the definition supports the Congressional goal of promoting broadband deployment and encouraging competition in the provision of broadband services, by ensuring regulatory parity among all broadband Internet access services - regardless of whether they are offered through wireline, cable, or wireless technology. Similarly, this approach also ensures consistent regulatory treatment among wireless broadband Internet access services using mobile, portable, or fixed technologies, both licensed and unlicensed. Classifying all wireless broadband Internet access services as non-CMRS information services, will result in a uniform, technology neutral regulatory scheme for the provision of all wireless Internet access services -- regardless of whether providers are using mobile, portable, or fixed technologies, or a combination of those technologies. Without a consistent approach toward all Internet access providers (both within the wireless industry and across diverse technologies), and absent a showing that an application of common carrier regulation to only one type of Internet access provider will promote the public interest, the possibility of full and fair competition will be compromised.

56. In sum, our statutory interpretation of the scope of the CMRS definition eliminates any ambiguity or conflict between sections 332 and 3 of the Communications Act, avoids any absurd or otherwise irrational results, furthers Congress's goal of encouraging the development of information services by ensuring that they remain free from common carrier regulation, and serves the Act's overarching goal of fostering competition by providing a level playing field in the market and removing unnecessary regulatory impediments. Accordingly, we conclude that wireless broadband Internet access service, as an information service, cannot also be a "commercial mobile service" under section 332 of the Communications Act.

### E. Applicability of Other Statutory Provisions

57. In light of our determination that wireless broadband Internet access service is an information service and not CMRS, we now address the applicability of certain statutory provisions to this information service. First, we reiterate our commitment to monitor the need to apply section 255(regarding access by persons with disabilities). Next, we address the applicability of sections 224(regarding pole attachments), 332(c)(7)(local authority over zoning), and 251(interconnection obligations). Finally, we remind the providers of wireless broadband Internet access service that certain consumer protections obligations might apply.

#### 1. Access by Persons with Disabilities

58. We reiterate our commitment to effectuate the accessibility policy embodied in section 255 of the Act. We will continue to monitor the development of wireless broadband Internet access service and its effects on the policy goals of section 255.[128]

59. Section 255(c) of the Act requires that "a provider of telecommunications service shall ensure that the service is accessible to and usable by individuals with disabilities, if readily achievable."[129] Although section 255 expressly applies to telecommunications services and not information services, the

---

[127] *See* Federal-State Joint Board on Universal Service, *Report to Congress*, CC Docket No. 96-45, 13 FCC Rcd 11501, 11511, para. 21 (1998); *see also* 47 U.S.C. § 231(e)(4) (excluding "telecommunications services" from the definition of "Internet access service"). We note that wireless services similar to mobile wireless broadband Internet access service were not available in the market place in 1993 when Congress adopted section 332 or, in 1996, when Congress adopted the section 3 definition of "telecommunication carrier."

[128] The Commission is currently reviewing the issue of disability access with respect to IP-enabled services. *IP-Enabled Services NPRM,* 19 FCC Rcd at 4897-501, paras. 58-60. *See also Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14919-22.

[129] 47 U.S.C. § 255(c).

Commission has used its ancillary jurisdiction under Title I to extend accessibility obligations to certain information services in the past, including the wireline broadband Internet access service.[130] While still at the nascent stage, wireless broadband Internet access services are rapidly being developed and deployed. We will continue to monitor the development of wireless broadband Internet access service and its effects on the important policy goals of section 255.[131] We reiterate our commitment to use our Title I and Title III authority, as necessary, to give full effect to the accessibility policy embodied in section 255.

### 2. Pole Attachments and Local Authority over Zoning

60. *Pole Attachments.* We clarify that where a wireless service provider uses the same pole attachments to provide both telecommunications and wireless broadband Internet access services, section 224 would apply, consistent with the U.S. Supreme Court's decision in *National Cable and Telecom. Ass'n. v. Gulf Power Co.*[132]

61. The Pole Attachment Act, codified in section 224 of the Communications Act, gives cable television systems and providers of telecommunications services the right to attach to utility poles of power and telephone companies at regulated rates.[133] Section 224(a)(4) defines "pole attachment" as "any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility."[134] "Utility" is defined under the statute as "any person who is a local exchange carrier or an electric, gas, water, steam, or other public utility, and who owns or controls poles, ducts, conduits, or rights-of-way used, in whole, or in part, for any wire telecommunications . . ."[135]

62. We clarify that where a wireless service provider uses the same pole attachments to provide commingled services (*i.e.*, both telecommunications and wireless broadband Internet access services), section 224(e) would apply. We note that this determination is consistent with the U.S. Supreme Court's decision in *National Cable and Telecom. Ass'n. v. Gulf Power Co,*[136] where it held that: a cable television system's pole attachments that provided commingled services, both high-speed Internet access service and cable television service, were "attachments" covered by the Pole Attachment Act codified in section 224(d) of the Communications Act; and wireless telecommunications providers' pole

---

[130] The Commission imposed accessibility obligations on voicemail and interactive menu services. *See* Implementation of Sections 255 and 251(a) of the Communications Act of 1924, as Enacted by the Telecommunications Act of 1996, Access to Telecommunications Service, Telecommunications Equipment and Customer Premises Equipment by Persons with Disabilities, WT Docket No. 96-198, *Report and Order and Further Notice of Inquiry*, 16 FCC Rcd 6417, 6455, para. 93 (1999) (*Section 255 Order*). The Commission declined, at that time, however, to extend accessibility obligations to other information services, such as email, electronic information services, and web pages, that did not appear to have the potential to render telecommunications services inaccessible to persons with disabilities. *Id.* at 6461, para 107. The Commission adopted a *Further Notice of Inquiry* at the same time to obtain additional information about Internet telephony and certain computer-based equipment that replicates the current telecommunications functionality. *See also Wireline Broadband Internet Access Services Order* 20 FCC Rcd at 14919, paras. 121-124 (where the Commission uses its ancillary jurisdiction under Title I to extend accessibility obligations to the wireline broadband Internet access service.)

[131] The Commission is currently reviewing the issue of disability access with respect to IP-enabled services. *IP-Enabled Services NPRM,* 19 FCC Rcd at 4897-501, paras. 58-60. *See also Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14919-22.

[132] 534 U.S. 327 (2002).

[133] *See* 47 U.S.C. § 224.

[134] 47 U.S.C. § 224(a)(4).

[135] 47 U.S.C. § 224(a)(1).

[136] 534 U.S. 327 (2002).

attachments of associated wireless equipment are covered under section 224(e) of the Communications Act.[137] Although we do not reach the question of the applicability of section 224 when an entity is solely providing wireless broadband Internet access services, we note that that issue may be addressed in other pending Commission proceedings.[138]

63. *Local Authority over Zoning.* We clarify that section 332(c)(7)(B) would continue to apply to wireless broadband Internet access service that is classified as an "information service" where a wireless service provider uses the same infrastructure to provide its "personal wireless services" and wireless broadband Internet access service.

64. Section 332(c)(7) preserves state and local authority over zoning and land use decisions for "personal wireless service facilities."[139] "Personal wireless services" is defined to mean commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services.[140] Under 332(c)(7), state or local governments may not unreasonably discriminate among providers of functionally equivalent services and shall not prohibit or have the effect of prohibiting the provision of personal wireless services; may not regulate in a manner that prohibits or has the effect of prohibiting the provision of personal wireless services; must act on applications within a reasonable period of time; and must make any denial of an application in writing supported by substantial evidence in a written record.[141] The statute also preempts local decisions premised directly or indirectly on the environmental effects of radio frequency (RF) emissions, assuming that the provider is in compliance with the Commission's RF rules.[142]

65. Similar to application of section 224 to commingled services above, we find that section 332 (c)(7)(B) would continue to apply to wireless broadband Internet access service that is classified as an

---

[137] *Id.* at 332-333, 339-342 (stating that the addition of another service --Internet access -- provided by a cable television system does not change the character of the cable television system attaching to the pole and that is what matters under the statute. Additionally, the Court held that wireless telecommunications providers' pole attachments of associated wireless equipment are covered under section 224(e) of the Act.). *See also*, In the Matter of Fiber Technologies Networks, LLC v. North Pittsburgh Telephone Co., File No. EB-05-MD-014, *Memorandum Opinion and Order*, para. 23, DA 07-486, rel. Feb. 23, 2007.

[138] In its comments on the Wireless Broadband Access Task Force Report, NextG Networks recommended that the Commission carefully consider all of the ramifications of classifying wireless broadband Internet access service as an information service, noting that if an entity is classified as providing only information services, it may face even greater hurdles in accessing utility poles and public rights-of-way -- two elements critical to the deployment of wireless broadband infrastructure. *See* Comments of NextG Networks, Inc. at 15-17, In re Wireless Broadband Access Task Force Report. As discussed above, these concerns may be addressed more appropriately in other pending proceedings or pending petitions regarding the applicability of section 224 to broadband Internet access service providers. *See, e.g.,* Petition for Rulemaking of Fibertech Networks, LLC, RM-11303 (filed Dec. 7, 2005) (requesting that the Commission adopt a set of "best practices" addressing competitor access to poles and conduct); "Pleading Cycle Established for Petition for Rulemaking of Fibertech Networks, LLC," Public Notice, 20 FCC Rcd 19865 (2005) and Petition of United States Telecom Association for a Rulemaking to Amend Pole Attachment Rate Regulation and Complaint Procedure, RM-11293 (filed Oct. 11, 2005) ) (requesting that the Commission institute a rulemaking to amend existing rules governing pole attachment rates, (continued ...)
(Continued from previous page) terms, and conditions); "Consumer and Governmental Affairs Bureau Reference Information Center Petition for Rulemaking Filed," Public Notice, rel. Nov. 2, 2005.

[139] 47 U.S.C. § 332(c)(7).

[140] 47 U.S.C. § 337(c)(7)(C)(i). We note that certain fixed wireless services may be considered exchange access services but not all are.

[141] *See* 47 U.S.C. § 332(c)(7)(B)(i)-(iii), (v).

[142] 47 U.S.C. § 332(c)(7)(B)(iv).

"information service" where a wireless service provider uses the same infrastructure to provide its "personal wireless services" and wireless broadband Internet access service.[143] We find that classifying wireless broadband Internet access services as "information services" will not exclude these services from the section 332(c)(7) framework when a wireless provider's infrastructure is used to provide such services commingled with "personal wireless service." Commingling services does not change the fact that the facilities are being used for the provisioning of personal wireless services. Therefore, application of section 332(c)(7) should remain unaffected. This interpretation is consistent with the public interest goals of this provision and ensures that wireless broadband Internet access service providers continue to use existing wireless infrastructure to rapidly deploy their services.[144] This result is also consistent with the Commission's commitment to its national broadband policy goals to "promote the deployment of advanced telecommunications capability to all Americans in a reasonable and timely manner."[145]

### 3. Rights and Obligations related to Interconnection

66. We clarify that a carrier providing both CMRS and wireless broadband Internet access service has the same rights and obligations regarding interconnection under section 251 of the Act or section 20.11 of the Commission's rules that it would have if it were only providing CMRS.[146]

67. Section 251 of the Act and section 20.11 of the Commission's rules provide mobile radio service providers with a number of rights and obligations involving or related to interconnection.[147] In the *Local Competition Order*, the Commission clarified that a carrier providing both a telecommunications service and an information service, "must be classified as a telecommunications carrier for purposes of section 251, and is subject to the obligations under section 251(a), to the extent that it is acting as a telecommunications carrier."[148] The Commission also ruled that "telecommunications carriers that have interconnected or gained access under sections 251(a)(1), 251(c)(2), or 251(c)(3), may offer information services through the same arrangement, so long as they are offering telecommunications services through the same arrangement as well."[149] The Commission further clarified in the *Wireline Broadband Internet Access Order* that its determination that wireline broadband Internet access was an information service and not a telecommunications service had "no effect whatsoever on the section 251 interconnection obligations of incumbent LECs or on competitive LECs' rights to obtain such interconnection."[150]

68. Nothing in this order should affect the Commission's previous finding that a carrier

---

[143] *See supra*, para. 63.

[144] In its comments on the Wireless Broadband Access Task Force Report, NextG Networks stated that access to utility poles and public rights-of-way is critical to the deployment of wireless broadband infrastructure and services. *See* Comments of NextG Networks, Inc. at 15-16, In re Wireless Broadband Access Task Force Report.

[145] *See* 47 U.S.C. § 157. *See also Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4848, para. 97 (noting, in attached Notice of Proposed Rulemaking, that one of the Commission's national broadband policy goals is to "promote the deployment of advanced telecommunications capability to all Americans in a reasonable and timely manner").

[146] 47 C.F.R. § 20.11.

[147] *See* 47 U.S.C. § 251; 47 C.F.R. § 20.11. *See also Local Competition Order*, 11 FCC Rcd at 15989, para. 993.

[148] *Local Competition Order*, 11 FCC Rcd at 15990, para. 995 (emphasis added).

[149] *Id.* Of course, unbundled network elements are not available to carriers for the exclusive provision of commercial mobile wireless services. Unbundled Access to Network Elements, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, WC Docket No. 04-313, CC Docket No. 01-338, *Order on Remand*, 20 FCC Rcd 2533, 2552-55, paras. 35-36 (2005), *aff'd*, Covad Communications Co. v. Federal Communications Commission, 450 F.3d 528 (D.C. Cir. 2006).

[150] *Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14923 n.400.

providing both a telecommunications service and information service, "must be classified as a telecommunications carrier for purposes of section 251, and is subject to the obligations under section 251(a), to the extent that it is acting as a telecommunications carrier."[151] Further, consistent with the previous findings, we clarify that our classification of wireless broadband Internet access service as information service should not affect the application of section 20.11 to CMRS carriers and the application of section 251 of the Act to any wireless carriers providing both telecommunications service and information service.

### 4. Consumer Protection Obligations

69. We remind wireless broadband Internet access service providers that any consumer protections obligations adopted in the *Consumer Protection in the Broadband Era* proceeding will extend to wireless broadband Internet access services.

70. In the *Consumer Protection in the Broadband Era NPRM,* the Commission emphasized consumer protection remains a priority and sought to develop a framework for consumer protection in the broadband age.[152] Such a framework would be built on the Commission's Title I ancillary jurisdiction to ensure that consumer protection needs are met by all providers of broadband Internet access services regardless of the underlying technology, including providers of wireless broadband Internet access services.[153] Accordingly, any consumer protection measures adopted in that proceeding will extend to wireless broadband Internet access services.

## IV. ORDERING CLAUSES

71. Accordingly, IT IS ORDERED, that pursuant to sections 1-4, 201(b) and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-54, 201(b), and 303(r), section 706 of the Telecommunications Act of 1996, 47 U.S.C. § 157, and section 1.2 of the Commission's rules, 47 C.F.R. § 1.2, the Declaratory Ruling IS ADOPTED.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[151] *Local Competition Order,* 11 FCC Rcd at 15990, para. 995 (emphasis added).

[152] *See Consumer Protection in the Broadband Era NPRM,* 20 FCC Rcd at 14929-35, paras. 146-59.

[153] *Id.*

## STATEMENT OF
## CHAIRMAN KEVIN J. MARTIN

*Re*: *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks, WT Docket No. 07-53*

In this Ruling, we find that wireless broadband Internet access service is an information service, and that mobile wireless broadband Internet access service is not a "commercial mobile service" under section 332 of the Act.

Today's ruling highlights that the broadband market today is increasingly characterized by multiple platforms that are vigorously competing for customers. Wireless service is becoming increasingly important as another platform to compete with cable and DSL as a provider of broadband.

I have long believed that the Commission should focus on creating a regulatory environment that promotes investment and competition by minimizing economic regulation. In addition, the Commission must set the rules of the road so that players can compete on a level playing field. In other words, all providers of the same service should be treated in the same manner regardless of the technology that they employ.

Today's classification eliminates unnecessary regulatory barriers for wireless broadband Internet access service providers and will further encourage investment and promote competition in the broadband market. The Commission's action also clarifies any regulatory uncertainty and establishes a consistent regulatory framework across broadband platforms. We have already classified Internet access services provided over cable plant, wireline facilities, and broadband over powerline as information services. Now, wireless broadband Internet access service will be treated the same way. This action is particularly timely in light of the recently auctioned AWS-1 spectrum for wireless broadband and our upcoming 700 MHz auction.

**CONCURRING STATEMENT OF
COMMISSIONER MICHAEL J. COPPS**

*Re: Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks, WT Docket No. 07-53*

I concur in today's decision not because I like it. Not because I think it's the right thing to do. But because in light of the Commission's post-*Brand X* decisions, today's outcome has long been inevitable. I nevertheless want to reiterate my view that consigning broadband services to an indeterminate Title I regulatory limbo is no substitute for a genuine national broadband strategy. It doesn't give either businesses or consumers the kind of certainty that they are entitled to. And I simply cannot accept, when the stakes are so high, that deferring difficult decisions—rather than actually making them—constitutes a responsible regulatory framework.

To be sure, we have clarified certain questions about E911 and CALEA and decided (unwisely in my view) that broadband providers need not contribute to Universal Service. But we still haven't addressed important questions about such things as privacy, disabilities access and the future of the Internet. I hope that we will move expeditiously to patch these alarming holes in the leaky roof we have created. Until we do so, I fear it will be the American public that gets soaked.

Moreover, the multi-faceted nature of wireless services and devices raises a whole host of novel questions that today's *Order* does not even ***attempt*** to answer. For instance: consider a cutting-edge device like Apple's much-anticipated iPhone, which allows a user to communicate via IP-based Wi-Fi technology as well as traditional CMRS service. Under our precedent, a consumer who uses the CMRS features of the device to place a phone call can be secure in the knowledge that our Title II CPNI rules require the carrier to protect his or her call and location information. But what about when that very same consumer uses that very same device just moments later to send an email via Wi-Fi, to call up a map of his or her location via a browser, or even to place a VoIP call to another Internet user? Because *those* services—which the customer can be excused for thinking of as functionally identical to the CMRS call—are now classified as Title I information services, the carrier appears to be entirely free, under our present rules, to sell off aspects of the customer's call or location information to the highest bidder. *Caveat emptor*, indeed!

Finally, I would like to point out one additional—and more promising—aspect of today's decision. Back in 2005, the Commission issued a policy statement adopting four principles applicable to Internet access services, including that "consumers are entitled to connect their choice of legal devices that do not harm the network."[1] Now that IP-based wireless services are classified as Title I information services, the inescapable logical implication of our 2005 decision is that the right to attach network devices—as well as the three other principles of our policy statement—now applies to wireless broadband services.

[1] Policy Statement, FCC 05-151, at 3 (2005) (citing *Hush-A-Phone Corp. v. United States*, 238 F.2d 266, 269 (D.C. Cir. 1956); *Use of the Carterfone Device in Message Toll Telephone Service*, 13 FCC 2d 420 (1968)) (The other principles are: "[C]onsumers are entitled to access the lawful Internet content of their choice. … [C]onsumers are entitled to run applications and use services of their choice, subject to the needs of law enforcement. … [C]onsumers are entitled to competition among network providers, application and service providers, and content providers.")

I believe the Commission accordingly has a clear and pressing responsibility to open a rulemaking that will clarify how these Title I principles should be applied in the wireless context. I also believe we should include questions about how and whether the classification of CMRS services as Title II services incorporates the principle of the seminal 1968 *Carterfone* decision.[2] I believe that our answers to these questions—or our failure to answer them—will have a direct impact on the pace of technological innovation in the years ahead and on the extent to which consumers can take full advantage of that innovation.

Indeed, as the Commission has already recognized in a host of areas—such as *Carterfone*'s discussion of the PSTN, our 2005 Policy Statement's discussion of the Internet, and our rules on cable set-top boxes—consumers generally benefit when they can select from among a range of network attachments, including devices not chosen for them by their service provider. Indeed, without these decisions, groundbreaking devices like the fax machine and dial-up modem—which provided most of us with our first taste of the Internet—would never have become so commonplace and so inexpensive so quickly. Nor is it likely that so many of us would have set up home networks and Wi-Fi routers if service providers were free to charge us an extra fee for doing so.

In light of the enormous benefits that the Commission's device attachment rules have enabled for so many of the networks regulated by the Commission, I would have preferred that today's reclassification item contain an NPRM teeing up these issues for wireless networks. I certainly hope that my colleagues will join me in taking up these important questions soon. There is so much potential in wireless broadband—for consumers and entrepreneurs both—and our challenge is to do everything we can to make sure the promise of these pioneering technologies is redeemed.

[2] *See id.*

## CONCURRING STATEMENT OF COMMISSIONER JONATHAN S. ADELSTEIN

*Re: Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks, WT Docket No. 07-53*

In this Declaratory Ruling, the Commission clarifies the regulatory framework for wireless broadband services. We determine that the treatment should be consistent with the framework established for broadband Internet access services provided over cable modem, wireline broadband, and power line facilities. While I have reservations with several aspects of this approach and the lack of public input into this process, I generally support this Declaratory Ruling because it is consistent with our broader efforts to treat similar services in a similar manner across technology platforms.

Now that we have put these providers on similar footing, it is high time to turn to protecting consumers in the broadband age. In fact, it is frustrating that the Commission is able to generate yet another reclassification item while the *Broadband Consumer Protection Notice* that we adopted over 18 months ago, and that will form the centerpiece of our consumer protection policies in this new framework, remains pending. Instead, we are devoting resources to an item that was not even specifically teed up by an interested party nor put out for public comment. Of course, some might say it is a lot easier to generate an item quickly when there is no record to consider. Perhaps the handwriting was on the wall, with no nuance to consider. But looking at the strained legal analysis in this item and the questions left unanswered, it is hard to see how specific public input would not have benefited this item.

The goal of this Declaratory Ruling is ostensibly to promote wireless broadband deployment. It is hard to fathom how it is likely to make much difference in the near term considering that no party bothered to ask us to formally consider it. It is hard to see how clarifying the regulatory classification will promote deployment when nobody was saying it was ever an impediment.

Rather than just going through the motions, I have made promoting wireless broadband deployment one of my key goals while at the Commission. Fostering deployment is so important because we continue to see a residential broadband market in which, according to FCC statistics, telephone and cable operators control a nearly 98 percent share, with many consumers lacking any meaningful choice of providers. So, if we are to give our communities the communications tools to compete on the global economic stage, it is critical that we take steps to promote much-needed competition in the provision of broadband services.

In many different proceedings, I have made wireless broadband deployment a priority and have actively worked with industry to secure real deployment. For example, I personally worked with Sprint and Nextel to secure significant build-out commitments from the companies to launch service in the 2.5 GHz band in association with their merger. The companies provided a specific schedule of implementation milestones that signal a commitment to deploy wireless broadband to at least 30 million Americans across 20 markets, both large and small. The infusion of capital into this market should stimulate product and service offerings that ultimately will benefit both the commercial and educational segments of the 2.5 GHz industry.

Similarly, I put a strong emphasis on promoting the availability of affordable wireless broadband services through our review of the AT&T-BellSouth merger. I worked closely with AT&T to secure the company's commitment to launch service in the under-used 2.3 GHz band by agreeing to a specific

construction commitment over the next three and a half years. In addition, the applicants committed to divest 2.5 GHz band licenses and leases held in the southeast, which will lead to the deployment of wireless broadband services in this market in direct competition to the newly formed company.

I have also jumpstarted wireless broadband efforts in the 2.5 GHz band by pushing the Commission to adopt more significant construction safe harbors. I believe the 2.5 GHz band has so much potential, and we already are seeing companies provide broadband services in dozen of markets across the country. I also pushed for more meaningful safe harbors in association with the construction extension afforded the 2.3 GHz industry. But I was unsuccessful in that effort because others would not support a greater commitment to wireless broadband deployment in conjunction with a three-year construction extension.

So it is against that backdrop that I review the item before me. At bottom, the legal approach we take here may not be my preferred option but I concur in today's decision for the same reasons that I concurred in our previous reclassification decisions.[1] As I made clear at the time we adopted the *Wireline Broadband Internet Access Order*, the reclassification approach raises some difficult questions about the legal and policy framework for broadband services. My underlying concern with the reclassification approach has always been that it takes the Commission outside the ambit of those core legal protections and grounding afforded by Congress. Yet, I have been willing to move forward because we are acting in a manner consistent with the Supreme Court's guidance in the *Brand X* decision, and this Declaratory Ruling, in turn, will give us an opportunity to adopt a consistent approach for cable, wireline, power line broadband, and now wireless broadband services.

But even as we move forward with this decision today, it is worth mentioning some of the important issues that we should make our first priority – chief among those is the protection of consumers. Indeed, my support for the reclassification approach has been conditioned on the Commission's decision to use its Title I authority to address important consumer protection and other concerns that remain relevant no matter how we classify broadband. I premised my support for the *Wireline Broadband Internet Access Order* on our decision to adopt a concurrent and important *Broadband Consumer Protection Notice* that sought comment on how we can ensure that we continue to meet our consumer protection obligations in the Act. It has now been 18 months since we opened that inquiry, so it is more important than ever that we make this proceeding a top priority.

Consumers must be at the top of our list, not the bottom, as we move into the broadband era. Our experience with the widespread and unauthorized proliferation of consumer telephone call records has been a sharp reminder that this Commission has an obligation to ensure that consumers' privacy expectations are met. But that privacy concern is not limited to the narrowband world. Consumers don't care whether their sensitive information is transferred by copper wire, fiber optic cable, a power line connection, or a wireless broadband link. They merely want us to implement and enforce the legal protections afforded by Congress.

We also need to advance the discussion of other sensitive issues, like our Truth-in-Billing rules, access for persons with disabilities, and the preservation and advancement of universal service. Universal

---

[1] Concurring Statement of Commissioner Jonathan S. Adelstein, *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, CC Docket No. 02-33, FCC 05-150, Report and Order and Notice of Proposed Rulemaking (August 5, 2005) (*Wireline Broadband Internet Access Order and Broadband Consumer Protection Notice*). Concurring Statement of Commissioner Jonathan S. Adelstein, *United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service*, WC Docket No. 06-10, FCC 06-165, Memorandum Opinion and Order (November 3, 2006).

service is a particularly critical because the Commission has a statutory obligation to ensure the sound footing of our federal programs that ensure access for school, libraries, low income consumers, and Rural America. This item also affects the jurisdictional classification of wireless broadband services without exploring the implications for consumer protection or universal service.

Finally, I am troubled with a couple of specific aspects in our Declaratory Ruling. One suggested reason for this decision is that it will provide regulatory certainty to wireless broadband Internet service providers. But we must be careful in drawing such a bright line between wireless broadband services and commercial mobile services and the regulatory protections that come with CMRS status. Those protections can be important for many small wireless providers, so we must be careful not to violate the tenet of 'First, Do No Harm' in drawing such a firm distinction. Moreover, to get to that distinction, the Commission engages in some legal gymnastics, particularly the conclusion that an interconnected mobile wireless broadband Internet access service should not be considered a commercial mobile service. In our bid to provide regulatory certainty, we must be careful not to leave providers to rely on such a tenuous legal framework.

For all these reasons, I concur in this Order.

**STATEMENT OF**
**COMMISSIONER DEBORAH TAYLOR TATE**

*Re: Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks, WT Docket No. 07-53*

Today, we continue down the path of deregulation as we move forward to ensure that the benefits of the new Digital Age accrue to all Americans. Specifically, we eliminate some of the regulatory requirements and uncertainties regarding wireless broadband services by classifying it as an "information service." The broadband Internet access market today is characterized by multiple platforms that are vigorously competing for customers. In prior proceedings, the Commission has classified cable, wireline, and BPL-enabled Internet access as information services. I am pleased that we do so in a technology-neutral manner that provides wireless broadband Internet access services a level playing field with other Internet access services.

**STATEMENT OF**
**COMMISSIONER ROBERT M. McDOWELL**

***Re:*** *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks, WT Docket No. 07-53*

Since coming to the Commission, I have advocated for the creation of regulatory parity when possible. With respect to video franchising, for instance, I pressed for a follow up, fast-track rulemaking to quickly build a record on the possibility of extending the de-regulatory benefits set forth in our recently released order to all video providers, be they incumbent cable providers or over-builders. And, I am pleased that we will release that order no later than September. All market players deserve the certainty and regulatory even-handedness necessary to spark investment, speed competition, empower consumers, and make America a stronger player in the global economy.

Today's action to classify wireless broadband Internet access service as an information service creates regulatory parity. Our determination, which the Commission has previously taken for Internet access over cable modem, wireline and power line facilities, will maximize innovation and consumer benefits by ensuring that the market-driven framework established by Congress is fully realized as wireless services continue to flourish and evolve. This year in particular the Commission is in an excellent position to promote the dissemination of wireless licenses among a wide variety of applicants, whether licensed or unlicensed, and therefore I believe our action is timely. I am excited about our work to prepare for the forthcoming 700 MHz auction, as well as future deployment in the TV "white spaces," because I am hopeful that the competitive opportunities presented by these proceedings, along with the certainty we create with today's ruling, will broaden the ability for entities seeking to enter the global wireless marketplace.

With respect to the substance of our action today, we first remind providers of wireless broadband Internet access services that any consumer protection obligations adopted in other related proceedings are extended to them. We also emphasize that today's declaratory ruling does not affect application of the spectrum allocation and licensing provisions of Title III, the associated Commission rules, and corresponding protections. In this regard, we clarify the following:

- First, where a wireless service provider uses the same pole attachments to provide both telecommunications and wireless broadband Internet access services, Section 224 of the Act applies;
- Second, local authority over zoning continues to apply where a wireless service provider uses the same infrastructure to provide "personal wireless services" and wireless broadband Internet access service, as set forth in Section 332(c)(7) of the Act; and
- Third, a carrier providing both CMRS and wireless broadband Internet access service has the same rights and obligations regarding interconnection under Section 251 of the Act (or section 20.11 of the Commission's rules) that it would have if it were only providing CMRS.

Finally, we reiterate the Commission's commitment to enforce the accessibility policy embodied in Section 255 of the Act (regarding persons with disabilities). All Americans, regardless of physical

ability, should be able to benefit from competitive broadband Internet service offerings.

In sum, effective personal telecommunications should deliver reliable, ever-increasing bandwidth to individuals at ever-decreasing cost. Each step the Commission takes to foster choice for all kinds of consumers -- residential, businesses, governments and public safety agencies -- moves us closer to ubiquitous, multi-media broadband availability. With today's action to eliminate potential barriers and reduce the uncertainty that may hinder competitors from constructing new delivery platforms -- and owners of existing platforms to upgrade their facilities -- the Commission is enhancing the opportunity for greater competition among, and within, various broadband platforms.

I thank the Chairman for his leadership on this endeavor, and I extend my thanks and congratulations to the Bureau for their hard work.

# EXHIBIT 4

e
Date of Hearing: June 29, 1998

ASSEMBLY COMMITTEE ON UTILITIES AND COMMERCE
Martinez, Chair

SB 378 (Peace) - As Amended: June 22, 1998

SUBJECT : Public utilities: Telephones.

SUMMARY : Requires entities to comply with various provisions which address the incidence of unauthorized charges on telephone bills, otherwise known as "cramming". Specifically, this bill :

1) Establishes intent language which seeks to reduce the inclusion of unauthorized charges on a subscriber's telephone bill by encouraging the verification of telephone charges, and providing an effective way to resolve disputes.

2) Requires that a telephone bill may only contain charges related to communications services which a subscriber has authorized.

3) Maintains that a billing telephone corporation must utilize a separate billing section for each entity that produces a charge on a subscriber's bill. The entity that produces a charge must do the following:

a) Include in the telephone bill the amount being charged for each item along with a clear description of the item.

b) Include information such as the name, address, and telephone number of the charging entity in order to resolve disputes related to charges.

c) Provide an expeditious process for resolving customer disputes of unauthorized charges and recognize that a subscriber cannot be held responsible for an unverified charge.

4) Requires an entity that produces a charge to resolve disputes or verify authorizations for charges no later than 30 days from the date complaints are received.

5) Establishes that the Public Utilities Commission (PUC) may suspend, terminate, or modify the billing service of an entity generating disputed charges if:

a) The commission receives more than 20 complaints about an entity within a 90 day period in reference to unauthorized charges; and

Case 3:07-cv-02231-RJB Document 18-2 Filed 02/20/2008 Page 48 of 52

b) The ratio of complaints is greater than one compliant for every 30,000 bills, of their total bills, that they produce for that period.

6) Grants the PUC the authority to suspend, terminate, or modify the billing service of an entity if the the entity violates any provision of the section.

EXISTING LAW :

1) Under the Telecommunications Customer Service Act of 1993, the PUC requires telephone corporations to provide subscribers with sufficient information which permits them to make informed decisions regarding telecommunications services. This includes the provider's identity, service options, pricing, and terms of service.

2) The PUC is limited to requiring the provider to grant information for its services only.

3) Any entity which violates the Public Utilities Act is guilty of a misdemeanor.

FISCAL EFFECT : Unknown

COMMENTS :

"Cramming" has been defined as the occurrence of unauthorized charges being placed in inconspicuous locations on telephone bills. SB 378 intends to resolve the incidence of "cramming", which is currently viewed as the number one compliant among telephone subscribers by the PUC. The PUC has noted that their Consumer Affairs Branch has received numerous complaints from both residential and business ratepayers regarding its occurrence. "Cramming" is a by-product of the deregulation of the telecommunications industry. It was not common in the past, yet todays open and less restrictive regulatory scheme permits telephone corporations to offer the use of their billing services.

"Cramming" charges are usually comprised of services such as unauthorized voice mail options, internet access options, calling cards, paging services, and 800 numbers. In many cases these unauthorized charges are initiated from sweepstakes, raffles, and telemarketers of unknown and unscrupulous companies. What happens is that customers will unknowingly fill out sweepstakes forms which contain fine print authorizations for billing charges. In other circumstances, subscribers inadvertently sign up for a service with a telemarketer over the phone by answering broad

Case 3:07-cv-02231-RJB Document 18-2 Filed 02/20/2008 Page 50 of 52

questions and accepting "gifts". Eventually, charges on the subscriber's telephone bill begin to appear with amounts ranging from $5 to $40 a month. Because the amount of the charge is generally low, the likelihood is high that the subscriber will not notice it.

In any case, the occurrence of unauthorized charges constitutes fraud, yet because the amounts of the charges are so minor, enforcement officials are not inclined to prosecute. Another enforcement problem affiliated with "cramming" revolves around the fact that the PUC currently does not have jurisdiction over many "cramming" violators. As a result, there is very little that a regulatory agency can do to resolve "cramming".

SB 378 attempts to address the problem of "cramming" by granting

□



the PUC limited jurisdiction over those entities that choose to place non-traditional billing charges on telephone bills. For example, the bill asserts that resolution of disputes related to unauthorized charges must occur rapidly. If disputes are not resolved, the bill contains a complaint formula which could lead to the suspension or termination of non-traditional charges on telephone bills for the violating entity. The PUC enforces these provisions and decides what penalty will be imposed if compliance is not achieved.

Aside from the resolution of disputes, the PUC can impose its authority of terminating billing service for entities if they violate any of the provisions of the section. Naturally, their authority is limited, and only extends to unregulated entities within the scope of the section. Still, it is sufficient to eliminate "crammers" that continuously put in place unauthorized charges.

Further, the bill places restrictions on what can be represented for charges on the telephone bill as well as procedures as to how these charges will be displayed. Section 2889.4 states that the telephone bill may only contain charges related to communications services. This is intended to significantly limit the types of items that can be placed on the bill, thereby effectively eliminating all "crammers" that sell non-communications services. A "crammer" would no longer be afforded the ability to sell toasters, sofas, or other non-traditional items on these bills. This would greatly assist in limiting potential billing entities to those in select industries. According to the author, select industries include cable services, internet providers, paging services, and so forth.

Although the author's intent of what constitutes a communications service has been expressed, it may be appropriate to define it in

the bill. Without a clear definition, the current language could lead to confusion and debate as to what can be construed as an applicable communication service. This could inadvertently hinder the effectiveness of the bill by permitting unintended participants, or discouraging intended participants, from utilizing the telephone billing option.

Also, the author may wish to clarify under Section 2889.4 (a) if it is his intent to entirely exclude any item on the bill that is not a charge for communications services. For example, is the intent of SB 378 to prohibit unrelated advertising or promotional items on the telephone bill? Does it seek to restrict bill inserts, stuffers, and so forth in the envelope? It may be appropriate to clarify this in order to avoid any misunderstandings from commercial participants.

There is currently another piece of legislation in the Senate that addresses the issue of "cramming", AB 2134. This bill is similar to SB 378 in that it provides for PUC oversight and penalties. Yet, it is different from SB 378 in that it possesses much more stringent verification requirements for those who wish to charge

□



for products via telephone bills. AB 2134 requires entities, offering products in this manner, to thoroughly inform the subscriber of the product being offered, and that it appear on the telephone bill. They must be able to verify the subscriber's consent and produce records to that effect to the subscriber, PUC, and the billing telephone company. Furthermore, the entity must obtain the consent of the telephone company to utilize its billing service. If the entity cannot provide proof of the subscriber's consent, as specified in the bill, then the subscriber is entitled to an adjustment on his/her bill.

SB 378 does state that a subscriber will not be held responsible for a charge that cannot be verified, yet its verification requirements are not as thorough. It maintains under section 2889.4 (b) that a telephone bill may only contain charges for items that have been authorized by the customer. The language does not state how authorization for charges is achieved. This area may be too broad, and may need to be more specific in order to be effective.

SB 378 is effective in limiting the scope of what kinds of services can be placed on a telephone bill. AB 2134 leaves the telephone billing charges open to any type of product or service. It is less restrictive in this regard.

REGISTERED SUPPORT / OPPOSITION :

Support

None reported.

Opposition

None reported.

Analysis prepared by : Rafael E. Prieto / auc / (916) 319-2083