Alan M. Mansfield (SBN 125998)
alan@rosnerandmansfield.com
John W. Hanson (SBN 214771)
john@rosnerandmansfield.com
ROSNER & MANSFIELD, LLP
10085 Carroll Canyon Road, Suite 100
San Diego, CA 92131
Tel: (858) 348-1005
Fax: (858) 348-1150

Attorneys for Plaintiffs

Art Neill (SBN 246717)
art@ucan.org
UTILITY CONSUMERS' ACTION NETWORK
3100 Fifth Ave., Suite B
San Diego, CA 92103
Tel: (619) 696-6966
Fax: (619) 696-7477

Attorneys for UCAN

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UTILITY CONSUMERS' ACTION NETWORK and ERIC TAYLOR, on behalf of themselves, their members and/or all others similarly situated, as applicable,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**SPRINT SOLUTIONS, INC.; SPRINT SPECTRUM, L.P.; SPRINT-NEXTEL CORPORATION,**<br><br>**Defendants.** | Case No. 07 CV 2231 RJB<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIFTH CAUSE OF ACTION IN SECOND AMENDED COMPLAINT**<br><br>**Date:** **June 27, 2008**<br>**Time:** **9:30 a.m.**<br>**Courtroom:** **Hon. Robert J. Bryan** |

## I. INTRODUCTION

Defendants Sprint Solutions, Inc. and Sprint Spectrum, L.P. ("Defendants" or "Sprint") assert that Plaintiffs failed to follow the Court's directive in its April 25, 2008 ruling to amend the Second Amended Complaint ("SAC") and "connect facts with specific provisions of the FCA." However, there is a fundamental difference between a fact and a legal argument. Contrary to Defendants' assertion that "plaintiffs added only argument and more confusion, not *facts*

justifying a statutory cause of action," the SAC explains in paragraphs 74-80 how the numerous facts detailed in the SAC connect to the relevant law and why Defendants are subject to the provisions of the Federal Communications Act ("FCA") under those circumstances. Simply put, Sprint charged taxes, fees, and surcharges that are solely related to telecommunications services and appears to have improperly acted as a common carrier in doing so. Such charges are unjust and unreasonable as they are assessed on services other than for telecommunications service or, in the case of unretrievable text messages, for no services at all. It is not, as Sprint suggests, because information services are exempt from such charges - although at least in the context of taxes, they are. Sprint has violated the FCA because the charges in question do not apply to such services and cannot be imposed on such services.

As Plaintiffs have complied with the directive of the Court to submit a more definite statement connecting the facts to the relevant law, this motion to dismiss must be denied.

## II. LEGAL STANDARD APPLIABLE TO THIS MOTION

As detailed in the accompanying Opposition to the Motion to Strike, Rule 12 motions are disfavored and subject to a high degree of scrutiny by the courts. "Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a 'short and plain statement of the claim showing that the pleader is entitled to relief.' [Fed. R. Civ. P. 8(a)(2); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1356]." *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 536 F.Supp.2d 1191, 1194 (C.D. Cal. 2008). The Court must accept as true all material allegations in the SAC as well as all reasonable inferences to be drawn from them, and must read the SAC in the light most favorable to plaintiff. *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).

A Rule 12 motion can only be granted if there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). Courts are particularly hesitant to dismiss claims at the pleadings stage if such claims could be better examined following the development of facts during discovery. *McGary v. City of Portland*, 386 F.3d 1259, 1279 (9th Cir. 2004). While Sprint asserts the SAC is not sufficiently detailed to explain how Sprint's

conduct violates the FCA, its couple of pages of argument fail to cite any authority that establish liability cannot be found under the FCA as a matter of law under the facts as plead. While the "[f]actual allegations must be enough to raise a right to relief above the speculative level", a complaint "does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007). As long as the facts detailed in the SAC as a whole assert a cognizable legal theory under which Sprint may be found liable under the FCA, the motion to dismiss must be denied.

## III. SPRINT'S CONDUCT REQUIRES APPLICATION OF THE FCA

The SAC alleges the following facts. Sprint operates primarily as a common carrier (SAC, ¶75). When Sprint provides wireless broadband Internet access to its customers by providing them a data services card, it does not distinguish between those services and the commercial mobile radio services (*i.e.*, wireless cellular telephone service) it also provides (SAC, ¶77). Sprint allows both phone and text messages to be sent to the wireless phone number associated with the data services card, despite a customer's inability to receive such messages because a data services card provides no such function (SAC, ¶¶28, 29). For example, Sprint denied Plaintiff Taylor's request to block text messages on his account despite Sprint's ability to block the receipt of text messages. Sprint also refused Plaintiff Taylor's request to place a note on his account that he should not be charged for any text messages because the wireless phone number on his account is not associated with a wireless phone, and he does not have nor did he request text messaging service. Instead, Sprint required him to expend time and resources calling customer service *each time* he received an improper text message and complain to the customer service representative, who would only remove a text message if the representative believed Plaintiff did not have a wireless phone on his account (SAC, ¶29).

To further add to customers' confusion, Sprint uses a uniform bill that includes all notifications and announcements concerning Sprint's commercial mobile radio services (SAC, ¶77). For example, Plaintiff Taylor's bill includes a "Total Minutes Used" section, which continuously states "You have not used any minutes this bill period." (SAC, Exhibit 1 at 1.) Plaintiff Taylor does not have a wireless phone account in which minutes may be used. Even the

description of Plaintiff Taylor's Data Plan includes a reference to wireless phone capabilities, stating: "Voice Capabilities Will Incur A Charge Of $.20 Per Minute" (SAC, Ex. 1 at 4). Sprint also uses the same customer service representatives and phone numbers to handle customer inquiries and complaints for wireless broadband Internet access and commercial mobile radio services (SAC, Ex. 1 at 1), and the same Terms and Conditions apply to both services (SAC, ¶77).

Based on these facts, the reasonable consumer is lead to believe by Sprint's conduct that there is no distinction within Sprint between providing wireless broadband Internet access and commercial mobile radio services and that Sprint is choosing to offer such services as a telecommunication service, thereby subjecting Sprint to the provisions of Title II the FCA. *See FCC Declaratory Ruling in Matter of Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 FCC Rcd. 5901, 5913-14 (May 23, 2007). Yet when facing a nationwide class claim challenging fees improperly imposed and potential violation of a federal cause of action, Sprint reverses course and claims it makes such a distinction, arguing it should be allowed to capitalize on its misleading actions when the taxes, fees, and surcharges associated only with telecommunications services are improperly assessed on customers who only access information services. In what capacity Sprint is offering such services is a disputed fact and issue for summary adjudication or trial – not this motion. It is also a separate factual question whether Sprint is effectively offering such services as a telecommunications service and whether the charges in question are legal under the circumstances.

The SAC alleges how Defendants have taken every action to treat wireless broadband Internet access as if they are offering a telecommunications service even though it is not, and how Sprint is treating wireless broadband Internet access customers in the same manner as commercial mobile radio services customers. Yet Sprint is charging wireless broadband Internet access customers for using text messaging services, even though it is a service not contracted for or accessible by wireless broadband Internet access customers. Sprint is also illegally assessing taxes, fees, and surcharges associated with telecommunications services to wireless broadband Internet access subscribers. If Sprint insists on acting as a common carrier while offering

wireless broadband Internet access, Sprint should specify what telecommunications services trigger such charges and should be held to the rules that govern such conduct.

## IV. THE SAC EXPLAINS WITH FACTS WHY THESE CHARGES ARE UNJUST AND UNREASONABLE

Defendants assert that plaintiffs concede the taxes, fees, and surcharges assessed are "just and reasonable". However, the justness and reasonableness of such charges assumes such charges are properly assessed in the first place – which, as alleged in the SAC, they are not.

Contrary to Defendants' assertion, the services at issue are exempt from certain taxes. For example, Congress has explicitly placed a moratorium on the taxing of Internet access under the Internet Tax Freedom Act, which was enacted as a note to section 151 of the FCA. *See* 47 U.S.C. 151 Note. Title XII, Section 1201 of that Act provides "It is the sense of Congress that no new Federal taxes similar to the taxes described in section 1101(a) should be enacted with respect to the Internet and Internet access during the moratorium provided in such section." See Ex. 1 attached hereto.[1] Wireless broadband Internet access provided by Sprint provides a method for accessing the Internet and is therefore exempt from these types of taxes. As a result, it is *per se* illegal to impose taxes on the data card services at issue.

Sprint seems to be of the belief that they could assess taxes, fees, and surcharges for telecommunications services on any service or product they provide. However, the law does not allow for such conduct. Assessing taxes, fees, and surcharges for telecommunications services when a customer has not contracted for such service is per se unreasonable. The notion raised by Defendants that the charges at issue here are "just and reasonable" as a matter of law would be akin to a department store asserting it could assess sales tax to its employee's income because it has both employees and merchandise. While a common carrier may charge just and reasonable rates for telecommunications services, it is axiomatic that Defendants must first provide such services to its data plan customers. Here, the customers did not contract for telecommunications services, and it is unjust and unreasonable for Sprint to charge such customers for taxes, fees, and

[1] This moratorium has been extended until 2014. *See* 47 U.S.C. Section 151 Note, Section 1101(a).

surcharges for telecommunications services that they did not contract for and were not in fact provided by Defendants, and which are illegal to impose.

To apply Defendants' analogy, if they sold lemonade to their customers by charging a monthly fee, assigned a phone number to the glass, charged the customer for text messages sent to phone number assigned to the glass, and charged them taxes, fees, and surcharges associated with telecommunications services, Defendants would claim such conduct is not governed by the FCA. It is absurd that Defendants believe they are entitled to assess charges for telecommunications services and claim the protections afforded a common carrier for doing so, as they do in their Motion, but then are unwilling to accept the responsibilities associated with conducting themselves in that capacity. Unless Sprint is willing to concede these charges were not properly imposed on the class because they were on information service accounts (as they did with other similar charges, *see* SAC ¶31), this claim must be permitted to proceed.

## V. THE FIFTH CAUSE OF ACTION STATES A CLAIM UPON WHICH RELIEF MAY BE GRANTED

Plaintiffs assert numerous facts within the SAC, as detailed above, to establish the necessary elements for a claim to recover damages under the FCA. First, Plaintiffs assert that Defendants are assessing charges that are only proper in connection with providing a wire or radio communication service. Second, Plaintiffs assert that Defendants are acting as common carriers, as established through their conduct as alleged throughout the SAC. Third, Plaintiffs assert that the data plan service customers have not contracted for or receive telecommunications services, but rather have only contracted with Defendants to provide information services, and as a consequence may not be assessed charges in connection with telecommunications services. Fourth, they allege it is unlawful under the FCA to assess taxes for such services when it is not permitted under the law. Taken together, these combined facts are connected to the law sufficient to assert a cause of action under the FCA.

Under 47 U.S.C. §206, if a common carrier such as Sprint:

shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful . . ., such common carrier shall be liable to

the person or persons injured thereby for the full amount of damages sustained in consequences of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recover, which attorney's fee shall be taxed and collected as part of the costs in the case.

Therefore, if Sprint imposes unjust and unreasonable charges because such charges cannot be legally imposed and does so while purportedly acting as a common carrier, Sprint is liable to its customers injured as a result thereof. Plaintiffs have properly stated a cognizable legal theory upon which relief can be granted under the FCA.

## VI. CONCLUSION

Based on the above, Sprint's motion to dismiss the Fifth Cause of Action must be denied.

DATED: June 13, 2008

Respectfully submitted,

ROSNER & MANSFIELD, LLP

By: ______________________
Alan M. Mansfield
alan@rosnerandmansfield.com
Attorneys for Plaintiffs

UTILITY CONSUMERS' ACTION NETWORK
Art Neill, Esq.
art@ucan.org
3100 Fifth Ave., Suite B
San Diego, CA 92103
Tel: (619) 696-6966
Fax: (619) 696-7477

Attorneys for UCAN

EXHIBIT 1

# INTERNET TAX FREEDOM ACT

# INTERNET TAX FREEDOM ACT

(Titles XI and XII of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999)

* * * * * * *

## TITLE XI—MORATORIUM ON CERTAIN TAXES

**SEC. 1100. [47 U.S.C. 151 note] SHORT TITLE.**

This title may be cited as the "Internet Tax Freedom Act".

**SEC. 1101. [47 U.S.C. 151 note] MORATORIUM.**

(a) MORATORIUM.—No State or political subdivision thereof shall impose any of the following taxes during the period beginning on October 1, 1998, and ending 3 years after the date of the enactment of this Act—

(1) taxes on Internet access, unless such tax was generally imposed and actually enforced prior to October 1, 1998; and

(2) multiple or discriminatory taxes on electronic commerce.

(b) PRESERVATION OF STATE AND LOCAL TAXING AUTHORITY.—Except as provided in this section, nothing in this title shall be construed to modify, impair, or supersede, or authorize the modification, impairment, or superseding of, any State or local law pertaining to taxation that is otherwise permissible by or under the Constitution of the United States or other Federal law and in effect on the date of enactment of this Act.

(c) LIABILITIES AND PENDING CASES.—Nothing in this title affects liability for taxes accrued and enforced before the date of enactment of this Act, nor does this title affect ongoing litigation relating to such taxes.

(d) DEFINITION OF GENERALLY IMPOSED AND ACTUALLY ENFORCED.—For purposes of this section, a tax has been generally imposed and actually enforced prior to October 1, 1998, if, before that date, the tax was authorized by statute and either—

(1) a provider of Internet access services had a reasonable opportunity to know by virtue of a rule or other public proclamation made by the appropriate administrative agency of the State or political subdivision thereof, that such agency has interpreted and applied such tax to Internet access services; or

(2) a State or political subdivision thereof generally collected such tax on charges for Internet access.

(e) EXCEPTION TO MORATORIUM.—

(1) IN GENERAL.—Subsection (a) shall also not apply in the case of any person or entity who knowingly and with knowledge of the character of the material, in interstate or foreign commerce by means of the World Wide Web, makes any communication for commercial purposes that is available to any

minor and that includes any material that is harmful to minors unless such person or entity has restricted access by minors to material that is harmful to minors—

(A) by requiring use of a credit card, debit account, adult access code, or adult personal identification number;

(B) by accepting a digital certificate that verifies age; or

(C) by any other reasonable measures that are feasible under available technology.

(2) SCOPE OF EXCEPTION.—For purposes of paragraph (1), a person shall not be considered to making a communication for commercial purposes of material to the extent that the person is—

(A) a telecommunications carrier engaged in the provision of a telecommunications service;

(B) a person engaged in the business of providing an Internet access service;

(C) a person engaged in the business of providing an Internet information location tool; or

(D) similarly engaged in the transmission, storage, retrieval, hosting, formatting, or translation (or any combination thereof) of a communication made by another person, without selection or alteration of the communication.

(3) DEFINITIONS.—In this subsection:

(A) BY MEANS OF THE WORLD WIDE WEB.—The term "by means of the World Wide Web" means by placement of material in a computer server-based file archive so that it is publicly accessible, over the Internet, using hypertext transfer protocol, file transfer protocol, or other similar protocols.

(B) COMMERCIAL PURPOSES; ENGAGED IN THE BUSINESS.—

(i) COMMERCIAL PURPOSES.—A person shall be considered to make a communication for commercial purposes only if such person is engaged in the business of making such communications.

(ii) ENGAGED IN THE BUSINESS.—The term "engaged in the business" means that the person who makes a communication, or offers to make a communication, by means of the World Wide Web, that includes any material that is harmful to minors, devotes time, attention, or labor to such activities, as a regular course of such person's trade or business, with the objective of earning a profit as a result of such activities (although it is not necessary that the person make a profit or that the making or offering to make such communications be the person's sole or principal business or source of income). A person may be considered to be engaged in the business of making, by means of the World Wide Web, communications for commercial purposes that include material that is harmful to minors, only if the person knowingly causes the material that is harmful to minors to be posted on the World Wide Web or knowingly solicits such material to be posted on the World Wide Web.

(C) INTERNET.—The term "Internet" means collectively the myriad of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected world-wide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocols to such protocol, to communicate information of all kinds by wire or radio.

(D) INTERNET ACCESS SERVICE.—The term "Internet access service" means a service that enables users to access content, information, electronic mail, or other services offered over the Internet and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers. Such term does not include telecommunications services.

(E) INTERNET INFORMATION LOCATION TOOL.—The term "Internet information location tool" means a service that refers or links users to an online location on the World Wide Web. Such term includes directories, indices, references, pointers, and hypertext links.

(F) MATERIAL THAT IS HARMFUL TO MINORS.—The term "material that is harmful to minors" means any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that—

(i) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;

(ii) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and

(iii) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

(G) MINOR.—The term "minor" means any person under 17 years of age.

(H) TELECOMMUNICATIONS CARRIER; TELECOMMUNICATIONS SERVICE.—The terms "telecommunications carrier" and "telecommunications service" have the meanings given such terms in section 3 of the Communications Act of 1934 (47 U.S.C. 153).

(f) ADDITIONAL EXCEPTION TO MORATORIUM.—

(1) IN GENERAL.—Subsection (a) shall also not apply with respect to an Internet access provider, unless, at the time of entering into an agreement with a customer for the provision of Internet access services, such provider offers such customer (either for a fee or at no charge) screening software that is designed to permit the customer to limit access to material on the Internet that is harmful to minors.

(2) DEFINITIONS.—In this subsection:

(A) INTERNET ACCESS PROVIDER.—The term "Internet access provider" means a person engaged in the business of providing a computer and communications facility through which a customer may obtain access to the Internet, but does not include a common carrier to the extent that it provides only telecommunications services.

(B) INTERNET ACCESS SERVICES.—The term "Internet access services" means the provision of computer and communications services through which a customer using a computer and a modem or other communications device may obtain access to the Internet, but does not include telecommunications services provided by a common carrier.

(C) SCREENING SOFTWARE.—The term "screening software" means software that is designed to permit a person to limit access to material on the Internet that is harmful to minors.

(3) APPLICABILITY.—Paragraph (1) shall apply to agreements for the provision of Internet access services entered into on or after the date that is 6 months after the date of enactment of this Act.

**SEC. 1102. [47 U.S.C. 151 note] ADVISORY COMMISSION ON ELECTRONIC COMMERCE.**

(a) ESTABLISHMENT OF COMMISSION.—There is established a commission to be known as the Advisory Commission on Electronic Commerce (in this title referred to as the "Commission"). The Commission shall—

(1) be composed of 19 members appointed in accordance with subsection (b), including the chairperson who shall be selected by the members of the Commission from among themselves; and

(2) conduct its business in accordance with the provisions of this title.

(b) MEMBERSHIP.—

(1) IN GENERAL.—The Commissioners shall serve for the life of the Commission. The membership of the Commission shall be as follows:

(A) 3 representatives from the Federal Government, comprised of the Secretary of Commerce, the Secretary of the Treasury, and the United States Trade Representative (or their respective delegates).

(B) 8 representatives from State and local governments (one such representative shall be from a State or local government that does not impose a sales tax and one representative shall be from a State that does not impose an income tax).

(C) 8 representatives of the electronic commerce industry (including small business), telecommunications carriers, local retail businesses, and consumer groups, comprised of—

(i) 5 individuals appointed by the Majority Leader of the Senate;

(ii) 3 individuals appointed by the Minority Leader of the Senate;

(iii) 5 individuals appointed by the Speaker of the House of Representatives; and

(iv) 3 individuals appointed by the Minority Leader of the House of Representatives.

(2) APPOINTMENTS.—Appointments to the Commission shall be made not later than 45 days after the date of the enactment of this Act. The chairperson shall be selected not later than 60 days after the date of the enactment of this Act.

(3) VACANCIES.—Any vacancy in the Commission shall not affect its powers, but shall be filled in the same manner as the original appointment.

(c) ACCEPTANCE OF GIFTS AND GRANTS.—The Commission may accept, use, and dispose of gifts or grants of services or property, both real and personal, for purposes of aiding or facilitating the work of the Commission. Gifts or grants not used at the expiration of the Commission shall be returned to the donor or grantor.

(d) OTHER RESOURCES.—The Commission shall have reasonable access to materials, resources, data, and other information from the Department of Justice, the Department of Commerce, the Department of State, the Department of the Treasury, and the Office of the United States Trade Representative. The Commission shall also have reasonable access to use the facilities of any such Department or Office for purposes of conducting meetings.

(e) SUNSET.—The Commission shall terminate 18 months after the date of the enactment of this Act.

(f) RULES OF THE COMMISSION.—

(1) QUORUM.—Nine members of the Commission shall constitute a quorum for conducting the business of the Commission.

(2) MEETINGS.—Any meetings held by the Commission shall be duly noticed at least 14 days in advance and shall be open to the public.

(3) OPPORTUNITIES TO TESTIFY.—The Commission shall provide opportunities for representatives of the general public, taxpayer groups, consumer groups, and State and local government officials to testify.

(4) ADDITIONAL RULES.—The Commission may adopt other rules as needed.

(g) DUTIES OF THE COMMISSION.—

(1) IN GENERAL.—The Commission shall conduct a thorough study of Federal, State and local, and international taxation and tariff treatment of transactions using the Internet and Internet access and other comparable intrastate, interstate or international sales activities.

(2) ISSUES TO BE STUDIED.—The Commission may include in the study under subsection (a)—

(A) an examination of—

(i) barriers imposed in foreign markets on United States providers of property, goods, services, or information engaged in electronic commerce and on United States providers of telecommunications services; and

(ii) how the imposition of such barriers will affect United States consumers, the competitiveness of United States citizens providing property, goods, serv-

ices, or information in foreign markets, and the growth and maturing of the Internet;

(B) an examination of the collection and administration of consumption taxes on electronic commerce in other countries and the United States, and the impact of such collection on the global economy, including an examination of the relationship between the collection and administration of such taxes when the transaction uses the Internet and when it does not;

(C) an examination of the impact of the Internet and Internet access (particularly voice transmission) on the revenue base for taxes imposed under section 4251 of the Internal Revenue Code of 1986;

(D) an examination of model State legislation that—

(i) would provide uniform definitions of categories of property, goods, service, or information subject to or exempt from sales and use taxes; and

(ii) would ensure that Internet access services, online services, and communications and transactions using the Internet, Internet access service, or online services would be treated in a tax and technologically neutral manner relative to other forms of remote sales;

(E) an examination of the effects of taxation, including the absence of taxation, on all interstate sales transactions, including transactions using the Internet, on retail businesses and on State and local governments, which examination may include a review of the efforts of State and local governments to collect sales and use taxes owed on in-State purchases from out-of-State sellers; and

(F) the examination of ways to simplify Federal and State and local taxes imposed on the provision of telecommunications services.

(3) EFFECT ON THE COMMUNICATIONS ACT OF 1934.—Nothing in this section shall include an examination of any fees or charges imposed by the Federal Communications Commission or States related to—

(A) obligations under the Communications Act of 1934 (47 U.S.C. 151 et seq.); or

(B) the implementation of the Telecommunications Act of 1996 (or of amendments made by that Act).

(h) NATIONAL TAX ASSOCIATION COMMUNICATIONS AND ELECTRONIC COMMERCE TAX PROJECT.—The Commission shall, to the extent possible, ensure that its work does not undermine the efforts of the National Tax Association Communications and Electronic Commerce Tax Project.

**SEC. 1103. [47 U.S.C. 151 note] REPORT.**

Not later than 18 months after the date of the enactment of this Act, the Commission shall transmit to Congress for its consideration a report reflecting the results, including such legislative recommendations as required to address the findings of the Commission's study under this title. Any recommendation agreed to by the Commission shall be tax and technologically neutral and apply to all forms of remote commerce. No finding or recommendation

shall be included in the report unless agreed to by at least two-thirds of the members of the Commission serving at the time the finding or recommendation is made.

**SEC. 1104. [47 U.S.C. 151 note] DEFINITIONS.**

For the purposes of this title:

(1) BIT TAX.—The term "bit tax" means any tax on electronic commerce expressly imposed on or measured by the volume of digital information transmitted electronically, or the volume of digital information per unit of time transmitted electronically, but does not include taxes imposed on the provision of telecommunications services.

(2) DISCRIMINATORY TAX.—The term "discriminatory tax" means—

(A) any tax imposed by a State or political subdivision thereof on electronic commerce that—

(i) is not generally imposed and legally collectible by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means;

(ii) is not generally imposed and legally collectible at the same rate by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means, unless the rate is lower as part of a phase-out of the tax over not more than a 5-year period;

(iii) imposes an obligation to collect or pay the tax on a different person or entity than in the case of transactions involving similar property, goods, services, or information accomplished through other means;

(iv) establishes a classification of Internet access service providers or online service providers for purposes of establishing a higher tax rate to be imposed on such providers than the tax rate generally applied to providers of similar information services delivered through other means; or

(B) any tax imposed by a State or political subdivision thereof, if—

(i) except with respect to a tax (on Internet access) that was generally imposed and actually enforced prior to October 1, 1998, the sole ability to access a site on a remote seller's out-of-State computer server is considered a factor in determining a remote seller's tax collection obligation; or

(ii) a provider of Internet access service or online services is deemed to be the agent of a remote seller for determining tax collection obligations solely as a result of—

(I) the display of a remote seller's information or content on the out-of-State computer server of a provider of Internet access service or online services; or

(II) the processing of orders through the out-of-State computer server of a provider of Internet access service or online services.

(3) ELECTRONIC COMMERCE.—The term "electronic commerce" means any transaction conducted over the Internet or through Internet access, comprising the sale, lease, license, offer, or delivery of property, goods, services, or information, whether or not for consideration, and includes the provision of Internet access.

(4) INTERNET.—The term "Internet" means collectively the myriad of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected world-wide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocols to such protocol, to communicate information of all kinds by wire or radio.

(5) INTERNET ACCESS.—The term "Internet access" means a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to users. Such term does not include telecommunications services.

(6) MULTIPLE TAX.—

(A) IN GENERAL.—The term "multiple tax" means any tax that is imposed by one State or political subdivision thereof on the same or essentially the same electronic commerce that is also subject to another tax imposed by another State or political subdivision thereof (whether or not at the same rate or on the same basis), without a credit (for example, a resale exemption certificate) for taxes paid in other jurisdictions.

(B) EXCEPTION.—Such term shall not include a sales or use tax imposed by a State and 1 or more political subdivisions thereof on the same electronic commerce or a tax on persons engaged in electronic commerce which also may have been subject to a sales or use tax thereon.

(C) SALES OR USE TAX.—For purposes of subparagraph (B), the term "sales or use tax" means a tax that is imposed on or incident to the sale, purchase, storage, consumption, distribution, or other use of tangible personal property or services as may be defined by laws imposing such tax and which is measured by the amount of the sales price or other charge for such property or service.

(7) STATE.—The term "State" means any of the several States, the District of Columbia, or any commonwealth, territory, or possession of the United States.

(8) TAX.—

(A) IN GENERAL.—The term "tax" means—

(i) any charge imposed by any governmental entity for the purpose of generating revenues for governmental purposes, and is not a fee imposed for a specific privilege, service, or benefit conferred; or

(ii) the imposition on a seller of an obligation to collect and to remit to a governmental entity any sales

or use tax imposed on a buyer by a governmental entity.

(B) EXCEPTION.—Such term does not include any franchise fee or similar fee imposed by a State or local franchising authority, pursuant to section 622 or 653 of the Communications Act of 1934 (47 U.S.C. 542, 573), or any other fee related to obligations or telecommunications carriers under the Communications Act of 1934 (47 U.S.C. 151 et seq.).

(9) TELECOMMUNICATIONS SERVICE.—The term "telecommunications service" has the meaning given such term in section 3(46) of the Communications Act of 1934 (47 U.S.C. 153(46)) and includes communications services (as defined in section 4251 of the Internal Revenue Code of 1986).

(10) TAX ON INTERNET ACCESS.—The term "tax on Internet access" means a tax on Internet access, including the enforcement or application of any new or preexisting tax on the sale or use of Internet services unless such tax was generally imposed and actually enforced prior to October 1, 1998.

## TITLE XII—OTHER PROVISIONS

### SEC. 1201. DECLARATION THAT INTERNET SHOULD BE FREE OF NEW FEDERAL TAXES.

It is the sense of Congress that no new Federal taxes similar to the taxes described in section 1101(a) should be enacted with respect to the Internet and Internet access during the moratorium provided in such section.

### SEC. 1202. NATIONAL TRADE ESTIMATE.

Section 181 of the Trade Act of 1974 (19 U.S.C. 2241) is amended—

(1) in subsection (a)(1)—

(A) in subparagraph (A)—

(i) by striking "and" at the end of clause (i);

(ii) by inserting "and" at the end of clause (ii); and

(iii) by inserting after clause (ii) the following new clause:

"(iii) United States electronic commerce,"; and

(B) in subparagraph (C)—

(i) by striking "and" at the end of clause (i);

(ii) by inserting "and" at the end of clause (ii);

(iii) by inserting after clause (ii) the following new clause:

"(iii) the value of additional United States electronic commerce,"; and

(iv) by inserting "or transacted with," after "or invested in";

(2) in subsection (a)(2)(E)—

(A) by striking "and" at the end of clause (i);

(B) by inserting "and" at the end of clause (ii); and

(C) by inserting after clause (ii) the following new clause:

"(iii) the value of electronic commerce transacted with,"; and

(3) by adding at the end the following new subsection:

"(d) ELECTRONIC COMMERCE.—For purposes of this section, the term 'electronic commerce' has the meaning given that term in section 1104(3) of the Internet Tax Freedom Act.".

**SEC. 1203. [19 U.S.C. 2241 note] DECLARATION THAT THE INTERNET SHOULD BE FREE OF FOREIGN TARIFFS, TRADE BARRIERS, AND OTHER RESTRICTIONS.**

(a) IN GENERAL.—It is the sense of Congress that the President should seek bilateral, regional, and multilateral agreements to remove barriers to global electronic commerce through the World Trade Organization, the Organization for Economic Cooperation and Development, the Trans-Atlantic Economic Partnership, the Asia Pacific Economic Cooperation forum, the Free Trade Area of the America, the North American Free Trade Agreement, and other appropriate venues.

(b) NEGOTIATING OBJECTIVES.—The negotiating objectives of the United States shall be—

(1) to assure that electronic commerce is free from—

(A) tariff and nontariff barriers;

(B) burdensome and discriminatory regulation and standards; and

(C) discriminatory taxation; and

(2) to accelerate the growth of electronic commerce by expanding market access opportunities for—

(A) the development of telecommunications infrastructure;

(B) the procurement of telecommunications equipment;

(C) the provision of Internet access and telecommunications services; and

(D) the exchange of goods, services, and digitalized information.

(c) ELECTRONIC COMMERCE.—For purposes of this section, the term "electronic commerce" has the meaning given that term in section 1104(3).

**SEC. 1204. [19 U.S.C. 2241 note] NO EXPANSION OF TAX AUTHORITY.**

Nothing in this title shall be construed to expand the duty of any person to collect or pay taxes beyond that which existed immediately before the date of the enactment of this Act.

**SEC. 1205. [19 U.S.C. 2241 note] PRESERVATION OF AUTHORITY.**

Nothing in this title shall limit or otherwise affect the implementation of the Telecommunications Act of 1996 (Public Law 104–104) or the amendments made by such Act.

**SEC. 1206. [19 U.S.C. 2241 note] SEVERABILITY.**

If any provision of this title, or any amendment made by this title, or the application of that provision to any person or circumstance, is held by a court of competent jurisdiction to violate any provision of the Constitution of the United States, then the other provisions of that title, and the application of that provision to other persons and circumstances, shall not be affected.